# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| BERKELEY COUNTY SCHOOL BOARD OF TRUSTEES,<br><br>     Petitioners,<br><br>v.<br><br>HUB INTERNATIONAL LIMITED, HUB INTERNATIONAL MIDWEST LIMITED, HUB INTERNATIONAL SOUTHEAST, KNAUFF INSURANCE AGENCY, INC., STANLEY J. POKORNEY, SCOTT POKERNEY, and BRANTLEY THOMAS,<br><br>     Respondent. | C.A. No. 2:18-cv-00151-DCN |

## DEFENDANTS HUB INTERNATIONAL LIMITED AND HUB INTERNATIONAL MIDWEST LIMITED'S MOTION TO ENFORCE ARBITRATION AGREEMENTS AND MEMORANDUM IN SUPPORT

Defendants Hub International Limited and Hub International Midwest Limited (the "Hub Defendants") respectfully move pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-4, for an order compelling arbitration in accordance with applicable arbitration agreements and staying this case.

### INTRODUCTION

Plaintiff Berkeley County School Board of Trustees (the "Board") alleges a scheme led by Brantley Thomas, the former Chief Financial Officer of the Berkeley County School District (the "District"), to defraud the District and enrich himself by stealing refunds, soliciting personal payments, and purchasing allegedly unnecessary insurance. That scheme dates back to 2001 and

was allegedly carried out with the help of Stanley Pokorney, an insurance broker who worked for Knauff Insurance Agency, Inc. ("Knauff"), and later for Hub International Southeast once Hub International Midwest Limited acquired Knauff.[1]  The Complaint contends that Thomas caused the District to purchase insurance policies and services sold by Knauff and the Hub Defendants, and that those policies and services had zero value to the District.  The Complaint thus seeks to recover every penny the District paid for those services, as well as treble and punitive damages, from the Hub Defendants for an alleged scheme of racketeering, fraud, breach of contract, and other torts that are alleged to have spanned the Complaint's sixteen-year period.

The services the Board now challenges were provided by the defendants pursuant to contractual terms.  And the Knauff contracts on which the Board relies for most of its claimed damages contained provisions stating that "*[a]ll* disputes, claims or controversies relating to" such agreements "or the services provided" pursuant to those agreements "*shall* be submitted" to arbitration.[2]  *E.g.*, Benfield Decl. Ex. B ¶4.4 (Brokerage Service Agreement dated June 18, 2002) (emphasis added).  That language on its face requires that the Board's claims seeking damages based on fees and premiums paid under the Knauff contracts be submitted to arbitration.  *See, e.g.*, *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013).  And it is clear that the Board's allegations against the Hub Defendants must be submitted to arbitration as well.  The Complaint essentially alleges a unitary, sixteen-year scheme in which the Hub Defendants merely continued the conduct of its predecessor after acquiring Knauff.  Claims regarding the Knauff contracts are thus inextricably intertwined with and significantly related to

---

[1] Hub International Southeast is not a separate corporate entity, but rather a division of Hub International Midwest Limited, and thus is not a proper defendant in this action.

[2] The Board seeks compensatory damages of approximately $9.35 million for amounts the District paid to Knauff and $4.83 million for amounts the District paid to the Hub Defendants. Compl. ¶¶44-45.

the rest of the Complaint's allegations against the Hub Defendants, and so the entire case should be submitted to arbitration. It would make no sense to have the arbitrator decide whether the alleged course of conduct violated RICO, state tort law, and contractual requirements during the Knauff period, and then to have this court separately consider those very same questions with respect to an allegedly identical course of conduct after the Hub Defendants acquired Knauff. To the extent there is any doubt about the scope of the arbitrable issues, moreover, the District agreed to submit such questions to the arbitrators. And even if it had not, it is well-established that, under the strong federal policy favoring arbitration agreements, any doubts about the scope of an arbitration agreement must be resolved in favor of arbitration. The Court should thus compel arbitration of all of the Board's claims and stay this case pending that arbitration.

## BACKGROUND

Plaintiff, the Board, alleges that the District's former Chief Financial Officer, Brantley Thomas, orchestrated a sixteen-year scheme in which he steered the District into buying insurance policies and services sold by the Hub Defendants and Knauff, a corporation that merged into Hub International Midwest Limited in 2012. *See* Compl. at 1-2 & ¶¶ 2, 7, 15-19; *see also* Benfield Decl. Ex. A (Articles of Merger). The Board alleges that those insurance policies and consulting services were unneeded and overpriced. *E.g.*, *id.* ¶¶ 42-43, 48-49, 147-151. It brings eleven claims, each of which seeks as damages every penny the District paid Knauff and the Hub Defendants for insurance premiums, fees, or both from 2001 through 2017. *See id.* ¶¶ 44-47, 158-245.

The Complaint alleges that Thomas and Stanley Pokorney, who "served as the District's insurance consultant and broker since at least 1993," engaged in a continuous scheme over the entirety of the Complaint's damages period, for which it attempts to hold all defendants liable.

Compl. at 2.  For example, the Complaint alleges that both Hub Defendants are "directly and vicariously liable for all of the torts alleged herein against Knauff, [Stanley] Pokorney, and Scott Pokorney." *Id.* ¶10.  And its allegations lump the Hub Defendants together with Knauff and the Pokorneys, referring to them collectively as the "Insurance Defendants," *id.* ¶11, and rarely differentiating their actions, *see, e.g.*, *id.* ¶21 ("[S]ince at least 2001, Thomas and the Insurance Defendants engaged in multiple illegal schemes pursuant to which the Insurance Defendants paid kickbacks to Thomas in exchange for his assistance in the Insurance Defendants' efforts to procure or maintain the District's insurance business."); *id.* ¶49 ("Despite their duties to the District . . . the Insurance Defendants made no effort to lower the District's insurance costs and, instead, recommended costly duplicative policies[.]").

The Complaint acknowledges that the services it now challenges as worthless were provided by Knauff and the Hub Defendants pursuant to contract; indeed, the Complaint asserts claims for breach of those contracts.  Compl. ¶¶233-236.  But while the Complaint makes no mention of it, the contracts between Knauff and the District contained clear and unequivocal arbitration provisions:

> ***All*** disputes, claims or controversies ***relating to this Agreement, or the services provided***, which are not otherwise settled, ***shall*** be submitted to a panel of three arbitrators and resolved by final and binding arbitration, to the exclusion of any courts of laws, under the commercial rules of the American Arbitration Association.
>
> . . .
>
> Judgment upon the award rendered may be entered in any court having jurisdiction thereof; however, the arbitrators may not enter an award for damages in excess of the actual compensatory damages sustained, nor make any award for punitive damages.  Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the cost of the third arbitrator and of the arbitration.

4

*E.g.*, Benfield Decl. Exs. B-G ¶¶ 4.4, 4.5 (Brokerage Service Agreements dated June 18, 2002; June 27, 2003; August 16, 2005; December 19, 2006; December 19, 2009; and May 1, 2011) (emphasis added).

Notwithstanding that arbitration provision, the Complaint demands that this federal court award treble damages of over $42.5 million, plus punitive damages and attorneys' fees. Compl. at 55 & ¶ 46.

## ARGUMENT

**I.     THE COURT SHOULD ENFORCE THE ARBITRATION PROVISIONS AND COMPEL THAT THE ENTIRE DISPUTE BE ARBITRATED**

The Supreme Court has repeatedly underscored the "emphatic federal policy in favor of arbitral dispute resolution" embodied in the FAA. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985); *see also, e.g.*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). The FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A party aggrieved by another's failure to follow such an agreement may petition a district court to order that arbitration to proceed. *Id.* § 4. And if issues in a pending suit are referable to arbitration, a district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." *Id.* § 3.

A party seeking to compel arbitration must establish: "'(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to

5

arbitrate the dispute.'" *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 87 (4th Cir. 2005) (quoting *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500-01 (4th Cir. 2002)).

As explained below, each of those requirements is met here. But if there were any doubt, "the heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration." *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 812 (4th Cir. 1989). Accordingly, the Court should "grant [the] motion to compel arbitration" and stay further proceedings in this Court. *Adkins*, 303 F.3d at 500.

### A. The Knauff Contracts Contain Valid Arbitration Agreements Covering This Dispute

#### 1. *The Written Arbitration Agreements Relate to the Parties' Dispute*

The contracts governing the relationship between Knauff and the District require that ***any*** dispute concerning the relationship between Knauff and the District be submitted to arbitration: "All disputes, claims or controversies relating to this Agreement, or the services provided, which are not otherwise settled, shall be submitted to a panel of three arbitrators and resolved by final and binding arbitration, to the exclusion of any courts of laws, under the commercial rules of the American Arbitration Association." *E.g.*, Benfield Decl. Ex. B ¶4.4 (Brokerage Service Agreement dated June 18, 2002).[3]

The allegations in the Complaint with respect to Knauff plainly fall within the scope of the parties' arbitration provision. The gravamen of the claims against the Hub Defendants stems from the actions of Stanley Pokorney "in his position with Knauff and Hub as the District's

---

[3] Courts routinely enforce similar clauses. *See, e.g.*, *Am. Recovery Corp. v. Comput. Thermal Imaging, Inc.*, 96 F.3d 88, 93, 97 (4th Cir. 1996) (reversing denial of motion to compel where parties agreed to arbitrate "any dispute that '***arose out of or related to***' the consulting agreement" (brackets omitted)).

6

insurance broker or consultant." Compl. ¶29. The Complaint alleges that "[t]he District entered into multiple contracts with the Insurance Defendants for consulting services, which required Defendants to use their expertise as insurance consultants to provide sound advice concerning the insurance needs of the District." *Id.* ¶234. And it is clear that those contracts are the same ones containing arbitration clauses. For example, a contract executed in June 2003 covered services provided on lines of insurance including "Inland Marine" and "Excess Liability." Benfield Decl. Ex. C ¶2.1; *see also* Benfield Decl. Ex. B ¶2.1 (June 2002 contract covering Excess Crime). The Complaint alleges that the Insurance Defendants' recommendation that the District purchase both types of policies was wrongful, and details at length the money the District supposedly wasted on Inland Marine coverage from 2001 through 2017. Compl. ¶¶40, 127-139. The Complaint similarly details allegedly unnecessary Directors and Officers coverage for Securing Assets for Education, a charitable organization supporting the District, which coverage Knauff agreed to provide services for in contracts dated December 2006 and December 2009. *See* Benfield Decl. Exs. E & F ¶2.1; Compl. ¶¶104-112. The Board also complains of a School Board Errors and Omissions Policy and the $70,000 annual broker fee it paid to Knauff in connection with it—provided for in an agreement that, like the foregoing Knauff contracts, contained an arbitration clause. *See* Compl. ¶¶140-146; Benfield Decl. Ex. G ¶¶2.1, 4.4.

The Complaint alleges that "[t]he Insurance Defendants breached [those] contracts . . . by providing unsound advice, and advising the District to purchase insurance that was unnecessary and excessive." Compl. ¶235. The other claims similarly allege breaches of duty or other wrongdoing arising from or relating to those contracts and the services they governed. The RICO claim seeks damages for "representing to the District that it needed certain insurance and insurance reviews, which it did not need . . . for the sole purpose of charging sham consulting

fees."  *Id.* ¶162.  Likewise, the fraud claim is based on "advising the [District] to purchase insurance that Defendants knew was unnecessary . . . for the sole purpose of collecting exorbitant advisor fees."  *Id.* ¶180; *see also, e.g.*, *id.* ¶208 (breach of fiduciary duty claim premised on bad advice and "exorbitant advisory fees").  And every one of the Board's claims seeks as damages the fees the District paid to Knauff for broker and consulting services.  *Id.* ¶¶168a, 176a, 188a, 196a, 203a, 210a, 219a, 232a, 236a, 241, 244.

There can be no serious dispute that such "disputes, claims or controversies" "relat[e] to [the parties'] Agreement, or the services provided" by Knauff.  *E.g.*, Benfield Decl. Ex. B ¶4.4.  The Court "must rigorously enforce [this] arbitration agreement[ ] according to [its] terms."  *Am. Express Co.*, 133 S. Ct. at 2309 (quotation marks omitted).

### 2.     *The Hub Defendants May Invoke the Arbitration Agreements*

It is clear, moreover, that all of the Hub Defendants may invoke the arbitration provision in the Knauff contracts to the extent the Board seeks to hold them liable for conduct during the period in which those agreements were in effect.  "Well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties."  *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416-17 (4th Cir. 2000).  This is such a case.

Among other things, the law is crystal clear that a "successor-in-interest may enforce an arbitration agreement."  *Cheraghi v. MedImmune, LLC*, No. 8:11-cv-01505(AW), 2011 WL 6047059, at *5 (D. Md. Dec. 5, 2011); *see also Smith Barney, Inc. v. Critical Health Sys. of N.C., Inc.*, 212 F.3d 858, 859-60 (4th Cir. 2000) (enforcing terms of arbitration agreement in favor of successor); *Gadberry v. Rental Serv. Corp.*, No. 0:09-3327-CMC-PJG, 2011 WL 767034, at *3 n.3 (D.S.C. Jan. 21, 2011) (rejecting "argument that the arbitration agreement does not apply to [a signatory's] corporate successor").  The Complaint acknowledges that Hub International

Midwest Limited is Knauff's successor-in-interest (having "acquired Knauff in 2012"), and on that very basis claims Hub "is directly and vicariously liable for all of the torts alleged herein against Knauff." Compl. ¶¶ 7, 10. By the Board's own allegations and logic, the Hub Defendants also succeeded to Knauff's rights to compel arbitration under its contracts with the District.

Separately, equitable estoppel allows a nonsignatory to compel arbitration where the signatory's claims "either literally or obliquely[ ] assert a breach of a duty created by the contract containing the arbitration clause." *Am. Bankers Ins. Grp. v. Long*, 453 F.3d 623, 629 (4th Cir. 2006).[4] And "[t]he Fourth Circuit has expressed a clear policy in favor of arbitrating claims against non-parties to an arbitration agreement if those claims are based on the same alleged facts underlying claims against a party to the agreement." *Hinson v. Jusco Co.*, 868 F. Supp. 145, 149 (D.S.C. 1994) (Norton, J.); *see J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320-21 (4th Cir. 1988) (claims against a nonsignatory parent may be arbitrable if they "are based on the same facts and are inherently inseparable" from claims against a signatory subsidiary). That is the case here. The Board seeks to hold the Hub Defendants liable for breaches of contracts between Knauff and the District that contained arbitration clauses. Compl. ¶¶ 234-236 (breach of contract claim). And while it styles other claims in terms of federal RICO or state tort violations, any duties owed by Knauff or the Hub Defendants during that period similarly arise from that contractual relationship between Knauff and the District. *See, e.g.*, *id.* ¶¶ 205-209 (alleging fiduciary duties breached by "advising [the District] to purchase and maintain insurance that was unnecessary and duplicative" and charging exorbitant fees for policies and services). Those claims too are therefore subject to arbitration under the Knauff

---

[4] South Carolina has adopted the Fourth Circuit's approach on this issue. *Swane Co. v. Berkeley County*, No. 2:15-cv-02586, 2015 WL 6688072, at *6 (D.S.C. Oct. 30, 2015) (Norton, J.).

9

contracts, *see Summer Rain v. Donning Co./Publishers, Inc.*, 964 F.2d 1455, 1457-59 (4th Cir. 1992) (gravamen of claims including RICO and fraud was breach of contracts with arbitration clauses); *Long v. Silver*, 248 F.3d 309, 317-19 (4th Cir. 2001) (claims including fraud, breach of fiduciary duty, civil conspiracy, and unfair trade practices were arbitrable because they relied on contract with arbitration clause or duties created thereby), and the Hub Defendants may enforce that requirement, *see Hinson*, 868 F. Supp. at 149.

### B.     All of the Board's Claims Are Subject to the Broad Arbitration Agreements

It is further clear that the Board's claims encompassing the period after Hub acquired Knauff should also be submitted to arbitration.  The "sweeping language of broad arbitration clauses"—such the arbitration provisions here, *see* p. 4, *supra*—"applies to disputes in which ***a significant relationship*** exists between the asserted claims and the contract in which the arbitration clause is contained."  *Landers v. FDIC*, 739 S.E.2d 209, 214 (S.C. 2013) (emphasis added).  The Complaint here alleges what amounts to a unitary scheme over the course of sixteen years—there is thus a "significant relationship" between the allegations of misconduct during periods while the Knauff agreements were in effect and the allegations pertaining to later periods, making the entire dispute subject to arbitration.  The law and common sense alike dictate that the dispute over the propriety of that common course of conduct be resolved in one proceeding, in a single forum.

The "significant relationship" test requires a court to look to the factual allegations underlying the claims, regardless of their legal labels, and to "[b]ear[ ] in mind the strong federal policy in favor of arbitration."  *Am. Recovery Corp. v. Comput. Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996).  With a broad arbitration clause, "the test . . . is not whether a claim arose under one agreement or another, but whether a significant relationship exists between the claim and the agreement containing the arbitration clause."  *Id.* at 94.  Thus, "[t]he scope of an

arbitration clause in one contract can extend to a dispute arising under a second contract, provided that the dispute 'significantly relates' to the first agreement." *Gen Elec. Capital Corp. v. Union Corp. Fin. Grp.*, 142 F. App'x 150, 152 (4th Cir. 2005). That test is satisfied here.

Courts have found that an arbitration clause may encompass more than claims arising under the terms of the specific contract containing it where the clause contains "broad" language like the clauses here—"[a]ll disputes, claims or controversies *relating to*" the contracts in which they are contained "or the services provided" in conjunction with that contract. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967) (labeling as "broad" a clause that required arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement"); *Great Am. Ins. Co. v. Hinkle Contracting Corp.*, 497 F. App'x 348, 353 (4th Cir. 2012) (similar); *Whitaker v. Protective Life Ins. Co.*, No. 6:10-02314-HFF, 2011 WL 13217968, at *3 (D.S.C. Aug. 18, 2011) ("any controversy" language connotes a broad arbitration agreement). The arbitration clauses in the Knauff agreements fit that description precisely, requiring that "[a]ll disputes, claims or controversies relating to this Agreement, or the services provided, . . . shall be submitted to" arbitration. *E.g.*, Benfield Decl. Ex. B ¶ 4.4

And it is likewise clear that all of the Board's claims bear a significant relationship to those contracts and services because the Complaint alleges an overarching scheme led by Thomas and Stanley Pokorney from 2001 through 2017, continuing unabated through the Knauff acquisition. The Board links all of Knauff's and the Hub Defendants' conduct throughout that period, casting each of its claims as embracing the entire time period and seeking to hold the Hub Defendants liable for all of it. Compl. ¶¶ 158-245. Stanley Pokorney is alleged to have engaged in the same wrongdoing and breaches of duty across that period, and the Complaint fails to distinguish for purposes of liability between contracts entered into by Knauff and the Hub

11

Defendants. *See, e.g., id.* ¶¶ 234-236 (alleging that "[t]he District entered into multiple contracts with the Insurance Defendants for consulting services" and that "[t]he Insurance Defendants breached their contracts with the District by providing unsound advice, and advising the District to purchase insurance that was unnecessary and excessive"). As the Board has pleaded its case, the Hub Defendants' alleged misconduct is of a piece with Knauff's alleged misconduct; it thus bears a significant relationship to the subject matter of the contracts with arbitration clauses. *See Hous. Auth. of City of Columbia v. Cornerstone Hous., LLC*, 588 S.E.2d 617, 622 (S.C. Ct. App. 2003) (dispute that was "significantly related to the subject matter of" certain contracts was arbitrable "even if the contracts failed to specifically include the time period when the dispute arose").

The Board has alleged a uniform course of conduct and seeks to hold all defendants liable for that entire course of conduct. Accordingly, the entirety of the Board's claims must be arbitrated together.

### C.     The FAA's Interstate Commerce Requirement Is Satisfied

The parties' dispute also easily satisfies the requirement that it "involv[e] commerce." *See* 9 U.S.C. § 2; *Am. Gen. Life & Accident Ins. Co.*, 429 F.3d at 87. The FAA "extend[s] . . . to the limits of Congress' Commerce Clause power." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 268 (1995). Thus, "an arbitration clause merely 'affecting' interstate commerce would be covered by the statute." *THI of S.C. at Columbia, LLC v. Wiggins*, No. 3:11-888-CMC, 2011 WL 4089435, at *1 n.3 (D.S.C. Sept. 13, 2011). That is manifestly so here, where a North Carolina corporation entered into an agreement involving insurance brokerage services with a South Carolina school district. Indeed, the Complaint itself alleges that Knauff and the Hub Defendants "engaged in, and its activities affected, interstate commerce, including the provision of brokerage and consulting services across state lines." Compl. ¶ 163.

**D.     The Board Has Failed To Submit This Dispute to Arbitration**

The final requirements for a court to compel arbitration are "the existence of a dispute between the parties," and "the failure, neglect or refusal of the defendant to arbitrate the dispute." *Am. Gen. Life & Accident Ins. Co.*, 429 F.3d at 87. The Board's assertion of multiple claims against the Hub Defendants in this federal court, rather than submitting those claims to arbitration, manifestly satisfies those elements.

## II.    ANY DISPUTES REGARDING THE ARBITRABILITY OF THE BOARD'S CLAIMS MUST THEMSELVES BE SUBMITTED TO ARBITRATION—BUT FAIL IN ANY EVENT

**A.     Any Question of Arbitrability Must Itself Be Resolved in Arbitration**

Should the Board resist arbitration of any or all of its claims against any or all of the defendants, any questions regarding the scope of arbitrability must themselves be submitted to arbitration. It is settled that "parties may choose 'to arbitrate gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 526 (4th Cir. 2017) (quoting *Rent-a-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)). The Knauff contracts contain just such a requirement that any gateway questions be arbitrated.

Specifically, the Knauff agreements require that any dispute be resolved "under the commercial rules of the American Arbitration Association." Benfield Decl. Exs. B-G ¶4.4. And the AAA Rules expressly provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA Rules, at R-7(a), https://www.adr.org/sites/default/files/commercial_rules.pdf. Thus, there is consensus among the circuits that where, as here, an arbitration agreement incorporates the AAA rules by reference, questions of arbitrability must be reserved for the arbitrators. *See, e.g.*, *Brennan v.*

13

*Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *Petrofac, Inc. v. DynMcDermott Petrol. Ops. Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005); *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005). The Fourth Circuit recently "agree[d]" with the reasoning of these circuits in holding "that the incorporation of arbitral rules substantively identical to" the AAA rules "serves as 'clear and unmistakable' evidence of the parties' intent to arbitrate arbitrability." *Simply Wireless*, 877 F.3d at 527-28.

As a result, if the Court believes that an issue of arbitrability is seriously disputed in this case, it should require that any such dispute be resolved by the arbitrators in the first instance.

### B. South Carolina's Exclusion of "Insurance Policies" from the FAA's Requirements Does Not Apply Here

The Hub Defendants anticipate that the Board will urge that the arbitration provisions at issue here are unenforceable under the South Carolina Uniform Arbitration Act, which exempts claims for "any insured or beneficiary under any insurance policy or annuity contract" from otherwise-applicable arbitration requirements. S.C. Code Ann. § 15-48-10. But that exclusion has no application here.

This Court has explained that § 15-48-10 serves to "reverse preempt" the FAA and "prohibit[] the enforcement of arbitration clauses *in insurance policies* under South Carolina law." *Am. Health Life Ins. Co. v. Heyward*, 272 F. Supp. 2d 578, 582 (D.S.C. 2003) (emphasis added). But that provision is irrelevant here because the arbitration clauses at issue are not "in insurance policies"—and indeed, the Complaint contains no allegation that Knauff failed to pay claims under the terms of any insurance policy. Rather, Knauff was and is alleged to have been an *insurance broker*, Compl. ¶ 2—as a result, it did not issue any of the policies in question. The arbitration provisions are contained in brokerage service agreements regarding the review

14

and management of a client's insurance needs, and the claims arise from the defendants' performance of such obligations. *See generally* Benfield Decl. Exs. B-G; *see also* Compl. at 2-3 (alleging duties "to provide prudent counsel to the District, and to advise against the purchase of unnecessary and duplicative insurance policies," which were breached by advising unnecessary policies and "charging sham broker's and consulting fees for management of insurance and insurance reviews"). South Carolina courts have consistently held that arbitration clauses in contracts such as the Knauff agreements here—which relate to insurance, but are not themselves insurance ***policies***—are not subject to § 15-48-10. *See Wilson v. Willis*, 786 S.E.2d 571, 587 (S.C. Ct. App. 2016) (reversing denial of motion to compel arbitration because the "Agency Agreement at issue . . . is not an insurance policy" and the asserted claims were not those of an "insured or beneficiary under any insurance policy"); *Walden v. Harrelson Nissan*, 731 S.E.2d 324, 326 (S.C. Ct. App. 2012) (reverse preemption only occurs "when a litigant seeks to enforce an arbitration agreement ***contained in an insurance policy*** governed by South Carolina law" (emphasis added)). In any event, as discussed above, any reverse preemption argument that the Board might raise must be resolved by the arbitrators. *See* pp. 13-14, *supra*.

### III.     ANY CLAIMS FOUND TO BE NON-ARBITRABLE SHOULD BE STAYED

As shown above, the Court should permit the arbitrators to decide the scope of arbitrable claims, as the parties agreed, and should compel arbitration of all claims if it nonetheless decides the scope of arbitrability itself. But if this Court holds any claims or issues to be non-arbitrable, it should stay them while the arbitration proceeds. *See Am. Recovery Corp.*, 96 F.3d at 97 (noting district court's discretion to issue such a stay). "When arbitration is likely to settle questions of fact pertinent to nonarbitral claims, consideration of judicial economy and avoidance of confusion and possible inconsistent results militate in favor of staying the entire action." *Nat'l Material Trading v. M/V Kaptan Cebi*, No. 2:95-3673-23, 1997 WL 915000, at *9

(D.S.C. Mar. 13, 1997). Here, the same types of conduct underlie all of the Board's claims across the entirety of the Complaint's time span. Efficiency thus counsels staying any claims for which the Court does not compel arbitration.

## **CONCLUSION**

For the foregoing reasons, the Hub Defendants respectfully request an order compelling arbitration and staying this case.

Dated:  March 5, 2018                                      Respectfully submitted,

                                                           /s   Christy F. Allen

Thomas J. Wiegand, admitted *pro hac vice*                 John A. Massalon (# 5227)
MOLOLAMKEN LLP                                             Christy F. Allen (# 07549)
300 N. LaSalle St.                                         WILLS MASSALON & ALLEN LLC
Chicago, IL  60654                                         PO Box 859
(312) 450-6700 (telephone)                                 Charleston, SC  29402
(312) 450-6701 (facsimile)                                 (843) 727-1144 (telephone)
twiegand@mololamken.com                                    (843) 727-7696 (facsimile)
                                                           jmassalon@wmalawfirm.net
Michael G. Pattillo, *pro hac* vice motion                 callen@wmalawfirm.net
forthcoming
William J. Cooper, *pro hac vice* motion
forthcoming
MOLOLAMKEN LLP
600 New Hampshire Ave., NW
Washington, DC  20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)

*Attorneys for Defendants Hub International Limited and Hub International Midwest Limited*