**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

**BERKELEY COUNTY SCHOOL DISTRICT,**

        **Plaintiff,**

**v.**                        **CIVIL ACTION NO. 2:18-cv-00151-DCN**

**HUB INTERNATIONAL LIMITED,
HUB INTERNATIONAL MIDWEST LIMITED,
KNAUFF INSURANCE AGENCY, INC.,
STANLEY J. POKORNEY,
SCOTT POKORNEY, and
BRANTLEY THOMAS,**

        **Defendants.**

**PLAINTIFF BERKELEY COUNTY SCHOOL DISTRICT'S MEMORANDUM IN
OPPOSITION TO HUB INTERNATIONAL LIMITED AND HUB
INTERNATIONAL MIDWEST LIMITED'S MOTION TO ENFORCE
ARBITRATION AGREEMENTS**

Plaintiff, Berkeley County School District (the "District"), by counsel, respectfully submits this Memorandum in Opposition to the Motion to Enforce Arbitration Agreements filed herein by Defendants Hub International Limited and Hub International Midwest Limited (the "Hub Defendants") (ECF 23).

## INTRODUCTION

In the Motion at bar, the Hub Defendants - who, through their agents, engaged in a multi-year scheme along with the District's Chief Financial Officer, Brantley Thomas ("Thomas") to defraud the District out of tens of millions of dollars - seek to deprive the District of their fundamental right to have the court decide the merit of their claims against them. The Hub Defendants attach to their Motion a Declaration from their Office

Manager along with six documents located in their files which they claim amount to agreements to arbitrate all of the disputes raised in Plaintiff's Complaint.[1]

The Hub Defendants' Motion rests entirely on the faulty assumption that the arbitration clauses upon which they rely are valid. Under South Carolina law, which governs the issue, they are not invalid and cannot be enforced. Moreover, they are void under South Carolina law because they violate the State and District Procurement Codes, as well as public policy. And, to the extent that Thomas was responsible for any arbitration agreements with Knauff, he was without authority to do so and his actions, could not, therefore, bind the District. The Motion must therefore be denied.

## SUMMARY OF THE NATURE OF THE CASE

The District filed the instant action to recover damages it sustained as the result of criminal activities and fraudulent schemes hatched and carried out by Hub International Limited and Hub International Midwest Limited (the "Hub Defendants"); Hub International Midwest Limited's predecessor, Knauff Insurance Agency, Inc. ("Knauff"); and two agents of Hub and Knauff, Stanley Pokorney and Scott Pokorney.[2] Together, these Defendants are referred to herein as the "Insurance Defendants." In its Amended Complaint, the District alleges that the Insurance Defendants, in concert with the District's former Chief Financial Officer, Brantley Thomas ("Thomas"), engaged in long-

---

[1] Since the filing of the Hub Defendants' Motion to Enforce, the Berkeley County School Board of Trustees, the initial Plaintiff in this action, has filed an Amended Complaint in which the District is substituted for the Board as party plaintiff.

[2] Not surprisingly, Scott Pokorney, who participated in the scheme to defraud the District by bribing Thomas and the District's former Risk Manager, has filed a "Response in Support of Hub Defendants' Motion to Enforce Arbitration Agreements" (ECF 29) in an effort to avoid judicial determination of the District's claims against him. In his motion, Scott Pokorney parrots the arguments of the Hub Defendants. This Opposition is in response to Scott Pokorney's arguments in addition to those of the Hub Defendants.

term schemes to defraud the District, its children, and its taxpayers, out of tens of millions of taxpayer dollars over the course of at least ten (10) years.

Thomas has entered pleas of guilty in the United States District Court for the District of South Carolina, Charleston Division, for his part in the schemes in which he engaged with the Insurance Defendants.    On December 7, 2017, the United States Attorney for the District of South Carolina issued an Information in which it charged Thomas with ten counts of Wire Fraud in violation of 18 U.S.C. §§ 1343 and 1346. (Information, attached hereto as Exhibit A; Amended Complaint, ¶ 18-25.)    The Information charges that "beginning in or about March, 2010, and continuing until in or about November 2016, the defendants, [Thomas]  and others knowingly and willfully devised and intended to devise, and participated in, a scheme to defraud the [District] and the citizens of Berkeley County by depriving them of their intangible right to [Thomas'] honest services as the [District's] Chief Financial officer."  (Exhibit A, p. 5.)  According to the Information, Thomas, as the District's CFO, was involved in obtaining insurance contracts and selecting who would broker those contracts.  The Information charges that in his position as the District's CFO, Thomas "steered BCSD insurance policy purchases through a broker employee and accepted cash kickbacks from that employee."  By doing so, the Information charges, Thomas deprived the citizens of Berkeley Count of Thomas' honest services.  (Exhibit A, pp. 5-6.)

The Information further charges that it was the purpose of the scheme for Thomas to use his official influence and position as the District's CFO to enrich himself by steering insurance contracts and business and accepting cash payments, or kickbacks, paid by an insurance broker employee. (Exhibit A p. 6.)  It was a part of the scheme,

according to the Information, to defraud that kickbacks were paid to Thomas by personal check, which Thomas deposited into his personal account. The checks would often contain information on a "memo" line and would indicate the money was intended as a personal gift, when in fact the purpose was as a kickback to Thomas for steering insurance policies and business to the insurance company. It was a part of the scheme to defraud that Thomas received approximately 16 checks of $2,000.00 each, for a total of $32,000.00 as kickbacks. (Exhibit A, p. 6.)

For the purpose of executing and attempting to execute the scheme, according to the Information, Thomas transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce, the below writings, signs, signals, pictures, and sounds, among others, all made payable to Thomas:

| Count | Check Date | Amount |
|-------|-----------|--------|
| 11 | 2/15/2013 | $2,000 |
| 12 | 5/20/2013 | $2,000 |
| 13 | 10/2/2013 | $2,000 |
| 14 | 3/12/2014 | $2,000 |
| 15 | 12/4/2014 | $2,000 |
| 16 | 3/24/2015 | $2,000 |
| 17 | 7/25/2015 | $2,000 |
| 18 | 10/20/2015 | $2,000 |
| 19 | 5/23/2016 | $2,000 |
| 20 | 11/8/2016 | $2,000 |

Upon information and belief, the unnamed insurance broker described in the Information is Hub, and the unnamed insurance broker employee is Defendant Stanley Pokorney. (Amended Complaint, ¶ 23.) Thomas has entered a plea of guilty to all of the foregoing federal charges against him. (Amended Complaint, ¶ 24.)

The Federal Information was limited in time to the period between 2010 and 2016. However, since at least 2005, Thomas and the Insurance Defendants engaged in multiple

illegal schemes pursuant to which the Insurance Defendants paid kickbacks to Thomas in exchange for his assistance in the Insurance Defendants' efforts to procure or maintain the District's insurance business.  (Amended Complaint, ¶ 25.)

In addition to the federal charges against Thomas, on November 15, 2017, a South Carolina grand jury, convened in Columbia, South Carolina, handed down a four-count Indictment charging Thomas with embezzlement in violation of S.C. Code Ann. § 16-13-210.[3]  (State Indictment, attached as Exhibit B; Amended Complaint, ¶¶ 26-32.)   In Count III of the Indictment, the Grand Jury charged that on or about November 29, 2007, while Thomas was responsible for the safekeeping, transfer and disbursement of public funds," he "did embezzle and convert to his own use ten thousand dollars or more ($10,000) of those public funds with the intention to defraud" the District.  (Exhibit B, p. 3.)  The Grand Jury charged that, on that date, Thomas "did convert to his personal use approximately $22,700.00 of public school funds, by deliberately causing the Berkeley County School District to overpay a vendor, and then having the vendor send a refund of the overpayment to his home address, upon which the funds were converted to his personal use."  Thomas' conduct, the Grand Jury charged, was "in violation of section 16-13-210 of the South Carolina Code of Laws, as amended," involved "public corruption arising out of or in connection with a crime involving public corruption," and such conduct was  not "authorized by law." (Exhibit B, pp. 3-4.)

Upon information and belief, the vendor to which the Grand Jury refers in Count III of its Indictment is Defendant Knauff, which was acquired by Defendant Hub

---

[3] A South Carolina grand jury handed down a Superseding Indictment for Embezzlement (Ten Counts) in violation of S.C. Code Ann. § 16-13-210, and Forgery (One Count) in violation of  S.C. Code Ann. § 16-13-10, against Thomas on October 17, 2017.

International Midwest Limited in 2012. Thus, as the Grand Jury charged, on November 15, 2017, Thomas caused the District to overpay Knauff/Hub in the amount of $22,700.00, and Knauff/Hub knowingly refunded the overpayment directly to Thomas, who converted it to his personal use in violation of section 16-13-210 of the South Carolina Code of Laws. Also upon information and belief, Stanley Pokorney was the Knauff/Hub employee who refunded the overpayment directly to Thomas so that he could convert it to his personal use, and this refund was a kickback to Thomas in exchange for Thomas' assistance in maintaining the insurance relationship between Knauff/Hub and/or steering new insurance business to Knauff/Hub. Thomas has agreed to enter a plea of guilty to this and all other charges against him. (Amended Complaint, ¶¶ 31-32.)

As the District's CFO, Thomas was in charge of the District's Risk Management Division, and he used that position to engage in fraudulent transactions in exchange for kickbacks from the Insurance Defendants. Thomas and the Insurance Defendants were able to conceal all of the foregoing illegal activities from the District by communicating with the Insurance Defendants in person, by telephone, and through the use of Thomas' home mailing address and personal cell phone and email address. Plaintiff alleges in its Amended Complaint that the schemes carried out by the Insurance Defendants and Thomas amounted to violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and give rise to a host of state law claims. Through the payment of kickbacks and bribes to Thomas, the Insurance Defendants profited from exorbitant commissions, and caused the District to pay costly insurance premiums for unnecessary insurance policies from at least 2005 through 2017.

## STATEMENT OF THE FACTS

In their Motion, the Hub Defendants, who were engaged in fraudulent insurance kickback schemes with Thomas as charged by the United States and the State of South Carolina, seek to enforce arbitration clauses in six "Agreements" that they claim to have located in their files and that they assert were entered into between Knauff and Thomas during the time that Thomas and Knauff were engaging in their illegal conduct.  The Hub Defendants claim that these arbitration clauses require this Court to submit this entire case to arbitration.

### *State and District Procurement Regulations*

Although Thomas failed to comply with it, purchases by the District, at all times relevant herein, have been subject to the State's Consolidated Procurement Code, which the District has adopted. *See* Berkeley County School District Procurement Code, April 2008, art. I, § 1 ("this document is adopted pursuant to the mandate of § 11-35-70 of the South Carolina Code of Laws, is intended to have the force and effect of law, and shall be known and may be cited as the "*Berkeley County School District* Procurement Code" (hereinafter the "BSDPC"); (S.C. Code § 11-35-70) (requiring the adoption of the State Consolidated Procurement Code or a code of substantial similarity).

Because Thomas had control over Risk Management in his position as CFO of the District, he was able to conduct his illegal activities in concert with the Insurance Defendants without detection.  The State Procurement Code provides the District with the authority to contract for certain services, including "Consultant Services," which is defined by the Code as

> An individual, partnership, corporation or any other legally established
> organization performing consulting services for or providing consulting

> advice to the State of South Carolina, or any governmental body thereof,
> over whom the State or governmental body has the right of control as to
> the result to be accomplished but not as to the details and means by which
> that result is to be accomplished.

S.C. Code Regs. 19-445.2025 (A) (2007 through present).   The BSDPC defines "services" as the " means the furnishing of labor, time, or effort by a contractor not required to deliver a specific end product, other than reports which are merely incidental to required performance. This term includes consultant services other than architectural, engineering, land surveying, construction management, and related services. This term does not include employment agreements or services defined above as "Information Technology IT services." (S.C. Code § 11-35-310(29))."   (BCSDPC 2008, Appendix). Such services were required by the Procurement Code to be "procured in accordance with the Code and these Regulations."   S.C. Code Regs. 19-445.2025 (A) (2007 through present).   As such, contracts for consultant services, such as offered by the Insurance Defendants, were required to be awarded pursuant to a competitive sealed bidding process.  SC Code § 11-35-1510 (2005 through present); S.C. Code Regs. § 19-445.2030 (2007 through present).

The BCSDPC and the Procurement Code do not permit the District to enter into agreements to arbitrate.  Thus, to the extent any person agreed on behalf of the District to arbitrate disputes between the District and Knauff, that person was without authority to do so.  Accordingly, the arbitration clause is deemed null and void.  *State v. Accela, Inc.*, 2012 SC CPO LEXIS 3 (January 20, 2012) (holding by the South Carolina Budget and Control Board, Procurement Services that under the State Procurement Code an agreement in a contract between the State and a contractor was null and void under S.C. Code § 11-35-4230 because the State did not have authority to agree to arbitration).

8

The Procurement Code also provided, at all times relevant, as follows:

Unless otherwise provided by law, a contract for supplies, services, or information technology must not be entered into for any a period of more than one (1) year unless approved in a manner prescribed herein. The term of the contract and conditions of renewal or extension must be included in the solicitation and funds must be available for the first fiscal period at the time of contracting. Payment and performance obligations for succeeding fiscal periods must be subject to the availability and appropriation of funds for them.

SC Code § 11-35-2030(1) (2007 through present); BCSDPC 2008, art. 5, § 2030 (1). The District was and is prohibited from entering into multi-year contracts unless "before the utilization" of such a contract it is "determined in writing"  that "estimated requirements cover the period of the contract and are reasonably firm and continuing and such a contract serves the best interests of the District by encouraging effective competition or otherwise promotes economies in procurement."  SC Code § 11-35-2030(2).

Here, with respect to the "Agreements" included in Exhibits D through G of Benfield's Declaration, which amount to multi-year contracts, no competitive bid process was conducted, no determination in writing was ever made in accordance with SC Code § 11-35-2030(2) as required for multi-year contracts.  Neither the BCSDPC nor the State Consolidated Procurement Code provided Thomas with authority to override their provisions.  (See Declaration of Marcie Abrahamson, attached as Exhibit C.)

### The "Agreements"

The Hub Defendants attach to their Motion a Declaration from Julia B. Benfield, a Knauff/Hub employee, who states that she began working at Knauff as an Account Manager in 2003 and was promoted to the office of Service Manager for Knauff in 2008, in which function she "managed the day-to-day activities of the staff that serviced

[Knauff's] customer accounts, including [the District]." (ECF 23-8 at ¶ 2). She states that among her duties as "Service Director" [sic], she "oversaw the maintenance of past and current records at the Charlotte office for all of the Knauff clients. The [District] was one such client." *Id.* Benfield goes on to state that Knauff was acquired by Hub International Midwest and the merger was effective December 31, 2012. Her title then changed to "Operations Manager, in which position [she] continued to manage the day-to-day activities of the office staff and continue [sic] to oversee the maintenance of client records.." *Id* at ¶ 3. Throughout her employment, Benfield avers, she has been located at Knauff/Hub's Charlotte office, where she continues as Hub's Operations Manager. *Id.*

Benfield then states that the "paper record at the Charlotte office contains" six Brokerage Service Agreements between Knauff and the District. She then lists six Brokerage Service Agreements, which she attaches as Exhibits B through G to her Declaration, all of which contain arbitration provisions. Finally, she states that the listed brokerage service agreements "have been kept in the normal course of business. The cover letters, invoices, and Brokerage Service Agreements in Exhibit F and G were located in Hub Midwest's files in the same order in which they are presented in Exhibits F and G." *Id.* at ¶ 5.

The six Agreements attached to Benfield's Declaration are as follows:

### *Exhibit B*

Exhibit B to Benfield's Declaration is in the form of a letter dated June 18, 2002 on Knauff letterhead addressed to Thomas. The letter references "Policy or Service Fee Consent – Policy Term 6-29-02/03." (Benfield Decl., Ex. B, p. 1 (ECF 23-2).) Under the heading "Compensation," it states:

> In consideration of the services to be provided, Client agrees to pay Knauff an annual fee of $100,000 payable in twelve (12) equal installments. Knauff's compensation shall be net of any premium or surplus lines taxes, sales, use, excise, value added or similar taxes, which taxes shall be the responsibility of, [sic] whether or not billed by Knauff. This agreement includes the services provided on the following lines of insurance: Commercial Package, Excess Liability, Active Bus Travel Accident, Excess Crime, Boiler & Machinery, and Medical Professional Liability (to be determined).

(Benfield Decl., Ex. B, p. 2 (ECF 23-2.)  Under "Term," the Agreement provides

> This Agreement shall be for a one year period commencing on June 29, 2002 and ending on June 29, 2003 unless earlier terminated by either party. Knauff's responsibilities for performing the services stated in this Agreement and for servicing Client's coverages or programs shall cease as of the date of termination.

(Benfield Decl., Ex. B, p. 2 (ECF 23-2).)  The Agreement at Exhibit B was signed on July 1, 2002 by "Angel Cartwright" for the District and on the same day by Stanley Pokorney for Knauff.

### *Exhibit C*

Exhibit C to Benfield's Declaration is in the form of a letter dated June 27, 2003 to Thomas referencing "Policy or Service Fee Consent, Policy Term 6-9-03/04." (Benfield Decl., Ex. C, p 1 (ECF 23-3).)  Under the heading "Compensation," it provides:

> In consideration of the services to be provided, Client agrees to pay Knauff an annual fee of $100,000 payable in twelve (12) equal installments. Knauff's compensation shall be net of any premium or surplus lines taxes, sales, use, excise, value added or similar taxes, which taxes shall be the responsibility of, [sic] whether or not billed by Knauff. This agreement includes the services provided on the following lines of insurance: Commercial Package, Inland Marine, Excess Liability, Activity Bus Travel Accident, Excess Crime, and Boiler & Machinery.

(Benfield Decl., Ex. C, p 2 (ECF 23-3).)  Under "Term," the letter at Exhibit C provides

> This Agreement shall be for a one year period commencing on June 29, 2003 and ending on June 29, 2004 unless earlier terminated by either party. Knauff's responsibilities for performing the services stated in this

Agreement and for servicing Client's coverages or programs shall cease as of the date of termination.

(Benfield Decl., Ex. C, p 2 (ECF 23-3).)  The letter bears what appears to be the signature of Brantley Thomas, signed on June 27, 2003, and Stanley Pokorney for Knauff, signed on June 30, 2003.

### Exhibit D

Exhibit D to Benfield's Declaration appears to be a letter dated August 16, 2005 addressed to Thomas and referencing "Policy or Service Fee Consent."  This letter bears the handwritten words "proposed 05/06" on the first page.  What this means or who wrote these words on the letter is unknown.  Under Section 1 entitled "Services Provided," the letter states "subject to the terms and conditions of this Agreement, Knauff agrees to provide the following services in connection with Client's Property and Casualty and Workers Compensation program."   (Benfield Decl., Ex. D, p. 1 (ECF 23-4).)   Under Section 2, entitled "Compensation," this letter states,

> In consideration of the services to be provided, Client agrees to pay Knauff an annual fee of $177,000 payable in quarterly installments. Knauff's compensation shall be net of any premium or surplus lines, taxes, sales, use, excise, value added or similar taxes, which taxes shall be the responsibility of [sic] whether or not billed by Knauff.

(Benfield Decl., Ex. D, p. 2 (ECF 23-4).)

Under Section 3, entitled "Term," the letter contains various handwritten revisions. The typewritten provision stated, "This Agreement shall remain in force as long as either the Insurance Reserve Fund (Property Casualty) or the School Board Trust (Workers Compensation) programs remain in force.  Handwritten revisions (without initial or any indication as to who made the revisions) changed the language to "This Agreement shall remain in force as long as either the Insurance Reserve Fund (Property/Casualty), the

School Board Trust (Workers Compensation) or any of the Knauff insurance contracts remain in force."  (Benfield Decl., Ex. D, p. 2 (ECF 23-4).)

The letter at Exhibit D was not signed or dated by anyone, and there is no indication that Knauff ever provided the services relating to Workers' Compensation or that it was ever paid $177,000.00 to provide them.  Moreover, there is no indication that Exhibit D was ever sent to or seen by anyone for the District.

### Exhibit E

Exhibit E to Benfield's Declaration is in the form of a letter dated December 19, 2006 to Thomas referencing "Brokerage Service Agreement – SAFE; Policy Term 12-19-06/09."  The letter states, "Attached please find the [Knauff] Brokerage Service Agreement ("Agreement") for the Berkeley County School District (SAFE)…"  (Benfield Decl., Ex. E, p. 1 (ECF 23-5).)  Under Section 2, entitled "Compensation," this letter states,

> 2.1  In consideration of the services to be provided, Client agrees to pay Knauff an annual fee of $118,625 to be paid annually.  Knauff's compensation shall be net of any premium or surplus line taxes, sales, use, excise, value added or similar taxes, which taxes shall be the responsibility of [sic], whether or not billed by Knauff.  This agreement includes the services provided on the following lines of insurance:  Directors & Officers Liability coverage.

(Benfield Decl., Ex. E, p. 2 (ECF 23-5.)  Under Section 3, entitled "Term," the letter states

> This Agreement shall be for multi-year periods commencing on December 19, 2006 unless earlier terminated by either party. Knauff's responsibilities for performing the services stated in this Agreement and for servicing Client's coverages or programs shall cease as of the date of termination.

(Benfield Decl., Ex. E, p. 2 (ECF 23-5).)  The letter at Exhibit E is not signed or dated by any party.  There is no indication that it was ever sent to or seen by anyone at the District.

### *Exhibit F*

Exhibit F to Benfield's Declaration contains three documents.  The first document appears to be a cover letter dated December 23, 2011, addressed to Thomas at his home address at 1007 Island Crossing Drive, Hanahan, South Carolina.  The letter is from Jana Pokorney, Senior Account Manager for Knauff, referencing "Securing Assets for Education (SAFE); Directors and Officers Liability Coverage."  The letter states, "As per your discussions with Stan, we have enclosed the invoices which represent the third of three year installment premiums for the above for the term December, [sic] 19, 2011/2012."  (Benfield Decl., Ex. F, p. 1 (ECF 23-6).)  Notably, the cover letter does not state that an agreement was attached, nor does it request Thomas' endorsement of an agreement.

The second two documents in the Exhibit are an invoice to SAFE dated December 21, 2011, for "Directors & Officers Liability/Employment Practices Liability Coverage" in the amount of $65,000.00, and an invoice to SAFE dated December 21, 2011 for "SAFE-Brokerage Service Fee – Third of Three-Year Term Installment Billing," in the amount of $118,625.00.  (Benfield Decl., Ex. F, pp. 2-3 (ECF 23-6).)

Finally within Exhibit F is a letter dated December 19, 2009 to Thomas, without a letterhead, referencing "Brokerage Service Agreement – SAFE; Policy Term 12-19-9/12." The letter states, "Attached please find the Knauff Insurance, Inc. (hereinafter "Knauff") Brokerage Service Agreement ("Agreement") for the Berkeley County School District

(SAFE) (hereinafter "Client")."  (Benfield Decl., Ex. F., p. 4 (ECF 23-6).)  It provides at

Section 2, entitled "COMPENSATION," as follows:

> In consideration of the services to be provide, Client agrees to pay Knauff an annual fee of $118,625 to be paid annually.  Knauff's compensation shall be net of any premium or surplus lines taxes, sales, use, excise, value added or similar taxes, which taxes shall be the responsibility of [sic], whether or not billed by Knauff.  This agreement includes the services provided on the following lines of insurance:  Directors and Officers Liability coverage."  (Hub Motion, Exhibit F.)

(Benfield Decl., Ex. F., p. 5 (ECF 23-6).)  Under Section 3, entitled "TERM," the letter

states,

> This Agreement shall be for multi-year periods commencing on December 19, 2009   unless earlier terminated by either party. Knauff's responsibilities for performing the services stated in this Agreement and for servicing Client's coverages or programs shall cease as of the date of termination.

(Benfield Decl., Ex. F., p. 5 (ECF 23-6).)  The letter states, "IN WITNESS WHEREOF,

the parties have executed this Agreement on the dated [sic] indicated below:."  (Benfield

Decl., Ex. F., p. 5 (ECF 23-6).)  The signature line of the letter bears Stanley Pokorney's

name for Knauff, without a signature or date, and no name or date for the District.

### *Exhibit G*

Exhibit G to the Benfield Declaration is a cover letter dated April 25, 2011 on

Knauff letterhead and addressed to Thomas at his home address at 1007 Island Crossing

Drive, Hanahan, South Carolina.  (Benfield Decl., Ex. G., p. 1 (ECF 23-7).)  The letter is

from Jana Pokorney, Senior Account Manager for Knauff, with a reference of "Various."

It states, "We are pleased to enclose the invoices which represent the annual premiums

you have discussed with Stan previously."  (Benfield Decl., Ex. G, p. 1 (ECF 23-7).)

Apparently attached to the letter is an invoice dated April 25, 2011 from Knauff to the

District for "Brokerage Service Fee for Multi-Year E&O Coverage – Annual Premium 5-1-11/12," in the amount of $70,000.00.  (Benfield Decl., Ex. G, p. 1 (ECF 23-7).) *The letter does not state that a contract or agreement is attached.*

Also within Exhibit G is a letter without letterhead dated May 1, 2011 to Thomas that states, "Attached please find the Knauff Insurance, Inc. (hereinafter "Knauff") Brokerage Service Agreement ("Agreement") for the Berkeley County School District (hereinafter "Client").  The letter lists services to be provided by Knauff, and then states as follows  under Section 2 entitled "COMPENSATION":

> In consideration of the services to be provide, Client agrees to pay Knauff an annual fee of $70,000 to be paid annually.  Knauff's compensation shall be net of any premium or surplus lines taxes, sales, use, excise, value added or similar taxes, which taxes shall be the responsibility of [sic], whether or not billed by Knauff.  This agreement includes the services provided on the following lines of insurance:  School Leaders Errors & Omissions Liability coverage."

(Benfield Decl., Ex. G (ECF 23-7).)  Under Section 3, entitled "TERM," the letter states:

> This Agreement shall be for multi-year periods commencing on June 20, 2011 unless earlier terminated by either party.  Knauff's responsibilities for performing the services stated in this Agreement and for servicing Client's coverages or programs shall cease as of the date of termination.

Finally, the letter states, "IN WITNESS WHEREOF, the parties have executed this agreement on the dated [sic] indicated below."  (Benfield Decl., Ex. G (ECF 23-7).)  The signature line of the letter bears Stanley Pokorney's name for Knauff, without a signature or date, and no name or date for the District.

None of the foregoing documents are valid or enforceable, and the Motion must be denied, for the reasons stated below.

## ARGUMENT

Pursuant to the Federal Arbitration Act,

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (2012). "While the Supreme Court has acknowledged a liberal policy favoring arbitration, . . . it has also consistently held that § 2 of the FAA reflects the fundamental principle that arbitration is a matter of contract." *Lorenzo v. Prime Comc'ns, L.P.*, 806 F.3d 777, 781 (4th Cir. 2015) (citations omitted); *Goodwin v. Branch Banking & Trust Co.*, 699 Fed. Appx. 274, 275 (4th Cir. 2017). "The burden of proving an agreement to arbitrate rests upon the party seeking arbitration." *Fastener Corp. of Am. v. Asheboro Elastics Corp.*, 1:12-CV-1296, 2013 U.S. Dist. LEXIS 88834, *6, (M.D.N.C. 2013) (citing *Silkworm Screen Printers, Inc. v. Abrams*, 978 F.2d 1256 (table), 1992 U.S. App. LEXIS 28843 (4th Cir. Nov. 4, 1992). In the Fourth Circuit, a litigant can compel arbitration under the FAA if the litigant can demonstrate: "(1) the existence of a dispute between the parties;  (2) a written agreement that includes an arbitration provision which purports to cover the dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate and foreign commerce, and (4) the failure, neglect, or refusal of the defendant to arbitrate the dispute." *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991).

In the instant matter, the Hub Defendants have failed to meet the second element - that a written agreement exists that includes an arbitration provision that purports to cover this dispute - because the "Agreements" attached to Benfield's Declaration are invalid under South Carolina law.

**Each of the "Agreements" Upon Which the Hub Defendants Rely Is Invalid.**

*The "Agreements" Are Invalid Under South Carolina Law.*

The Hub Defendants' entire argument in support of their Motion to Enforce Arbitration Agreements is premised on the faulty foundation that the arbitration agreements in question are valid. The Hub Defendants never address this issue, yet it is fatal to their Motion. As the United States Supreme Court has opined, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (holding that "even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate."). "Whether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation." *Adkins*, 303 F.3d at 501(citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *see also Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 699 (4th Cir. 2012) (holding that "the question of whether an enforceable arbitration agreement exists . . . is a matter of contract interpretation governed by state law."). "Arbitration agreements are required because parties are agreeing to waive their fundamental right to have a court decide the merits of their disputes." *Theo's Pizza, LLC v. Integrity Brands, LLC*, 2017 U.S. Dist. LEXIS 67331, *4 (D.S.C. 2017) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). "The court will not impute an agreement to arbitrate where [the] plaintiff has not explicitly agreed to do so." *Id.*

In South Carolina, the necessary elements for a contract are offer, acceptance, and valuable consideration. *Roberts v. Gaskins*, 327 S.C. 478, 486 S.E.2d 771, 773 (S.C. 1997); *Stanley Smith & Sons v. Limestone Coll.*, 283 S.C. 430, 434, 322 S.E.2d 474, 477 (Ct. App. 1984) ("The parties must manifest their mutual assent to all essential terms of the contract in order for an enforceable obligation to exist.").   Here, there was no acceptance of the arbitration clauses on the part of the District because, as stated in the Declaration, the District did not know the agreements at Exhibits D through G existed until the instant Motion was filed.  *See e.g., PCS Nitrogen Fertilizer, L.P. v. The Christy Refractories, LLC*, 225 F.3d 974, 980 (8th Cir. 2000) (mere acceptance of and payment for goods does not constitute acceptance of all the terms in the seller's counter-offer and create a contract that included an arbitration agreement); *Hobbs v. Tamko Bldg. Prods.*, 479 S.W.3d 147 (Mo. 2015) (plaintiff who purchased shingles from a seller did not accept the arbitration agreement in a warranty by merely purchasing the shingles where she had never received the agreement).   Furthermore, the purported agreements at Exhibits D through G bear nothing more than a blank signature line for the District under the term "Client."  A blank signature line below a pre-printed company name indicates no intent to sign and demonstrates a lack of mutual assent.  *See Baier v. Darden Restaurants*, 420 S.W.3d 733, 739 (Mo. Ct. App. 2014); *Bair v. Manor Care of Elizabethtown, PA, LLC*, 108 A.3d 94, 97, 2015 Pa. Super. LEXIS 15; *Pollin v. Mindy Mfg. Co.*, 236 A.2d 542 (Pa. Super. Ct. 1967).

In the instant case, there is no indication that the documents allegedly produced from the Hub Defendants' files were ever offered or that their terms were ever accepted. Among the six "Agreements" upon which the Hub Defendants rely for their Motion to

Enforce, two (Exhibits B and C) were for one-year terms and one of those was signed by an individual not authorized to act on behalf of the District. In any event, those Agreements are not relevant to this action in light of the amendment to Plaintiff's Complaint, which does not include the years during which those documents were supposedly in place.

Of the remaining four agreements, one (Exhibit D) contains handwritten notations made by an unknown person, relates to services for Workers' Compensation and Property/Casualty that were never provided, is undated and unsigned, covers multi-year terms in violation of the Procurement Code (as addressed *infra*), states that it was "proposed" as opposed to executed a year after the date on the letter, and there is no evidence that it was ever actually presented to or accepted by the District.

The remaining three "Agreements" (Exhibits E, F, and G) are unsigned and undated, cover multi-year terms in violation of the Procurement Code, relate solely to discrete insurance policies for the Directors and Officers of SAFE (E and F) and Errors and Omissions of the School Board (G) and no other policies, and the cover letters located in the Hub Defendants' files indicate that they were never sent to the District or, if they were sent at all, they were sent to Thomas at his home address and not to the District.

The District's records reflect no indication that the foregoing "Agreements" at Exhibits D through G were ever presented to or received by the District. (Declaration of Marcie Abrahamson, attached as Exhibit C.) The cover letters in the files with them did not make mention of them. Most likely, Pokorney printed them out and placed them in his file, without ever presenting them to the District. If they were presented, the

presentation was likely to Thomas at his home address, in accordance with the manner in which Defendants conducted their schemes to conceal their activities, and were never presented to the District.  And as addressed *infra,* Thomas could not agree on behalf of the District to Exhibits D through G to Benfield's Declaration without violating the State and District procurement codes.  Accordingly, there is no evidence that the formation requirements under South Carolina law have been met.  The Motion should therefore be denied.

### *The Arbitration Clauses Are Invalid Because They Violate the State and District Procurement Codes.*

A contract that violates the State's procurement code is void.  *Charleston Television, Inc. v. South Carolina Budget & Control Bd.*, 301 S.C. 468, 475, 392 S.E.2d 671, 675 (1990) (holding that a lease entered into by a governmental agency in contravention of the procurement code was null and void); *State v. Accela, Inc.*, 2012 SC CPO LEXIS 3 (January 20, 2012) (holding that the State, under S.C. Code § 11-35-4230, did not have authority to enter into an arbitration agreements with contractors).  Here, there is an obvious reason why the "Agreements" attached to Benfield's Declaration at Exhibits D through G are not signed by anyone.  This is because, under the Procurement Code, no one was authorized to enter into any such agreement.  At all times relevant herein, purchases by the District have been subject to the State's Procurement Code, which the District has adopted.  The agreements in question cover the provision of consultant services, which were required to be procured under the State and District Procurement Codes by the competitive bid process.  S.C. Code Regs. 19-445.2025.  Further, under the Procurement Code, the District is prohibited from entering into multi-year contracts unless "before the utilization" of such a contract it is "determined in

writing" that "estimated requirements cover the period of the contract and are reasonably firm and continuing and such a contract serves the best interests of the District by encouraging effective competition or otherwise promotes economies in procurement." SC Code § 11-35-2030(2) (2005 through present); BCSDPC, art. 5, § 2030(2).  And employees of the District are without authority to enter into agreements to arbitrate in any event.  *Accela, Inc., supra.*

Here, with respect to the "Agreements" included in Exhibits D through G of Benfield's Declaration, no such determination in writing was ever made, and the Procurement Code does not provide Thomas with authority to override its provisions or make exemptions or even to enter into arbitration clauses .  None of these documents at Exhibits D through G even have a typewritten indication of who supposedly assented to them.

Here, Knauff was familiar with the requirements of the Procurement Code, as it had lodged a protest relating to a previous invitation for bids for insurance services. (Settlement Agreement, attached as Exhibit D.)  "One who deals with a governmental entity  and its agents does so at his peril and is obliged to ascertain the restrictions and limitations placed on the governmental entity  and its agents by statutes of the state and the Constitution." *See Accela, supra* (citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S. Ct. 1 (1947) (holding anyone contracting with the federal government assumes the risk of accurately ascertaining the limits of the government agent's statutory authority) (Cited by the South Carolina Supreme Court in *Unisys Corp. v. S.C. Budget & Control Bd. Div. of Gen. Servs.*, 346 S.C. 158, 170, 551 S.E.2d 263, 270 (2001) as being in accord with its holding that "contracts formed pursuant to the Procurement  Code are

deemed to incorporate the applicable statutory provisions and such provisions shall prevail. ").

No one, not Thomas or any other District employee, that the authority to bind the District to these arbitration agreements. (Declaration of Marcie Abrahamson, attached as Exhibit C.) Because Thomas had no authority to enter into any contract for consulting services in violation of the Procurement Code and State statute, the arbitration agreements upon which the Hub Defendants rely are void.

### *The Arbitration Clauses Are Null and Void Because They Were Induced By Fraud.*

The Supreme Court has counseled "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2" of the FAA. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). The FAA permits federal courts to adjudicate claims of "fraud in the inducement of the arbitration clause itself" because such claims "g[o] to the 'making' of the agreement to arbitrate" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 355 (2011). Here, the District was unaware of the letter "Agreements" attached to Benfield's Declaration, and they were void because they were in violation of the foregoing procurement codes. But to the extent that anyone other than Thomas was aware of them, they were induced by fraud by the Insurance Defendants and Thomas, and the arbitration provisions are therefore void. The arbitration clauses were included in the agreements to protect the Insurance Defendants as a part of their schemes with Thomas to defraud the District and prevent it from litigating its claims against them. Notably, the documents at Exhibits E through G bear dates during the time period – 2007 through 2016 – that federal and state authorities have proven, and the Amended Complaint alleges, that

Thomas and the Insurance Defendants engaged in their fraudulent schemes. These Defendants should not be permitted to enjoy the benefit of clauses embedded in agreements that were placed there for fraudulent purposes. Under the circumstances of this case, the Court should determine that they are void and cannot be enforced as the result of fraudulent inducement.

### The Arbitration Clauses Are Unenforceable Because Defendants' Actions As Alleged in the Complaint Were Illegal, Outrageous, and Fraudulent.

Similarly, because the Defendants' actions as the District alleges in the Complaint were illegal, outrageous, and fraudulent, the Court should refuse to enforce the arbitration clauses. In *Partain v. Upstate Automotive Group*, 386 S.C. 488, 689 S.E.2d 602 (2010), *reh'g denied*, 2010 S.C. LEXIS 79 (Mar. 17, 2010), the Court found that an arbitration provision did not apply to a tort claim premised on an alleged "bait and switch" in a consumer transaction. The court agreed with the plaintiff's argument that even if his claim were encompassed by the arbitration clause, the clause did not apply because the defendant's alleged actions constituted "illegal and outrageous acts" that were unforeseeable. Similarly, in *Aiken v. World Finance Corp.*, 373 S.C. 144, 644 S.E.2d 705 (2007), *cert. denied*, 552 U.S. 991 (2007), the Court held that a consumer was not bound by an arbitration clause in loan documents when the consumer was damaged by the intentional tort of identity theft conducted by the lender's employees. The Court found that this outrageous tort, although factually related to the parties' contract, was legally distinct from their contractual relationship. The theft and misuse of the plaintiff's personal information was conduct that the plaintiff could not have foreseen when doing business with the lender. As such, the plaintiff could not have intended to submit claims arising out of the theft to arbitration.

Likewise, here, the District could not have foreseen that Thomas and Stanley Pokorney would engage in the illegal and outrageous acts of fraud, conversion, embezzlement, and theft that are alleged in the Amended Complaint. The arbitration clauses are not, therefore, enforceable. As the District has discovered since learning of Thomas' activities, the relationship between Thomas and the Insurance Defendants was that of an illegal scheme to defraud the District. Even if properly formed, the arbitration agreements were created at the time when Knauff and Stanley Pokorney were bribing and providing kickbacks to Thomas in exchange for insurance business. They are the result of a fraud on the District, an innocent party. Now, the parties responsible for the fraudulent scheme seeks to enforce it the illegal agreement to arbitrate.

In accordance with the foregoing authorities, the Court should not reward these schemers by compelling the District to submit to arbitration. *See Janvey v. Alguire*, 847 F.3d 231, 249-251 (Fifth Circuit 2017) (Higganbotham, concurring) (opining that the inherent need for privacy in a Ponzi scheme rendered an arbitration clause an "instrument of criminal enterprise" and an "instrument of fraud" on the part of the company orchestrating it, and therefore the company's receiver could not be compelled to arbitrate his case on behalf of creditors under the clause). The Hub Defendants inserted the arbitration clause into Agreements to limit their liability for fraud and punitive damages with respect to the ongoing scheme. To the extent Thomas agreed to it, he did so for his own benefit, not for the benefit of the District. As in *Janvey*, including an arbitration clause in the contracts, worked to the Insurance Defendants' advantage and was an instrument of their criminal enterprise, particularly considering that Knauff was always seeking to obtain additional business from other school districts.

***Any Agreements Between Thomas And The Insurance Defendants To Arbitrate Disputes Cannot Bind The District Because Thomas Was Committing Fraud for His Own Benefit In His Dealings With Knauff.***

The Hub Defendants seek to bind the District based on agreements to arbitrate that were allegedly entered into between them and Thomas. However, "[f]or purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person." *Mauldin Furniture Galleries, Inc. v. Branch Banking & Trust Co*., No. 6:10-240-TMC, 2012 U.S. Dist. LEXIS 121140 (Cain, J.) (citing Restatement (Third) of Agency § 5.04; *White v. FDIC*, 122 F.2d 770, 776 (4th Cir. 1941) ("[T]he personal interest of a director adverse to that of the corporation will prevent notice to him being deemed notice to the corporation . . . ."); *Wight v. BankAmerica Corp*., 219 F.3d 79, 87 (2d Cir. 2000) ("[M]anagement misconduct will not be imputed to the corporation if the officer acted entirely in his own interests and adversely to the interests of the corporation . . . . the theory is that 'where an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it.'"); *First Nat'l Bank of Sikeston v. Transamerica Ins. Co*., 514 F.2d 981, 986 (8th Cir. 1975) ("When the employer, officer or director's interest is adverse to the corporation, his knowledge is not imputed to it.").

Here, as alleged in the Amended Complaint, Thomas engaged in multiple acts of fraud in concert with the Insurance Defendants so that he could obtain kickbacks. He

was committing fraud for his own benefit and, as such, was acting outside the scope of his agency for the District.  Under these circumstances, he did not have authority to bind the District to an arbitration clause.  The Motion must, therefore, be denied.

### The Agreements At Exhibits D Through G Relate To Only Limited Areas of Coverage.

The Hub Defendants misrepresent to the Court that the agreements "require that *any* dispute concerning the relationship between Knauff and the District be submitted to arbitration"  (MTE, p. 6.)  The arbitration provisions in the invalid contracts state that "all disputes, claims or controversies *relating to this Agreement or services provided*"…..  shall be submitted to arbitration."  Each of the letters in question relate solely to finite types of insurance coverage and services provided solely with respect to those policies.  Exhibit D relates solely to the District's Property and Casualty and Workers Compensation insurance programs with the Insurance Reserve Fund and the School Board Trust, respectively; Exhibit E relates solely to Directors and Officers Liability Coverage for SAFE; Exhibit F again relates solely to Directors and Officers Liability Coverage for SAFE; and Exhibit G relates solely to School Leaders Errors & Omissions Liability Coverage.  The Complaint alleges tortious conduct relating to many other types of insurance coverage over many other years that were not related in any way to the invalid contracts.  Thus, the claim that these invalid agreements require the all of the District's claims relating to the relationship between Knauff and the District must be submitted to arbitration is simply false.  Indeed, the vast majority of the claims made against the Insurance Defendants are not related to these areas of coverage.

Moreover, the arbitration clauses purport to restrict the parties' rights to punitive damages.  It must be remembered that the District's "representative" in dealing with

Knauff has been convicted of fraud and embezzlement relating to his relationship with the Insurance Defendants. It would indeed be an anomaly of the law if two actors engaged in fraud were permitted to reach an agreement to prohibit the defrauded entity from recovering punitive damages against them. The Hub Defendants do not (because they cannot) name the person within the District who entered into the Agreements. Regardless, no person within the District had the authority to agree to arbitration or to the limitation of punitive damages. (See Declaration of Marcie Abrahamson, attached as Exhibit C.) Such would be void as against public policy because it would act as a prospective waiver of federal statutory rights under RICO, which allows for treble damages. *See Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 334-35 (4th Cir. 2017) (holding that an arbitration agreement in a payday loan between the borrower and lender, which was wholly owned by tribe, was invalid as a matter of public policy when its choice of law provision stated that tribal law applied since that provision acted as a prospective waiver of federal and state statutory rights).

### *The District Does Not Seek To Enforce The Knauff Agreements.*

The Hub Defendants assert that Plaintiff is seeking to enforce these contracts and cannot, therefore, avoid enforcement of the arbitration provisions in them. The District did not make such a claim, simply because it did not know that these documents existed. In any event, in its Amended Complaint, the District does not make a claim for breach of contract. This argument is therefore without merit.

### *The Arbitration Clauses in the "Agreements" Do Not Require Arbitrators to Determine Arbitrability.*

Because no agreements were formed, as stated above, the documents attached to the Benfield Declaration are void and unenforceable. This is a question of state law, and

the Hub Defendants have presented no authority to the contrary.  The Hub Defendants do assert that the question of arbitrability is to be decided by the arbitrators.  They make this claim because the arbitration clauses in the documents make reference to the FAA.  They rely on the Fourth Circuit's decision in *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 530 (4ᵗʰ Cir. 2017) for this argument.  However, the Fourth Circuit made clear that it was the specific provision relating to arbitrability in the arbitration agreement in question that determined the outcome.  As the Court stated, "Importantly, [the arbitration agreement] also included a provision stating that "[n]otwithstanding any choice of law provision in this Agreement, the parties agree that the Federal Arbitration Act [("FAA")], 9 U.S.C. §§ 1-15, *not state law, shall govern the arbitrability of all disputes under this Agreement"* (the "FAA clause").  *Id.* (emphasis added).  Here, the clauses in question contain no such statement addressing arbitrability.   The Hub Defendants' argument that the question of arbitrability should be decided by arbitrators is therefore baseless.  *See Thomas v. Santander Consumer USA, Inc.*, No. 0:15-4980-CMC-PJG, 2016 U.S. Dist. LEXIS 143437, *4 (D.S.C. 2016) (noting that "when a question of arbitrability arises, the district court, not the arbitrator, decides whether a matter should be resolved through arbitration.") (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299-301 (2010); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942-44 (1995); *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 651 (1986).

## CONCLUSION

For the foregoing reasons, Berkeley County School District, by counsel, respectfully requests that this Court DENY the Motion to Enforce Arbitration

Agreements filed herein by Defendants Hub International Limited and Hub International

Midwest Limited.

                                                 **SMYTH WHITLEY, LLC**


                                                 s/Joshua S. Whitley_____
                                                 Joshua S. Whitley
                                                 SC Federal Bar No.: 10829
                                                 126 Seven Farms Drive
                                                 First Citizens Plaza, Suite 150
                                                 Charleston, South Carolina 29492
                                                 843.606.5635 Office
                                                 843.654.4095 Facsimile
                                                 jwhitley@smythwhitley.com

                                                 Jeffrey A. Breit
                                               Virginia State Bar No.: 18876
                                               BREIT DRESCHER IMPREVENTO, P.C.
                                               600 22nd Street, Suite 402
                                               Virginia Beach, Virginia 23451
                                               757.670.3888 Office
                                               757.670.3939 Facsimile
                                               Jeffrey@breit.law
                                               *Pro Hac Vice*

                                               *Counsel for Berkeley County School*
                                               *District*

Charleston, South Carolina
March 19, 2018