**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

**BERKELEY COUNTY SCHOOL**
**DISTRICT,**

               Plaintiff**,**

**v.**                            **CIVIL ACTION NO. 2:18-cv-00151-DCN**

**HUB INTERNATIONAL LIMITED,**
**HUB INTERNATIONAL MIDWEST LIMITED,**
**KNAUFF INSURANCE AGENCY, INC.,**
**STANLEY J. POKORNEY,**
**SCOTT POKORNEY, and**
**BRANTLEY THOMAS,**

               Defendants.

**AMENDED COMPLAINT**

COMES NOW Plaintiff, the Berkeley County School District, by counsel, and for its Amended Complaint against Defendants, states as follows:

**INTRODUCTION**

This case arises out of a series of insidious schemes hatched by Defendants Hub International Limited, Hub International Midwest Limited ("Hub"); Knauff Insurance Agency, Inc. ("Knauff"); Stanley J. Pokorney ("Pokorney"); and Scott Pokorney ("Scott Pokorney") (hereinafter the "Insurance Defendants"), in concert with Defendant Brantley Thomas ("Thomas"), the former Chief Financial Officer of the Berkeley County School District (the "District"), to defraud the District and its children out of tens of millions of taxpayer dollars over the course of many years.   Thomas and the Insurance Defendants fully concealed the schemes from the District, and they were not discovered until after February 6, 2017, when officials from the Federal Bureau of Investigation ("FBI") and

Wells Fargo Bank met with officials of the District and informed them that Thomas – who served as the District's Chief Financial Officer and had worked for the District since 1993 - was under federal investigation for misappropriation of public funds. The District terminated Thomas' employment the next day. Since that time, the District has learned that over a period of many years, Thomas engaged in a pervasive scheme of corruption, in which he embezzled and misappropriated District funds, demanded and accepted multiple illegal kickbacks, and exposed the District to exorbitant fees and losses that have cost the taxpayers of Berkeley County tens of millions of dollars.  It was not until the February 2017 meeting with the FBI that Thomas' schemes to enrich himself at the expense of the District began to come to light.

Among the Thomas' myriad schemes that the District unearthed after the February 2017 meeting with the FBI were those hatched by Thomas in concert with Hub; Hub's predecessor, Knauff; and Pokorney, who served as an officer in both corporations. Pokorney had served as the District's insurance consultant and broker since at least 1993. During this period, and at least since 2005, Thomas, Pokorney, and other agents of Knauff and Hub conspired and engaged in multiple schemes in which Thomas helped the Insurance Defendants obtain the District's insurance business for consulting and conducting insurance reviews, in exchange for which they paid Thomas illegal kickbacks in the form of cash, expensive hotel accommodations and dinners, and elaborate spa treatments.  The Insurance Defendants were eager allies with Thomas, and they were more than willing to breach their fiduciary duties to the District and engage in fraud to garner and maintain the District's insurance business.

As the District's insurance consultants, the Insurance Defendants were charged with fiduciary duties of loyalty and good faith, which required them to use their office and expertise to provide prudent counsel to the District, and to advise against the purchase of unnecessary and duplicative insurance policies. Instead, they breached their fiduciary responsibilities and defrauded the District, in exchange for access to millions of dollars in public funds, thereby depriving the District and the taxpayers of Berkeley County of the honest services of its Chief Financial Officer. With Thomas' loyal assistance, secured by a long series of illegal kickbacks, the Insurance Defendants repeatedly and secretly breached their duties to the District by advising the District to purchase insurance policies that Defendants knew were excessive and not necessary to protect the District from risk, and charging sham broker's and consulting fees for management of insurance and insurance reviews.

Thomas is now being prosecuted for his participation in the schemes with Defendants Hub, Knauff, and Pokorney to defraud the District. On December 7, 2017, the United States Attorney for the District of South Carolina filed an Information in which it charged Thomas with ten counts of Wire Fraud arising out the illegal kickbacks he received from an insurance agent. The Information, detailed below, charges that between 2010 and 2016, Thomas received illegal kickbacks from an insurance agency in the amount of $32,000.00 in increments of $2,000.00. Thomas has admitted to and has plead guilty to the charges in the Information. Upon information and belief, that insurance company is Hub, and the employee who made the illegal payments is Pokorney.

As alleged herein, however, the conspiracy between the Insurance Defendants and Thomas and the kickbacks paid by the Insurance Defendants to Thomas began long before 2010. For instance, **Thomas has also been indicted on multiple counts of Embezzlement by a South Carolina Grand Jury relating to other nefarious acts committed by him while he was the District's CFO.** Among the charges listed in the Indictment is a count for embezzlement of approximately $22,700.00 in public school funds which asserts that on November 29, 2007, Thomas deliberately caused the Berkeley County School District to overpay a vendor, and then had the vendor send a refund of the overpayment to his home address, at which time Thomas converted the funds to his personal use. Upon information and belief, the vendor to which the charge refers is Knauff/Hub, and Pokorney was the Knauff/Hub employee who deliberately sent the refund to Thomas' home address.

As detailed herein, the Insurance Defendants' position of trust as the District's insurance consultants, coupled with their kickbacks to Thomas, provided them with perfect cover for their predatory practices. Under the guise of helping the District protect itself from risk and loss of property, the Insurance Defendants, with Thomas' assistance, were able to shroud themselves in a cloak of virtue for years. The veil now has been lifted to expose years of insidious opportunism, with unbridled greed as the Insurance Defendants' true motivator. At a time when resources for public education are scarce and educators are overworked and underpaid, these Defendants intentionally and willfully defrauded the District and its children of precious funds that could have been used to hire new teachers, purchase supplies and equipment, and improve facilities. Through this action, the District seeks compensatory, treble, and punitive damages, along with

attorneys' fees and costs, for the tortious conduct of these fiduciaries, who lined their pockets at the expense of the children of Berkeley County for many years.

## PARTIES

1.  Plaintiff, Berkeley County School District, is a body politic and corporate of the State of South Carolina within the meaning of S.C. Code Ann. § 59-17-10, and in that capacity is authorized to bring this action.

2.  At times relevant herein, Knauff was a North Carolina corporation with its principal offices located at 1001 Moorehead Square Drive, Suite 400, Charlotte, North Carolina 28203, and operated as an insurance agency and brokerage firm.  Knauff provided insurance brokerage and consulting services to the District from 2001 to 2012.

3.  Defendant Hub International Limited is an international insurance brokerage firm incorporated in Delaware with its principal office located at 300 North LaSalle Street, Chicago, Illinois.  Hub International Limited includes in excess of 400 integrated brokerages across North America.  Hub International Limited is not licensed by the South Carolina Department of Insurance to conduct insurance business in South Carolina and is not registered to do business in South Carolina.

4.  Defendant Hub International Midwest Limited is an insurance brokerage firm affiliated with Hub International Limited.  Hub International Midwest Limited is an Indiana corporation with its principal office located at 55 E. Jackson Boulevard, Floor 14A, Chicago, Illinois 60604-4466.  Hub International Midwest Limited is licensed to conduct insurance business in South Carolina by the South Carolina Department of Insurance and is registered to do business in South Carolina.

5.  Hub International Limited and Hub International Midwest Limited are referred to

collectively herein as "Hub."

6.      Hub International Midwest Limited acquired Knauff in 2012.   According to Articles of Merger filed with the North Carolina Secretary of State, the two entities merged on December 31, 2012, and Hub International Midwest Limited became the surviving entity.   Thereafter, from 2012 to the present, Hub has provided insurance brokerage and consulting services to the District.   Upon information and belief, Hub has also provided, and continues to provide, insurance brokerage and consulting services to a number of other school districts in South Carolina, including, but not limited to, school districts in Newberry County; Spartanburg County; Edgefield County; Oconee County; Fairfield County; Greenville County; Cabarrus County; Clarendon County; Kershaw County; Anderson County; Union County; and Lancaster County.

7.      Upon information and belief, Stanley Pokorney ("Pokorney") is, and at all times relevant herein has been, a citizen of North Carolina residing in Charlotte, North Carolina. From 2012 to 2017, Pokorney was the Senior Vice President of Hub International Southeast located at 1001 Morehead Square Drive, Suite 400, Charlotte, North Carolina  28203.  Before Hub acquired Knauff, Pokorney was a Senior Vice President with Knauff and provided brokerage services to the District since at least 1993.

8.      Upon information and belief, Scott Pokorney ("Scott Pokorney") is, and at all times relevant herein has been, a citizen of North Carolina residing in Charlotte, North Carolina.  Scott Pokorney is, and at all times relevant herein has been, an employee of Hub, serving as a Commercial Sales Executive at Hub's offices located at 1001 Morehead Square Drive, Suite 400, Charlotte, North Carolina  28203.  Scott Pokorney is Stanley J. Pokorney's son.

9.     Defendant Hub is directly and vicariously liable for all of the torts alleged herein against Knauff, Pokorney, and Scott Pokorney.

10.    Defendants Hub, Knauff, Pokorney, and Scott Pokorney are referred to herein collectively as the "Insurance Defendants."

11.    Defendant Brantley Thomas ("Thomas") was the Comptroller, Executive Director of Finance, and eventually the Chief Financial Officer of the BCSD from 1993 through February 7, 2017.  Thomas is a resident of Berkeley County, South Carolina.  All of Thomas' wrongs, as alleged herein, were adverse to the interests of his principal, the District.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§ 1961, 1962, 1964, 1965 and 28 U.S.C. §§ 1331 and 1367. This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965(a), (b) and (d), and its general equitable jurisdiction.

13.    Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) because Defendants transact business in this District. In addition, venue is proper pursuant to 28 U.S.C. § 1391(b) because defendant Thomas resides in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  In accordance with Local Civ. Rule 3:01(B) (DSC), counsel for Plaintiff endorses and certifies that this case is assignable to the Charleston Division of the United States District Court for the District of South Carolina.

## FACTUAL BACKGROUND

14.     The District first became aware that it had suffered injuries as a result of the actions of the Defendants as alleged herein after February 6, 2017, when officials from the Federal Bureau of Investigation ("FBI") and Wells Fargo Bank met with officials of the District and informed them that Thomas was under federal investigation for misappropriation of public funds.

15.     The District terminated Thomas' employment the next day.  Since that time, upon investigation, the District learned that over a period of many years, Thomas engaged in a pervasive scheme of corruption, in which he embezzled and misappropriated public funds.

16.     Among the myriad fraudulent schemes that the District unearthed after the February 2017 meeting with the FBI were those hatched by Thomas in concert with Hub; Hub's predecessor, Knauff; and Pokorney, who served as an officer in both corporations.

17.     Thomas and the Insurance Defendants went to great lengths to conceal their conduct, and were able to keep their activities hidden by communicating via personal contact and the use of Thomas' home mailing address and personal email address.

### *Federal Information*

18.     On December 7, 2017, the United States Attorney for the District of South Carolina issued an Information in which it charged Thomas with ten counts of Wire Fraud in violation of 18 U.S.C. §§ 1343 and 1346.  (Information, attached hereto as **Exhibit A**.)

19.     The Information charges that "beginning in or about March, 2010, and continuing until in or about November 2016, the defendants, BRANTLEY DENMARK THOMAS

III and others knowingly and willfully devised and intended to devise, and participated in, a scheme to defraud the [District] and the citizens of Berkeley County by depriving them of their intangible right to BRANTLEY DENMARK THOMAS III's honest services as the [District's] Chief Financial Officer." (**Exhibit A, p. 5**.) Thomas, as the District's CFO, was involved in obtaining insurance policies and selecting who would broker those contracts. The Information charges that in his position as the District's CFO, Thomas "steered BCSD insurance policy purchases through a broker employee and accepted cash kickbacks from that employee." (**Exhibit A, pp. 5-6**.) By doing so, the Information charges, Thomas deprived the citizens of Berkeley Count of Thomas' honest services. *Id.*

20.    The Information charges that it was the purpose of the scheme for Thomas to use his official influence and position as the District's CFO to enrich himself by steering insurance contracts and business and accepting cash payments, or kickbacks, paid by an insurance broker employee. (**Exhibit A, p. 6**.)

21.    It was a part of the scheme, according to the Information, to defraud that kickbacks were paid to Thomas by personal check, which Thomas deposited into his personal account. The checks would often contain information on a "memo" line and would indicate the money was intended as a personal gift, when in fact the purpose was as a kickback to Thomas for steering insurance policies and business to the insurance company. It was a part of the scheme to defraud that Thomas received approximately 16 checks of $2,000.00 each, for a total of $32,000.00 as kickbacks. (**Exhibit A, p. 6**.)

22.    For the purpose of executing and attempting to execute the scheme, according to the Information, Thomas transmitted and caused to be transmitted by means of wire and

radio communication in interstate commerce, the below writings, signs, signals, pictures, and sounds, among others, all made payable to Thomas:

| Count | Check Date | Amount |
|-------|-----------|--------|
| 11 | 2/15/2013 | $2,000 |
| 12 | 5/20/2013 | $2,000 |
| 13 | 10/2/2013 | $2,000 |
| 14 | 3/12/2014 | $2,000 |
| 15 | 12/4/2014 | $2,000 |
| 16 | 3/24/2015 | $2,000 |
| 17 | 7/25/2015 | $2,000 |
| 18 | 10/20/2015 | $2,000 |
| 19 | 5/23/2016 | $2,000 |
| 20 | 11/8/2016 | $2,000 |

23.     Upon information and belief, the unnamed insurance broker described in the Information is Hub, and the unnamed insurance broker employee is Defendant Pokorney.

24.     Thomas has entered a plea of guilty to all of the foregoing federal charges against him.

25.     The Federal Information was limited in time to the period between 2010 and 2016.   However, since at least 2005, Thomas and the Insurance Defendants engaged in multiple illegal schemes pursuant to which the Insurance Defendants paid kickbacks to Thomas in exchange for his assistance in the Insurance Defendants' efforts to procure or maintain the District's insurance business.

*State Indictment*

26.     On November 15, 2017, a South Carolina grand jury handed down a four-count Indictment charging Thomas with embezzlement in violation of S.C. Code Ann. § 16-13-210.[1]  (Information, attached as **Exhibit B**.)

_____

[1] A South Carolina grand jury handed down a Superseding Indictment for Embezzlement (Ten Counts) in violation of S.C. Code Ann. § 16-13-210, and Forgery (One Count) in violation of  S.C. Code Ann. § 16-13-10, against Thomas on October 17, 2017.

27.    In Count III of the Indictment, the Grand Jury charged that on or about November 29, 2007, while Thomas was responsible for the safekeeping, transfer and disbursement of public funds," he "did embezzle and convert to his own use ten thousand dollars or more ($10,000) of those public funds with the intention to defraud" the District.

28.    The Grand Jury charged that, on that date, Thomas "did convert to his personal use approximately $22,700.00 of public school funds, by deliberately causing the Berkeley County School District to overpay a vendor, and then having the vendor send a refund of the overpayment to his home address, upon which the funds were converted to his personal use." (**Exhibit B**, p. 3.)

29.    Thomas' conduct, the Grand Jury charged, was "in violation of section 16-13-210 of the South Carolina Code of Laws, as amended," involved "public corruption arising out of or in connection with a crime involving public corruption," and such conduct was not "authorized by law." (**Exhibit B**, pp. 3-4.)

30.    Upon information and belief, the vendor to which the Grand Jury refers in Count III of its Indictment is Defendant Knauff, which was acquired by Defendant Hub in 2012. Thus, as the Grand Jury charged, on November 15, 2017, Thomas caused the District to overpay Knauff/Hub in the amount of $22,500.00, and Knauff/Hub knowingly refunded the overpayment directly to Thomas, who converted it to his personal use in violation of section 16-13-210 of the South Carolina Code of Laws**.**

31.    Upon information and belief, Pokorney was the Knauff/Hub employee who refunded the overpayment directly to Thomas so that he could convert it to his personal use, and this refund was a kickback to Thomas in exchange for Thomas' assistance in maintaining the insurance relationship between Knauff/Hub and/or steering new

insurance business to Knauff/Hub.

32.    Thomas has agreed to enter a plea of guilty to this and all other charges against him.

*Excessive Premiums and Fees for Unnecessary and/or Duplicative Insurance Policies*

33.    At all times relevant herein, Pokorney, in his position with Knauff and Hub as the District's insurance broker or consultant, recommended various insurance policies to the District which Defendants knew were unnecessary and prohibitively expensive.

34.    In its Insurance Proposals, Hub represented that it was "committed to providing [the District] with the best available insurance brokerage service."  (See Hub Proposal of Insurance, 2014-2015, attached as **Exhibit C**.)

35.    Hub represented that, as the District's insurance consultant or broker, it would "act as [the District's] trusted partner," "look for creative, cost-effective methods for treating risk," "keep [the District] informed of changes occurring in the insurance marketplace," "act as [the District's] advisor and advocate," and "represent [the District] in the marketplace in the most informed, effective, and professional manner possible." *Id.*

36.    In those proposals, Hub also stated that, "insurance should not be purchased for small exposures since the cost is prohibitive and may use premium dollars you need to cover your major exposures," thereby representing that it would only recommend insurance policies that were in the best interests of the District.  (**Exhibit C**.)

37.    At all times relevant herein, the District has maintained an occurrence-based general tort liability policy with the South Carolina Insurance Reserve Fund ("IRF"), as well as property and casualty insurance through the IRF, which have always been *more*

than sufficient to cover all of the District's liability and property insurance needs.

38.     The IRF is a Division of the South Carolina State Fiscal Accountability Authority, and reports to the five-member board through the Office of the Executive Director. The State Fiscal Accountability Authority is authorized and required to provide insurance to governmental entities pursuant to S.C. Code §§ 1-11-140; 10-7-10 through 10-7-40; 10-7-120; 10-17-130; 15-78-10 through 15-78-150; 59-67-710; 59-67-790; 1-11-147; 11-9-75; and 38-13-190.

39.     Section 10-7-40 of the Code of South Carolina specifically requires that, "[a]ll insurance of public school buildings and on the contents thereof, whether such buildings are held and operated under the general school laws or laws applicable to special school districts only, shall be carried by the State Fiscal Accountability Authority."  S.C. Code § 10-7-40.

40.     The IRF functions as a governmental insurance operation with the mission to provide insurance specifically designed to meet the needs of governmental entities at the lowest possible cost. The IRF operates like an insurance company, by issuing policies, collecting premiums (based in consultation with actuaries), and by paying claims from the accumulated premiums in accordance with the terms and conditions of the insurance policies it has issued.

41.     All premiums received by the IRF are deposited with the Office of the State Treasurer where the funds are maintained as the IRF Trust Account. By statutory requirement, these funds are to be used to pay claims and operating expenses of the IRF. The Office of the State Treasurer is responsible for investing these funds.

42.     The IRF uses no agents, brokers, or advertising, and does not actively solicit accounts. The lack of a profit motive and the lack of acquisition expenses such as agents' commissions, along with the use of the investment income in rate determination allows the IRF to maintain the lowest possible rate structure.

43.     The IRF offers, and the District has, throughout the years, purchased the following lines of insurance through the IRF:

| | |
|---|---|
| Liability Insurance: | Automobile Liability |
| | School Bus Liability |
| | General Tort Liability |
| | Medical Professional Liability |
| Property Insurance: | "All Risk" Coverage on Buildings and Contents |
| | Builders' Risk |
| | Data Processing Equipment and Media |
| | Inland Marine |

44.     As the District's insurance consultants, the Insurance Defendants recommended, and the District, through Thomas, purchased myriad commercial insurance policies, including the following:

   a.  Builder's Risk Policies;
   b.  Student Accident Policies;
   c.  Crime – Excess Crime Policies;
   d.  Cyber Policies;
   e.  Excess General Liability and Umbrella Policies;
   f.  Directors and Officers Liability Policies for the nonprofit organization Securing Assets for Education ("SAFE"), which operates to benefit the BCSD;
   g.  Inland Marine Policies, including terrorism coverage; and
   h.  Errors and Omissions coverage for School Board members.

(**Exhibit C**.)

45.     At all times relevant herein, Defendants were aware that the District had sufficient insurance coverage for liability and property through the IRF.

46.     Despite their duty to the District to provide sound insurance advice and their representation that they were acting as the District's advisor and advocate, the Insurance Defendants advised the District to purchase various forms of insurance that they knew were unnecessary, as the risks in question were either negligible or non-existent or already covered by insurance procured by the District through the IRF or insurance was available to the District through the IRF for much less.

47.     The Insurance Defendants also conducted costly "reviews" of the District's insurance policies not brokered by Defendants, including a review of the District's workers' compensation coverage, for which they charged hefty consultant's fees.

48.     During the period from 2005 to 2012, the District paid premiums for the insurance policies purchased through Knauff in the amount of **$3,374,267.00**.  Knauff charged consulting and broker's fees to the District during that period in the amount of **$1,586,273.65.**  Knauff thus charged fees in the amount of **47** percent of the premiums paid during that period.  (Knauff Vendor Report, attached as **Exhibit D**.)

49.     For the period from 2012 through 2017, after Hub's acquisition of Knauff,  the District paid premiums on policies purchased through Hub in the amount of **$3,425,698.50.**  Hub charged the District **$1,408,038.00** in consulting and broker's fees during that period.  Hub thus enjoyed fees during that period in the amount of  **41** percent of the premiums paid.  (Hub Vendor Report, attached as **Exhibit E**.)

50.     Thus, the total premiums paid to the Insurance Defendants from 2005 through 2017 amounted to **$6,799,956.50**, and the broker's fees charged by the Insurance Defendants during that period totaled **$2,994,311.65.**  Thus, for the period from 2005 through 2017, the Insurance Defendants were paid broker's fees in the amount of **44**

percent of the premiums paid.  (**Exhibit E**.)

51.    As alleged herein, all of the foregoing premiums and fees were the result of Defendants' fraud, conspiracy with Thomas, and breaches of their fiduciary duties. Defendants' tortious activities thus cost the District **$9,794,277.15** in excessive premiums and consultant's fees.

52.    All of these premiums and fees charged on insurance policies were unnecessary or could have been purchased from the IRF at a lower premium and without incurring a broker's or consultant's fee.

53.    Despite their duties to the District to act in its best interests, and the excessive fees paid to the Insurance Defendants for their expertise as insurance consultants, the Insurance Defendants made no effort to lower the District's insurance costs and, instead, recommended costly duplicative policies so that they could charge outrageous fees associated with such policies.

54.    The loss runs over the period of time during which the Insurance Defendants served as the District's insurance consultant would have demonstrated to any experienced insurance consultant, acting in good faith and in the District's best interests, that the District was expending millions of dollars of its precious resources needlessly to insure itself against non-existent, or nominal, risk.  Still, the Insurance Defendants continued to advise the District to renew the policies year after year so that they could charge their exorbitant fees.

55.    By contrast, the loss runs for the general liability and property and casualty policies the District has purchased from the IRF demonstrate that the District has actively relied upon those policies.  From 2011 through 2017, the District has paid the IRF

premiums of $16,739,321.53, and the claims incurred total $4,569,511.67 during that period. (IRF Loss Runs, attached as **Exhibit F**.)

56.    In addition, with Thomas' assistance, the Insurance Defendants charged the District excessive fees for reviewing the District's workers' compensation and property policies.

57.    Pokorney regularly represented to his school district clients that he was saving them money on premiums (**Exhibit G**, attached), when in fact he was selling them unnecessary and expensive insurance policies, for which Hub charged excessive consulting fees.

58.    As Pokorney stated in his January 14, 2014 email to his school district client, "THE MOST DIFFICULT PART OF OUR PROCESS IS TO – FIND A CFO/DISTRICT THAT IS WILLING TO SIDE-STEP POLITICS FOR THIS KIND OF IMPROVEMENT!"    (**Exhibit G**.)    In other words, selling public school districts superfluous insurance policies is not easy.    In the case of the BCSD, it required the payment of kickbacks to the District's CFO.

59.    Despite their duty to act in the best interests of the District, in engaging in their coverage "reviews," Defendants failed to properly audit the District's records for insurance needs, including property insurance, and instead served as the District's consultant and broker only for purposes of collecting premiums and fees, and to kick back payments to Thomas for awarding business to them.

### Bribes and Kickbacks to Thomas

60.    Defendants were able to carry out and conceal their schemes as aforesaid by establishing and maintaining a close relationship with Thomas, and by communicating

with him and sending fee invoices through mail sent to his home address and emails sent to his personal email account, and by paying kickbacks to him, without the knowledge of the District.  (See Letter from Hub dated December 20, 2016, attached as **Exhibit H**.)

61.    The Insurance Defendants knew that Thomas was an active participant in the scheme to defraud the District, and was willing to assist Defendants in procuring and maintaining the District's insurance business and in conducting expensive and unnecessary insurance reviews in exchange for personal bribes and kickbacks at the expense of the District.

62.    With Thomas, the Insurance Defendants hatched a scheme by which the Insurance Defendants would advise the District to purchase new insurance policies, renew existing policies, and engage in insurance reviews;   the Insurance Defendants would charge exorbitant consultant's or broker's fees related to the insurance policies recommended or reviews purportedly conducted and send the invoices directly to Thomas; Thomas would assist the Insurance Defendants and ensure that such policies were purchased or renewed and that the Insurance Defendants were paid for insurance reviews and sham consulting fees; and Thomas would receive kickbacks in exchange for his assistance in the form of cash, expensive trips, hotel rooms, dinners, and spa services.

63.    In an effort to continue to enjoy both the commissions they received from insurers and the consultant's and/or broker's fees they received from the District, the Insurance Defendants continued to bribe Thomas and provide kickbacks to him from the fees and commissions they received.

64.    The Insurance Defendants' conduct was in direct violation of the State Ethics Code, which provides, at Section 8-13-705, as follows:

(A)  A person may not, directly or indirectly, give, offer, or promise anything of value to a public official, public member, or public employee with the intent to:

(1)  influence the discharge of a public official's, public member's, or public employee's official responsibilities;
(2)  influence a public official, public member, or public employee to commit, aid in committing, collude in, or allow fraud on a governmental entity; or
(3)  induce a public official, public member, or public employee to perform or fail to perform an act in violation of the public official's, public member's, or public employee's official responsibilities.

65.    Thomas accepted bribes and conspired with Pokorney to bind the District to insurance policies that were unnecessary and prohibitively expensive, allowing the Insurance Defendants to collect exorbitant broker's fees on those policies from the District and commissions from insurers.

66.    Through their schemes, Pokorney and Thomas conspired to fleece the District of tens of millions of dollars in consulting and broker's fees and insurance premiums.

67.    Also as a part of their conspiracy, Pokorney used Thomas as a reference to convince other school districts to procure insurance through Knauff and Hub, for which Thomas was rewarded with kickbacks.  (See emails dated June 12, 2013 between Pokorney and Thomas (entitled "Got—Milk"), attached as **Exhibit I**.)

68.    At all times relevant, Knauff and Hub ratified and approved of the actions of their agent, Pokorney, as described herein.

### *The Insurance Defendants' Receipt of Commissions from Insurers and Broker's Fees from the District on the Same Policies*

69.    In its Proposal of Insurance, Hub specifically stated that Hub would not receive any fees from the District on policies for which Hub received a commission from the insurance company issuing those policies without disclosing that information to the

District before charging the fees.  (**Exhibit C**.)

70.    In previous proposals, the Insurance Defendants also represented that they were not receiving commissions from insurers on policies on which they charged the District brokers' fees.

71.    Under South Carolina insurance law, broker's fees are required to be disclosed and must be reasonable.

72.    The Insurance Defendants were "insurance brokers" under South Carolina law, which is defined as "a property and casualty insurance producer licensed by the director or his designee who……."sells, solicits, or negotiates insurance on behalf of an insured" or who "takes or transmits other than for himself an application for insurance or a policy of insurance to or from an insured…"  S.C. Code Ann. § 38-45-10.

73.    Pursuant to S.C. Code Ann. § 38-45-160, "No policy fee may be charged by a broker unless it is a reasonable fee, it is made part of the contract, and the broker's premium tax rate is paid upon the policy fee. If for any reason the director or his designee disapproves the placement or the insurer ultimately refuses to write the risk, the broker shall immediately refund the full policy fee to the policyholder."  *Id.*

74.    Thus, a broker's receipt of a fee from the insured and a commission from an insurance company is not permitted by law without full disclosure to the client, and the fee charged, if disclosed, must be reasonable.

75.    Despite this, at the same time the Insurance Defendants were receiving commissions from insurers for having sold policies to the District, they were receiving exorbitant "consultant's fees" and "broker's fees" from the District, without disclosing that information to the District beforehand, creating a violation of statute as well as a

conflict of interest about which the District should have been informed.

### *Builder's Risk Insurance*

76.     Following voter approval in November 2012, the District was permitted to issue $198 million in bonds for purposes of building new schools in the District.

77.     On February 13, 2013, Pokorney approached Thomas to sell the District Builder's Risk insurance for the projects to be constructed.   (See email chain between Thomas, Pokorney, and later between Thomas and Connie Meyers and others, beginning on February 13, 2013 and extending through May 1, 2013, attached as **Exhibit J**.)

78.     Two days after Pokorney's email, on February 15, 2013, Pokorney wrote a personal check to Thomas in the amount of $2,000.00, which Thomas admits was a kickback.  (See Information, **Exhibit A**, p. 6.)

79.     The District had purchased Builder's Risk insurance in the past from the IRF; however, that insurance did not cover the *contractor*; instead, it only covered the District.

80.     Builder's Risk insurance that provides coverage to contractors is ordinarily purchased by contractors, and this had been the District's practice in the past.

81.     Emails during this period reveal that Thomas was insistent upon the District covering the contractors' risk for the referendum projects, despite disapproval from the District's Superintendent and questions raised by the District's Capital Projects Manager, and claimed that providing the insurance to the contractors would be cheaper than allowing them to purchase it themselves.  (**Exhibit J**.)   Upon informing Pokorney of the Superintendent's resistance to the District providing builder's risk insurance to the contractors on the referendum projects, Pokorney expressed his concern that Thomas might be exposing the insurance schemes they had hatched.  In an email dated February

21, 2013 to Thomas' home email address, Pokorney stated:

> If I don't get something (indication) very, very (MIND BOGGLING) strong – and since your "HIGHER UPS" are pointed that direction – and for **YOUR BEST INTEREST AND PROTECTION** ---Okay to let the contractor – do.

*Id.* (emphasis in original).)

82.     Despite this, Pokorney and Thomas determined that the District would purchase the insurance, after which Thomas received another check, dated May 20, 2013, from Pokorney in the amount of $2,000.00, which he admits was a kickback.    (See Information, **Exhibit A**, p. 6.)

83.     The purchase of Builder's Risk insurance through Pokorney was far more expensive than it would have been if the contractors had purchased it for themselves. From 2013 through 2016, the District paid the following premiums for Builder's Risk insurance:

|  |  |
|---|---|
| 2013-2014 | $249,269.00 |
| 2014-2015 | 444,879.00 |
| 2015-2016 | 112,759.00 |
| 2016-2017 | 75,251.00 |

**(Exhibit E**.)

84.     In addition, Hub charged the following consultant's fees for the  builder's risk policies for the period from 2013-2017:

|  |  |
|---|---|
| 2013-2014 | $50,000.00 |
| 2014-2015 | $50,000.00 |
| 2015-2016 | $50,000.00 |

                    2016-2017              $85,000

**(Exhibit E.)**

85.     The Builder's Risk insurance recommended by the Insurance Defendants for the referendum projects thus cost the District a total of $1,109,529.00.

86.     In Hub's Client Management Service Fee Agreement for Builder's Risk, which states it is for "consulting services," Hub agreed to provide a "dedicated service team to coordinate customized service plan and respond to [the BCSD's] insurance needs" and to provide an "annual summary/review of loss experience," and an "annual review of renewal coverage."  (Client Management Service Fee Agreement, 2016-2017, attached as **Exhibit K**.)

87.     An experienced insurance consultant acting in the best interests of its client would know that the premiums and fees being charged for Builder's Risk insurance to the BCSD from 2013 through 2017 were far more expensive than such coverage would have been if the contractors had procured the coverage themselves, and the loss runs demonstrated this over the years.

88.     Still, the Insurance Defendants advised the District to purchase the coverage, and continued to advise the District to renew it from 2013 through 2017.

89.     To date, the District must continue to purchase costly Builders' Risk insurance for projects under construction due to the scheme the Insurance Defendants set up because the cost cannot be reverted to be borne by the contractors at this post-bid stage of the projects.

90.     Defendants knew that builder's risk coverage for the District could be purchased from the IRF, and that coverage for the contractors was ordinarily purchased by the

contractors, without the exorbitant consulting fees charged.

91.    Hub rewarded Thomas for his assistance in steering the District toward Builder's Risk insurance procured through Hub by providing Thomas with illegal kickbacks.

92.    One striking example of the excessive nature of the premiums charged, and the complete failure of Defendants to act in the District's best interests despite the enormous consulting fees charged, occurred in 2015 on the Philip Simmons High School project, which was one of the schools built pursuant to the referendum.

93.    In 2015, the District's Interim Director of Facilities, Gene Sides, stated that he believed that the premium for builder's risk insurance on the Philip Simmons project – which amounted to $488,000 – was too high.   Thereafter, by changing the elevation of the project, the premium was reduced to $224,007 - a savings of $264,166.  (See email from Hub dated November 3, 2015, attached as **Exhibit L**.)

94.    Oddly, Hub touted this premium reduction as an example of how it "always strive[s] to do [its] best for" the District.  (**Exhibit L.**)  What it actually evinced was the opposite - that despite charging hundreds of thousands of dollars in consultation fees for builder's risk insurance, Hub was making no effort to minimize the District's insurance premiums, and it took a comment by a District employee to Hub to ultimately reduce the premium by more than half.  The consultant thus proved not to be the expert; rather the client/insured provided the expert guidance, which wholly evidences the folly of Hub's consultant fees

### *Student Accident Insurance*

95.    Until 2015, the District's broker for Student Accident insurance was The Young

Group in Raleigh, North Carolina.  Originally, the coverage was purchased from Sentry Insurance Company, and then moved to AIG/Bollinger in 2012.

96.      Such coverage, provided by a school district, is highly unusual and prohibitively expensive, and an insurance consultant receiving hundreds of thousands of dollars to act in the best interests of a school district such as Berkeley would have advised against it.

97.      In March of 2015, Hub and Thomas hatched a scheme for Hub to become the District's exclusive broker for Student Accident insurance coverage, in exchange for which Thomas would receive kickbacks from Hub.

98.      On March 16, 2015, Defendant Scott Pokorney, an agent with Hub and Stanley Pokorney's son, sent an email to Thomas requesting information relating to the Student Accident coverage.  **(Exhibit M.)**

99.      On March 24, 2015, Stanley Pokorney wrote a check to Thomas in the amount of $2,000.00 in exchange for Thomas' assistance in steering the Student Accident coverage to Hub, which Thomas has admitted was a kickback.  (*See* **Exhibit A**.)

100.    On April 15, 2015, Thomas and Scott Pokorney had dinner together during a meeting of the SCASBO in Myrtle Beach, South Carolina, during which they devised the plan to oust Young as the BCSD's broker for Student Accident coverage.  Scott Pokorney had invited Thomas to be Hub's guest at the dinner, for which Hub footed the bill. (**Exhibit N**.)

101.    Thereafter, on July 16, 2015, Thomas wrote to The Young Group (in a letter drafted by Scott Pokorney) stating that Scott Pokorney of Hub would be the exclusive broker of record for the Student Accident Insurance policy renewing on August 1, 2015. (**Exhibit O.)**

102.    Nine days later, on July 25, 2015, Stanley Pokorney wrote Thomas a check in the amount of $2,000.00 in exchange for Thomas' having transferred the District's Student Accident coverage from The Young Group to Hub, which Thomas has admitted was a kickback.  (*See* **Exhibit A**, p. 6.)

103.    For the 2014-2015 school year, the Bollinger Student Accident policy procured through The Young Group cost the District a premium of $312,572.00.  There was no separate broker's fee paid to The Young Group.

104.    After Hub became the District's "exclusive broker of record" for the 2015-2016 school year, the gross premium for Student Accident insurance rose to $366,902.00. Upon information and belief, Thomas then caused Hub to be paid $45,000.00 for management of this coverage alone.  (**Exhibit E**.)

105.    The premium for Student Accident coverage remained at $366,902.00 for the year 2015-2016, and the Insurance Defendants again charged the District with a management fee of $45,000.00.  The premium rose to $388,087.00 for the year 2016-2017, and the Insurance Defendants again charged the District $45,000.00 in management fees. (**Exhibit E**.)

106.    The loss runs for the Student Accident policy would have demonstrated to any experienced insurance consultant, acting in good faith and in the District's best interests, that the Student Accident policies were unnecessary.

107.    An experienced insurance consultant acting in the best interests of a school district such as the BCSD would have advised against the purchase and maintenance of a Student Accident policy.  The sole purpose behind the Insurance Defendants' advice to maintain the coverage was to charge exorbitant management fees, which were secured

through illegal kickbacks paid to Thomas.

***Directors and Officers Liability Policies for SAFE***

108.    From 2010 to 2017, the Insurance Defendants were the brokers for the Directors and Officers insurance coverage ("D&O") for Securing Assets for Education ("SAFE") a charitable organization that supports the District.

109.    The premium for this coverage was $65,000 per year for 2010-2011 through 2014-2015, and decreased to **$32,131.00** for years 2015-2016 through 2016-2017. (**Exhibits D and E.**)

110.    For each year from 2010-2011 through 2016-2017, the Insurance Defendants have charged the District a consultant's fee for this coverage in the amount of **$118,625.00**, for a total of **$830,375.00** in fees alone for that period. *Id.*

111.    During the life of the D&O/SAFE policy, there has not been even one claim asserted against the Directors and Officers of SAFE, or any claim against the D&O/SAFE insurance policies, and the Insurance Defendants have provided absolutely no services associated with these policies to justify their predatory fees.

112.    Notwithstanding their duty as insurance consultants to act in the District's best interests, and despite their knowledge that the insurance was unnecessary, the Insurance Defendants have never advised against the retention of the D&O/SAFE policies, and instead have continued to charge and collect exorbitant fees on the policy.

113.    Tellingly, in the wake of the FBI indictment, Scott Pokorney is now recommending to the District that it cancel this coverage because it is unnecessary. Moreover, he claims he has repeatedly advised the District of the same but, upon request, refused to produce the prior correspondence to the District regarding this revisionist

recommendation.

114.    Because Defendants' fees for the D&O/SAFE policies were so clearly outrageous, Thomas hid them among the other fees paid to the Insurance Defendants, describing them as payments for "Builder's Risk" so that they would be paid out of the referendum fund over which Thomas had complete control.

115.    The consultant's fees charged for the D&O/SAFE policies were predatory in nature, and it was a breach of fiduciary duty for Defendants, who were duty-bound to the District to act in good faith and in the best interests of the District, to charge such an exorbitant fee for the policies, particularly policies that required no servicing.

116.    The predatory and excessive consultant's fees for the D&O/SAFE policies were the result of a conspiracy between Thomas and Pokorney to defraud the District and SAFE, for which Hub paid Thomas kickbacks in the form of cash, expensive trips, dinners, and spa services.

*Excess Insurance, Crime Insurance, and Cyber Insurance Policies*

117.    Upon the advice of the Insurance Defendants, the District, through Thomas, procured Excess Insurance coverage, despite sufficient coverage procured and available to it through the IRF, and despite the limitations placed on the District's liability exposure by the State Tort Claims Act.

118.    For the year 2010-2011, the District purchased excess general liability coverage from Great American Insurance, paying a premium of $20,000.00, with a separate broker's fee of $25,000.00.    That same year, upon the advice of the Insurance Defendants, the District purchased excess (umbrella) coverage from States Insurance for $69,535.00, with a separate broker's fee of $109,045.20.    Also in 2010-2011, upon the

advice of the Insurance Defendants, purchased a Crime Insurance policy through Liberty Mutual Insurance Company, with premium of $3,951.00, with a service fee of $790.20. Thomas renewed the coverage at the same rates and paying the same fee for 2011-2012. (**Exhibits D and E**.)

119.    In 2012-2013, upon the advice of the Insurance Defendants, the District renewed the Great American and States excess policies, with the premium for the Great American policy being $21,409.00, with a service fee to Defendants of $25,000.00.   The States Insurance premium rose to $75,611.00, with Defendants charging a service fee of $113,891.80.  The Crime Insurance policy's premium and Defendants' fees remained the same. *Id.*

120.    In April of 2013, the Insurance Defendants advised the District to purchase Cyber Insurance through the National Fire Insurance Company of Pittsburgh, Pennsylvania, another unnecessary policy insuring risks for which the District was already sufficiently covered, for the period from 2013-2014.  (**Exhibit P.**)

121.    The premium for this excessive coverage was $15,716.00, and the Insurance Defendants charged a consultant's fee of $3,143.20.   (**Exhibit E.**)

122.    Before recommending the Cyber Policy, the Insurance Defendants, despite their duty to act in the best interests of the District as the District's insurance consultants, did nothing to make certain that the District received the best quotes for this insurance coverage, nor did they make any recommendations to increase security to reduce the premiums for this coverage.

123.    On June 17, 2014, despite no claims having been incurred that were covered under the Cyber policy, the Insurance Defendants recommended, and Thomas readily

agreed to, an increase in the Cyber limits from $1 million to $2 million.  (Email chain between Thomas and Jan Pokorney dated June 16-17, 2014, attached as **Exhibit Q**.)

124.    The premium for the Cyber policy increased to $26,815.00 in 2014-2015, then to $27,586.00 in 2015-2016.    In 2016-2017, the premium charged was $24,233.00. (**Exhibit E**.)

125.    Despite being paid commissions by the insurance companies for these policies, the Insurance Defendants charged the District with broker's fees of $3,143.20 for 2013-2014; $5,363.00 for 2014-2015; $5,517.20 for 2015-2016; and $4,846.60 for 2016-2017.

126.    The premiums for the States Excess Policy, Liberty Mutual Crime Policy, and National Fire Insurance Cyber Policy, all of which were unnecessary, continued to rise over the period from 2013-2014 through 2016-2017, and totaled $675,090.00 for the period from 2010-2011 through 2016-2017.  (**Exhibit E**.)

127.    In addition, every year, from 2010-2011 through 2016-2017, the Insurance Defendants charged the District $114,682.00 in fees alone for the States Excess Policy, Liberty Mutual Crime Policy, and National Fire Insurance Cyber Policy, for a total of $802,774.00 in excessive fees for unnecessary insurance policies.  (**Exhibits D and E**.)

128.    Upon information and belief, there have been no losses paid on the foregoing excess policies or the Cyber Policy.  The only claim that has been made on the Crime Policy, ironically, was under the policy's employee dishonesty coverage for Thomas' illegal activities.

129.    These costly premiums for excessive and unnecessary coverage, and the exorbitant broker's fees charged, were the result of the secret conspiracy between Thomas and Pokorney to defraud the District, which allowed the Insurance Defendants to

charge the fees and provide Thomas with personal kickbacks.

130.    An experienced insurance consultant acting in the best interests of a district such as Berkeley would have recommended against purchasing this unnecessary and/or duplicative insurance coverage, or recommended discontinuing it, in light of the District's limited exposure.

*Inland Marine Insurance*

131.    Also upon the advice of the Insurance Defendants, the District has for years purchased and renewed Inland Marine Insurance covering movable equipment such as lawn mowers and golf carts.

132.    Such insurance was required to be purchased from the IRF pursuant to Section 10-7-40 of the South Carolina Code, which provides that, "[a]ll insurance of public school buildings and on the contents thereof, whether such buildings are held and operated under the general school laws or laws applicable to special school districts only, shall be carried by the State Fiscal Accountability Authority." S.C. Code § 10-7-40.

133.    The District had available to it a purported $53,000,000 in a reserve fund, which was more than sufficient to pay for lost or damaged lawn mowers or golf carts, and any experienced insurance consultant acting in the best interests of a district such as the BCSD would advise against wasting money to procure such insurance.

134.    Between the years 2013-2014 and 2016-2017, upon the advice of Pokorney and Hub, the District spent $114,902.00 in premiums on Inland Marine insurance.  (**Exhibit E**.)

135.    For the period between 2005-2006 and 2012-2013, upon the advice of the Insurance Defendants, the District spent $750,433.58 on Inland Marine coverage.

(**Exhibits D and E**.)

136.    Loss runs from 2006 through 2013 provided by the insurer show that there were a total of three claims under the Inland Marine policy during that seven-year period for a total of $8,494.27 in claims paid.  (See Great American Inland Marine Loss Runs, attached hereto as **Exhibit R**.)

137.    Loss runs from 2014 through 2017 provided by the insurer show that there were a total of three (3) claims during that period for a total of $13,618.00 claims paid.  (See Allianz Policy History Report, attached hereto as **Exhibit S**.)

138.    Through the Inland Marine policy, the District paid exorbitant rates for coverage of items such as golf carts and lawn mowers, for which the replacement cost would have been far less expensive than the premiums paid.

139.    Moreover, the District had agreed with the IRF to purchase all policies offered by the IRF or no policies at all.  Thus, the District should never have purchased Inland Marine insurance from a commercial provider.  If an Inland Marine policy was needed, the District should have purchased it from the IRF pursuant to the agreement between the IRF and the District, and it was required to be purchased from the IRF pursuant to Section 10-7-40 of the South Carolina Code.

140.    Defendants received commissions from the insurer for their placement of Inland Marine coverage, which they knew to be unnecessary and cost prohibitive.

141.    In addition, in August 2016, Defendants advised the District to include terrorism coverage within their Inland Marine coverage, despite their knowledge that the coverage was unnecessary, and in any event, fully covered under the District's policy with the IRF. In order to continue to receive kickbacks from the Insurance Defendants, Thomas readily

agreed to procure such coverage, and terrorism coverage was added to the District's Inland Marine policy. (**Exhibit T**.)

142. Any experienced insurance consultant, acting in the best interests of a school district such as the BCSD, would have advised against the purchase of Inland Marine insurance and terrorism coverage. Because the Insurance Defendants sought to continue their receipt of commissions from the insurer, they made no effort to engage in an audit or otherwise determine whether the coverage was necessary.

143. The procurement and continuation of the unnecessary Inland Marine and terrorism insurance was made possible due to the willingness of Thomas to purchase any policy recommended by Defendants in exchange for kickbacks from the Insurance Defendants.

*School Board Errors and Omissions Policy*

144. Upon the Insurance Defendants' advice, on July 14, 2005, the District purchased a School Board Errors and Omissions Liability policy (the "E&O policy") with a six-year extended reporting term and a premium of $69,370.00. (See **Exhibit D**.)

145. Also upon the Insurance Defendants' advice, the District renewed the policy in 2011 for another six-year term, for a premium of $75,000.00. (**See Exhibit D**.)

146. In 2010, the Insurance Defendants began charging the District with a broker's fee for the E&O policy at $70,000.00 per year. (**Exhibit D.**)

147. Thus, from 2010 through 2016, the District paid broker's fees for the School Board E&O policy in the amount of $350,000.00 on policies with premiums totaling $144,370.00.

148. Upon information and belief, there have been no claims paid under any of the

foregoing E&O policies since their inception.

149.    Defendants knew that an E&O policy was not necessary, yet they made no effort to advise against it and, instead, charged the District outrageous consulting fees from 2010 to 2016.

150.    With Thomas' assistance, the Insurance Defendants were able to avoid scrutiny of their excessive broker's fees on the E&O policy, for which the Insurance Defendants rewarded Thomas handsomely with kickbacks.

### *Workers' Compensation Review*

151.    For years, the District has purchased its workers' compensation coverage from the South Carolina School Boards Insurance Trust ("SCSBIT").

152.    In March of 2016, the Insurance Defendants sought to procure the District's workers' compensation business and, in furtherance of that effort, Pokorney conspired with Thomas to have the District engage in an unnecessary and costly analysis of the District's workers' compensation coverage.

153.    On March 14, 2016, Thomas wrote to Danny Deal, the Assistant Direct or the Workers' Compensation Section of the SCBIT, and stated that the District's "new Superintendent has asked us to have an independent review of all of our major insurance policies including P/C, Auto, student accident and Workers Comp and others." (Email to Deal, attached as **Exhibit U**.

154.    Thomas then sent an email to Stanley Pokorney dated March 14, 2016, wherein he informed Pokorney as follows:

> It was good to see Scott and Renee last week.  I think the girls went out Thursday.  I gave Danny a heads up Friday that the  email was coming. Maybe this year come up with a recommendation that we pursue for 17-18.  I also want to do P/C  I do not like IRF.

(Emails between Thomas and Pokorney dated March 14, 2016, attached as **Exhibit V**.)

Thomas and Pokorney were therefore conspiring for Hub to take over both the workers'

compensation policies and the property and casualty insurance purchased from the IRF,

so that Hub could charge excessive fees on the coverage and Thomas could receive even

more kickbacks from Hub.

155.    The "review" conducted by Hub was a ruse through which Pokorney hoped to

gain the District's business in exchange for bribes and kickbacks to Thomas.  Upon its

completion, the Insurance Defendants presented the District with an invoice in the

amount of $47,000.00 for the "analysis."  (See **Exhibit E**.)

156.    Later, on August 23, 2016, again in an effort to gain the District's workers'

compensation business, Pokorney hosted Thomas and the Risk Manager for the District

in Charlotte, where the Insurance Defendants bribed Thomas and Talbert by paying for

all of Thomas and Talbert's accommodations, including elaborate hotel rooms, dinners,

drinks, and spa services, all in violation of the State Ethics Act.  (See email chains

leading up to August 23, 2016, attached as **Exhibit W**.)

157.    The fully-accommodated trip to Charlotte, which was never reported, in violation

of the South Carolina Ethics Act, was an illegal bribe to Thomas and the Risk Manager,

and was the result of a conspiracy between Thomas and Pokorney in the Insurance

Defendants' efforts to gain the District's workers' compensation business and ultimately

fleece the District of additional excessive consultant's fees, with additional kickbacks to

Thomas.

*Knauff and Hub's Knowledge of the Actions of Their Agents.*

158.    Hub, and its predecessor, Knauff, knew or should have known that their agents, Pokorney (who was employed by Knauff and then Hub after the merger with Knauff) and Scott Pokorney (who was employed by Hub beginning in at least August of 2014), were engaged in the illegal, fraudulent, and unethical conduct as alleged herein.

159.    Despite their actual and constructive knowledge of the foregoing illegal, fraudulent, and unethical activities on the part of Pokorney and Scott Pokorney, Knauff and Hub continued to employ them and allowed those activities to continue until Thomas was indicted in 2017.

160.    Accordingly, Hub is directly and vicariously liable to the District for the damages sustained as a result of the actions of Pokorney and Scott Pokorney as alleged herein.

### CAUSES OF ACTION

### FOR A FIRST CAUSE OF ACTION
### VIOLATIONS OF THE RACKETEER INFLUENCED AND
### CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961, *et seq.*
### ("RICO")
### *All Defendants*

161.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

162.    The District is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

163.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and (d), including Thomas, who is sued herein in his individual capacity.

### *I. Pattern of Racketeering Activity*

164.    The following acts of racketeering began by at least 2007 and continued through at least 2016, and form a pattern of continuous and interrelated racketeering activity within the meaning of RICO.

165.    Defendants conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of, *inter alia,* more than two acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, as asserted in the Information filed by the United States Attorney for the District of South Carolina, the wire fraud charges to which Thomas has entered a plea of guilty, as well as violations of South Carolina bribery statutes.

166.    The foregoing predicate acts have the same or similar purposes (defrauding the District through payments to Thomas in exchange for steering insurance business to the Insurance Defendants), results (awarding insurance business to the Insurance Defendants or maintaining existing business in exchange for kickbacks and bribes), participants (Thomas and the Insurance Defendants), victims (the District and the children and taxpayers of Berkeley County, as well as other school districts throughout the state of South Carolina), and/or methods of commission (payments to Thomas by the Insurance Defendants by check, services, accommodations, meals, and/or travel as kickbacks or bribes).  They are interrelated by their distinguishing characteristics and are not isolated events.

167.    As part of this pattern, continuing over the course of years, by using, *inter alia*, the mails, private interstate carriers and interstate wire communications, the Defendants through their enterprise, defrauded the District continuously during the period between

2007 and 2016. In particular, without limitation, in violation of 18 U.S.C. §§ 1341 and 1343, Defendants employed the Postal Service and/or private or commercial interstate carriers and/or interstate wire communications to send their emails, letters, and invoices, to the District, and to Thomas, and to receive from the District the payment of fees and associated expenses.

### A.    Wire Fraud in Violation of 18 U.S.C. §§ 1343 and 1346.

168.    Beginning in or about 2007, and continuing until at least November, 2016, Thomas and the Insurance Defendants knowingly and willfully devised and intended to devise and participated in, a scheme to defraud the District and the citizens of Berkeley County.

169.    The Federal Information (Exhibit A) charges, and Thomas has admitted by his entry of a plea of guilty, that beginning in or about March, 2010, and continuing until in or about November, 2016, Thomas and others "knowingly and willfully devised and intended to devise, and participated in, a scheme to defraud the BCSD and the citizens of Berkeley County by depriving them of their intangible right to [Thomas'] honest services as [the District's] Chief Financial Officer."  (Exhibit A.)

170.    The "others" referred to in the Information are, upon information and belief, the Insurance Defendants.

171.    Thomas, as the District's Chief Financial Officer, was involved in obtaining insurance contracts and selecting who would broker those contracts.  Because of his position of trust, Thomas was involved with awarding insurance policy contracts and business to the Insurance Defendants.

172.    In  his position as the District's Chief Financial Officer, Thomas steered the District's insurance policy purchases and consulting services to the Insurance Defendants in exchange for which Thomas accepted kickbacks from the Insurance Defendants, in particular, Pokorney.

173.    The purpose of the scheme was to use Thomas' official influence and position as the District's Chief Financial Officer to enrich Thomas and the Insurance Defendants by Thomas' steering insurance business to the Insurance Defendants in return for cash payments, or kickbacks, paid by the Insurance Defendants.

174.    It was part of the scheme to defraud that kickbacks were paid to Thomas by personal check, which Thomas deposited in his personal account.  As a part of the scheme to defraud, Thomas, beginning in at least March, 2010, received approximately 16 checks of $2,000.00 each, described *infra*, for a total of $32,000.00 in kickbacks in the form of personal checks.

175.    On or about February 15, 2013, the Insurance Defendants transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce, a check in the amount of $2,000.00 made out to Thomas as a kickback for steering insurance business to the Insurance Defendants, which Thomas deposited in his personal account.

176.    On or about May 20, 2013, the Insurance Defendants transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce, a check in the amount of $2,000.00 made out to Thomas as a kickback for steering insurance business to the Insurance Defendants, which Thomas deposited in his personal account.

177.    On or about October 2, 2013, the Insurance Defendants transmitted and caused to

be transmitted by means of wire and radio communication in interstate commerce, a check in the amount of $2,000.00 made out to Thomas as a kickback for steering insurance business to the Insurance Defendants, which Thomas deposited in his personal account.

178.    On or about March 12, 2014, the Insurance Defendants transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce, a check in the amount of $2,000.00 made out to Thomas as a kickback for steering insurance business to the Insurance Defendants, which Thomas deposited in his personal account.

179.    On or about December 4, 2014, the Insurance Defendants transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce, a check in the amount of $2,000.00 made out to Thomas as a kickback for steering insurance business to the Insurance Defendants, which Thomas deposited in his personal account.

180.    On or about March 24, 2015, the Insurance Defendants transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce, a check in the amount of $2,000.00 made out to Thomas as a kickback for steering insurance business to the Insurance Defendants, which Thomas deposited in his personal account.

181.    On or about July 25, 2015, the Insurance Defendants transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce, a check in the amount of $2,000.00 made out to Thomas as a kickback for steering insurance business to the Insurance Defendants, which Thomas deposited in his personal account.

182.    On or about October 20, 2015, the Insurance Defendants transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce, a check in the amount of $2,000.00 made out to Thomas as a kickback for steering insurance business to the Insurance Defendants, which Thomas deposited in his personal account.

183.    On or about May 23, 2016, the Insurance Defendants transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce, a check in the amount of $2,000.00 made out to Thomas as a kickback for steering insurance business to the Insurance Defendants, which Thomas deposited in his personal account.

184.    On or about November 8, 2016, the Insurance Defendants transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce, a check in the amount of $2,000.00 made out to Thomas as a kickback for steering insurance business to the Insurance Defendants, which Thomas deposited in his personal account.

185.    The specific official acts taken by Thomas in exchange for bribes and kickbacks paid by the Insurance Defendants include, but are not limited to:

a. Committing the District to insurance polices brokered by the Insurance Defendants that Thomas and the Insurance Defendants knew were not needed and/or were exorbitantly expensive;

b. Steering the District's insurance business to the Insurance Defendants;

c. Committing the District to exorbitant broker's and consultant's fees paid to the Insurance Defendants;

d. Causing the issuance of payments to the Insurance Defendants for broker's and

consultant's fees, despite the Insurance Defendants' breach of their fiduciary duties to the District in their failure to act in the best interests of the District and provide sound insurance consultation;

e.   Committing the District to costly insurance reviews conducted by the Insurance Defendants which were unnecessary and/or produced no results favorable to the District; and

f.   Committing the District to costly insurance premiums and consulting fees paid to the Insurance Defendants without conducting any research, or having the Insurance Defendants conduct research, as to whether the policies and consulting fees were necessary and/or reasonable, and without conducting or reviewing loss run reports to determine whether such policies and fees were necessary and/or reasonable.

186.    Thomas and the Insurance Defendants engaged in a *quid pro quo*, inasmuch as they had specific intent to give or receive something of value in exchange for official acts.

187.    Thomas agreed to perform all of the foregoing acts at the time of the *quid pro quo*.

188.    Thomas understood that he was expected, as a result of the payments by the Insurance Defendants, to exercise particular kinds of influence connected with his office, i.e., steering all of the District's insurance business to the Insurance Defendants, as specific opportunities arose.

189.    Thomas and the Insurance Defendants engaged in a course of conduct of cash, favors, and gifts flowing to Thomas in exchange for a pattern of official actions favorable

to the Insurance Defendants.

190.    Thomas has entered a plea of guilty to Honest Services Wire Fraud in violation of 18 U.S.C. §§ 1343 and 1346 for his participation in the foregoing scheme, thereby admitting that he fraudulently deprived the District of his honest services by engaging in the scheme, and that he engaged in the scheme with others, who are, upon information and belief, the Insurance Defendants.

### B.    Mail Fraud in Violation of 18 U.S.C. §§ 1341 and 1346

191.    The foregoing acts also amount to mail fraud in violation of 18 U.S.C. § 1341, as Thomas and the Insurance Defendants knowingly caused the use of the mails for the purpose of executing their scheme or artifice to defraud, using Thomas' home mailing address to send kickbacks and bribes to him for the purpose of executing their scheme to defraud the District.

192.    In addition, as charged in Count III of the South Carolina grand jury's indictment handed down on November 15, 2017 (the "Indictment"), on or about November 29, 2007, while Thomas was responsible for the safekeeping, transfer, and disbursement of public funds, he embezzled and converted to his own use $22,700.00 of public school funds, by deliberately causing the District to overpay a vendor, and then having the vendor send a refund of the overpayment to his home address, upon which the funds were converted to his personal use.

193.    As charged in the Indictment, the foregoing was in violation of Section 16-13-210 of the South Carolina Code of Laws.  Thomas will enter a plea of guilty to the charge.

194.    The vendor to which Count III of the South Carolina Indictment refers is, upon

information and belief, Knauff/Hub, and the individual who refunded the overpayment to Thomas, by sending it in the mail to Thomas' home address, was Pokorney.

195.    The payment of $22,700.00 to Thomas was a bribe, paid to Thomas by the Insurance Defendants in exchange for his influence as the District's Chief Financial Officer in charge of procuring insurance policies for the District and determining who would be awarded such business.

196.    Thus, on November 29, 2007, Knauff/Hub and Pokorney engaged in a scheme with Thomas pursuant to which Knauff/Hub and Pokorney defrauded the District by overcharging it for premiums and/or consulting services and paid Thomas $22,700.00 out of the proceeds as a bribe and/or kickback.

197.    The specific official acts taken by Thomas in exchange for bribes and kickbacks paid by the Insurance Defendants include, but are not limited to:

    a.  Committing the District to insurance polices brokered by the Insurance Defendants that Thomas and the Insurance Defendants knew were not needed and/or were exorbitantly expensive;

    b.  Steering the District's insurance business to the Insurance Defendants;

    c.  Committing the District to exorbitant broker's and consultant's fees paid to the Insurance Defendants;

    d.  Causing the issuance of payments to the Insurance Defendants for broker's and consultant's fees, despite the Insurance Defendants' breach of their fiduciary duties to the District in their failure to act in the best interests of the District and provide sound insurance consultation;

    e.  Committing the District to costly insurance reviews conducted by the Insurance

Defendants which were unnecessary and/or produced no results favorable to the District; and

f.  Committing the District to costly insurance premiums and consulting fees paid to the Insurance Defendants without conducting any research, or having the Insurance Defendants conduct research, as to whether the policies and consulting fees were necessary and/or reasonable, and without conducting or reviewing loss run reports to determine whether such policies and fees were necessary and/or reasonable.

198.  Thomas and the Insurance Defendants engaged in a *quid pro quo*, inasmuch as they had specific intent to give or receive something of value in exchange for official acts.

199.  Thomas agreed to perform all of the foregoing acts at the time of the *quid pro quo*.

200.  Thomas understood that he was expected, as a result of the payments by the Insurance Defendants, to exercise particular kinds of influence connected with his office, i.e., steering all of the District's insurance business to the Insurance Defendants, as specific opportunities arose.

201.  Thomas and the Insurance Defendants engaged in a course of conduct of cash, favors, and gifts flowing to Thomas in exchange for a pattern of official actions favorable to the Insurance Defendants.

C.    *Bribery of Public Official in Violation of S.C. Code §§ 16-9-210 and 16-9-220.*

202.    The Insurance Defendants corruptly gave, offered, and promised to Thomas, after his appointment to public office, gifts and gratuities, in the form of cash (as alleged *supra*), accommodations, travel, meals, and services, with intent to influence his acts, opinions, decisions, and judgment on insurance matters that came before him in his official capacity as the Chief Financial Officer of the District, in violation of S.C. Code § 16-9-210.

203.    Violation of Section 16-9-210 is punishable by imprisonment in the State Penitentiary at hard labor not exceeding five years or by a fine not exceeding three thousand dollars and imprisonment in jail not exceeding one year.

204.    Thomas, the Chief Financial Officer of the District, corruptly accepted gifts and gratuities, in the form of cash, accommodations, travel, meals, and services, to do acts beneficial to Thomas under an agreement and/or understanding that his judgment would be given in favor of continued or additional business with the Insurance Defendants on insurance matters brought before him in his official capacity, in violation of S.C. Code § 16-9-220.

205.    Violation of Section 16-9-220 is punishable by imprisonment in the State Penitentiary at hard labor not exceeding ten years or by fine not exceeding five thousand dollars and imprisonment in jail not exceeding two years.

206.    In addition to the foregoing cash payments, which Thomas has admitted were kickbacks by entering his plea of guilty, Thomas received kickbacks from the Insurance Defendants in the form of meals, accommodations, services, and gifts, as alleged herein in exchange for exercising his influence to steer the District's insurance business to the

Insurance Defendants, including, but not limited to, the provision of meals, accommodations, services, and gifts to Thomas and the District's then Risk Manager in August 2016, all in an effort to obtain and/or maintain insurance business from the District and defraud the District.

207.    Defendants' violations of Sections 16-9-210 and 16-9-220 are predicate offenses amounting to racketeering activity pursuant to 18 USCS § 1961 (1) (A), as bribery chargeable under State law and punishable by imprisonment for more than one year.

## II.     Violation of 18 U.S.C. § 1962(c).

208.    The Insurance Defendants and Thomas combined and conspired to form an ongoing organization and "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), the purpose of which was to defraud the District and the taxpayers of Berkeley County out of tens of millions of dollars in unnecessary insurance premiums and sham consulting and broker's fees.

209.    Defendants' enterprise was an association in fact with an identifiable structure and with specific divisions of responsibility with respect to the efforts to defraud the District and the taxpayers of Berkeley County by conspiring and representing to the District that it needed certain insurance and insurance reviews, which it did not need, and failing to advise the District in accordance with their fiduciary duties, for the sole purpose of charging sham consulting fees payable to the Insurance Defendants, in exchange for which Thomas was rewarded with bribes and kickbacks from the Insurance Defendants.

210.    The enterprise engaged in, and its activities affected, interstate commerce, including the provision of brokerage and consulting services across state lines.  The Insurance Defendants are located in the State of North Carolina, and the District is

located in the State of South Carolina. The enterprise and its activities thereby affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

211.    Defendants conducted and participated in the conduct of the enterprise's illegal affairs knowingly, through a pattern of racketeering activity as set forth *supra*.

212.    Defendants' conduct violated 18 U.S.C. §§ 1962(c).

### III.  Violation of 18 U.S.C. § 1962(d)

213.    The Insurance Defendants' conduct, as set forth herein, was in concert with Thomas, and planned and pre-arranged with and known by each of the Defendants pursuant to the enterprise's common scheme to charge sham consulting fees for brokerage and insurance review; advise the District to procure unnecessary insurance coverage; engage in mail fraud; fraudulently conceal, obtain, and/or provide illegal kickbacks; and fraudulently conceal the conspiracy from the District.

214.    Defendants conspired to violate 18 U.S.C. §§ 1962(c) from at least 2007 through 2016.

215.    The Insurance Defendants and Thomas conspired with each other and others known and unknown to violate 18 U.S.C. § 1962 (c) as detailed at length above, and took the acts alleged herein, i.e., the payment of*, inter alia,* cash, services, meals, and accommodations in exchange for insurance business, in furtherance thereof.

216.    The Insurance Defendants and Thomas entered into agreements to commit the predicate acts as alleged *supra*, and knew that the acts were part of a part of a pattern of racketeering activity.

217.    The object of the conspiracy was to defraud the District of millions of dollars paid

to the Insurance Defendants, in exchange for which Thomas received bribes and kickbacks in the form of, *inter alia*, cash, services, meals, and accommodations.

218.    Defendants' conduct violated 18 U.S.C. § 1962(d).

219.    As a direct and proximate result of the foregoing conduct by Defendants, the Plaintiff has been damaged and suffered substantial injury within the meaning of 18 U.S.C. § 1964(c) as follows:

  a.  The amount paid to the Insurance Defendants for sham consulting and/or broker's fees in the amount of $2,994,311.65; and

  b.  The amount paid to the Insurance Defendants on premiums for unnecessary and excessive insurance policies purchased by the District upon the advice of Defendants for the sole purpose of collecting broker's fees in the amount of $6,799,956.50.

220.    Each Defendant is jointly and severally liable to the BCSD for the foregoing RICO violations, and treble damages and reasonable attorneys' fees are demanded in accordance with 18 U.S.C. § 1964(c).


## FOR A SECOND CAUSE OF ACTION
### FRAUD
### *All Defendants*

221.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

222.    The Insurance Defendants and Thomas made false representations of material fact

to, and fraudulently concealed material facts from, the BCSD by advising the BCSD to purchase insurance that Defendants knew was unnecessary, and which they knew was available to the District through the IRF at a much lower premium and without fees, for the sole purpose of collecting exorbitant advisor fees from the District.

223.    The Insurance Defendants and Thomas also made false representations of material fact to, and fraudulently concealed material facts from, the BCSD, by conspiring with one another and providing Thomas with bribes and kickbacks, in exchange for which Thomas assisted these Defendants in their efforts to procure and maintain the District's insurance business.

224.    The Insurance Defendants also made false representations of material fact to, and fraudulently concealed material facts from, the District, by conspiring with Thomas and providing him with bribes and kickbacks, in exchange for which Thomas permitted the Insurance Defendants to conduct expensive and unnecessary insurance reviews of workers' compensation and property insurance and ensured that Defendants received payment for such reviews.

225.    The Insurance Defendants also made false representations of material fact to, and fraudulently concealed material facts from, the District, by representing to the District that they were acting in the District's best interests in charging excessive fees for unnecessary insurance reviews and in recommending unnecessary insurance coverage.

226.    Defendants knew that the foregoing material facts were false, or recklessly disregarded their truth or falsity, or fraudulently concealed the truth from the District, with the intent that their representations and/or concealments be acted upon.

227.    The District had no knowledge of the falsity of the material facts misrepresented

and concealed by the Insurance Defendants and Thomas and relied upon them to its detriment and consequent and proximate injury.

228.    The Insurance Defendants' fraudulent activities were also in violation of S.C. Code Ann. § 38-43-190, which provides that an insurance producer who "knowingly procures the payment of a premium of insurance or the obligation for the payment of a premium of insurance by fraudulent representation is guilty of a misdemeanor and, upon conviction, must be fined in the discretion of the court or imprisoned not more than three years, or both." *Id.*

229.    Through their conduct as aforesaid, Defendants intended to harm the District by fleecing it of tens of millions of dollars, and their conduct did in fact harm the District, which paid tens of millions of dollars in unnecessary, duplicative premiums, and sham consulting fees.

230.    The damages sustained by the District as a result of fraud perpetrated by the Defendants are as follows:

a.    The amount paid to the Defendants for sham consulting and/or broker's fees in the amount of $2,994,311.65;

b.    The amount paid to the Defendants on premiums for unnecessary and excessive insurance policies purchased by the District upon the advice of Defendants for the sole purpose of collecting broker's fees in the amount of $6,799,956.50; and

c.    Punitive damages because

i.    The District's harm was the result of Defendants' willful, wanton and reckless conduct;

ii.    Defendants' conduct was intended to harm the District, which conduct did

2:18-cv-00151-DCN     Date Filed 03/19/18     Entry Number 36     Page 52 of 70

in fact harm the District;

    iii.   Defendant Thomas has pled guilty to and has been convicted of a felony arising out of the same act or course of conduct complained of by the District and that act or course of conduct is a proximate cause of the District's damages;

    iv.   Defendants' conduct was motivated primarily by unreasonable financial gain, and the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was known or approved by Pokorney, an officer of Defendants; and

    v.   Defendants' actions could subject Defendants to conviction of a felony and those acts and course of conduct are a proximate cause of the District's damages.

231.   Each Defendant is jointly and severally liable to the District for all of the acts of fraud alleged herein.

## FOR A THIRD CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### *All Defendants*

232.   Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

233.   The Insurance Defendants and Thomas made false representations of material fact to, and fraudulently concealed material facts from, the District by advising the District to purchase insurance that Defendants knew was unnecessary, and which they knew was

available to the District through the IRF at a much lower premium and without fees, for the sole purpose of collecting exorbitant advisor fees from the District.

234.    The Insurance Defendants and Thomas also made false representations of material fact to, and fraudulently concealed material facts from, the District, by conspiring with one another and providing Thomas with bribes and kickbacks, in exchange for which Thomas assisted these Defendants in their efforts to procure and maintain the District's insurance business.

235.    The Insurance Defendants also made false representations of material fact to, and fraudulently concealed material facts from, the District, by conspiring with Thomas and providing him with bribes and kickbacks, in exchange for which Thomas permitted the Insurance Defendants to conduct expensive and unnecessary insurance reviews of workers' compensation and property insurance and ensured that the Insurance Defendants received payment for such reviews.

236.    The Insurance Defendants also made false representations of material fact to, and fraudulently concealed material facts from, the District, by representing to the District that they were acting in the District's best interests in charging excessive fees for unnecessary insurance reviews and in recommending unnecessary insurance coverage.

237.    Defendants had pecuniary interests in making the foregoing false representations to the District.  The Insurance Defendants had a pecuniary interest in their receipt of their sham consultant's fees for unnecessary and excessive insurance coverage, and Thomas had a pecuniary interest in his receipt of bribes and kickbacks from the Insurance Defendants in exchange for his assistance in steering the District's insurance business to the Insurance Defendants.

238.    The Insurance Defendants owed a duty of care to the District as its insurance consultants and brokers to see that they communicated truthful information to the District.  Thomas also owed a duty of care to the District, as its Chief Financial Officer, to see that he communicated truthful information to the District.

239.    Defendants breached their duties to the District in failing to provide it with prudent advice that the District was over-insured.

240.    Defendants breached their duties to the District in failing to properly review the insurance products the District had purchased from the IRF which were more than sufficient to cover the District's insurance needs, and instead advising the District to purchase excessive insurance for the sole purpose of charging the District exorbitant consulting fees.

241.    Defendants breached their duties to the District by offering, delivering, and accepting bribes and kickbacks in an effort to maintain and gain additional insurance business from the District.

242.    The District justifiably relied on Defendants' representations that the recommended insurance policies and consulting fees were necessary and in the District's best interests.

243.    The District suffered pecuniary losses as the proximate result its reliance upon Defendants' representations, as follows:

    a.    The amount paid to the Insurance Defendants for sham consulting and/or broker's fees in the amount of  $2,994,311.65; and

    b.    The amount paid to the Insurance Defendants on premiums for unnecessary and excessive insurance policies purchased by the District upon the advice of

Defendants for the sole purpose of collecting broker's fees in the amount of $6,799,956.50.

244.    The District is also entitled to punitive damages because

    i.  The District's harm was the result of Defendants' willful, wanton and reckless conduct;

    ii.  Defendants' conduct was intended to harm the District, which conduct did in fact harm the District;

    iii.  Defendant Thomas has pled guilty to and has been convicted of a felony arising out of the same act or course of conduct complained of by the District and that act or course of conduct is a proximate cause of the District's damages;

    iv.  Defendants' conduct was motivated primarily by unreasonable financial gain, and the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was known or approved by Pokorney, an officer of Defendants; and

    v.  Defendants' actions could subject Defendants to conviction of a felony and those acts and course of conduct are a proximate cause of the District's damages.

245.    Each Defendant is jointly and severally liable to the District for their negligent misrepresentations to the District.

**FOR A FOURTH CAUSE OF ACTION**
**CIVIL CONSPIRACY**
***All Defendants***

246.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and

every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

247.    Defendants combined for the purpose of defrauding the District and causing the District special damage.

248.    Defendants Thomas and the Insurance Defendants conspired and agreed that the Insurance Defendants would advise the District that it required certain insurance, insurance reviews, and consulting services, which it did not, and further conspired to allow the Insurance Defendants to reap exorbitant broker and consultant's fees from the District.

249.    Defendants acted in furtherance of the conspiracy by having the District engage the Insurance Defendants to provide insurance consulting and brokerage services to the District at exorbitant prices in exchange for which Thomas received kickbacks in the form of cash, extravagant trips, massages and spa services, and expensive dinners.

250.    Through their conduct as aforesaid, Defendants intended to harm the District by fleecing it of tens of millions of dollars for their personal gain, and their conduct did in fact harm the District, which paid tens of millions of dollars in unnecessary, duplicative premiums and sham consulting fees.

251.    The District suffered special damage as the result of the conspiracy in the form of

    a.    The amount paid to the Insurance Defendants for sham consulting and/or broker's fees in the amount of  $2,994,311.65;

    b.    The amount paid to the Insurance Defendants on premiums for unnecessary and excessive insurance policies purchased by the District upon the advice of

Defendants for the sole purpose of collecting broker's fees in the amount of $6,799,956.50; and

c.   Punitive damages because

    i.   Defendants' conduct was intended to harm the District, which conduct did in fact harm the District;

    ii.   Defendants' conduct was motivated primarily by unreasonable financial gain, and the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was known or approved by Pokorney, an officer of Defendants; and

    iii.   Defendants' actions could subject Defendants to conviction of a felony and those acts and course of conduct are a proximate cause of the District's damages.

## FOR A FIFTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
### *All Defendants*

252.   Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

253.   The District imposed a special confidence in Defendants, so that these Defendants, in equity and good conscience, were bound to act in good faith and with due regard to the interests of the District, thereby giving rise to fiduciary relationships with the District.

254.   As the fiduciaries of the District, Defendants owed a clear duty to the District of

undivided loyalty, absolute faithfulness, and a duty to exercise due care and diligence with respect to their advice related to the purchase and management of the District's insurance needs.

255. With the fiduciary relationship assumed by Defendants also came the duties and obligations to keep the District informed of all facts pertinent to and materially affecting the District's insurance needs, and to exercise reasonable care, diligence, and prudence in the performance of their duties.

256. Defendants breached their fiduciary duties to the District by advising it to purchase and maintain insurance that was unnecessary and duplicative; charging exorbitant advisory fees for unnecessary and duplicative insurance policies; charging exorbitant advisory fees for sham insurance reviews; and conspiring to engage, and engaging, in a bribery and kickback scheme in an effort to maintain the business relationship, procure additional insurance business, and charge inflated and fraudulent consulting fees.

257. Through their conduct as aforesaid, Defendants intended to harm the District by fleecing it of tens of millions of dollars, and their conduct did in fact harm the District, which paid tens of millions of dollars in unnecessary, duplicative premiums and sham consulting fees.

258. As a direct and proximate result of Defendants' breaches of fiduciary duty, the District suffered the following damages:

a. The amount paid to the Insurance Defendants for sham consulting and/or broker's fees in the amount of $2,994,311.65;

b. The amount paid to the Insurance Defendants on premiums for unnecessary and

excessive insurance policies purchased by the District upon the advice of Defendants for the sole purpose of collecting broker's fees in the amount of $6,799,956.50; and

c.  Punitive damages because

    i.  The District's harm was the result of Defendants' willful, wanton and reckless conduct;

    ii.  Defendants' conduct was intended to harm the District, which conduct did in fact harm the District;

    iii.  Defendant Thomas has pled guilty to and has been convicted of a felony arising out of the same act or course of conduct complained of by the District and that act or course of conduct is a proximate cause of the District's damages;

    iv.  Defendants' conduct was motivated primarily by unreasonable financial gain, and the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was known or approved by Pokorney, an officer of Defendants; and

    v.  Defendants' actions could subject Defendants to conviction of a felony and those acts and course of conduct are a proximate cause of the District's damages.

259.  Each Defendant is jointly and severally liable to the District for their breaches of fiduciary duty.

**FOR A SIXTH CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
***All Defendants***

260.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

261.    The District imposed a special confidence in Defendants, so that these Defendants, in equity and good conscience, were bound to act in good faith and with due regard to the interests of the District, thereby giving rise to fiduciary relationships with the District.

262.    As the fiduciaries of the District, Defendants owed a clear duty to the District of undivided loyalty, absolute faithfulness, and a duty to exercise due care and diligence with respect to their advice related to the purchase and management of the District's insurance needs.

263.    With the fiduciary relationship assumed by Defendants also came the duties and obligations to keep the District informed of all facts pertinent to and materially affecting the District's insurance needs, and to exercise reasonable care, diligence, and prudence in the performance of their duties.

264.    Defendants breached their fiduciary duties to the District by advising it to purchase and maintain insurance that was unnecessary and duplicative; charging exorbitant advisory fees for unnecessary and duplicative insurance policies; charging exorbitant advisory fees for sham insurance reviews; and conspiring to engage, and engaging, in a bribery and kickback scheme in an effort to maintain the business relationship, procure additional insurance business, and charge inflated and fraudulent consulting fees.

265.    The Insurance Defendants knew that Thomas was in breach of his fiduciary duties to the District, and participated in his breach of duty, by offering and providing him with bribes and kickbacks in exchange for his assistance in steering the District's insurance business to the Insurance Defendants.

266.    Thomas knew that the Insurance Defendants were in breach of their fiduciary duties to the District, and participated in their breaches of duty, by accepting bribes and kickbacks in exchange for his assistance in steering the District's insurance business to the Insurance Defendants.

267.    As a direct and proximate result of Defendants' aiding and abetting breaches of fiduciary duty, the District suffered the following damages:

a.    The amount paid to the Insurance Defendants for sham consulting and/or broker's fees in the amount of $2,994,311.65;

b.    The amount paid to the Insurance Defendants on premiums for unnecessary and excessive insurance policies purchased by the District upon the advice of Defendants for the sole purpose of collecting broker's fees in the amount of $6,799,956.50; and

c.    Punitive damages because

    i.    The District's harm was the result of Defendants' willful, wanton and reckless conduct;

    ii.    Defendants' conduct was intended to harm the District, which conduct did in fact harm the District;

    iii.    Defendant Thomas has pled guilty to and has been convicted of a felony arising out of the same act or course of conduct complained of by the

District and that act or course of conduct is a proximate cause of the
District's damages;

    iv.  Defendants' conduct was motivated primarily by unreasonable financial
gain, and the unreasonably dangerous nature of the conduct, together with
the high likelihood of injury resulting from the conduct, was known or
approved by Pokorney, an officer of Defendants; and

    v.  Defendants' actions could subject Defendants to conviction of a felony
and those acts and course of conduct are a proximate cause of the
District's damages.

268.    Each Defendant is jointly and severally liable to the District for aiding and
abetting breaches of fiduciary duty.

**FOR A SEVENTH CAUSE OF ACTION**
**NEGLIGENCE**
*All Defendants*

269.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and
every allegation asserted in the preceding and following paragraphs, including each and
every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-
adopts and re-alleges each such allegation.

270.    As the District's insurance consultants, the Insurance Defendants represented that
they possessed  the degree of learning or skill ordinarily possessed by insurance
consultants in the localities where they rendered their services.

271.    As the District's Chief Financial Officer, Thomas represented that he possessed
the degree of learning or skill ordinarily possessed by chief financial officers for South
Carolina school districts.

272.    Defendants owed the District a duty to exercise reasonable care and diligence in the exercise of their skill in providing insurance brokerage and consulting services.

273.    Defendants breached their duties to the District in failing to provide it with prudent advice that the District was over-insured.

274.    Defendants breached their duties to the District in failing to properly review the insurance products the District had purchased from the IRF which were more than sufficient to cover the District's insurance needs, and instead advising the District to purchase excessive insurance for the sole purpose of charging the District with exorbitant consulting fees.

275.    Defendants breached their duty to the District by offering, delivering, and accepting bribes and kickbacks in an effort to maintain and gain additional insurance business from the District.

276.    As a direct and proximate result of the Defendants' negligence as aforesaid,  the District has been damaged in the amount of

   a.  The amount paid to the Insurance Defendants for sham consulting and/or broker's fees in the amount of $2,994,311.65; and

   b.  The amount paid to the Insurance Defendants on premiums for unnecessary and excessive insurance policies purchased by the District upon the advice of Defendants for the sole purpose of collecting broker's fees in the amount of $6,799,956.50.

277.    Each Defendant is jointly and severally liable to the District for their negligence as aforesaid.

**FOR AN EIGHTH CAUSE OF ACTION**

## NEGLIGENCE PER SE/VIOLATION OF STATUTE
### *The Insurance Defendants*

278.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

279.    By statute in South Carolina, an insurance producer who "knowingly procures the payment of a premium of insurance or the obligation for the payment of a premium of insurance by fraudulent representation is guilty of a misdemeanor and, upon conviction, must be fined in the discretion of the court or imprisoned not more than three years, or both." S.C. Code Ann. § 38-43-190.

280.    The Insurance Defendants knowingly procured the payment of premiums of insurance from the District by fraudulently misrepresenting the District's need for the insurance procured, fraudulently concealing their conspiracy with Thomas, and providing him with bribes and kickbacks, in exchange for which Thomas assisted Defendants in their efforts to procure and maintain the District's insurance business.

281.    Under South Carolina insurance law, an "insurance broker" is defined as "a property and casualty insurance producer licensed by the director or his designee who……."sells, solicits, or negotiates insurance on behalf of an insured" or who "takes or transmits other than for himself an application for insurance or a policy of insurance to or from an insured…" S.C. Code Ann. § 38-45-10.

282.    At all times relevant herein, the Insurance Defendants were "insurance brokers" under South Carolina law.

283.     Pursuant to S.C. Code Ann. § 38-45-160, "No policy fee may be charged by a broker unless it is a reasonable fee, it is made part of the contract, and the broker's premium tax rate is paid upon the policy fee. If for any reason the director or his designee disapproves the placement or the insurer ultimately refuses to write the risk, the broker shall immediately refund the full policy fee to the policyholder." *Id.*

284.     Thus, a broker's receipt of a fee from the insured and a commission from an insurance company is not permitted by law without full disclosure to the client, and the fee charged, if disclosed, must be reasonable.

285.     In violation of the foregoing statutes, the Insurance Defendants received commissions from insurers for having sold policies to the District, while also charging exorbitant "consultant's fees" and "broker's fees" to the District, without disclosing that information to the District beforehand.

286.     The foregoing statutory provisions give rise to a duty on the part of  the Insurance Defendants to refrain from charging unreasonable broker's fees without full disclosure, and from engaging in fraudulent misrepresentation in procuring insurance, both of which duties were breached by the Insurance Defendants.

287.     The essential purpose of the foregoing statutes is to protect from the kind of harm the District has suffered.

288.     The District is a member of the class of persons the foregoing statutes are intended to protect.

289.     As a direct and proximate result of the foregoing statutory violations, the District suffered damages as follows:

     a.   The amount paid to the Insurance Defendants for sham consulting and/or broker's

fees in the amount of $2,994,311.65;

b.   The amount paid to the Insurance Defendants on premiums for unnecessary and excessive insurance policies purchased by the District upon the advice of Defendants for the sole purpose of collecting broker's fees in the amount of $6,799,956.50; and

c.   Punitive damages because

    i.   The District's harm was the result of Defendants' willful, wanton and reckless conduct;

    ii.   Defendants' conduct was intended to harm the District, which conduct did in fact harm the District;

    iii.   Defendant Thomas has pled guilty to and has been convicted of a felony arising out of the same act or course of conduct complained of by the District and that act or course of conduct is a proximate cause of the District's damages;

    iv.   Defendants' conduct was motivated primarily by unreasonable financial gain, and the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was known or approved by Pokorney, an officer of Defendants; and

    v.   Defendants' actions could subject Defendants to conviction of a felony and those acts and course of conduct are a proximate cause of the District's damages.

## FOR A NINTH CAUSE OF ACTION
## CONVERSION

*All Defendants*

290.  Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

291.  Defendants assumed and exercised the right of ownership over funds belonging to the District to the exclusion of the District's rights.

292.  Thomas assumed and exercised the right of ownership over refunds belonging to the District to the exclusion of the District's rights in the amount of $22,700.00.

293.  The Insurance Defendants assumed and exercised the right over ownership over funds paid for commissions that were procured through fraud, to the exclusion of the District's rights.

294.  As a direct and proximate result of Defendants' conversion, the District has suffered the following damages:

   a.  The amount paid to the Insurance Defendants for sham consulting and/or broker's fees in the amount of $2,994,311.65; and

   b.  The amount paid to the Insurance Defendants on premiums for unnecessary and excessive insurance policies purchased by the District upon the advice of Defendants for the sole purpose of collecting broker's fees in the amount of $6,799,956.50.

   c.  The amount the Insurance Defendants paid to Thomas for a refund of $22,700.00.

### FOR A TENTH CAUSE OF ACTION
### CONSTRUCTIVE TRUST
### *All Defendants*

295.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

296.    Plaintiff was in a confidential and fiduciary relationship with the Defendants in which Plaintiff reposed special confidence in Defendants, so that Defendants, in equity and good conscience, were bound to act in good faith and with due regard to the interests of the District.

297.    Defendants acquired funds from the District through a breach of trust and violations of their fiduciary duties.

298.    Through their fraudulent schemes as aforesaid, Defendants obtained money which does not equitably belong to them and which they cannot in good conscience retain or withhold from the District, which is beneficially entitled to it.

299.    The constructive trust created warrants an award of damages against Defendants in the amount paid to the Insurance Defendants for sham consulting and/or broker's fees totaling  $2,994,311.65.

### FOR AN ELEVENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### *All Defendants*

300.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-

adopts and re-alleges each such allegation.

301.    In connection with the fraudulent scheme as aforesaid, each of the Defendants received moneys paid by BCSD, purportedly for, among other things, the provision of professional services. In fact, Defendants knew that, rather than receiving valuable professional services, Plaintiff was being charged for exorbitant consulting and broker fees for unnecessary insurance policies.

302.    Consequently, Defendants were unjustly enriched at the expense of the District, and Defendants are not, therefore, entitled to retain any of these moneys and should be required to repay all sham consulting and/or broker's fees totaling $2,994,311.65.

303.    Each Defendant is jointly and severally liable to the BCSD for unjust enrichment.

## JURY DEMAND

Plaintiff hereby requests a jury trial, as a matter of right, on all claims alleged herein.

WHEREFORE, Plaintiff, Berkeley County School District, by counsel, respectfully requests this Court to enter judgment in its favor against Defendants in the amount of **$29,382,831.40,** or trebled damages of the above stated **$9,794,277.15,** or other amount to be determined at trial, plus punitive damages, pre-judgment and post-judgment interest at the maximum rate allowed by law, reasonable attorneys' fees, Court costs, and such further relief as the Court deems just.

SMYTH WHITLEY, LLC

*s/Joshua S. Whitley*
Joshua S. Whitley
SC Federal Bar No.: 10829
126 Seven Farms Drive
First Citizens Plaza, Suite 150
Charleston, South Carolina 29492
843.606.5635 Office
843.654.4095 Facsimile
jwhitley@smythwhitley.com

Jeffrey A. Breit, Esquire
Virginia State Bar No.: 18876
BREIT DRESCHER IMPREVENTO, P.C.
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
757.670.3888 Office
757.670.3939 Facsimile
Jeffrey@breit.law
*Pro Hac Vice*


*Counsel for Berkeley County*
*School District*

Charleston, South Carolina
March 19, 2018