**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| BERKELEY COUNTY SCHOOL DISTRICT, | ) ) ) | |
| Plaintiff, | ) ) | No. 2:18-cv-00151-DCN |
| vs. | ) ) ) | **ORDER** |
| HUB INTERNATIONAL LIMITED, HUB INTERNATIONAL MIDWEST LIMITED, HUB INTERNATIONAL SOUTHEAST, KNAUFF INSURANCE AGENCY, INC., STANLEY J. POKORNEY, SCOTT POKORNEY, and BRANTLEY THOMAS, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the court on defendants HUB International Limited, HUB International Midwest Limited, HUB International Southeast, and Knauff Insurance Agency, Inc.'s (collectively, "HUB") motion to compel arbitration. Defendants Stanley J. Pokorney ("Pokorney") and Scott Pokorney ("Scott Pokorney") (collectively with HUB, "the Insurance Defendants") joined in the motion. For the reasons set forth below, the court denies the motion to compel arbitration.

## I.  BACKGROUND

This case arises out of the alleged embezzlement of millions of dollars from plaintiff Berkeley County School District ("the District"). The District alleges that its former Chief Financial Officer Brantley Thomas ("Thomas") conspired with HUB and HUB's employees Pokorney and Scott Pokorney to defraud the District through a concerted kickback scheme related to the purchasing of unnecessary insurance policies.

Specifically, the District alleges that "Thomas engaged in a pervasive scheme of corruption, in which he embezzled and misappropriated District funds, demanded and accepted multiple illegal kickbacks, and exposed the District to exorbitant fees and losses that have cost the taxpayers of Berkeley County tens of millions of dollars." ECF No. 36 at 2. Thomas allegedly conspired with Pokorney, who was the District's insurance consultant and broker, and HUB to concoct a scheme in which Thomas helped Pokorney and HUB obtain the District's insurance business in exchange for kickbacks. As part of this scheme, the District alleges, Thomas and the Insurance Defendants advised the District to purchase insurance policies that they knew were excessive and duplicative and for which the Insurance Defendants received commissions. The District also alleges that the Insurance Defendants charged sham broker's and consulting fees for the management of this insurance and the associated insurance reviews that were improperly conducted. The District alleges that from 2005 to 2017, it paid $6,799,956.50 in premiums and $2,994,311.65 in broker's fees to the Insurance Defendants. Throughout the scheme, Thomas was provided with kickbacks totaling $32,000, in addition to expensive trips, hotel rooms, meals, and spa services.[1]

    As part of their alleged concerted effort to defraud the District, Thomas and the Insurance Defendants entered into a number of brokerage service agreements ("the Brokerage Service Agreements"), each containing the following arbitration clause:

> All disputes, claims or controversies relating to this Agreement, or the services provided, which are not otherwise settled, shall be submitted to a panel of three arbitrators and resolved by final and binding arbitration, to the exclusion of any courts of laws, under the commercial rules of the American Arbitration Association.

---

[1] The court has reviewed Thomas's presentence report and Preliminary Order of Forfeiture, which lead the court to believe the kickbacks far exceed $32,000.

> In those instances where any party is involved in an underlying claim or coverage dispute but the other is not, it is agreed that the arbitrators shall not be bound by any factual or legal determinations in such underlying claim or coverage dispute and that the arbitrators shall, in those cases where liability and/or damages cannot fairly be evaluated until resolution of the underlying claim or coverage dispute, defer their consideration pending resolution of any such underlying claim or coverage dispute.

See, e.g., ECF No. 23, Ex. B at 3 ("the Arbitration Clauses"). The District claims that it had never seen these Brokerage Service Agreements until the Insurance Defendants filed the motion at issue here.

On November 15, 2017, a South Carolina grand jury indicted Thomas on four counts of embezzlement. In one of the counts, the grand jury charged that Thomas deliberately caused the District to overpay a vendor and then ordered the vendor to send the refund of the overpayment to Thomas's home so that Thomas could use the refund for personal use. The complaint alleges that the vendor was Knauff Insurance Agency ("Knauff"), the predecessor to HUB, and Pokorney was the Knauff employee who refunded to the overpayment to Thomas. Thomas entered a plea of guilty to all of the state charges.

In addition, on December 7, 2017, the United States Attorney for the District of South Carolina charged Thomas with ten counts of wire fraud arising out of the illegal kickbacks in the amount of $32,000 that he received from "a broker employee" in exchange for "steer[ing] [the District's] insurance policy purchases through" the broker employee. ECF No. 36 at 9. Thomas entered a guilty plea to these charges. The broker employee, the District alleges, is Pokorney.

On January 18, 2018, the District filed suit in this court alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the South Carolina

Unfair Trade Practices Act, fraud, aiding and abetting fraud, civil conspiracy, breach of fiduciary duty, negligence, constructive trust, and unjust enrichment against all defendants, and negligence per se and breach of contract against the Insurance Defendants. On March 5, 2018, HUB filed a motion to compel arbitration, arguing that all of the District's claims stem from the Brokerage Service Agreements that contain the Arbitration Clauses. ECF No. 23. Scott Pokorney joined the motion on March 12, 2018, ECF No. 29, and Pokorney joined the motion on March 19, 2018, ECF No. 35. On March 19, 2018, the District filed a response to the motion to compel arbitration. ECF No. 33. On that same day, the District also filed an amended complaint. ECF No. 36. In this amended complaint, now the operative complaint in this case, the District removes certain claims, such as the breach of contract claim, and levies the following causes of action: RICO, fraud, negligent misrepresentation, civil conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, conversion, constructive trust, and unjust enrichment against all defendants, and negligence per se against the Insurance Defendants. HUB filed a reply on March 26, 2018. ECF No. 38. The court held a hearing on May 17, 2018. Pursuant to the court's request, the parties submitted supplemental briefing on July 6, 2018 addressing the potential impact of the United States Supreme Court's grant of certiorari in Archer and White Sales, Inc. v. Henry Schein, Inc., 878 F.3d 488 (5th Cir. 2017), cert. granted, 138 S.Ct. 2678 (2018) (mem.). ECF Nos. 57–59.[2] The motion has been fully briefed and is now ripe for the court's review.

_____

[2] The Supreme Court recently issued its opinion in this case. Henry Schein, Inc. v. Archer & White Sales, Inc., 2019 WL 122164 (U.S. Jan. 8, 2019). On January 9, 2019, HUB filed a notice alerting the court of the Supreme Court's opinion and arguing

## II. DISCUSSION

The Insurance Defendants contend that this case must be resolved by arbitration because the Arbitration Clauses in the Brokerage Service Agreements clearly evince the parties' intent to submit the threshold question of arbitrability to the arbitrator. As such, they argue, any questions about the validity, scope, or enforceability of the Arbitration Clauses have been reserved for the arbitrators to decide. The District opposes arbitration and submits a number of challenges to both the Arbitration Clauses and the entirety of the Brokerage Service Agreements, including: (1) the Brokerage Service Agreements and Arbitration Clauses are invalid under South Carolina law because the District never agreed to them and was unaware they existed until the filing of this motion to compel; (2) Thomas could not have agreed to the Brokerage Service Agreements because the South Carolina state procurement code requires that the District undertake a competitive bid process to enter into such contracts, which was not followed here, and the procurement code does not allow for the District to enter into contracts that require arbitration; (3) the Arbitration Clauses should be found null and void because they were induced by fraud; (4) the Arbitration Clauses are unenforceable because the Insurance Defendants' and Thomas's actions related to the Brokerage Service Agreements were illegal, outrageous, and fraudulent; (5) Thomas was acting outside of the scope of his agency when he entered into the Brokerage Service Agreements; (6) not all of the claims in the amended

---

that it provides support for the motion to compel arbitration. ECF No. 60. The District responded to the notice on January 23, 2019, ECF No. 61, and HUB filed a motion to strike the District's response on January 28, 2019, ECF No. 62. As discussed in greater detail below, the court does not rely on <u>Henry Schein, Inc.</u> in its order. Nor does the court rely on the additional authorities included in the District's response and identified in HUB's motion. Therefore, the court finds HUB's motion to strike to be moot.

5

complaint relate to the Brokerage Service Agreements; (7) the District is not seeking to

enforce the Brokerage Service Agreements, which would in turn require enforcing the

Arbitration Clauses; and (8) the Arbitration Clauses do not require arbitrators to

determine arbitrability. The Insurance Defendants counter that all of the District's

challenges to the existence of both the Arbitration Clause and the Brokerage Service

Agreements must be resolved by the arbitrator, because the commercial rules of the

American Arbitration Association ("AAA") were incorporated by reference into the

Arbitration Clauses. The rules state that "[t]he arbitrator shall have the power to rule on

his or her own jurisdiction, including any objections with respect to the existence, scope,

or validity of the arbitration agreement or to the arbitrability of any claim." ECF No. 38

at 3 (citing AAA Rules, R-7(a)). Thus, according to the Insurance Defendants, there is

"clear and unmistakable evidence of the parties' intent to arbitrate arbitrability," meaning

the court has no jurisdiction to determine even the threshold question of arbitrability and

must send the case to arbitration. See Simply Wireless, Inc. v. T-Mobile US, Inc., 877

F.3d 522, 527–28 (4th Cir. 2017).

The law on arbitration has become rather complex. There are nuances that can be

easy to overlook, and courts use various terms interchangeably, which has led to areas of

the law becoming convoluted. Therefore, before addressing the specific arguments of the

case at hand, the court will provide an overview of the law related to the relevant

arbitration principles at issue here.

As an initial matter, courts use the word "agreement" in a variety of contexts

when discussing arbitration, sometimes making it difficult to determine to which

agreement the court is actually referring. The general meeting of the minds to use

arbitration as a method of dispute resolution will be referred to as "an agreement to arbitrate." Within an agreement to arbitrate, parties may also agree to send questions of arbitrability to arbitration. Arbitrability refers to "gateway questions," such as whether the parties agreed to arbitrate or whether the agreement to arbitrate covers a certain dispute. <u>Rent-A-Center, W., Inc. v. Jackson</u>, 561 U.S. 63, 68–69 (2010). An agreement to arbitrate these gateway questions "is simply an additional, antecedent agreement" to an agreement to arbitrate. <u>Id</u>. at 70.

An agreement to arbitrate may be included in a contractual relationship in two ways. First, the parties may form a new relationship, for example, an employer/employee relationship. Pursuant to that relationship, they may sign a contract, the entirety of which requires parties to arbitrate any disputes related to their relationship. For example, in <u>Rent-A-Center</u>, the employer hired an employee, and they entered into a contract titled "Mutual Agreement to Arbitrate Claims" as a condition to the employee's employment. 561 U.S. at 65. The court will refer to this type of agreement to arbitrate as an "arbitration contract." Within an arbitration contract, there may be a delegation provision that delegates any dispute regarding the parties' relationship to arbitration ("delegation provision"). <u>Id.</u> at 68.

Alternatively, parties may enter into a contract related to any number of topics. The court will refer to this contract as a "container contract." Within that contract, there may be an arbitration clause ("arbitration clause") that requires any claim related to the container contract to be resolved by arbitration. An example of a container contract is found in <u>Simply Wireless, Inc.</u>, where the parties entered into a contract titled "Amended & Restated Limited Purpose Co-Marketing and Distribution Agreement for Equipment

Sold th[r]ough HSN & QVC" pursuant to the parties' joint project. 877 F.3d at 524. This contract contained an arbitration clause that sent claims related to the contract to arbitration. Id. at 525. Moreover, within the arbitration clause, there may be a delegation provision that requires an arbitrator to resolve any arbitrability questions. Here, the challenged agreement to arbitrate is an arbitration clause found within the Brokerage Service Agreements, which are container contracts. While there is no separate delegation provision in the Arbitration Clauses within the Brokerage Service Agreements, the Insurance Defendants argue that the incorporation of the AAA rules create a de facto delegation provision. Therefore, for ease of reference and where appropriate, in subsequent discussion the court will refer to agreements to arbitrate as arbitration clauses.

### A. Principles of Arbitration Law

First, the court will discuss how a challenge to the validity of an arbitration clause under the § 2 of the Federal Arbitration Act ("FAA") is handled. Then the court will distinguish between a challenge to the validity of the clause and a challenge to whether an agreement to arbitrate was formed in the first place. This distinction between validity and formation will become important later in the discussion. After identifying the distinction, the court will explain that when a party argues that it never agreed to arbitrate, it is generally the court's role to determine whether the parties did in fact form an agreement to arbitrate. In addition, the court will analyze the question of whether it must constrain its formation determination to the arbitration clause, or if it may consider formation of the container contract as well. Then, the court will discuss how challenges to a delegation provision are handled. Within this discussion, the court draws another distinction between the arbitrability issues of scope and formation. The court concludes by explaining that even if it appears that the parties agreed to arbitrate issues of

arbitrability, the court still must first determine whether those parties entered into an agreement to arbitrate in the first place, meaning that here, the court must determine whether the District formed an agreement to arbitrate with the Insurance Defendants. The court also concludes that it may consider both the Arbitration Clauses and the Brokerage Service Clauses to determine if such an agreement exists. For the reasons discussed further below, the court finds here that an agreement to arbitrate was not properly formed, and thus denies the Insurance Defendants' motion to compel arbitration.

### 1. Challenges to Validity of an Arbitration Clause under § 2 of the FAA

Under the FAA, arbitration clauses "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (U.S. 1983). As the Supreme Court explained in Buckeye Check Cashing, Inc. v. Cardegna, there are two types of challenges under § 2 that a party may make related to the validity of an arbitration clause. 546 U.S. 440, 444 (2006). The first challenge is to the validity of the arbitration clause itself, and the second challenge goes to the validity of the entire container contract. Id. A challenge to the validity of the container contract must go to an arbitrator, because the arbitration clause within the container contract represents the parties' agreement to resolve the challenge through arbitration. Id. at 448–49. But a challenge to the validity of the arbitration clause itself may be considered by a court. Id. A court may do so because the arbitration clause provides the court the authority to compel arbitration, so if the arbitration clause is invalid, the court cannot compel arbitration. This distinction gives courts the ability to view the validity of an arbitration

clause separately from the validity of the container contract.  Id. at 449.  Courts refer to

this as the severability rule.  See, e.g., Rent-A-Center, 561 U.S. at 71 (discussing this

distinction and referring to it as "the severability rule").  Therefore, courts generally have

the power to determine the validity of an arbitration clause before requiring the parties to

arbitrate an issue.  However, if a party is challenging the validity of the container

contract, the challenge must be heard by an arbitrator.

### 2.  Validity Distinguished from Formation

The issue of whether an arbitration clause is valid under § 2 of the FAA is a

different issue from whether the parties ever formed an agreement to arbitrate.  Rent-A-

Center, 561 U.S. at 70 n.2; see also Buckeye Check Cashing, Inc., 546 U.S. at 444 n.1

("The issue of the contract's validity is different from the issue whether any agreement

between the alleged obligor and obligee was ever concluded.").[3]  Indeed, the Supreme

Court explained that the validity of an arbitration clause, which is governed by § 2,

addresses "whether it is legally binding, as opposed to whether it was in fact agreed to."

Rent-A-Center, 561 U.S. at 69 n.1 (emphasis added); see also Nat'l Fed'n of the Blind v.

The Container Store, Inc., 904 F.3d 70, 80 (1st Cir. 2018) ("Pursuant to established

Supreme Court precedent, however, there's an important distinction between arguments

challenging the validity of an agreement and those challenging an agreement's

formation." (citations omitted) (emphasis in original)); Lefoldt for Natchez Reg'l Med.

Ctr. Liquidation Tr. v. Horne, L.L.P., 853 F.3d 804, 810 (5th Cir. 2017) ("The Court

_____

[3] While the Rent-A-Center Court and the Buckeye Check Cashing, Inc. Court both
identify this distinction, they also both clarify that they only subsequently address
validity of the agreements to arbitrate, not their formation.  Rent-A-Center, 561 U.S. 63,
71 n.2; Buckeye Check Cashing, Inc., 546 U.S. at 444 n.1.  Therefore, neither Court
discusses this distinction beyond its initial identification of the distinction.

made clear in <u>Buckeye Check Cashing</u> and <u>Rent-A-Center</u> that when it explained that '[t]here are two types of validity challenges under § 2,' it was not addressing a contention that no agreement was ever concluded by the parties.'" (citations omitted)).  Therefore, an arbitration clause's validity under § 2 goes to whether the clause may be enforced, requiring the court to send the dispute to arbitration, not whether the parties agreed to arbitrate in the first place.

### 3.  Challenges to the Formation of an Agreement to Arbitrate

When a party disputes whether it agreed to the arbitration clause in the first place, as opposed to whether the clause is valid, it is exclusively within the court's province to determine if an agreement to arbitrate was formed.  "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below)[4] should apply ordinary state-law principles that govern the formation of contracts."  <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995).  This stems from the basic principle that arbitration is a matter of contract law, and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  <u>United Steelworkers of Am. v. Warrior & Gulf Nav. Co.</u>, 363 U.S. 574, 582 (1960).  "This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration."  <u>AT&T Techs., Inc. v. Commc'ns Workers of Am.</u>, 475 U.S. 643, 648–49 (1986) (citing <u>Gateway Coal Co. v. Mine Workers</u>, 414 U.S. 368, 374 (1974)).  As with any contract dispute, courts have the authority to evaluate whether an agreement to arbitrate was formed.  <u>See</u> <u>Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>,

_____

[4] This qualification relates to challenges to delegation provisions, which the court discusses in the next section.

11

388 U.S. 395, 403–04 (1967) ("[A] federal court may consider only issues relating to the making and performance of the agreement to arbitrate."). Therefore, "a court may order arbitration only when it 'is satisfied that the parties agreed to arbitrate.'" Lorenzo v. Prime Commc'ns, L.P., 806 F.3d 777, 781 (4th Cir. 2015) (quoting Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 297 (2010)).

When a party challenges whether it agreed to arbitrate, it is unclear if the court is constrained to only consider the formation of the arbitration clause, or if it may consider the formation of the entire container contract as well. While the severability rule clearly establishes that a court may only consider the validity of an arbitration clause and not the validity of the container contract, there is a distinction between validity and formation. This suggests that the severability rule may not apply to formation challenges. The Supreme Court has not provided a clear answer to this question. In Buckeye Check Cashing, Inc., the Court specifically referred to a contract when discussing the validity/formation distinction, suggesting that a court may consider the container contract's formation. See 546 U.S. at 444 n.1 ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded."). However, in Rent-A-Center, the Court used the word "agreement" ambiguously, making it difficult to determine if the Court was referring to the agreement to arbitrate or the container contract. [5] In its discussion, the Rent-A-Center Court first distinguished between challenges to the validity of "the agreement to

_____

[5] Notably, the agreement to arbitrate at issue in Rent-A-Center was an arbitration contract with a delegation provision. 561 U.S. at 65–66. However, the Court held that the principles it discussed apply whether the agreement to arbitrate was an arbitration contract or an arbitration clause within a container contract. Id. at 71–72.

arbitrate" and to the validity of "the contract as a whole." 561 U.S. at 70. It continued by stating that it would only consider the first challenge, and then said in a footnote that "[t]he issue of the agreement's 'validity' is different from the issue [of] whether any agreement between the parties 'was ever concluded.'" Id. at 70 n.2. The footnote cited Buckeye Check Cashing, suggesting that the "agreement" to which the Court refers is the container contract. However, the Court previously used the word "contract" to refer to the container contract instead of "agreement," suggesting that "agreement" applies to the agreement to arbitrate.

This lack of clarity was perpetuated in Granite Rock Co. v. Int'l Broth. of Teamsters, 561 U.S. 287 (2010). In Granite Rock Co., local union members went on strike on June 9, 2004 when their negotiations to enter into a new collective bargaining agreement ("CBA") with Granite Rock failed. Id. at 292. On July 2, the parties agreed to a CBA, which contained a no-strike provision and an arbitration clause. Id. However, the relationship soured again, the strike continued, and Granite Rock initiated a lawsuit on July 9 for violation of the no-strike provision, pursuant to the terms of the new CBA. Id. at 293–94. In response, the union argued that the CBA was not ratified until August 22, meaning that it was not ratified when the suit was filed or while the strike was occurring. Id. at 304. This created a debate over whether, under the new CBA, the parties had to arbitrate the ratification date dispute. The issue presented to the Supreme Court was whether the question of when the CBA was ratified, and therefore formed, was a question for the court or arbitration. The Supreme Court held that it was an issue for the court to decide, because if the CBA was not ratified at the time the suit was filed, then

the parties had not agreed to arbitrate at that time, and the dispute could not be sent to arbitration.  Id. at 305.

However, as at least one commentator has noted, "[t]he decision is fundamentally ambiguous" in that the Court "describes the issue in some places in the opinion as entailing the existence of the contract as a whole, and in other places as entailing the existence of the arbitration agreement as such—almost as if that distinction no longer mattered, provided the existence of the one or the other is in issue."  George A. Bermann, The "Gateway" Problem in International Commercial Arbitration, 37 Yale J. Int'l L. 1, 50 n.133 (2012).  Indeed, in some places of the opinion, the Court considered whether the CBA as a whole, which was the container contract, was formed to determine if the parties agreed to the arbitration clause within the CBA.  See Granite Rock Co., 561 U.S. at 305 ("If . . . the CBA containing the parties' arbitration clause was not ratified, and thus not formed, until August 22, there was no CBA for the July no-strike dispute to 'arise under,' and thus no valid basis for the . . .  conclusion that Granite Rock's July 9 claims arose under the CBA and were thus arbitrable.").

In subsequent circuit court cases, some courts have only considered challenges to the formation of the agreement to arbitrate and not challenges to the formation of the container contract.  For example, in Nat'l Fed'n of the Blind, the First Circuit only addressed the formation of the agreement to arbitrate.  904 F.3d at 83–84.  It interpreted the plaintiffs' challenge as being to the formation of the agreement to arbitrate and did not reach the issue of whether formation challenges to the container contract belong with the court.  Id. at 82 n.16.  Yet in Edwards v. Doordash Incorporated, the Fifth Circuit

considered whether the entire container contract was formed, not the narrower question of whether an agreement to arbitrate was formed.  888 F.3d 738, 744 (5th Cir. 2018).

This is where the validity and formation distinction plays an important role. When a party challenges validity, the court may only look at the validity of the arbitration clause, not the validity of the container contract, as required by the severability rule. However, validity and formation are different, suggesting that a court may not be bound by the severability rule when considering formation.  This would allow the court to consider both the arbitration clause and the container contract to determine whether the parties ever formed an agreement to arbitrate.  From a practical standpoint, it would be quite difficult to view the arbitration clause in isolation from the container contract when determining formation issues, because indicators of mutual assent, such as a party's signature, normally apply to the entire contract, not just an individual clause.  Indeed, "[w]hen one has not manifested assent to the container contract, one cannot be bound by a single stitch of its text."  David Horton, <u>Arbitration about Arbitration</u>, 70 Stan. L. Rev. 363, 424 (2018); <u>see also</u> <u>Lorenzo</u>, 806 F.3d at 782 (finding no agreement to arbitrate by relying on a signed acknowledgement form that the parties did not agree to be contractually bound by the employee handbook, which contained an arbitration clause); <u>Opals on Ice Lingerie v. Bodylines Inc.</u>, 320 F.3d 362, 372 (2d Cir. 2003) (finding no agreement to arbitrate because each party signed different contract addenda containing arbitration provisions that mandated arbitration in different states, meaning there was no meeting of the minds).  Based on the foregoing discussion, the court finds that it is not bound to solely consider the formation of the Arbitration Clauses, and it may consider whether the parties formed the Brokerage Service Agreements as well.

### 4. Challenges to a Delegation Provision

These concepts become even more complicated when the parties challenge a delegation provision within an arbitration clause. Because a delegation provision is simply an "additional, antecedent agreement" to arbitrate, a party may challenge the validity of a delegation provision under § 2 of the FAA. Rent-A-Center, 561 U.S. at 70. However, as discussed above, there is a distinction between validity and formation. The issue here is whether this court may determine if the parties formed an agreement to delegate arbitrability questions to an arbitrator.

Disputes over arbitrability require a two-step process. Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union, 665 F.3d 96, 101 (4th Cir. 2012). First, the court must "determine who decides whether a particular dispute is arbitrable: the arbitrator or the court." Id. (emphasis in original). If the court determines "the court is the proper forum in which to adjudicate arbitrability, [it] then decide[s] whether the dispute is, in fact, arbitrable." Id. When conducting the first step, the court must find "clear and unmistakable" evidence that the parties agreed to delegate arbitrability questions to arbitration. Simply Wireless, Inc, 877 F.3d at 526. This is because "empowering an arbitrator to determine arbitrability in the first instance 'cuts against the normal rule' that arbitrability disputes are for the court to resolve." Id. (quoting Hayes v. Delbert Servs. Corp., 811 F.3d 666, 671 (4th Cir. 2016)). As such, "[t]he 'clear and unmistakable standard' is exacting, and the presence of an expansive arbitration clause, without more, will not suffice." Peabody Holding Co., 665 F.3d at 102. As explained by the Rent-a-Center Court, the "clear and unmistakable" requirement relates "to the parties' manifestation of intent, not to the agreement's validity." 561 U.S. at n.1 (emphasis in original). This relates back to the distinction between formation and validity. Therefore,

when deciding whether a party agreed to delegate questions of arbitrability to arbitration, a court does not do so under § 2 of the FAA but instead by determining the parties' intent.

Courts use the term "arbitrability" generally and liberally, but it is important to distinguish between two different arbitrability issues: (1) the scope of an arbitration clause, i.e., whether a particular dispute should be subject to arbitration; and (2) whether the parties agreed to arbitrate. [6]  Despite the importance of this distinction, it has gotten lost through the catchall use of the phrase "arbitrability."  But in cases such as this, where the District argues that it did not agree to arbitrate anything, including questions of arbitrability, the distinction is crucial.[7]

In most cases discussing arbitrability, the arbitrability question is one related to the scope of the clause, because the parties do not dispute the fact that they entered into

---

[6] As an additional matter, the District submitted its amended complaint on March 19, 2018—after HUB filed its motion to compel arbitration.  In the amended complaint, the District removed the cause of action for breach of contract and also removed reference to any time periods during which the scheme was perpetrated.  This is, HUB defendants argue, "part of a thinly-veiled attempt to gerrymander the District's case" to circumvent the arbitration requirement in the Brokerage Service Agreements.  ECF No. 38 at 1.  Based on the timing of the filing of the amended complaint after HUB's motion to compel arbitration and on the same day as the District filed its response, as well as the fact that the amended complaint removes the breach of contract claim and all references to specific time periods yet maintains substantially the same factual allegations, the court is inclined to agree.  Nonetheless, it is the amended complaint that is the operative complaint.  Moreover, this argument goes to whether the District's claims fall within the scope of the arbitration clause, and the court need not reach that issue because it finds that no agreement to arbitrate was formed in the first place.

[7] This distinction makes the recent opinion in Henry Schein, Inc., 2019 WL 122164, inapplicable to the instant case.  In Henry Schein, Inc., the Court rejected the "wholly groundless" exception that would allow courts to determine whether an agreement to arbitrate applied to a particular dispute, even when the parties agreed to arbitrate arbitrability.  Id. at *3, *5.  The "wholly groundless" exception relates to the scope of the agreement to arbitrate, not to its formation.  Therefore, it is inapplicable to the District's argument that it never formed an agreement to arbitrate.

an agreement to arbitrate.  Instead, they dispute whether their specific claim falls within the type of claims that they agreed to arbitrate, and who should decide if the claim falls within the scope.  In these scenarios, it makes sense for the court to look at the language of an arbitration clause to determine whether the parties "clearly and unmistakably" intended that an arbitrator would determine an issue because the parties agreed to the language.  See Simply Wireless, Inc., 877 F.3d at 528 (language of arbitration clause evinces parties' clear and unmistakable intent to delegate question of whether claim fell within scope of clause to an arbitrator); Carson v. Giant Food, Inc., 175 F.3d 325, 329–30 (4th Cir. 1999) (language of arbitration clause in the collective bargaining agreements was too broad to evince clear and unmistakable evidence that the parties agreed that an arbitrator would determine whether the discrimination claims at issue fell within the scope of the arbitration clause); E.I. Dupont de Nemours and Co. v. Martinsville Nylon Employees' Council Corp., 78 F.3d 578, 1996 WL 84501, at *1–2 (4th Cir. 1996) (unpublished table opinion) (language in arbitration clause contained no provision that clearly and unmistakably agreed to let an arbitrator determine whether a claim fell within the scope of the arbitration clause).

The issue of whether the parties agreed to arbitrate, however, raises fundamental concerns about whether the parties gave up their rights to resolve their claims in court and instead consented to arbitration.  Despite the development of the jurisprudence on arbitrability, the basic concept that parties must agree to arbitrate remains true.  See United Steelworkers of Am., 363 U.S. at 582 ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").  However, when courts generally refer to "arbitrability," which can include "whether the parties agreed to

arbitrate," see Rent-A-Center, 561 U.S. at 69, the basic requirement that the parties agreed to arbitrate gets wrapped up in the "scope of" arbitrability analysis, creating confusion over whether it is the court's or arbitrator's role to determine whether the parties agreed to arbitrate. Because arbitrability includes whether the parties agreed to arbitrate, the question seems as though it should fall into the arbitrability framework discussed above. Yet some courts have said that "[a]rguments that an agreement to arbitrate was never formed, though, are to be heard by the court even where a delegation clause exists." Edwards, 888 F.3d at 744.

The court's ability to determine whether an agreement to arbitrate was formed in the first place, even when a delegation provision exists, can be gleaned from the Supreme Court's review of arbitration framework in Granite Rock Co. The Court explained first that "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." 561 U.S. at 297. In order to do so, "the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." Id. The Court went on to explain that "[w]here there is no provision validly committing them to an arbitrator, these issues typically concern the scope of the arbitration clause and its enforceability." Id. In other words, when a delegation provision exists, the court should not determine the scope and enforceability of an arbitration clause. But the Court continued, stating that "[i]n addition, these issues always include whether the clause was agreed to, and may include when that agreement was formed." Id. (emphasis added). This language clearly indicates that regardless of whether a delegation provision exists, it

is always within the court's province to determine whether an agreement was <u>formed</u> in

the first place.  The Court provided further support for this concept, stating that

> our precedents hold that courts should order arbitration of a dispute only
> where the court is satisfied that neither the formation of the parties'
> arbitration agreement <u>nor</u> (absent a valid provision specifically committing
> such disputes to an arbitrator) its enforceability or applicability to the
> dispute is in issue.  Where a party contests either or both matters, "the court"
> must resolve the disagreement.

<u>Id.</u> at 299–300 (emphasis in original).  Again, the Court identified that whether the parties

formed an agreement to arbitrate is separate from issues related to a delegation provision.

Therefore, whether a party formed an agreement to arbitrate, including whether it agreed

to arbitrate arbitrability, is a question for the court to resolve.  As discussed above, when

considering a challenge to the formation of an agreement to arbitrate, a court may

consider both the formation of the arbitration clause and the container contract.

Moreover, there can be no "clear and unmistakable" evidence in an arbitration

clause that parties intended to delegate questions of arbitrability to arbitration when the

parties disagree over whether the arbitration clause was formed in the first place.  The

distinction between the arbitrability concepts of scope and agreement to arbitrate

illustrates this point well and is best exemplified by arbitrability cases involving

arbitration clauses that incorporate the JAMS rules or AAA rules.  Courts are frequently

and consistently finding that when an arbitration clause incorporates arbitration rules,

whether they be JAMS or AAA rules, there is clear and unmistakable evidence that the

parties intended to arbitrate arbitrability.  <u>See, e.g.</u>, <u>Simply Wireless, Inc</u>, 877 F.3d at

528; <u>Brennan v. Opus Bank</u>, 796 F.3d 1125, 1130 (9th Cir. 2015).  Indeed, the Insurance

Defendants, relying on <u>Simply Wireless</u> and various other circuit court cases, argue here

that the parties agreed to arbitrate arbitrability because the AAA rules are incorporated in

the Arbitration Clauses.  However, in <u>Simply Wireless</u>, the arbitrability issue was the

<u>scope</u> of the arbitration clause, so it made sense to look at the language of the clause.  The

parties did not dispute the fact that they had formed an agreement to arbitrate when they

executed the contract containing the arbitration clause.  877 F.3d at 526.  Instead, the

parties disagreed on whether Simply Wireless's claims fell within the scope of the

arbitration agreement.  <u>Id.</u>  Thus, the court found it appropriate to send the question of

arbitrability to the arbitrator to determine whether this dispute fell within the scope of the

arbitration clause.  <u>Id.</u> at 529.  Other circuit court cases in which the parties'

incorporation of JAMS or AAA rules are used to meet the "clear and unmistakable"

standard also involve whether the parties' dispute falls within the scope of the arbitration

clause, not whether the parties agreed to <u>form</u> the arbitration clause.  <u>See</u> <u>Brennan</u>, 796

F.3d at1127–28 (party opposing arbitration argued that the arbitration clause was

unconscionable and did not argue that he never agreed to arbitration in the first place);

<u>Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.</u>, 687 F.3d 671, 674–75 (5th

Cir. 2012) (parties did not dispute whether they had formed an agreement to arbitrate);

<u>Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship</u>, 432 F.3d 1327, 1331–32 (11th Cir.

2005) (party opposing arbitration argued that arbitration clause was unenforceable, not

that it never formed an agreement to arbitrate); <u>Contec Corp. v. Remote Sols., Co.</u>, 398

F.3d 205, 210–11 (2d Cir. 2005) (parties did not dispute that they had formed an

agreement to arbitrate).

It simply makes no sense for a court to determine that a party clearly and

unmistakably chose to give arbitrability issues to an arbitrator based on the content of an

arbitration clause, namely the incorporation of AAA Rules, when the party argues that <u>it</u>

did not agree to an arbitration clause in the first place. To do so would be using the substance of an arguably unformed agreement to show that the agreement was formed. This argument is circular and nonsensical, and as the Eight Circuit describes, it "puts the cart before the horse." Nebraska Machinery Co. v. Cargotec Solutions, LLC, 762 F.3d 737, 741 n.2 (8th Cir. 2014). It is impossible to infer that the District intended to delegate issues of arbitrability to an arbitrator from the language of the Arbitration Clauses, including the incorporation of the AAA Rules, if the District did not agree to the Arbitration Clauses or the Brokerage Service Agreements in the first place. As the U.S. District Court for the Eastern District of Pennsylvania explained, "[w]hen one party contends that an agreement to arbitrate was never formed, looking to the text of that very agreement is problematic because the agreement is only a valid indicator of the parties' intent if they agreed to be bound by its terms." Allstate Ins. Co. v. Toll Bros., Inc., 171 F. Supp. 3d 417, 424 (E.D. Pa. 2016); see also China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp., 334 F.3d 274, 288 (3d Cir. 2003) ("[I]ncorporation of [arbitration] rule[s] into the contract is relevant only if the parties actually agreed to its incorporation. After all, a contract cannot give an arbitral body any power, much less the power to determine its own jurisdiction, if the parties never entered into it."). As a result, "[t]he more basic issue . . . of whether the parties agreed to arbitrate in the first place is one only a court can answer, since in the absence of any arbitration agreement at all, 'questions of arbitrability' could hardly have been clearly and unmistakably given over to an arbitrator." VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P., 717 F.3d 322, 326 n.2 (2d Cir. 2013). Therefore, "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption

does not apply to disputes concerning whether an agreement to arbitrate has been made."
Applied Energetics, Inc. v. NewOak Capital Markets, LLC, 645 F.3d 522, 526 (2d Cir. 2011).

Here, the District argues that it never agreed to arbitrate in the first place. Therefore, it would make no sense for the court to look for "clear and unmistakable" evidence of the District's intent in the Arbitration Clauses to which the District argues it never agreed to in the first place. Instead, the court must look at South Carolina contract formation law to determine if the parties ever agreed to arbitrate in the first place, and in doing so, the court may look at the entirety of the Brokerage Service Agreements, not just the Arbitration Clauses within them.

### B.    Contract Formation under South Carolina Law

The District made various challenges to both the Arbitration Clauses and the Brokerage Service Agreements to show that it did not agree to arbitrate. As discussed above, the court may consider both types of challenges when determining whether the District ever agreed to arbitrate. The District's challenges that go to the formation of the Arbitration Clauses or the Brokerage Service Agreements are: (1) some of the Brokerage Service Agreements are not signed by the District, and the District was unaware that the agreements existed until the motion to compel was filed;[8] and (2) Thomas acted outside of the scope of his agency when he entered into the Brokerage Service Agreements.[9]  The

---

[8] While the District titled the section of its brief containing this argument as "The 'Agreements' Are Invalid Under South Carolina Law," the substance of the argument clearly discusses the formation of the agreements, not their validity.

[9] The District also argues that the Arbitration Clauses are void because they violate South Carolina's procurement code and they were induced by fraud. These arguments go to the validity of the clause, not its formation. The District's other arguments go to the enforceability and the scope of the arbitration clause, which the court will not consider at this time.

court now turns to examine each of the Brokerage Service Agreements containing the Arbitration Clauses.

The first Brokerage Service Agreement, Exhibit B to the Benfield Declaration, covering 2002–2003, was signed by Angel Cartwright, who the District explained was three or four levels below Thomas—an "underling." Tr. 24:3–5. In the second Brokerage Service Agreement, Exhibit C, covering 2003–2004, the contract was signed by Thomas. The third Brokerage Service Agreement, Exhibit D, is a letter dated August 16, 2005 with the handwritten notation "proposed 05/06" with a term, partially amended by handwriting, of "as long as either the Insurance Reserve Fund (Property/Casualty), the School Board Trust (Workers Compensation) or any of the Knauff insurance contracts remain in force." ECF 23-4 at 2–3. It is not signed by either party. The fourth Brokerage Service Agreement, Exhibit E, indicates that the "Agreement shall be for multi-year periods commencing on December 19, 2006 unless earlier terminated by either party" and it is not signed by either party. ECF No. 23-5 at 3. The fifth Brokerage Service Agreement, Exhibit F, contains a similar clause stating that the term of the agreement is "for multi-year periods commencing on December 19, 2009 unless earlier terminated by either party" and again is not signed by either party. ECF No. 23-6 at 6. Notably, this contract was sent to Thomas at his home address. In the final contract, Exhibit G, the same "multi-year period" term appears, with the agreement commencing on June 29, 2011. ECF No. 23-7 at 5. Again, the agreement is unsigned. With these descriptions of the Brokerage Service Agreements in mind, the court now turns the District's formation challenges and finds that the District did not agree to any of the Brokerage Service Agreements or the Arbitration Clauses within them.

When a court decides if parties agreed to arbitrate, it applies state law on contract formation. First Options of Chicago, Inc., 514 U.S. at 944; Lorenzo, 806 F.3d at 781 ("And the question of whether the parties agreed to arbitrate is resolved by application of state contract law."). Under South Carolina law, "[t]he necessary elements of a contract are an offer, acceptance, and valuable consideration." S. Glass & Plastics Co. v. Kemper, 732 S.E.2d 205, 209 (S.C. Ct. App. 2012). "A valid and enforceable contract requires a meeting of the minds between the parties with regard to all essential and material terms of the agreement." Stevens & Wilkinson of S.C., Inc. v. City of Columbia, 762 S.E.2d 696, 701 (S.C. 2014). Here, the Brokerage Service Agreements found in Exhibits D through G are not signed by either party. Moreover, the District represented to the court that it did not know these Brokerage Service Agreements containing the Arbitration Clauses even existed until HUB filed its motion to compel arbitration, which is supported by the fact that the agreements are unsigned. The District obviously could not have agreed to the Brokerage Service Agreements if it did not know they existed. Therefore, it is clear that there was no meeting of the minds where the District agreed to be bound by the Brokerage Service Agreements or the Arbitration Clauses.

The Insurance Defendants argue that while the District may have not accepted the terms of the Brokerage Service Agreements through signing the agreements, it did accept them through performance, i.e., paying the broker's and consultant's fees. It is true that a party may accept an offer and form a contract through performance. See Sauner v. Pub. Serv. Auth. of S.C., 581 S.E.2d 161, 165–66 (S.C. 2003) ("A unilateral contract occurs when there is only one promisor and the other party accepts, not by mutual promise, but by actual performance."). But where the Insurance Defendants falter is by applying the

usual rule to this most unusual set of facts. The Insurance Defendants overlook the fact that it was Thomas who caused the District to make the payments and perform the contract. And as the District alleges, Thomas did so as part of a scheme to defraud the District. Thomas was the Comptroller, Executive Director of Finance, and Chief Financial Officer of the District during the relevant time period. The amended complaint alleges that "the District, <u>through Thomas</u>, purchased a myriad [of] commercial policies" recommended by the Insurance Defendants. ECF No. 36 at 14 (emphasis added). In addition, the amended complaint alleges, Thomas would "ensure" that the Insurance Defendants were paid their brokerage fees. <u>Id.</u> at 18. Moreover, the amended complaint, through the incorporation of the Information in Thomas's federal criminal case, alleges that Thomas "was responsible for procuring and paying for [the District's] insurance policies," which were maintained by an insurance broker. ECF No. 36-1 at 2. That insurance broker, the amended complaint alleges, was HUB. In doing so, Thomas was allegedly able "to enrich himself by steering insurance contracts and business and accepting cash payments, or kickbacks, paid by an insurance broker employee." <u>Id.</u> at 6. The amended complaint alleges that the insurance broker employee was Pokorney. Yet another allegation of Thomas's control over the District's payments to the Insurance Defendants is contained in the amended complaint's discussion of the state indictment. The District alleges that Thomas "deliberately caus[ed] the [District] to overpay a vendor," and that the vendor is Knauff. ECF No. 36 at 11.

Considering these allegations together, the amended complaint alleges that it was Thomas who caused the District to pay the brokerage service fees, and he did so with the purpose of defrauding the District. As such, the court is unwilling to consider the

District's payment of the broker's and consultant's fees as the District's acceptance of the Brokerage Service Agreements. To do so would validate Thomas's fraud and self-enrichment to the detriment of the District, the victim of his scheme. Instead, if the performance of payment is to be considered acceptance of the Brokerage Service Agreements, the court imputes that performance to Thomas. In a similar vein, the Brokerage Service Agreements in Exhibits B and C were signed by an "underling" of Thomas and Thomas, respectively. Therefore, when considering both the agreements that were signed by Thomas (or his "underling") and the agreements that were unsigned but for which Thomas orchestrated payment, the question becomes whether the District may be bound by the Brokerage Service Agreements that were entered into by Thomas.

Normally, Thomas, as the Chief Financial Officer of the District, would have the authority to act on behalf of the District, binding the District to the Brokerage Service Agreements. This argument would be convincing if it were not for the glaring fact that Thomas used his position to defraud the District. Under South Carolina law, an employer is bound by its employee's actions only when the employee is acting within the scope of his employment. Murphy v. Jefferson Pilot Comms. Co., 613 S.E.2d 808, 812 (S.C. Ct. App. 2005) (citing Gathers v. Harris Teeter Supermarket, Inc., 317 S.E.2d 748, 753 (S.C. Ct. App. 1984)). "An important factor in determining if an employee acted within the scope of his employment is whether the act was in furtherance of the employer's business." Vereen v. Liberty Life Ins. Co., 412 S.E.2d 425, 429 (S.C. Ct. App. 1991) (citing Crittenden v. Thompson-Walker Co., 341 S.E.2d 385 (S.C. Ct. App. 1986)). But if the employee "acts for some independent purpose of his own, wholly disconnected

from the furtherance of his employer's business," then his conduct is outside of the scope of his employment, and it will not be imputed to his employer.  Id.

Clearly, Thomas did not act within the scope of his employment when he caused the District to pay the fees to the Insurance Defendants.  Thomas did so for the independent purpose of receiving kickbacks, and he was not acting in furtherance of the District's business because the payments to the Insurance Defendants actually harmed the District.  Similarly, Thomas was not acting within the scope of his employment when he signed the first and second Brokerage Service Agreements.[10]  He acted for his own benefit, namely to receive kickbacks from HUB.  However, to drive the point home, the Fourth Circuit, interpreting South Carolina law, considered a factually similar scenario in Young v. FDIC, 103 F.3d 1180 (4th Cir. 1997).  The plaintiff brought claims for civil conspiracy and fraudulent misrepresentation, among others, against a bank based on the actions of the bank's vice president.  Id. at 1189–90.  The plaintiff alleged the bank's vice president conspired with other actors to defraud the plaintiff and negligently misrepresented to the plaintiff that the company from whom the plaintiff had bought a surety bond deposited a sum of money at the bank when it had not.  Id.  The Fourth Circuit, interpreting South Carolina law, held that the bank could not be held liable for its vice president's actions because the vice president was acting "to benefit his own independent purpose of defrauding" the plaintiff.  Id. at 1190.  Here, not only was Thomas clearly acting to benefit the independent purpose of lining his pocket with taxpayer money, but he was also acting to the detriment of his employer, the District.  It

---

[10] The court notes that Angel Cartwright signed the first contract between HUB and the District.  However, as explained at the hearing, Angel Cartwright was an "underling" of Thomas.  Tr. 24:3–5.  As such, the court imputes the signature to Thomas.

would simply make no sense to bind the District to its rogue employee's actions that were part of a criminal enterprise to defraud the District.

In sum, the District never agreed to the Brokerage Service Agreements or the Arbitration Clauses upon which the Insurance Defendants rely in asking the court to compel arbitration. Any appearance of agreement to the Brokerage Service Agreements is based on Thomas's actions, and Thomas was clearly acting outside of the scope of his employment. Therefore, he did not bind the District to the Brokerage Service Agreements or the Arbitration Clauses. Because there was no agreement to arbitrate, the court will not send the District's claims to arbitration.[11]

### III.   CONCLUSION

For the reasons set forth above, the court **DENIES** the Insurance Defendants' motion to compel arbitration.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 29, 2019**
**Charleston, South Carolina**

---

[11] Pokorney and Scott Pokorney made the additional argument that they, as nonsignatories to an arbitration agreement, may compel arbitration. However, because the court finds that no agreement to arbitrate was formed, it need not consider this argument.