*Berkeley County School District v. HUB International Limited*
Civil Action No.: 2:18-cv-00151-DCN
Plaintiff's Motion to Quash

# EXHIBIT B
## (B. Thomas Deposition Transcript)

1

```
1              UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF SOUTH CAROLINA
2                  CHARLESTON DIVISION

3

4   BERKELEY COUNTY SCHOOL  ) CASE No.  2:18-cv-00151-DCN
    DISTRICT,               )
5                           )
         Plaintiff,         )        DEPOSITION
6                           )           OF
         -vs-               )      Brantley Thomas
7                           )
    HUB International       )
8   Limited, HUB            )
    International Midwest    )
9   Limited, Knauff Insurance)
    Agency, Inc., Stanley J..)
10  Pokorney, Scott Pokorney,)
    and Brantley Thomas,     )
11                          )
         Defendants.         )
12

13

14  DATE:            Tuesday, November 10, 2020

15  TIME:            10:23 a.m.

16  LOCATION:        Via Remote Teleconference
                     for all Parties
17

18  REPORTER:        Lisa Kerns
                     Professional Court Reporter
19

20

21  --------------------------------------------
22      RES COURT REPORTING SERVICES
        243 NELLIEFIELD CREEK DRIVE
23        CHARLESTON, SC 29492
             (843)818-9396
24           (843) 654-9534
        LISAKERNS.CRS@GMAIL.COM
25
```

RES COURT REPORTING SERVICES (843) 654-9534 OR (843) 818-9396

---

2

**REMOTE APPEARANCES**

For the Plaintiff:        Richard A. Harpootlian, PA.
                          By: Richard Harpootlian, Esq.
                          By: Phillip Barber, Esq.
                          1410 Laurel Street
                          Columbia, SC 29202

For the Defendant:        MoloLamken LLP
                          By: Thomas Wiegand, Esq.
                          300 North LaSalle Street
                          Chicago, IL 60654

For the Defendant:        Wills Massalon Allen
                          By: John Massalon, Esq.
                          97 Broad Street
                          Charleston, SC 29402

Also present:             Heather Hardy

**INDEX TO EXAMINATIONS**

WITNESS                                          PAGE

Brantley Thomas                                    3

EXAMINATION BY MR. HARPOOTLIAN                     3
EXAMINATION BY MR. WIEGAND                        36
FURTHER EXAMINATION BY MR. HARPOOTLIAN            71
FURTHER EXAMINATION BY MR. WIEGAND               79

**INDEX TO EXHIBITS**

No Exhibits were proffered during this deposition.

**QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER**

(None)

RES COURT REPORTING SERVICES (843)654-9534 OR (843)818-9396

---

3

STIPULATIONS

It was stipulated by and between counsel for the parties that this deposition is taken pursuant to notice and that all questions as to notice are waived; that all objections, save as to the form of the question, are reserved until the time of trial; that the deposition is taken pursuant to the Federal Rules of Civil Procedure for the purposes allowed therein; and that the deponent was explained his/her right to read and sign the deposition and waived that right.

(**Brantley Thomas,** having been first duly sworn, testified as follows:)

EXAMINATION

BY MR. HARPOOTLIAN:

Q.    Okay.  Mr. Thomas, my name is Dick; can everybody here?

A.    I can.

Q.    Okay.  Mr. Thomas, my name is Dick Harpootlian.  I am an Attorney, and I represent the Berkeley County School District in a lawsuit against some folks including, in this particular lawsuit, HUB and in fact its predecessor Knauff?

A.    Correct.

RES COURT REPORTING SERVICES (843)654-9534 OR (843)818-9396

---

4

Q.    Were you -- Well, first of all, I need to explain to you how this works.  Have you ever had your Deposition taken before?

A.    Yes, I have.

Q.    Okay.  In this matter or some other matter?

A.    Other matters.

Q.    Okay.  So, I'm still required by the Rules to explain to you how this works, okay?

A.    Okay.

Q.    So, I'm going to ask you a series of questions, and normally I would say you have to answer and an audio way.  Not nod your head, but since we are on the telephone.

A.    It will be audio.

Q.    It will be audio no matter what we do.  Secondly, your answers yes and no are good answers.  Yep or nope are tough, tough for the Court Reporter to interpret, understand?

A.    I understand.

Q.    She needs to hear your Annunciation.  Now, also, if during this process you here an objection go ahead and answer the question anyway unless you; you do not have an Attorney, correct?

A.    Correct, I do not.

Q.    Okay.  So, you would have to enter an

RES COURT REPORTING SERVICES (843)654-9534 OR (843)818-9396

5

1  objection.  I mean, you would have to, not enter an
2  objection, but if you don't want to answer a question,
3  for instance, if you wanted to take the Fifth Amendment,
4  you would have to, you would have to indicate by your,
5  your answer that you're taking, you are refusing to
6  answer under your rights under the Fifth Amendment of
7  the Constitution of the United States.
8      A.   Correct.
9      Q.   Or, if you have had conversations with one of
10  your Attorneys in the past and you think that's attorney
11  client, if I would try to elicit from you a, a question
12  that you think involves conversations you've had with a
13  lawyer, with only a lawyer --
14      A.   Right.
15      Q.   -- then those are attorney client.
16      A.   Right.
17      Q.   Other than that, if an objection is entered
18  you should go ahead and answer the question anyway.  You
19  should listen to the question, and if it is confusing or
20  compound in some way ask me or whoever is asking, asking
21  the questions to repeat it, okay?
22      A.   I understand.
23      Q.   Okay.  So, let me first of all, for the
24  Record, since this is a Telephone Deposition, I want to
25  establish a couple facts for the Record.  You are in

6

1  fact, Brantley Denmark Thomas, III.  I think you've
2  answered that already, correct?
3      A.   Yes.
4      Q.   Okay.  And you are in fact Brantley Denmark
5  Thomas, III?
6      A.   Yes.
7      Q.   And you were the CFO at one point from the
8  early 2000's to 2017 of the Berkeley County School
9  District; is that correct?
10      A.   Yes.
11      Q.   And in, in -- Let me make sure I get this
12  correct.  You have, in December of 2000 -- Well, let me
13  make sure I'm right about this.  I believe in December
14  of 2017, you pled guilty in Federal Court for a number
15  of charges, correct?
16      A.   Yes.
17      Q.   And included in those charges was embezzling
18  money from, from the Berkeley County School District,
19  correct?
20      A.   Yes.
21      Q.   And let me make sure I find the correct thing
22  I'm looking for.  Here it is.  Okay.  Here's the
23  information.  Hold on one second.  I want to make sure.
24  Did you, you pled guilty to --
25          MR. WIEGAND:  Mr. Harpootlian, I can,

7

1  this is Mr. Wiegand, I can stop you there.
2  It's a leading question.
3          MR. HARPOOTLIAN:  Well, you can object
4  to it.
5          MR. WIEGAND:  I'm objecting.
6  BY MR. HARPOOTLIAN:
7      Q.   Okay.  That's fine.  Okay.  So, in Count 18
8  of your Indictment, let me read this to you.  You, you
9  were, you were charged with a Scheme to Defraud.
10  Beginning with Paragraph 15, but Paragraph 18, it
11  indicates, "it was the purpose of the scheme for Thomas
12  to use his official influence and position, as the
13  Berkeley County School District CFO to enrich himself by
14  sharing insurance contracts and business and accepting
15  cash payments or kickbacks paid by insurance broker
16  employee."  Okay, now you plead guilty to that, correct?
17      A.   Yes, I did.
18      Q.   And did you accept kickbacks, cash payments
19  paid by an insurance, over a period while you were CFO,
20  paid by an insurance broker employee?
21      A.   Yes.
22      Q.   And who was that insurance broker employee or
23  employees that assisted you in a scheme to defraud?
24      A.   That was Mr. Stan Pokorney, and I guess Jana
25  Pokorney and Scott Pokorney.

8

1      Q.   Okay.  Now, let's, I'm going to flesh that out
2  just a little bit.  First of all, let me see how I can
3  do this in a concise way.  In, let's talk about, was
4  there a, a incident which began, or what's the -- Strike
5  that.
6          Was there an incident in 2007, that you
7  remember, involving a corrupt act by you that was
8  assisted in any way by Stan or his wife, Jana Pokorney?
9      A.   Yes, I do.
10          MR. WIEGAND:  Object.  Objection.  Go
11  ahead.
12  BY MR. HARPOOTLIAN:
13      Q.   So, did that involve a -- Well, first of all,
14  what did that involve?
15      A.   That involved an over payment by us of
16  probably a brokerage fee, and so we were asking for a
17  refund.
18      Q.   Okay.
19      A.   And --
20      Q.   And, and I'm looking at, of course we don't
21  have exhibits for you to look at, so I'm going to tell
22  you, this is Bates Stamped 000476, a letter from you to
23  Jana Pokorney on November 19th, 2007, in which you asked
24  Jana Pokorney to prepare a refund in the amount of
25  $22,770.00 made payable to Wachovia.

9

1    **A.**   Correct.  Yes.

2    **Q.**   Okay.  Did --

3                 MR. WIEGAND:  Objection.

4    BY MR. HARPOOTLIAN:

5    **Q.**   Did, okay --  Why did you want that check made

6    out to Wachovia?

7    **A.**   I was wanting to make that check out to

8    Wachovia to be able to divert it to my personal funds.

9    **Q.**   So, you were going to steal that $22,770.00?

10   **A.**   Yes.

11   **Q.**   Now, to your knowledge, and by the way, to

12   your knowledge did you get that check made out to

13   Wachovia?  Was that, did you receive a check from Jana

14   Pokorney for $22,770.00 made out to Wachovia?

15   **A.**   I, I did.

16                MR. WIEGAND:  Objection.

17   BY MR. HARPOOTLIAN:

18   **Q.**   Okay.  And what did you do with that check?

19   Did you --

20   **A.**   It was actually written out to Berkeley County

21   Schools, and so I sent it back.

22   **Q.**   Right.  And then when you sent it back, did

23   you have any instructions for Ms. Pokorney?

24   **A.**   I had the same instructions from the original

25   request.

---

10

1    **Q.**   Which was?

2    **A.**   To convert it to a check made payable to

3    Wachovia Bank.

4    **Q.**   And did you have discussions with her about

5    that?

6    **A.**   Yes, I did.

7    **Q.**   Did you have discussions with Stan Pokorney

8    about that?

9    **A.**   Yes, I did.

10   **Q.**   Okay.

11                MR. WIEGAND:  Objection.

12   BY MR. HARPOOTLIAN:

13   **Q.**   Okay.  And what was the nature of the

14   discussions with Stan Pokorney about your, your

15   decision, making it to Wachovia as opposed to the

16   Berkeley County School District?

17   **A.**   The discussions with Mr. Pokorney were in the

18   realms of if, if you need that made out to Wachovia, we

19   can try, we can make that happen.  But it was a

20   difficult task from what I understand due to the

21   accounting procedures at the, at the insurance company.

22   **Q.**   Based on your discussions with Mr. Pokorney,

23   what, if anything, did you believe his knowledge of, of

24   your discussions with him, what, if anything, did you

25   believe his knowledge of whether or not you intended to

---

11

1    convert that to your own use?

2                MR. WIEGAND:  Objection.

3    BY MR. HARPOOTLIAN:

4    **Q.**   Go ahead.

5    **A.**   I believe that he knew that I, I planned to

6    take that money for my own use and, and comments related

7    to like, we'll take care of it.  If you need that let me

8    know.

9    **Q.**   Okay.  So, what about Ms. Pokorney, did you

10   have any discussions with her?  What, if any

11   discussions, would you have had with her that would lead

12   you to believe that she knew you were stealing the

13   money?

14   **A.**   Other than asking for the check back to

15   Wachovia, discussing it with their accounting department

16   of it being difficult, but she was able to do what I

17   requested, and I do believe that she knew that I was

18   planning to take the money.

19   **Q.**   And in your emails -- Well, in your emails,

20   did you have any discussions with Ms. Pokorney about why

21   you represented that you needed that made out to

22   Wachovia?

23                MR. WIEGAND:  Objection.

24                THE WITNESS:  I believe that I, my

25   typical answer, I don't exactly -- It would be

---

12

1    probably to make a lease payment or payment to

2    refund something to Wachovia.

3    BY MR. HARPOOTLIAN:

4    **Q.**   Okay.  Now, in your discussions this occurred

5    and then after this occurred, what if, what if any

6    discussions did you have with Stan or with Ms. Pokorney

7    that would indicate to you that they knew you had stolen

8    this money?

9    **A.**   Well, like I say, discussions between that

10   time and forward I would, I would hear comments like,

11   you don't have to worry, we'll protect you.  It's

12   between us.  No one will find out.  Those kinds of

13   statements.

14   **Q.**   Was that from Stan or his wife?  I mean --

15   **A.**   From Stan, yes.  Yes.  From Stan.

16   **Q.**   Okay.  Now, between, and let's look at the

17   period between this happening in 2010.  You signed a

18   number of service agreements and approved a number of

19   insurance policies for, and at that point, it was

20   Knauff, correct?

21   **A.**   Correct.  Yes.

22   **Q.**   And, and, and the Knauff broker was who?

23   **A.**   Mr. Pokorney, Stan Pokorney.

24   **Q.**   Okay.  And do you know what his wife's role

25   was?

**13**

1    A.  I believe, probably Account Executive or
2  Account Rep, I believe.
3    Q.  Now, during that period of time as you signed
4  for those, what we talked about, the service agreements,
5  Brokerage Service Agreements, and you signed those, was
6  your decisions based on of those being a good deal for
7  the Berkeley County School District, or some other
8  factor?
9          MR. WIEGAND:  I, I will object to the
10       form.
11  BY MR. HARPOOTLIAN:
12    Q.  Go ahead.
13    A.  I would just, I would comment that those
14  decisions were based on, from my own interests and not
15  the School District's interest.
16    Q.  And when you say your own interest, what was
17  that?
18    A.  To be able to -- Well to one to defuse any
19  sort of guilt or shame from the $22,770.  A fear of him,
20  you know, telling on me, and keeping the business there.
21  So we --
22    Q.  Did he ever say anything to you during that
23  period of time that would lead you to believe that that
24  was a viable fear?  That, that was, was that based on
25  something he said or just your, your, your

**14**

1  uncorroborated fears?
2          MR. WIEGAND:  Objection.
3  BY MR. HARPOOTLIAN:
4    Q.  Go ahead.
5    A.  Based on comments like either you do not have
6  to worry, we'll protect you.  Between us, no one will
7  find out.  That same scenario.
8    Q.  So do you, now let me, let me go to another
9  matter during -- Well, first let me back off.  Let me --
10  Strike that.  Let me, let me go to -- Now, beginning in
11  2000 --
12      Well, first of all, were you, did you receive
13  any cash from, or checks, from Mr. Pokorney?
14    A.  I did.  I believe around 2010 on to my
15  departure.
16    Q.  Okay.  And do you remember how much those
17  checks were?
18    A.  Those were in $2000 increments.
19    Q.  Do you know, I mean, do you have any specific
20  recollection of how many a year, or how many?
21    A.  They would come, usually they would come in
22  and around annual renewal periods, right after the
23  invoices were sent.  And then some would be twice a
24  year.  I don't remember the exact amount, but some would
25  come twice a year and some would come once a year.

**15**

1    Q.  And did you and Mr. Pokorney discuss the,
2  these checks?  Did he pay you in checks or in cash?
3    A.  Check.
4    Q.  Okay.  And when you got such a check did he
5  deliver it personally, or did he mail it, or how did he
6  --
7    A.  He mailed it to my home.
8    Q.  To your home.  Let me go back for just a
9  second.  That raises another issue.  On that 2007
10  payment, was that mailed to the office or was that
11  mailed to your home?
12    A.  I don't remember that.  I don't remember, but
13  I'm assuming it was mailed to my home, but I don't
14  remember.
15    Q.  And, and let me ask you this.  It would appear
16  that there were some things mailed to your home and some
17  things mailed to your, the Berkeley County School
18  District.  Why was something to be mailed to your home?
19          MR. WIEGAND:  Objection.  Go ahead.
20          THE WITNESS:  I, I, I believe they were
21       mailed to my home so that I would be able to
22       get the invoices and the documents, so I could
23       avoid the different approval levels and get
24       them straight to getting paid.
25  BY MR. HARPOOTLIAN:

**16**

1    Q.  Okay.  Did you and Mr. Pokorney ever
2  discussed that, that you're avoiding these other steps?
3    A.  No, they just started coming to my home.
4    Q.  Okay.  Now -- And because they came to your
5  home, did you in fact, were you able to avoid certain
6  approvals?
7    A.  Yes.
8    Q.  Now, these, these, these, these payments that
9  began in 2010, did, did Stan tell you what the, I mean,
10  did you ever hear from Mr. Pokorney what you're supposed
11  to do with the money, or did y'all have some story to
12  cover the money, or what?
13    A.  There was discussions --
14          MR. WIEGAND:  Objection.
15  BY MR. HARPOOTLIAN:
16    Q.  Go ahead.
17    A.  There was discussions, or not discussions, but
18  maybe written on the check in the memorandum section
19  related to my daughter's college fund.
20    Q.  Okay.  Now, did you establish your daughter's
21  college fund with these $2,000 payments?
22    A.  I did not.
23    Q.  Did you, did you have any arrangement for your
24  daughter's college at that point?
25    A.  Yes, I did.  When she was born I had a, the

**17**

1  South Carolina Tuition Repayment plan started that I had
2  bought, and that paid for tuition at a South Carolina
3  State school.
4      Q.  And that was a one time payment when she was
5  born?
6      A.  I did an installment.
7      Q.  For how long?
8      A.  A five years, five year installment.
9      Q.  Okay. And when was she born?
10     A.  In 2000.
11     Q.  Okay.  So, by 2005 you had that paid for?
12     A.  Yes, pretty much.
13     Q.  Okay.
14     A.  Yes.
15     Q.  Okay.
16     A.  Yes.
17     Q.  So, did any, did any of this money go to some
18  college fund for her, the 2000, the 2000 at a time from
19  Pokorney?
20     A.  No.
21     Q.  And what was the purpose of the $2000 coming
22  to you?
23     A.  Again, I would go back to the statement I
24  made, but to me they were, I considered them to be a
25  means to continue my business with them, whether or not

**18**

1  it was Knauff or HUB.  And again, comments like you do
2  not have to worry about, we'll protect you, it's between
3  us, and no one will find out were made by him.
4      Q.  Now, did, did Mr. Pokorney ever ask you about
5  how your daughter's college fund was coming?
6      A.  No, he did not.
7      Q.  Did he ever indicate to you -- Well, strike
8  that?
9          So, and those payments went on.  So, during
10  the period of time from 2010 forward, as you were making
11  decisions about whether to assign brokerage services
12  agreements or renew insurance policies presented by Mr.
13  Pokorney, what, if any role the 2007, and or the $2000,
14  the 2007, $22,000 issue or the $2000 payments after 2010
15  made in your play, what role did it play in your
16  decision to whether or not to go, go forward with these
17  services agreements or renewed insurance policies?
18         MR. WIEGAND:  Objection.
19  BY MR. HARPOOTLIAN:
20     Q.  Go ahead.
21     A.  I again would go back to the statement I
22  made about making these decisions for my own interest
23  and not the School Districts.  Again, worried about the,
24  you know, the shame and guilt of it and being exposed,
25  so...

**19**

1      Q.  And, and when you were taking the $2000 at a
2  time from Mr. Pokorney, did you regard this as a bribe?
3      A.  I did.
4      Q.  Did Mr. Pokorney acknowledged to you, ever, I
5  mean, again other than in the general we'll take care of
6  you, we'll look out for you.  Don't worry about it.
7  Anything specific about the payments or the 2007 issue?
8      A.  No.
9          MR. WIEGAND:  Objection.
10         THE WITNESS No.  Other than general
11     comments, yes.
12  BY MR. HARPOOTLIAN:
13     Q.  Like general comments being?
14     A.  Like, we'll take care of you.  You know, don't
15  worry.  There's also discussions about, you know, my
16  brother and those sorts of things, more of a family
17  connection, so.
18     Q.  And did you have a close family connection
19  with him?
20     A.  I believed at the time it was, but then no.  I
21  really did not.  I was always searching for some, you
22  know, relationship along those lines but it really
23  wasn't true, so no.
24     Q.   Okay.  Now, so -- Hold on a sec.  Hold one
25  second.  Mr. Thomas --

**20**

1      A.  Yes.
2      Q.  -- a couple of other things.  One, how would
3  you, I mean about the college payments, did you ever
4  characterize the, or would Stan ever characterize these
5  as a joke?
6          MR. WIEGAND:  Objection.  Leading.
7  BY MR. HARPOOTLIAN:
8      Q.  Go ahead.
9      A.  I believe more, I would use the word a ruse,
10  or a just a, you know, just as a way to, as payments to
11  me for the business, that's kind of how I would describe
12  it.
13     Q.  I guess what I'm asking you is, did, I mean,
14  based on your discussions with Stan, did he, what if any
15  characterization would you have about his contributing
16  to your daughter's college fund?
17     A.  Oh, Okay.  I, I --
18         MR. WIEGAND:  Objection.
19  BY MR. HARPOOTLIAN:
20     Q.  Go ahead.
21     A.  I believe it to be, well, I believed it to be
22  not appropriate and odd.  I mean, I just knew that I
23  didn't need it and so --
24     Q.  What I'm asking you, though, is what was Mr.
25  Pokorney's belief based on your discussion with him?

21

1   A.   Oh, Mr. Pokorney's belief?
2        MR. WIEGAND:  Objection.
3   BY MR. HARPOOTLIAN:
4   Q.   Go ahead.
5   A.   I believe his belief was to continue the, the
6   relationship on a level where I would keep business
7   with, with him.
8   Q.   Did, did, did you regard the money being paid
9   to you as a bribe?
10  A.   I did.
11  Q.   Based on your discussions with Mr. Pokorney,
12  do you believe he understood it to be a bribe?
13  A.   Yes.
14       MR. WIEGAND:  Objection.
15  BY MR. HARPOOTLIAN:
16  Q.   Okay.  So, now, let me ask you this, did Mr.
17  Pokorney ever ask you to do anything relative to other
18  School Districts?
19  A.   Others?  Yes.  Yes.
20  Q.   Okay.  What was that?
21  A.   Other School Districts would go out for
22  periodic bids, R&D's for insurance services, and so I
23  was asked to be a reference.
24  Q.   And were you a reference?
25  A.   I certainly was, yes.

22

1   Q.   And so you recommended Mr. Pokorney and HUB to
2   other School Districts.
3   A.   I did.
4   Q.   And was that based on an honest belief that
5   they were, that Mr. Pokorney had the best services or
6   that he had bribed you?
7        MR. WIEGAND:  Objection.
8   BY MR. HARPOOTLIAN:
9   Q.   Go ahead.
10  A.   I believed that to be -- Again, I would go
11  back to the, you know, I was making those decisions
12  again for myself and not the other School Districts.
13  Q.   Okay.  Cause it was in your interest to do
14  that, not the Berkeley County School Districts or the
15  other School Districts?
16  A.   Or the other School District, yes.
17  Q.   Okay.  Now, the, now who is, who is Marcy?
18  A.   Marcy was an employee in the School District,
19  and she had the role of Risk Manager, but also in
20  Procurement.
21  Q.   So, if an invoice came from HUB or from Knauff
22  through the normal course of being mailed to the School
23  District, would she be the first one to see it?
24  A.   If she was at, well, I guess --
25       MR. WIEGAND:  Object to the form.

23

1   BY MR. HARPOOTLIAN:
2   Q.   Go ahead.
3   A.   Again, The first one to see it would be the
4   mailroom, and the they were distribute it to the
5   appropriate staff person.  And if Marcy was the one at
6   Risk management, Marcy would have been the one to see it
7   and get approval.
8   Q.   Okay, and then after she signed off on it,
9   where would it go?
10  A.   Depending on The amount of the invoice, if it
11  was over I believe it was 50,000, I would see it and
12  then it would go to Accounts Payable for processing.
13  Q.   Okay.  And that brings up another point.  What
14  was your authority to sign off on, on consulting
15  agreements or approved payments?
16       MR. WIEGAND:  Objection.
17       THE WITNESS:  The authority level, I
18  believe anything over 75,000 was.  But we had
19  a system where we -- But also too, let me stop
20  and go back a little bit.  I presume that
21  Insurance Services were exempt from
22  Procurement Code, but I took that leap to
23  override some of those but the --
24  BY MR. HARPOOTLIAN:
25  Q.   Well, let me stop you there.  You say you took

24

1   that leap to override.  Did you make that decision to
2   facilitate the approval of these contracts?
3   A.   Yes.
4   Q.   And you did that based on your, them helping
5   you steal money and bribing you?
6   A.   Yes.
7        MR. WIEGAND:  Objection.
8        THE WITNESS:  Yes.
9   BY MR. HARPOOTLIAN:
10  Q.   Okay.  Now, let's proceed to another area.
11  So, you're familiar with the insurance services
12  agreements that were entered into by the School District
13  on a number, on a number of different lines with either
14  Knauff or HUB, correct?
15  A.   Yes.  Yes.
16  Q.   And let me see if I can find one here.  Here's
17  one.  No, that's not the one I want.  Hang on.  No
18  that's not the -- How about this one right here?  I
19  thought I had one right here.  Hold on.  I think this
20  one right here.  Okay.  I'm going to read something to
21  you.  It's called a Client Management Service Fee
22  Agreement.  No, this ones's too old.  Too new, I mean.
23  Okay.  So, I'm looking at one Bate Stamped Number
24  000026, HUB26.  It's a letter from it looks like Stan
25  Pokorney to you.  It's dated May 2011 and there are,

**25**

1  first of all, do you have authority to execute these,
2  these Agreements?  Well, first of all, you have, to your
3  knowledge have you ever executed one of these
4  Agreements?
5      A.  Yes, I did.
6          MR. WIEGAND:  Objection.
7  BY MR. HARPOOTLIAN:
8      Q.  Okay.  So, did you have authority in these
9  Agreements?
10         MR. WIEGAND:  Objection.
11         THE WITNESS:  Yes.
12  BY MR. HARPOOTLIAN:
13     Q.  Okay.  And do you know what year you did it or
14  didn't do it; do you remember specifically?
15     A.  I don't remember the years.
16     Q.  Okay.
17     A.  Probably every year.
18     Q.  And were you executing these Agreements
19  based on what was best for the School District, or
20  because they were bribing you, or covered up for your
21  stealing?
22     A.  I believed it --
23         MR. WIEGAND:  Objection.
24         THE WITNESS:  I believe it was to
25         continue that scheme of bribery.

**26**

1  BY MR. HARPOOTLIAN:
2      Q.  Okay.  Now, Mr. Thomas, these Agreements were
3  sent to, in many instances sent to your home as opposed
4  to the School District, why was that?
5      A.  I believe --
6          MR. WIEGAND:  Objection.
7          THE WITNESS:  I believe to, for me to
8          see my, for my eyes only to sign and to get
9          back to them.
10  BY MR. HARPOOTLIAN:
11     Q.  So, were you following -- Well let me strike
12  that.
13         Were you following your School Districts
14  procedure by having them sent to your house?
15     A.  No.
16     Q.  Okay.  Now, you also used a combination of
17  your School Districts emails and your private emails.
18  When you were communicating with the Pokorney's we see a
19  number of instances where you are using your private, I
20  think it's a Comcast account?
21     A.  That is correct.
22     Q.  Why, why would you didn't?
23         MR. WIEGAND:  Objection.
24         THE WITNESS:  I would to that so the
25         emails would not be archived on the Districts

**27**

1          system.
2  BY MR. HARPOOTLIAN:
3      Q.  Why, why were you worried about that?
4      A.  Because people would, I know we would, people
5  would be able to read them, and check them, and also
6  Freedom of Information Act.
7      Q.  So, you need to keep them secret?
8      A.  Yes.
9      Q.  Is that because they had help you steal money
10  in 2007 and, and at some point began bribing you?
11         MR. WIEGAND:  Objection.
12         THE WITNESS:  Yes.
13  BY MR. HARPOOTLIAN:
14     Q.  Would that have been evidence of, if you had
15  read those and piece them together, could you perhaps
16  figure out that you had been bribed?
17     A.  Yes.
18     Q.  Okay.  Now -- Okay.  Can we can, can I may be
19  close to done.  Let's go on, let me put you on hold for
20  a moment, please.
21     A.  Okay.
22         (Whereupon, a break was taken, after
23         which the following proceedings were:)
24  BY MR. HARPOOTLIAN:
25     Q.  Hey.  Dick Harpootlian, I'm back.  I was going

**28**

1  to go here and I got sort of distracted a minute ago
2  from this 2011 Agreement, Mr. Thomas.  So, let me just
3  speak again on Bates Stamp 26 through 29.  It says,
4  "Dear Brantley, attached please find Knauff, Inc.,
5  Broker Service Agreement for Berkeley County School
6  District client."  So, those are the Terms and
7  Conditions Knauff agrees to provide the following
8  services.  And it goes through with, define property and
9  provide program coverage or Risk Identification
10  Evaluation, Risk Finance Program Design.  Market
11  Submission Preparation Review.  Brokering, which is 1.4.
12  Identify, evaluate, and develop market.  Conduct
13  negotiations with markets.  Compare and make
14  recommendations about programs, selections, price
15  coverage, and programs with markets selected by clients.
16  1.5 Risk finance program.  Execution of 1.6.  Ongoing
17  client services 1.7 which is Claim Services.  And
18  Compensation would be, "client agrees to pay Knauff an
19  annual fee of $70,000 dollars to be paid annually."  And
20  the School District's responsibilities.
21         There are a number of duties spelled out that
22  or service spelled out here that Mr. Pokorney says that
23  he can provide.  To the best of your knowledge, in, in
24  this Agreement or any other Services Agreement, that was
25  ever between Knauff, or HUB and the School District,

## 29

1  were any of these services ever provided?
2      MR. WIEGAND: Objection.
3  BY MR. HARPOOTLIAN:
4      Q. Go ahead.
5      A. I believe when you read, I'm not sure what,
6  but it was, but Claims Service was, but the rest of
7  them, no.
8      Q. Okay. Claims Services was the last one. Rest
9  no. So, did you ever receive memos about risk
10  identification evaluation from Mr. Pokorney?
11      A. The only impromptu meetings where I would be
12  presented with a scratch piece of paper of the plan for
13  the following year, but nothing formal.
14      Q. But in terms of him actually doing work on it
15  any, any work that would justify $70,000 a year, in your
16  mind did he do that?
17      MR. WIEGAND: Objection.
18      THE WITNESS: No.
19  BY MR. HARPOOTLIAN:
20      Q. Okay. So, the reason that you would renew it
21  the next year was because he had done such a great job
22  or, was it because of the bribery?
23      MR. WIEGAND: Objection.
24  BY MR. HARPOOTLIAN:
25      Q. Go ahead.

## 31

1  pay them for services because they were either covering
2  up your theft or bribing you?
3      MR. WIEGAND: Objection.
4      THE WITNESS: Yes.
5  BY MR. HARPOOTLIAN:
6      Q. Okay. And that's the entire period of time
7  every year.
8      A. Yes.
9      MR. WIEGAND: Objection. It misstates
10  testimony.
11      MR. HARPOOTLIAN: I'm sorry?
12      MR. WIEGAND: Misstates testimony.
13  BY MR. HARPOOTLIAN:
14      Q. You know, that's for the Jury or a Judge to
15  figure out. But -- Well, maybe I need to clarify that.
16  The arrangements you had with them, whether it was
17  buying insurance or signing these, agreeing to, or
18  signing the Brokerage Service Agreements, was that
19  because you thought they were the best deals for the
20  School District, or because you were being, they were
21  covering up your theft or bribing you?
22      MR. WIEGAND: Objection.
23      THE WITNESS: The bribery.
24  BY MR. HARPOOTLIAN:
25      Q. The bribery?

## 30

1      A. Again, I base my decisions on my own interest.
2  So, to bribe.
3      Q. Okay. And this entire relationship with Mr.
4  Pokorney going back, do you remember whether or not if
5  you received anything from Mr. Pokorney prior to 2007?
6  Do you know? Do you remember?
7      A. Other, no I don't, other than some, like I
8  don't know when that started, but sometimes the vendors
9  would send fruit and stuff to the office, or you know.
10  So, yeah --
11      Q. So no, no, no cash?
12      A. No.
13      Q. Okay. Let me ask you this. No, two things.
14  One, you're still a party to this lawsuit, correct?
15      A. Yes.
16      Q. You're still getting sued?
17      A. Yes.
18      Q. Okay. And so as such, your Deposition is
19  being taken today as what we would call an Adverse
20  Party, right?
21      A. Yes.
22      Q. Okay. So, let me ask you some, some questions
23  that I would ask an Adverse Party in a Case such as
24  this. Did you conspire with the Pokorney's when they
25  were with Knauff and with HUB, to steal money from or

## 32

1      MR. WIEGAND: Objection.
2      THE WITNESS: Yes.
3  BY MR. HARPOOTLIAN:
4      Q. And the theft?
5      A. Yes.
6      Q. Okay. Covering up your theft and bribing you,
7  right?
8      A. Yes.
9      MR. WIEGAND: Objection.
10  BY MR. HARPOOTLIAN:
11      Q. Okay. Now, let me, let me, let me sort of
12  backup for just a second. I spoke with you by phone
13  yesterday; is that correct?
14      A. Yes.
15      Q. Is that the first time, or any time that
16  you've ever talk to me?
17      A. Yes.
18      Q. And you, I believe your Public Defender was on
19  that phone call with me?
20      A. She was.
21      Q. Okay. Now, why have you in prior interviews
22  or depositions, you have taken the Fifth Amendment and
23  refuse to answer any questions, why are you --
24      A. Well --
25      Q. Sorry?

33

1    **A.** Are you talking to me?

2    **Q.** Yes.

3    **A.** Okay. Yes.

4    **Q.** So, why is it you had this change of heart,

5    this change in position in answering my questions today?

6    **A.** Well, I, I feel it's time for myself to own up

7    to, own up to this and be something positive. I

8    promised my father before he died that I would do

9    something for him to make this right and so, and also my

10    daughter. And so this is my way of making things right,

11    for telling the, the truth and the real story behind

12    this.

13    **Q.** Can I, I mean can the Berkeley County School

14    District help you in any way? I mean, I know you're

15    under a Federal, you pled guilty in Federal Court and

16    State Court, you're serving your sentences, right?

17    **A.** Correct. Yes.

18    **Q.** Can we do, we my clients, do anything to

19    assist you in mitigating your, getting resentenced? I

20    mean if your Public Defender's have talked to you about

21    this, so I, I don't want to you to breach any

22    attorney-client privilege relationships, but are you

23    motivated by wanting something, or just doing the right

24    thing?

25    **A.** I'm doing the right thing.

34

1               MR. WIEGAND: Objection.

2    BY MR. HARPOOTLIAN:

3    **Q.** Okay. Now, we looked at a number of things

4    involving HUB and Knauff and we think during the period

5    of time you had relationships with the Pokorney's, you

6    either bought or signed, bought the premiums for the

7    insurance, or the payments for the Brokerage Service

8    Agreement were somewhere between 12 and $15 million. Do

9    you believe, based on your conduct, that HUB, who bought

10    Knauff, should pay that money back?

11               MR. WIEGAND: Objection.

12    BY MR. HARPOOTLIAN:

13    **Q.** Go ahead.

14    **A.** Yes.

15    **Q.** Okay. And if the law allows multiples of that

16    money to be paid, should they pay that?

17    **A.** Yes.

18               MR. WIEGAND: Objection.

19    BY MR. HARPOOTLIAN:

20    **Q.** Okay. I think I'm done. This will take 30

21    seconds. Hold on. One other thing, you're in the

22    federal penitentiary?

23    **A.** Yes.

24    **Q.** I'm sorry. Apparently it's not a, I was

25    corrected earlier it's called something other than a

35

1    penitentiary?

2    **A.** A Federal Satellite Hub(sic).

3    **Q.** Okay. Sorry.

4    **A.** I don't know, I don't know the lingo.

5    **Q.** And where is that?

6    **A.** That's in Jesup, Georgia.

7    **Q.** And how long have you been there?

8    **A.** March 2019.

9    **Q.** And when do you expect to leave there?

10    **A.** I have, with some of the First Step Act, I'm

11    trying to mitigate some of that, but I think 2023 is

12    about it.

13    **Q.** Okay, and you will walk free at that point?

14    **A.** No. I have State.

15    **Q.** What, what was your State Sentence?

16    **A.** Ten years.

17    **Q.** Okay. So, you go from Federal custody to

18    State custody sometime in 2023?

19    **A.** Yes.

20    **Q.** For 10 years?

21    **A.** Yes.

22    **Q.** Okay. Hold on one second, please.

23               (Whereupon, a break was taken, after

24               which the following proceedings were:)

25    BY MR. HARPOOTLIAN:

36

1    **Q.** Okay. That's, that's all I have, Mr. Thomas.

2    If HUB Council has questions, they can proceed.

3               **EXAMINATION**

4    BY MR. WIEGAND:

5    **Q.** Yes, this is Mr. Wiegand. Let me ask you a

6    few questions, Mr. Thomas. Sir, in September 2020, so

7    just a couple of months ago, you filed a Petition for

8    early release seeking to end your incarceration in a

9    Federal facility, correct?

10    **A.** Yes.

11    **Q.** And the Public Defender that we referred to,

12    that you referred to earlier during your testimony, that

13    Public Defender was actually appointed by the Court to

14    help you in trying to seek your early release, correct?

15    **A.** Yes.

16    **Q.** And so the discussion that you had yesterday

17    was that with the same Public Defender on the line?

18    **A.** Ah, yes.

19    **Q.** Okay. And so, was it just the two of you with

20    Mr. Harpootlian who talked yesterday?

21    **A.** I don't remember the rest of the group, but I

22    remember Mr. Harpootlian, Ms. Bent(sic), and then also

23    my sister.

24    **Q.** Okay. And then Mr. Harpootlian, yesterday he

25    tried to get every detail out of you that he possibly

37

1  could, correct?
2      A.   Detail?  I was just talking the truth
3  yesterday.
4      Q.   He was trying to get, didn't he ask you a
5  bunch of questions yesterday about exactly when you had
6  certain conversations, correct?
7      A.   Yes.
8      Q.   And he asked you exactly what was it that Mr.
9  Pokorney would have said to you in those conversations,
10 correct?
11     A.   Would have said to me?  No.  I'm not sure I
12 understand.
13     Q.   Well, he asked you about conversations with
14 Mr. Pokorney, he asked you specifically what words were
15 used, correct?
16     A.   What words were used by Stan?
17     Q.   Yes.
18     A.   Well, only the words that I understood them to
19 use.
20     Q.   He asked you for every detail you could
21 recall, correct?
22     A.   Yes.
23     Q.   And everything that you've discussed today in
24 response to his leading questions was as a result of
25 your conversation --

38

1              MR. HARPOOTLIAN:  Object to the form.
2         Let me say something for the Record.  Object
3         to the form.  He is an adverse party.  There's
4         no such thing as a leading question.  Go
5         ahead.
6  BY MR. HARPOOTLIAN:
7      Q.   Well, no, no, no.  He's clearly working
8  together with you.  You're all cooperating.  He's your
9  employee.  He's your former employee and you're all
10 cooperating.
11             MR. HARPOOTLIAN:  No, he's not.  He's
12        being sued.  He's an adverse party.  Go ahead.
13             MR. WIEGAND:  The fact that would put
14        him on that -- At any rate, I disagree with
15        that.  The Court can handle that.
16             MR. HARPOOTLIAN:  Yes.
17 BY MR. WIEGAND:
18     Q.   But you gave him everything.  You gave Mr.
19 Harpootlian every possible detail you could remember
20 yesterday, right?
21     A.   The truth.  I gave him the truth yesterday.
22     Q.   And Sir, indeed, you gave him every detail you
23 could remember, didn't you?
24     A.   I gave him the truth.
25             MR. HARPOOTLIAN:  Object.  Object to

39

1  the form.  This is repetitive.  You asked him
2  details --
3  BY MR. WIEGAND:
4      Q.   He hasn't, he hasn't given me an answer.  Sir,
5  I didn't ask you whether you gave him the truth.  Did
6  you give him everything you could possibly recall
7  regarding conversations with Mr. Pokorney?
8      A.   Yes.
9      Q.   And every possible detail you recall of the
10 details you've already stated today on the Record, in
11 terms of those conversations with Mr. Pokorney?
12     A.   Repeat that question again.
13     Q.   Yes.  So far, earlier today, when questioned
14 by Mr. Harpootlian, you disclosed every possible detail
15 you can recall of a conversation with Mr. Pokorney,
16 didn't you?
17     A.   Again, I'm, I'm, I'm talking to the truth and
18 I gave them everything that I remembered.
19     Q.   And so getting back to your petition for
20 early release, you expect that the Berkeley County
21 School District will be given an opportunity to weigh in
22 on whether you should be released early, don't you?
23             MR. HARPOOTLIAN:  Object to the form.
24        And is not consistent with the Federal law.
25        We do not get a chance to weigh in.

40

1  BY MR. WIEGAND:
2      Q.   You are not then.  You can note that.  Mr.
3  Thomas, please answer.
4      A.   There's no connection between the two.  Again,
5  I am doing this for my father, and my daughter and
6  myself.
7      Q.   I want to ask what you believed.  Do you
8  believe that the Berkeley County School District could
9  weigh in and prevent you from getting an early release,
10 if it so chose?
11     A.   I, I do not know what they would do, no.
12     Q.   Do you believe it's possible that if the
13 Berkeley County School District was continuing to be
14 upset with you, that it could mess up your ability to
15 get an early release, right?
16     A.   I, I'm not going to make that connection with
17 out me peaking to council.
18     Q.   Sir, even if this first petition for an early
19 release is not granted, you still hope for an early
20 parole at some point, right?
21     A.   But that's not connected, no.
22     Q.   I didn't ask that.  I said, even if a petition
23 is not granted, at some point in the future you know
24 that you'd want to seek early parole, right?
25     A.   Yes.

**41**

1  Q.   You would expect that at that time, the
2  Berkeley County School District would be given a chance
3  to provide input on whether you should be allowed early
4  parole, don't you?
5  A.   As the victim, yes they should.
6  Q.   Okay.  So, it's important to you to do
7  whatever you can to go along with what the Berkeley
8  School District wants, correct?
9  A.   It's not important to them, it's important to
10  me to do this, to do what's right.
11  Q.   You understand that if you make the Berkeley
12  County School District happy today, you've got a better
13  chance of them going along with an early release for you
14  later, don't you?
15  A.   I, that is not my motive here.  My motive is
16  to do what is correct and my conscience.
17  Q.   Well, sir let's get to this 2007 refund.  In
18  2007, you stated to Janna Pokorney that you mistakenly
19  made an over payment of about $22,770, correct?
20  A.   Yes.
21  Q.   But today you're now saying that, that you
22  made that overpayment intentionally?
23  A.   The 2007 event, whether it was intentional or
24  not, but it, it came to an idea as a way to put some
25  money in my pocket.  So, I don't know if it was

**42**

1  intentional or not, but it might have been an accident,
2  but I saw that as a way to take money.
3  Q.   Okay, so --
4  A.   But I don't remember.
5  Q.   So, it could be that you mistakenly made an
6  overpayment of $22,770, is that your testimony?
7  A.   I don't know if it's, I just, I don't recall
8  the exact circumstances.
9  Q.   Okay.  And so when you asked for the
10  repayment, it could be that that was an honest request
11  for a repayment because you made an overpayment
12  mistakenly, right?
13  A.   I asked them to convert the check to Wachovia
14  so I could take it.
15  Q.   But you never, you never stated in any
16  communication to Jana Pokorney that the reason you
17  wanted the check written to Wachovia was that you could
18  take it personally, did you?
19  A.   They knew what I was doing.  I, I they would
20  make comments like, again, I don't have to worry.  We'll
21  protect you.  Between us.  And that came from Stan.
22  Q.   And we're going to get to that.  We'll get to
23  that.  First of all, you never stated in any written
24  communications the Jana Pokorney, that the reason you
25  made the overpayment was so that you could get money

**43**

1  back to yourself, did you?
2  A.   Not specifically, but they knew it.
3  Q.   And you never stated in writing that the
4  reason you wanted to check written or issued to Wachovia
5  was so that you could take the money for yourself, did
6  you?
7  A.   Mr. Pokorney, when he heard about it he, he
8  talked to me about it and said that if you need the
9  money, we can make it happen.
10  Q.   Sir, back to my question.  We're going to get
11  to what you talked to Mr. Pokorney about.  But in terms
12  of your written communications with Jana Pokorney, you
13  never stated that the reason you wanted the check cut to
14  Wachovia was so you could convert it to your personal
15  use, did you?
16  A.   Not specifically, no.
17  Q.   Okay.  Sir, why are you fighting so hard to
18  make Jana Pokorney and Stan Pokorney look bad?
19  MR. HARPOOTLIAN:  I would object to the
20  form of the question.
21  MR. WIEGAND:  You can object.
22  MR. HARPOOTLIAN:  I'm objecting and
23  it's argumentative.  And we can, if you
24  continue with this line of harassment we'll
25  get Judge Norton on the phone.

**44**

1  BY MR. WIEGAND:
2  Q.   Sir, answer the question.  Why are you trying
3  so hard to divert my questions and fight with them?
4  A.   To fight with them?
5  Q.   Yes.
6  A.   Because I allowed them to take over my life,
7  and now I am again doing the right thing for myself, my
8  father, and my daughter by telling the truth.
9  Q.   Sir, let's go back to what you actually said.
10  If you'd try to just answer the questions openly and
11  honestly, I'm sure everybody would be impressed with
12  that.
13  A.   Okay.
14  MR. HARPOOTLIAN:  Object to the form.
15  BY MR. WIEGAND:
16  Q.   You agree --
17  MR. HARPOOTLIAN:  Object to the form.
18  Do not tell the witness how I'm going to be
19  impressed or not be impressed.  I'm on the
20  phone and you should not characterize who he's
21  supposed to answer for, and how he should
22  impress.  If you continue this pattern, we
23  will get Judge Norton on the phone so that he
24  can, he can instruct you how to ask questions.
25  BY MR. WIEGAND:

**45**

1  Q.  Sir, tell me about every conversation you had
2  with Jana Pokorney -- Well, let's strike that.  Let's
3  start here first.
4       There actually was never a second check cut to
5  Wachovia, was there $22,700?
6  A.  I believe there was.
7  Q.  You don't recall actually seeing that, do you?
8  A.  I believe I got at my house and took it to
9  Wachovia.
10  Q.  Sir, do you actually recall seeing a check
11  written to Wachovia?
12  A.  I, I, I mean that's 13 years ago, so I do
13  believe that they made it happen, yes.
14  Q.  But you don't recall seeing it is the point of
15  your answer; is that right?
16       MR. HARPOOTLIAN:  Objection.  He's
17       answered the question.
18  BY MR. WIEGAND:
19  Q.  All right.  So, sir isn't what happened that
20  Jana Pokorney told you in an email that she cannot issue
21  a check to Wachovia, but you could simply endorse it
22  over because it's already written to the Berkeley County
23  School District?
24       MR. HARPOOTLIAN:  Object.  Object to
25       the form.  That is not accurate, and if you

**47**

1  Q.  And when you said, "I called Wachovia and
2  asked if I could endorse," what you meant there was you
3  asked if you could endorse the check that was written to
4  Berkeley County School District, right?
5       MR. HARPOOTLIAN:  Object to the form.
6       Object to the form.
7       THE WITNESS:  That I don't remember
8       doing, calling Wachovia.  I was just probably
9       --
10  BY MR. WIEGAND:
11  Q.  Well, this was 13 years ago.
12  A.  I know.
13  Q.  But you don't deny that that's what you well
14  might have done at the time, right?
15  A.  I might have, but I don't think I did, because
16  I wouldn't have done that.
17  Q.  You don't, you don't have any other
18  recollection of what you meant by that sentence, do you?
19  A.  No.
20  Q.  And so, it's possible that what happened is
21  there is simply the first, and one check, written to
22  Berkeley County School District, and you endorsed it
23  over, right?
24  A.  You know, 13 years ago, I don't remember, but
25  I do remember getting the check back, I thought

**46**

1       have a specific document you'd like to publish
2       to him, with a Bates Stamp number since we are
3       on a telephone deposition I'll be happy for
4       you to do that.  There's no such document.
5  BY MR. WIEGAND:
6  Q.  Sir, if I give you a Bates number does that,
7  that doesn't prove anything to you, does it?
8       MR. HARPOOTLIAN:  You can, you can
9       publish it to him.  I'll check.
10       MR. WIEGAND:  How, how can I publish a
11       document to him over the phone?
12       MR. HARPOOTLIAN:  You can read it to
13       him, I did.
14  BY MR. WIEGAND:
15  Q.  Sir, isn't it true that there is an email in
16  which -- Hold on just a second.  Sir, I'm showing to you
17  from a document with HUB's Bates, HUB Bates Number 2739.
18  You send an email on November 29th, 2007, to Jana
19  Pokorney that says, "Sorry for any trouble, but a good
20  suggestion.  I called Wachovia and asked if I could
21  endorse and they said, yes."  Sir --
22  A.  Yes.
23  Q.  -- do did not, you sent that communication,
24  right?
25  A.  If that's what the document says, yes.

**48**

1  rewritten to Wachovia.
2  Q.  But it's possible that what happened is you
3  checked, you sent the check back to Jana Pokorney, and
4  Jana Pokorney sent you the exact same check back and
5  told you she was not able to have it issued to Wachovia,
6  right?
7  A.  I mean, it's possible, but I don't know.
8  Q.  All right.  And sir, you also recall that the
9  reason that you made an overpayment was because it was
10  an overpayment of brokerage fees, didn't you?
11  A.  I believe it was, yes.
12  Q.  Yeah.  But that's another area where you're
13  wrong, you did not overpay brokerage fees did you?
14  A.  No, I don't remember.
15  Q.  Isn't it true that the overpayment related to
16  some premium for insurance?
17  A.  I don't remember.
18  Q.  So sir, you simply don't recall this event
19  from November of 2007?
20  A.  Well, I don't remember those specifics.
21  Q.  Do you recall any specific phone call with
22  Jana Pokorney, and recalling that you're under Oath,
23  sir, at the time of the November 2007 refund?
24  A.  Say again.
25  Q.  At the time of the November 2007 refund

49

1  incident, do you recall any specific conversation with
2  Jana Pokorney?
3      A.  I mean I either through email or phone, I
4  don't remember, but I, I probably did, yes.
5      Q.  But my point is, as we sit here today, you
6  don't recall any specific conversation with her at that
7  time, right; is that correct?
8      A.  Yes.
9      Q.  Now, sir, you attempted to talk about your
10  understanding of conversations with Stan Pokorney; do
11  you recall that?
12      A.  Yes.
13      Q.  And you, you use words to the effect of "we'll
14  take care of it."  Do you recall that?
15      A.  Yes.
16      Q.  Tell me the first time you can recall a
17  conversation with Stan Pokorney, when was it and what
18  exactly was said in that regard?
19      A.   Well, I'm going to go back to the whole
20  relationship with Mr. Pokorney and HUB and Knauff
21  relating to, not only the 22,000, but also the $2,000
22  checks and just, just the general relationship with
23  brokerage fees and policies that maybe we didn't really
24  need, and he said, don't worry, we'll take care of you.
25      Q.  Sir.  Here's what I want.  Tell me the first

50

1  time you ever had a conversation with Brantley Thomas --
2  Well, sorry.
3          Please tell me the first time you had a
4  conversation with Stan Pokorney where he said we'll take
5  care of it or anything to that effect?  When's the first
6  time that happened, if you can recall?
7      A.  I Don't really recall.
8      Q.  Okay.  So, if you don't recall when it was,
9  you don't actually recall what exactly was said to you?
10      A.   I guess what I meant was I just remember it
11  in and around that event of 2007, that's when all this
12  kind of got started.  So, it was around that.
13      Q.  Do you, do you recall who called who?  Do you
14  remember if you called him or he called you?
15      A.  I don't remember that.
16      Q.  Do you recall how the conversation even came
17  up?
18      A.  Other than maybe Jana talked to him about it
19  and he called me.  I just don't.
20      Q.  You're guessing, right?
21      A.  I'm not guessing, I know.
22      Q.  You -- Well, tell me what you know.  Who
23  called who?
24      A.  That I don't remember.
25      Q.  Okay.  When's the first date that you recall

51

1  -- Strike that.
2          Sir, you have no recollection of the first
3  time discussing with Stan Pokorney anything about the
4  November 2007 refund?
5      A.  Excuse me?  Can you ask, ask the question
6  again?
7      Q.  Yes.  Do you recall any specific conversation
8  in which the 2007 refund was discussed between you and
9  Stan Pokorney?
10      A.  The exact tone of the comments or part of the
11  conversation was, if you need the money, we'll take care
12  of it.  But whether I call him or he called me, I don't
13  remember.
14      Q.  So, when did this conversation occur?
15      A.  In or around 2007, right after the check,
16  whenever that was.
17      Q.  Right after the check?
18      A.  Yes.
19      Q.  The check that, that was issued to Berkeley
20  County School District, as a refund, right?
21      A.  Yes.
22      Q.  So, there isn't anything that, that Jana
23  Pokorney or Stan Pokorney did to pay you any money
24  through that refund, right?
25      A.  I mean, they did process the check.  Whether

52

1  it was, I, I remember it being paid to Wachovia, but it
2  may not have been.  But it's, it was something that,
3  they understood what I was doing.
4      Q.  Well, how is it that you can now say that they
5  understood what you were doing?  That's a serious
6  accusation.  How best can you support it?
7      A.  The feeling.  Again, I'm going to go back to
8  comments like you'll not have to worry we'll protect
9  you.  It's between us.  No one will find out.  Is, that
10  was a constant theme with him and, and just I knew what
11  he meant.
12      Q.  Well, when he -- So, let's say he did use the
13  words, no one will find out.  If, you, you can recall
14  when he used those words, right?
15      A.  Again, they were a constant theme, so I mean
16  on and on, so...
17      Q.  So, like every day?
18      A.  Not every day.  Like when, it just came up
19  with the $2,000 and the 22,000 and, and the annual
20  premiums and the annual Brokerage Fee Agreements.
21      Q.  But you can't recall any specific discussion
22  regarding the 2007 refund, right?
23      A.  Again, it was a common theme, so it just
24  happened when it happened.
25      Q.  Do you recall any given month or year when

---

**53**

1   this statement was supposedly made by Mr. Pokorney?
2        A.   Like I said, it was it was a common theme.
3   Every time it dealt with 50,000 dollars or the 22,000 or
4   again the annual renewals and premiums.  It was a
5   constant theme of his.  So, specific dates I don't know,
6   but it was a constant theme so whatever it was, it was.
7        Q.   Sir, let's discuss the, the premiums for
8   insurance.  These insurance policies where actual bona
9   fide insurance policies from third party insurance
10  companies, correct?
11       A.   I believe so, yes.
12       Q.   Every one of them, right?
13       A.   Yes.
14       Q.   And they actually did provide insurance to
15  either the District or SAFE, correct?
16       A.   I mean, yes.
17       Q.   And they were in the business interests, at
18  least to some extent, of the District and SAFE, correct?
19       A.   Yes.
20       Q.   Okay.  Did anybody ever tell you that those
21  insurance policies were inappropriate for the District?
22       A.   I mean, I had people looking at, who wanted
23  our business, and they would look at our policies and
24  basically say that you're being over, over insured.  But
25  I never did anything about it because I did not want to

---

**54**

1   leave HUB for fear of being exposed.
2        Q.   Who was it that told you that these policies
3   weren't -- Well, strike that.
4        So, you're now claiming that, that people told
5   you that you were paying more than you needed to,
6   correct?
7        A.   Well, I mean, that's what insurance people do
8   I believe, yes.  They want you to change.
9        Q.   And, all right.  So, they --
10       A.   It was not uncommon.
11       Q.   It was not uncommon, it's not uncommon that
12  the insurance person would tell you, hey, I can do a
13  better job for you than your current person, right?
14       A.   Yes.
15       Q.   All right.  But nobody ever told you that the
16  policies were completely worthless, right?
17       A.   No.
18       Q.   All right.  Now, you talked about your
19  daughter's college funds at some length, right?
20       A.   Yes.
21       Q.   And I mean, this morning you talked about at
22  some length?
23       A.   Yes.
24       Q.   And you said that you have a prepayment for a
25  state or public school, correct?

---

**55**

1        A.   Yes.  State college.  Yes.
2        Q.   Okay, but your daughter did not end up going
3   to a state college, right?
4        A.   That's where she is, at a state school.
5        Q.   Did your daughter have aspirations to go to a
6   private school?
7        A.   She had aspirations to go to, we looked at
8   several schools, but she ended up going to a State
9   school in South Carolina.  But the other schools were
10  not private, they were other state schools.
11       Q.   Hadn't she wanted to go to a school where
12  you're going to have to pay for higher tuition?
13       A.   Yes, but we ended up not going to going there.
14       Q.   Okay.  But at one point in time, that
15  certainly was your goal wasn't it?
16       A.   Not my goal.  I want her to go where she
17  wanted to go.
18       Q.   And hadn't your daughter looked at going to a
19  school that would have cost a lot more than the public
20  schools?
21       A.   Well, again, my father has gifted stocks to
22  her that would have taking care of it.
23       Q.   So, the answer is, yes?  She did, she did at
24  one point aspire to go to a school that was going to
25  cost more than the public school, right?

---

**56**

1        A.   I'm sure aspired, but she was looking at
2   colleges that would come to her high school, and she
3   felt a connection with some of them, but she ended up
4   going to the school where her cousin goes to and a
5   school where her babysitter went to because she had some
6   personal connections to the school that she went to,
7   which was a state school in South Carolina.
8        Q.   Sir --
9        A.   It was her decision.
10       Q.   -- you said that you said that Stan Pokorney
11  had provided you some checks, correct?
12       A.   Yes.
13       Q.   And those checks indicated on them, you said
14  that they were for, for college funds; is that right?
15       A.   Some did and some didn't.  Yes.
16       Q.   Do you recall how many did or didn't?
17       A.   No, I do not.
18       Q.   You never told Stan Pokorney hey, you know, I
19  don't need any money for college funds; you never said
20  that, did you?
21       A.   No, but he kept sending them cause they were
22  connecting to the business.
23       Q.   But you never, but you never -- Hold it.  You
24  never told Mr. Pokorney, hey, I don't need any money for
25  her college fund, she's going to a public school that

---

57

1 I've got it paid for.  You never told him that, did you?

2     **A.**  I didn't know where she was going to go at the

3 time.

4     **Q.**  You thought you did need the money for her to

5 attend college, didn't you?

6     **A.**  No.

7     **Q.**  Well, did you, did you want Stan Pokorney to

8 think that you needed money for that?

9     **A.**  I don't -- No. I don't know.  No.

10     **Q.**  Sir, don't you think it's possible that Stan

11 Pokorney actually thought he was trying to help your

12 daughter attend the college she wanted to go to by

13 providing you checks?

14     **A.**  He might have thought that, but that's not why

15 he didn't.  I know that.

16     **Q.**  Well, he might have thought that, and that

17 would be why he didn't if he might have thought that,

18 right?

19     **A.**  I don't know what he was thinking, so...

20     **Q.**  Okay.  I'll take that.  I and you never

21 discussed expressly with Stan Pokorney, hey, if you send

22 me some checks I will give you more business, did you?

23     **A.**  No, I did not do that, but again, every time

24 those checks came he said, you know, and they would come

25 at the annual renewal periods so, they were connected to

**RES COURT REPORTING SERVICES (843)654-9534 OR (843)818-9396**

58

1 continued business with them, and I knew that, and they

2 knew that.

3     **Q.**  Can you tell me of a single conversation that

4 you had with Mr. Pokorney in which that was expressed by

5 him?

6     **A.**  I mean, specifically?  Again, I go back to

7 just, again I know that that's what they were for and

8 comments like we will not have to worry about it, we'll

9 protect you.  Again, I knew them for continued

10 business, and they were a bribe.

11     **Q.**  But there's nothing that you can recall that

12 he specifically said to you to support that, right?

13     **A.**  Not that I can recall.

14     **Q.**  Sir, you discussed using your Comcast email

15 account, do you recall that discussion this morning?

16     **A.**  Yes.

17     **Q.**  Sir, isn't it true that you regularly used

18 your Comcast email account as your quote "home email?"

19     **A.**  Everybody does.  Yes.

20     **Q.**  Okay.  Well, but you would tell people

21 actually in emails send them to my Comcast account,

22 because that's my home email, wouldn't you?

23     **A.**  I use that on occasion because, one to hide

24 things from going on the District server.

25     **Q.**  Well, sir, you don't deny that there are over

**RES COURT REPORTING SERVICES (843)654-9534 OR (843)818-9396**

59

1 20 people from the District just since 2012 who

2 communicated with you at the Comcast email address; do

3 you not?

4     **A.**  I don't know how many people, but I know some

5 of them did it, yes.

6     **Q.**  A lot of them communicated with you on

7 business matters at your request, correct?

8     **A.**  I thought it, well maybe.  I don't recall

9 that, but probably so. Or texting.

10     **Q.**  I'm talking about the Comcast email account.

11 Isn't it true that, and who is Archie Franchini?

12     **A.**  He is, he was a Deputy Superintendent.

13     **Q.**  Isn't it true that Archie Franchini would

14 forward you emails at your Comcast account when he, when

15 it was the evening and he knew you were there?

16     **A.**  Yes.

17     **Q.**  And so Mr. Franchini knew that the Comcast

18 account was your business account that you used when you

19 were home?

20     **A.**  Well, it was also, I had access to a, an

21 iPhone that had computer access to my emails connected.

22 So, a lot, a lot more than likely that they were just

23 personal stuff.  We're talking related to the School

24 District stuff that we didn't want to talk to on, on

25 District email.

**RES COURT REPORTING SERVICES (843)654-9534 OR (843)818-9396**

60

1     **Q.**  So, you mean you and Mr. Franchini were

2 talking about personal stuff on your Comcast account?

3     **A.**  I don't remember, I don't remember all that.

4 But, I mean, he would send stuff to me on my personal

5 email that maybe be we wanted to keep off the District

6 stuff.  I don't know what he was --

7     **Q.**  Mr. Franchini would?

8     **A.**  Yes.

9     **Q.**  So you, so --

10     **A.**  And I'm not sure, I don't understand why all

11 of this is connected.  But anyway's, I mean, I did use

12 personal email, but again --  Never mind.

13     **Q.**  Well, sir, the reason that you used the

14 Comcast email address is that, that it was easier for

15 you to access that while you work from home, right?

16     **A.**  Everybody would say that.  But also, again, I

17 had access to my email from work on my phone --

18     **Q.**  Correct.

19     **A.**  -- and they --

20     **Q.**  But if you worked from your computer at home,

21 you needed to use the Comcast address, didn't you?

22     MR. HARPOOTLIAN:  He was not finished

23 with the answer.  Please let him answer and

24 then you can move on to the next question.  Go

25 ahead.

**RES COURT REPORTING SERVICES (843)654-9534 OR (843)818-9396**

61

1  THE WITNESS: Okay. Thank you. I
2  would use the home address as a matter of
3  convenience. But also, again, I would, I had
4  access to my work email on my phone. Again,
5  it was easier to do that, but I had access to
6  my email and I could see work email from my
7  phone because I had it connected. So, more
8  than likely home email was basically for stuff
9  that was maybe not wanting to be on District
10  email.
11  BY MR. WIEGAND:
12  Q. Sir, so, you are saying you could see District
13  email on your phone, correct?
14  A. Yes I can, I could.
15  Q. But, but if you wanted to work from your
16  computer you needed access to a Comcast address while
17  you were home, correct?
18  A. If I worked on the computer, yes.
19  Q. Okay. And in fact, on business matters, you
20  often told people that she needed it's sent to your
21  Comcast address so you could look at it at home, right?
22  A. I mean, I would do that because of the
23  position and I wanted to be ready for the next day or
24  whatever it was, so yes.
25  Q. And so Sir, if something is mailed to you with

62

1  your name on the envelope it doesn't have to get opened
2  prior to it being sent to you at the District, correct?
3  A. Usually, the standard procedure was, I think,
4  was to open it to see, unless it had confidential on it,
5  to see where it went, what it was and where it needed to
6  go. I mean, a lot of stuff that I didn't need to see
7  that they would open and hand it to the person that
8  needs to see it.
9  Q. But if your name, why would they opened it if
10  your names on it?
11  A. I, I, I would get a lot of things, invoices
12  and whatever with my name on it and they would open it
13  but give it to the person that needed unless it was, you
14  know, unless it said confidential or personal on it and
15  they would not open it.
16  Q. Who is, who is they?
17  A. The mailroom. And there were occasions where
18  they didn't open it, but there were occasions where they
19  did.
20  Q. Can you think of a time when an invoice that
21  had your name on the envelope wasn't sent to you?
22  A. Yeah. Oh, not sent to me?
23  Q. Correct.
24  A. Yeah.
25  Q. When?

63

1  A. I mean, all kinds of vendors. I mean, all
2  kinds of vendors through Berkeley County schools.
3  Q. So, this is an invoice. So, when a letter
4  addressed to you at your District address that contains
5  an invoice, would not be provided to you?
6  A. Possibly not. No.
7  Q. Can you recall a single one that was not
8  provided to you?
9  A. I can't remember that far back. No. It's --
10  Q. Okay. And, and even these invoices -- Strike
11  that.
12  Sometimes you actually asked for things to be
13  sent to you at home, correct?
14  A. Well, I know things would be, before being
15  asked things would be sent to me at home, yes.
16  Q. Sir, my question is, sometimes you actually
17  asked for things to be sent to you at home, correct?
18  A. Yes. Yes.
19  Q. And regardless of whether an invoice was sent
20  to you at home, or at the District, in either case you
21  still signed it and then submitted it for payment if you
22  thought it was to be paid, right?
23  A. I knew it wasn't, I would sign it and ask for
24  the, more than likely I would ask for the check to be
25  brought back to me so I could mail it, but I would take

64

1  it directly to Accounts Payable and not go through the
2  Risk Manager or whatever department it might need to be
3  going through.
4  Q. Well, is there a time that you can recall
5  actually having an insurance invoice -- Strike that.
6  When you give the document to Accounts
7  Payable, that's giving it to a Berkeley County School
8  District employee, right?
9  A. Yes, it is.
10  Q. And if Accounts Payable thought there was a
11  problem, Accounts Payable would have told somebody,
12  right?
13  A. If they did. If not, I mean, more than likely
14  if I told them they would not question it.
15  Q. My simple point is regardless of whether an
16  invoice is sent to you at home or at the District, you
17  can do the same thing with it, right?
18  A. It has to get paid, yes.
19  Q. All right. And, and once the check gets cut,
20  but why would they hand it to you as opposed, opposed to
21  just mail it to Knauff?
22  A. It depends on what it was. Sometimes I'd ask
23  for it to be given to me so I can make sure it got to
24  the right person. Sometimes the mail didn't get out
25  fast enough, so I would get it there.

## 65

1    **Q.**  Sir, isn't it true that what happened is there
2    are a couple of occasions where you asked for a check to
3    be given to you because you then negotiated the check in
4    your own personal account and stole the money?
5    **A.**  No.  Not from that direct -- No, not that way.
6    No.
7    **Q.**  Sir, do you recall that in July of 2002, you
8    had a check made out to the order of Berkeley County --
9    Strike that.
10    Do you recall that in -- Just a second.
11    Do you recall that in July 2002 you caused a
12    check to be made out to Knauff Insurance for $100,000
13    and you personally converted it to your own use?
14    **A.**  I don't recall that.
15    **Q.**  You haven't disclosed, you have not yet
16    disclosed to the Berkeley County School District that
17    you did that have you?
18    **A.**  I am going to plead the Fifth, because I don't
19    recall that.
20    **Q.**  Sir, isn't it true then that again in July
21    2003 you caused the District to issue a check in the
22    amount of $100,000 payable to Knauff, but stole that
23    money as well, didn't you?
24    **A.**  I'm going to plead the Fifth.
25    **Q.**  Sir, are you aware that those amounts have

## 66

1    been claimed by the Berkeley County School District as
2    damages in their lawsuit against Knauff and HUB?
3    **A.**  I'm going to plead the Fifth.  I don't know.
4    **Q.**  Those damage claims are wrong, because that
5    was money that you stole and was not money paid to
6    Knauff or HUB?
7    MR. HARPOOTLIAN:  Object to the form.
8    THE WITNESS:  I'm going to plead the
9    Fifth.
10    BY MR. WIEGAND:
11    **Q.**  And you're not claiming that any of that money
12    was ever provided in any way to the Pokorney's or to
13    Knauff or HUB, right?
14    **A.**  I'm going to plead the Fifth.
15    **Q.**  Let's take a short break and let me look at my
16    notes, please.
17    **A.**  Y'all, I'm about to faint, so...
18    (Whereupon, a break was taken, after
19    which the following proceedings were:)
20    BY MR. WIEGAND:
21    **Q.**  Mr. Thomas, I'm back.  You testified a little
22    bit this morning also about services that were provided
23    pursuant to Brokerage Service Agreements; do you recall
24    that?
25    **A.**  Yes.

## 67

1    **Q.**  You don't have the document listing all of
2    those services in front of you do you?
3    **A.**  No, I do not.
4    **Q.**  And Sir, do you recall that there were
5    bimonthly meetings that occurred between Stan Pokorney
6    and Knauff on the one hand, and District employees on
7    the other hand?
8    **A.**  I mean, the only time -- No, I'm not.
9    **Q.**  You don't deny that those occurred, do you?
10    **A.**  I, I don't know that they did or not.  I was
11    given scratch pieces of paper with stuff on it.
12    **Q.**  Sir, you sometimes attended bimonthly meetings
13    with Stan Pokorney, didn't you?
14    **A.**  I don't recall this.
15    **Q.**  So, you don't recall that one way or the
16    other, correct?
17    **A.**  No. I might have, so...
18    **Q.**  And Sir, you don't know what exactly Mr.
19    Pokorney did in terms of marketing of insurance policies
20    and, and servicing the Districts accounts when you were
21    not sitting and talking with him, do you?
22    **A.**  All, all I really knew as far as some of the
23    services that we received on a regular basis were the
24    claims service.  As far as behind the scenes, no.  But I
25    didn't see much evidence of it.

## 68

1    **Q.**  Sir, for Builders Risk Policies did the
2    District have -- Strike that.
3    For the Builders Risk Policies, wouldn't
4    Knauff and Stan Pokorney have to track what the value of
5    the buildings were on a periodic basis and keep that
6    reported?
7    **A.**  Our construction people would send that out,
8    yes.
9    **Q.**  And Sir, do you recall that Stan Pokorney also
10    had to do a lot of work to try to help the District
11    report sexual molestation claims as they came up?
12    **A.**  I remember some, some old cases that, I can't
13    remember if they were recovered after his or not, but I
14    do believe there was some work related to that, but I
15    don't recall exactly when.
16    **Q.**  Do you recall the name Tellemontes Case, that
17    would be one of those sexual molestation claims?
18    **A.**  I do not recall that name.
19    **Q.**  Do you recall the Hallagan Law Firm being
20    involved?
21    **A.**  I remember them.
22    MR. HARPOOTLIAN:  Object to the form.
23    THE WITNESS:  Yeah, they were our, our
24    District attorney at the time, yes.
25    BY MR. WIEGAND:

69

1      Q.  And the Hallagan Law Firm had been aware of

2  sexual molestation claims that had never been reported

3  to the insurers, correct?

4      A.  That I don't recall.

5      Q.  But it's possible that is exactly how it

6  happened; isn't that right?

7      A.  That is possible.  I don't recall.

8      Q.  And did Mr. Pokorney have to work a lot in

9  order to try to get coverage for the District after the

10  District failed to report those claims?

11      A.  I mean, I don't call.  I remember them working

12  on it, but I don't recall that, how much they did.

13      Q.  Sir, you discussed earlier that insurance

14  services were exempt from the insurance code?

15      A.  Yes.

16      Q.  Correct?

17      A.  Yes.

18      Q.  That, that had been the case even before you

19  became in charge of insurance, right?

20      A.  Yes.

21      Q.  And wasn't it Ken Coffey who brought Stan

22  Pokorney in to work with the Berkeley County School

23  District?

24      A.  I believe so, yes.

25      Q.  And Ken Coffey was the first one to actually

70

1  enter into a Brokerage Services Agreement with Stan

2  Pokorney while he was at Willis Corroon, right?

3      A.  Yes.

4      Q.  And that agreement was for $100,000, right?

5      A.  I believe so, yes.

6      Q.  And so when you entered into a Brokerage

7  Service Agreement in 2002 with Knauff, that was on the

8  same terms that you had agreed , as the District had

9  agreed to with Willis Corroon the prior year, right?

10      A.  Yes.

11      Q.  And the same thing in 2003, you renewed that

12  Brokerage Service Agreement again on the same terms as

13  Ken Coffey had established with Willis Corroon, right?

14      A.  Yes.

15      Q.  And Sir, you don't deny that Stan Pokorney is

16  actually very knowledgeable in the area of school

17  insurance, do you?

18      A.  I, I don't know.  I don't know.

19      Q.  You don't deny it do you?

20      A.  I don't deny it, but I don't know.

21      Q.  What else did you discussed yesterday in terms

22  of trying to help the School District in providing

23  testimony in this Case?

24      A.  All, all of this stuff was just the truth.

25      Q.  Were there other areas of testimony that they

71

1  asked you to try to provide today?

2      A.  No.

3      Q.  All right.  I'd like to take a short break.

4      (Whereupon, a break was taken, after

5  which the following proceedings were:)

6  BY MR. WIEGAND:

7      Q.  Don't have any further questions at this time.

8         **EXAMINATION**

9  BY MR. HARPOOTLIAN:

10      Q.  Okay.  Mr. Thomas, I've got a few follow-up

11  questions.

12      A.  Yes, sir.

13      Q.  So, and let me sort of, first of all let me do

14  this in reverse order.  You were asked about things

15  that, that Mr. Pokorney did about, pursuant to Service

16  Agreements.  And you indicated that you did not know

17  much of anything but you were also asked to provide Mr.

18  Wiegand with different meetings and those sort of

19  things?

20      A.  Yes.

21      Q.  As the person, the Chief Financial Officer

22  that dealt with Mr. Pokorney, were you concerned at the

23  time about the amount of services he, he provided?  Was

24  that the basis of what ever you were paying?

25      A.  Yes.

72

1      Q.  Okay.  I mean, the basis for the services he

2  was providing or your relationship with him?

3      A.  The relationship.

4      MR. WIEGAND:  Objection.  Leading.

5  BY MR. HARPOOTLIAN:

6      Q.  Okay.  So, and, and to that end, when, when he

7  sent you a, a Management Service Fee Agreement, a

8  Services Agreement, and there was a price on it, were

9  those negotiated.  I mean, did he sit down and say I

10  want 120, and you say no I'm going to pay you only a

11  hundred?  Was any one of those ever a negotiation?

12      A.  No.

13      MR. WIEGAND:  Objection.

14  BY MR. HARPOOTLIAN:

15      Q.  So, when he came to you with a, a Client

16  Management Service Fee Agreement, one of these Service

17  Agreements, at any point, at any point during the entire

18  period of time that you are dealing with him, was there

19  ever a negotiation between you as a CFO and he as the

20  Representative of Knauff and then HUB, about how much

21  they should be, and what that was?  And when I say,

22  okay, first of all, how much would that be?

23      A.  No.

24      MR. WIEGAND:  Objection.

25  BY MR. HARPOOTLIAN:

---

73

1  **Q.** Okay. And so, I mean, when you were dealing
2  with other vendors who wanted to provide a service, did
3  you ever negotiate with them about how much they would
4  charge you?
5  **A.** We would negotiate like a percentage for, you
6  know, construction fees, or a percentage for bad check
7  collection, those sorts of things, yes.
8  **Q.** So, in other words, it was a flat fee. Not a
9  percentage, a flat fee. Any time someone came in and
10  offered you to do a service for a flat fee you just took
11  their quote, and that was it?
12       MR. WIEGAND: Objection.
13  BY MR. HARPOOTLIAN:
14  **Q.** Go ahead.
15  **A.** Not necessarily. We would, based on all the
16  other things if they were on the level I would run them
17  through Procurement and let them deal with it. There
18  was also a lot of things on State Contract that I would
19  use so that I wouldn't have to negotiate.
20  **Q.** Okay. I guess what I'm getting to is this?
21  When he presented you with one of these Service
22  Agreements, Fee Agreements, and quoted those, and say it
23  went for $118,000, was that a negotiation? And you kind
24  of indicated no. Was it a price that you deemed fair,
25  or was it relying on the fact that he was bribing you

---

74

1  and he had covered up your theft of the $22,000?
2       MR. WIEGAND: Objection.
3  BY MR. HARPOOTLIAN:
4  **Q.** Go ahead.
5  **A.** I would, I would make my decision based on
6  trying to cover up the bribing.
7  **Q.** Okay.
8  **A.** And the theft.
9  **Q.** Okay. And the bribing was the $2,000
10  payments. I'm talking about how did the 2007 theft of
11  the $22,000 factor into that?
12       MR. WIEGAND: Objection.
13  BY MR. HARPOOTLIAN:
14  **Q.** Go ahead.
15  **A.** It factored in the point that basically from
16  that from that period on if I were to cause any sort of
17  need to move our business, or to negotiate, or to do
18  whatever that might cause him to lose any portion of our
19  business, he would probably exposed me, or at least I
20  feared that he would.
21  **Q.** Okay. So, okay. So, let me talk about the
22  Comcast account. And you were asked by Mr. Wiegand
23  about a number of District employees that used it. How
24  many vendors communicated with you on your Comcast
25  account?

---

75

1  **A.** I, I would not say many at all. Probably, I
2  mean, I don't really recall, but Stan was probably one
3  of the few.
4  **Q.** Okay. And was he, did he use it a lot?
5  **A.** I'm not sure at what --
6       MR. WIEGAND: Objection.
7  BY MR. HARPOOTLIAN:
8  **Q.** Go ahead.
9  **A.** -- a lot means.
10  **Q.** A lot means communicated frequently on your
11  Comcast account?
12  **A.** Yes.
13  **Q.** Okay. Now, was that because you were getting
14  ready for something the next day, or were you working
15  on something in a hurry?
16       MR. WIEGAND: Objection.
17  BY MR. HARPOOTLIAN:
18  **Q.** Why were you communicating with him on your
19  private account?
20  **A.** Again, I was --
21       MR. WIEGAND: Objection.
22       THE WITNESS: -- I was trying to keep it
23  off the District server.
24  BY MR. HARPOOTLIAN:
25  **Q.** Okay. Why?

---

76

1  **A.** So, if, Freedom of Information. If somebody
2  were to see that they would question it.
3  **Q.** Okay. So, let me ask you about this college
4  fund? Did you need money for your daughter's college
5  fund? And I know you have answered this question, I
6  just want to make it a predicate to the next question?
7  **A.** No.
8  **Q.** Did you ever ask Stan Pokorney to help you
9  with your daughter's college fund?
10  **A.** I did not.
11  **Q.** Did, did -- Strike that.
12      So, when you receive these checks from Mr.
13  Pokorney, and even though it said college funds on the
14  bottom of it, would it be -- Well, strike that.
15      So, let me ask you this. Let's assume you did
16  need money for your daughter's college fund. Would it
17  be appropriate for, and let's say you needed money for
18  your wife's, you know, some operation she needed, or
19  let's say you needed money for, to buy a nicer house, or
20  some other need, would it be appropriate for you to take
21  money, $2,000 a chunk from a vendor, any vendor?
22  **A.** Absolutely not.
23  **Q.** And that would be a bribe, would it not?
24  **A.** It would be.
25  **Q.** Whether it was for your daughter's college

---

77

1  education, or your wife's operation, or a new house,
2  right?
3      **A.** Absolutely. Yes. No. Yes.
4      **Q.** Okay. Gotcha. So, that we're not confused
5  here. Now, let's go to this 2007 where whether or not
6  it was written to, you believe that it was written to
7  Wachovia or you believe it was written to --
8      **A.** I believe so, but without seeing any of the
9  documents I don't know.
10      **Q.** Did you steal the money?
11      **A.** Yes, I did.
12      **Q.** Okay. And did the Pokorney's help you in the
13  process of stealing the money?
14          MR. WIEGAND: Objection.
15          THE WITNESS: They did. Yes. Yes.
16  BY MR. HARPOOTLIAN:
17      **Q.** Okay. And did Stan, whenever the conversation
18  was, before or after. Did he acknowledged to you that
19  he helped you steal the money?
20          MR. WIEGAND: Objection.
21  BY MR. HARPOOTLIAN:
22      **Q.** Go ahead.
23      **A.** Yes. And again, in the context of we'll, you
24  know, nobody will find out. We'll protect you, and
25  we'll, we will make sure it happens.

78

1      **Q.** Okay. So nobody will find out, and we'll
2  protect you, and what was he talking about in that
3  conversation?
4          MR. WIEGAND: Objection.
5  BY MR. HARPOOTLIAN:
6      **Q.** Go ahead.
7      **A.** He knew that if I were to take this he would
8  exposed me and I would have been, you know --
9      **Q.** So, he hung that over your head?
10      **A.** Yes, he did.
11      **Q.** Okay. Now, again, and maybe this will sort
12  of, this entire process in dealing with Stan Pokorney,
13  and when I say, let's say entirely in 2007 forward,
14  decisions made about either Services Agreement or or,
15  you know, or, or buying insurance as recommended by
16  Pokorney, were those decisions made on what was best for
17  the Berkeley County School District, or where they based
18  on the threat to expose you and the bribes?
19          MR. WIEGAND: Objection.
20  BY MR. HARPOOTLIAN:
21      **Q.** Go ahead.
22      **A.** They, they were based on the threat to expose
23  me and because of the bribes and the theft.
24      **Q.** Hold on one second. I may be done. I have
25  nothing further.

79

1      **A.** Okay. Thank you.
2      **Q.** Are we done?
3          EXAMINATION
4  BY MR. WIEGAND:
5      **Q.** No. So, so again, Mr. Thomas, you can't, you
6  cannot recall a single time where you were threatened to
7  be exposed because of this November 2007 refund, right?
8      **A.** The threat came in, in the statement that he
9  would constantly say to me, the theme of that statement,
10  and I knew what he was talking about.
11      **Q.** When you say you knew what he was talking
12  about, he never said the November 2007 refund, right?
13      **A.** But it all started around that time, so I knew
14  it was connected to it, but no.
15      **Q.** And so, you're not sure, let's say that these
16  conversations where he says hey don't worry we'll
17  support you, isn't it true that Stan Pokorney knew that
18  there were people inside the District that didn't like
19  you?
20      **A.** I didn't know that.
21      **Q.** Isn't it true that Stan Pokorney would have
22  supported you because he thought you were good employee?
23      **A.** I don't know that.
24      **Q.** It's possible that any statement Mr. Pokorney
25  made saying hey, don't worry, we'll protect you, would

80

1  have been because he knew you had internal enemies?
2          MR. HARPOOTLIAN: Object to the form.
3          THE WITNESS: I, I didn't know I had
4      internal enemies, but I --
5  BY MR. WIEGAND:
6      **Q.** Isn't it true that, that the Superintendent,
7  Chester Floyd, wasn't thrilled with you?
8      **A.** I didn't know that.
9      **Q.** Isn't it true that Stan Pokorney would have
10  gone to bat to protect you against Mr. Floyd if needed?
11      **A.** I do not know that.
12      **Q.** Isn't it true that Mr. Floyd was upset when
13  the Zurich Law Firm was refusing to pay for the
14  Tellemontes sexual molestation claims?
15          MR. HARPOOTLIAN: Object to the form,
16      and object to, this is not appropriate
17      recross. Thank you. Move to be struck.
18  BY MR. WIEGAND:
19      **Q.** You can answer.
20      **A.** Yeah, again I don't, I do not know what he was
21  thinking. So, no.
22      **Q.** So, you don't know what it was that Mr.
23  Pokorney, if he ever said to you don't worry we'll
24  protect you, you're not sure what he meant, are you?
25          MR. HARPOOTLIAN: Object.

81

1          THE WITNESS:  I, I believed it to be
2     connected to the 2007 events and forward, yes.
3     I believed it.
4     BY MR. WIEGAND:
5          Q.    Okay.  You believed that, but you don't know
6     what he believed, right?
7               MR. HARPOOTLIAN:  Object to the form.
8               THE WITNESS:  Correct.
9     BY MR. WIEGAND:
10         Q.    All right.  You can answer.
11         A.    Yes.
12         Q.    Okay.  Thank you.
13              MR. HARPOOTLIAN:  Thank you.  Thank you
14     Mr. Thomas.
15              THE WITNESS:  Thank you.
16              (Deposition concluded at 12:06 p.m.).
17              *          *          *
18
19
20
21
22
23
24
25

RES COURT REPORTING SERVICES (843)654-9534 OR (843)818-9396

---

82

1     STATE OF SOUTH CAROLINA )  C-E-R-T-I-F-I-C-A-T-E
2     COUNTY OF CHARLESTON    )
3
4          I, Lisa Kerns, Court Reporter and Notary Public,
5     certify that I did have Brantley Thomas appear before me
6     at 10:23 a.m. on November 10, 2020, Via Remote
7     Teleconference for all Parties; that the witness was
8     duly sworn and cautioned to tell the truth, the whole
9     truth, and nothing but the truth; that the foregoing
10     pages constitute a true and accurate transcript of the
11     testimony given at that time and place.
12          I further certify that I am not of counsel or kin
13     to any of the parties to this cause of action, nor am I
14     interested in any manner in its outcome.
15          IN WITNESS WHEREOF I have hereunto set my hand
16     and seal this 11th day of November 2020.
17
18     _____
19     Notary Public for South Carolina
       My commission expires February 8, 2028
20
21
22
23
24
25

RES COURT REPORTING SERVICES (843)654-9534 OR (843)818-9396

## $

**$100,000** [3] - 65:12, 65:22, 70:4
**$118,000** [1] - 73:23
**$15** [1] - 34:8
**$2,000** [5] - 16:21, 49:21, 52:19, 74:9, 76:21
**$2000** [5] - 14:18, 17:21, 18:13, 18:14, 19:1
**$22,000** [3] - 18:14, 74:1, 74:11
**$22,700** [1] - 45:5
**$22,770** [3] - 13:19, 41:19, 42:6
**$22,770.00** [3] - 8:25, 9:9, 9:14
**$70,000** [2] - 28:19, 29:15

## 0

**000026** [1] - 24:24
**000476** [1] - 8:22

## 1

**1.4** [1] - 28:11
**1.5** [1] - 28:16
**1.6** [1] - 28:16
**1.7** [1] - 28:17
**10** [3] - 1:14, 35:20, 82:6
**10:23** [2] - 1:15, 82:6
**11th** [1] - 82:16
**12** [1] - 34:8
**120** [1] - 72:10
**12:06** [1] - 81:16
**13** [3] - 45:12, 47:11, 47:24
**1410** [1] - 2:3
**15** [1] - 7:10
**18** [2] - 7:7, 7:10
**19th** [1] - 8:23

## 2

**20** [1] - 59:1
**2000** [5] - 6:12, 14:11, 17:10, 17:18
**2000's** [1] - 6:8
**2002** [3] - 45:17, 65:11, 70:7
**2003** [2] - 65:21, 70:11
**2005** [1] - 17:11
**2007** [26] - 8:6, 8:23,

15:9, 18:13, 18:14, 19:7, 27:10, 30:5, 41:17, 41:18, 41:23, 46:18, 48:19, 48:23, 48:25, 50:11, 51:4, 51:8, 51:15, 52:22, 74:10, 77:5, 78:13, 79:7, 79:12, 81:2
**2010** [5] - 12:17, 14:14, 16:9, 18:10, 18:14
**2011** [2] - 24:25, 28:2
**2012** [1] - 59:1
**2017** [2] - 6:8, 6:14
**2019** [1] - 35:8
**2020** [4] - 1:14, 36:6, 82:6, 82:16
**2023** [2] - 35:11, 35:18
**2028** [1] - 82:19
**22,000** [3] - 49:21, 52:19, 53:3
**243** [1] - 1:22
**26** [1] - 28:3
**2739** [1] - 46:17
**29** [1] - 28:3
**29202** [1] - 2:4
**29402** [1] - 2:9
**29492** [1] - 1:22
**29th** [1] - 46:18
**2:18-cv-00151-DCN** [1] - 1:4

## 3

**3** [2] - 2:13, 2:14
**30** [1] - 34:20
**300** [1] - 2:6
**36** [1] - 2:15

## 5

**50,000** [2] - 23:11, 53:3

## 6

**60654** [1] - 2:6

## 7

**71** [1] - 2:15
**75,000** [2] - 23:18
**79** [1] - 2:16

## 8

**8** [1] - 82:19
**843)654-9534** [1] -

1:23
**843)818-9396** [1] - 1:23

## 9

**97** [1] - 2:8

## A

**a.m** [2] - 1:15, 82:6
**ability** [1] - 40:14
**able** [7] - 9:8, 11:16, 13:18, 15:21, 16:5, 27:5, 48:5
**absolutely** [2] - 76:22, 77:3
**accept** [1] - 7:18
**accepting** [1] - 7:14
**access** [7] - 59:20, 59:21, 60:15, 60:17, 61:4, 61:5, 61:16
**accident** [1] - 42:1
**account** [14] - 26:20, 58:15, 58:18, 58:21, 59:10, 59:14, 59:18, 60:2, 65:4, 74:22, 74:25, 75:11, 75:19
**Account** [2] - 13:1, 13:2
**accounting** [2] - 10:21, 11:15
**Accounts** [5] - 23:12, 64:1, 64:6, 64:10, 64:11
**accounts** [1] - 67:20
**accurate** [2] - 45:25, 82:10
**accusation** [1] - 52:6
**acknowledged** [2] - 19:4, 77:18
**act** [1] - 8:7
**Act** [2] - 27:6, 35:10
**action** [1] - 82:13
**actual** [1] - 53:8
**address** [7] - 59:2, 60:14, 60:21, 61:2, 61:16, 61:21, 63:4
**addressed** [1] - 63:4
**adverse** [2] - 38:3, 38:12
**Adverse** [2] - 30:19, 30:23
**Agency** [1] - 1:9
**ago** [5] - 28:1, 36:7, 45:12, 47:11, 47:24
**agree** [1] - 44:16
**agreed** [2] - 70:8, 70:9
**agreeing** [1] - 31:17
**Agreement** [13] -

24:22, 28:2, 28:5, 28:24, 34:8, 70:1, 70:7, 70:12, 72:7, 72:8, 72:16, 78:14
**agreement** [1] - 70:4
**agreements** [6] - 12:18, 13:4, 18:12, 18:17, 23:15, 24:12
**Agreements** [13] - 13:5, 25:2, 25:4, 25:9, 25:18, 26:2, 31:18, 52:20, 66:23, 71:16, 72:17, 73:22
**agrees** [2] - 28:7, 28:18
**ahead** [27] - 4:22, 5:18, 8:11, 11:4, 13:12, 14:4, 15:19, 16:16, 18:20, 20:8, 20:20, 21:4, 22:9, 23:2, 29:4, 29:25, 34:13, 38:5, 38:12, 60:25, 73:14, 74:4, 74:14, 75:8, 77:22, 78:6, 78:21
**Allen** [1] - 2:7
**allowed** [3] - 3:10, 41:3, 44:6
**allows** [1] - 34:15
**Amendment** [3] - 5:3, 5:6, 32:22
**amount** [5] - 8:24, 14:24, 23:10, 65:22, 71:23
**amounts** [1] - 65:25
**annual** [6] - 14:22, 28:19, 52:19, 52:20, 53:4, 57:25
**annually** [1] - 28:19
**Annunciation** [1] - 4:20
**answer** [19] - 4:11, 4:22, 5:2, 5:5, 5:6, 5:18, 11:25, 32:23, 39:4, 40:3, 44:2, 44:10, 44:21, 45:15, 55:23, 60:23, 80:19, 81:10
**ANSWER** [1] - 2:21
**answered** [3] - 6:2, 45:17, 76:5
**answering** [1] - 33:5
**answers** [2] - 4:16
**anyway** [2] - 4:22, 5:18
**anyway's** [1] - 60:11
**appear** [2] - 15:15, 82:5
**APPEARANCES** [1] - 2:1
**appointed** [1] - 36:13

**appropriate** [5] - 20:22, 23:5, 76:17, 76:20, 80:16
**approval** [3] - 15:23, 23:7, 24:2
**approvals** [1] - 16:6
**approved** [2] - 12:18, 23:15
**Archie** [2] - 59:11, 59:13
**archived** [1] - 26:25
**area** [3] - 24:10, 48:12, 70:16
**areas** [1] - 70:25
**argumentative** [1] - 43:23
**arrangement** [1] - 16:23
**arrangements** [1] - 31:16
**aspirations** [2] - 55:5, 55:7
**aspire** [1] - 55:24
**aspired** [1] - 56:1
**assign** [1] - 18:11
**assist** [1] - 33:19
**assisted** [2] - 7:23, 8:8
**assume** [1] - 76:15
**assuming** [1] - 15:13
**attached** [1] - 28:4
**attempted** [1] - 49:9
**attend** [2] - 57:5, 57:12
**attended** [1] - 67:12
**attorney** [4] - 5:10, 5:15, 33:22, 68:24
**Attorney** [2] - 3:21, 4:23
**attorney-client** [1] - 33:22
**Attorneys** [1] - 5:10
**audio** [3] - 4:12, 4:14, 4:15
**authority** [4] - 23:14, 23:17, 25:1, 25:8
**avoid** [2] - 15:23, 16:5
**avoiding** [1] - 16:2
**aware** [2] - 65:25, 69:1

## B

**babysitter** [1] - 56:5
**backup** [1] - 32:12
**bad** [2] - 43:18, 73:6
**Bank** [1] - 10:3
**Barber** [1] - 2:3
**base** [1] - 30:1
**based** [16] - 10:22, 13:6, 13:14, 13:24, 14:5, 20:14, 20:25,

21:11, 22:4, 24:4, 25:19, 34:9, 73:15, 74:5, 78:17, 78:22
**basis** [4] - 67:23, 68:5, 71:24, 72:1
**bat** [1] - 80:10
**Bate** [1] - 24:23
**Bates** [6] - 8:22, 28:3, 46:2, 46:6, 46:17
**became** [1] - 69:19
**began** [3] - 8:4, 16:9, 27:10
**beginning** [2] - 7:10, 14:10
**behind** [2] - 33:11, 67:24
**belief** [4] - 20:25, 21:1, 21:5, 22:4
**Bent(sic** [1] - 36:22
**Berkeley** [28] - 3:22, 6:8, 6:18, 7:13, 9:20, 10:16, 13:7, 15:17, 22:14, 28:5, 33:13, 39:20, 40:8, 40:13, 41:2, 41:7, 41:11, 45:22, 47:4, 47:22, 51:19, 63:2, 64:7, 65:8, 65:16, 66:1, 69:22, 78:17
**BERKELEY** [1] - 1:4
**best** [6] - 22:5, 25:19, 28:23, 31:19, 52:6, 78:16
**better** [2] - 41:12, 54:13
**between** [15] - 3:2, 12:9, 12:12, 12:16, 12:17, 14:6, 18:2, 28:25, 34:8, 40:4, 42:21, 51:8, 52:9, 67:5, 72:19
**bids** [1] - 21:22
**bimonthly** [2] - 67:5, 67:12
**bit** [3] - 8:2, 23:20, 66:22
**bona** [1] - 53:8
**born** [3] - 16:25, 17:5, 17:9
**bottom** [1] - 76:14
**bought** [4] - 17:2, 34:6, 34:9
**Brantley** [9] - 1:10, 1:6, 2:13, 3:13, 6:1, 6:4, 28:4, 50:1, 82:5
**breach** [1] - 33:21
**break** [6] - 27:22, 35:23, 66:15, 66:18, 71:3, 71:4
**bribe** [6] - 19:2, 21:9, 21:12, 30:2, 58:10,

76:23
**bribed** [2] - 22:6, 27:16
**bribery** [4] - 25:25, 29:22, 31:23, 31:25
**bribes** [2] - 78:18, 78:23
**bribing** [9] - 24:5, 25:20, 27:10, 31:2, 31:21, 32:6, 73:25, 74:6, 74:9
**brings** [1] - 23:13
**Broad** [1] - 2:8
**Broker** [1] - 28:5
**broker** [4] - 7:15, 7:20, 7:22, 12:22
**Brokerage** [8] - 13:5, 31:18, 34:7, 52:20, 66:23, 70:1, 70:6, 70:12
**brokerage** [5] - 8:16, 18:11, 48:10, 48:13, 49:23
**Brokering** [1] - 28:11
**brother** [1] - 19:16
**brought** [2] - 63:25, 69:21
**Builders** [2] - 68:1, 68:3
**buildings** [1] - 68:5
**bunch** [1] - 37:5
**business** [16] - 7:14, 13:20, 17:25, 20:11, 21:6, 53:17, 53:23, 56:22, 57:22, 58:1, 58:10, 59:7, 59:18, 61:19, 74:17, 74:19
**buy** [1] - 76:19
**buying** [2] - 31:17, 78:15
**BY** [81] - 2:14, 2:15, 2:15, 2:16, 3:16, 7:6, 8:12, 9:4, 9:17, 10:12, 11:3, 12:3, 13:11, 14:3, 15:25, 16:15, 18:19, 19:12, 20:7, 20:19, 21:3, 21:15, 22:8, 23:1, 23:24, 24:9, 25:7, 25:12, 26:1, 26:10, 27:2, 27:13, 27:24, 29:3, 29:19, 29:24, 31:5, 31:13, 31:24, 32:3, 32:10, 34:2, 34:12, 34:19, 35:25, 36:4, 38:6, 38:17, 39:3, 40:1, 44:1, 44:15, 44:25, 45:18, 46:5, 46:14, 47:10, 61:11, 66:10, 66:20, 68:25, 71:6, 71:9,

72:5, 72:14, 72:25, 73:13, 74:3, 74:13, 75:7, 75:17, 75:24, 77:16, 77:21, 78:5, 78:20, 79:4, 80:5, 80:18, 81:4, 81:9

## C

**cannot** [2] - 45:20, 79:6
**care** [8] - 11:7, 19:5, 19:14, 49:14, 49:24, 50:5, 51:11, 55:22
**CAROLINA** [2] - 1:1, 82:1
**Carolina** [5] - 17:1, 17:2, 55:9, 56:7, 82:18
**case** [2] - 63:20, 69:18
**CASE** [1] - 1:4
**Case** [3] - 30:23, 68:16, 70:23
**cases** [1] - 68:12
**cash** [5] - 7:15, 7:18, 14:13, 15:2, 30:11
**caused** [2] - 65:11, 65:21
**cautioned** [1] - 82:8
**certain** [2] - 16:5, 37:6
**certainly** [2] - 21:25, 55:15
**CERTIFICATE** [1] - 82:1
**certify** [2] - 82:5, 82:12
**CFO** [4] - 6:7, 7:13, 7:19, 72:19
**chance** [3] - 39:25, 41:2, 41:13
**change** [3] - 33:4, 33:5, 54:8
**characterization** [1] - 20:15
**characterize** [3] - 20:4, 44:20
**charge** [2] - 69:19, 73:4
**charged** [1] - 7:9
**charges** [2] - 6:15, 6:17
**CHARLESTON** [3] - 1:2, 1:22, 82:2
**Charleston** [1] - 2:9
**check** [36] - 9:5, 9:7, 9:12, 9:13, 9:18, 10:2, 11:14, 15:3, 15:4, 16:18, 27:5, 42:13, 42:17, 43:4, 43:13, 45:4, 45:10, 45:21, 46:9, 47:3,

47:21, 47:25, 48:3, 48:4, 51:15, 51:17, 51:19, 51:25, 63:24, 64:19, 65:2, 65:3, 65:8, 65:12, 65:21, 73:6
**checked** [1] - 48:3
**checks** [11] - 14:13, 14:17, 15:2, 49:22, 56:11, 56:13, 57:13, 57:22, 57:24, 76:12
**Chester** [1] - 80:7
**Chicago** [1] - 2:6
**Chief** [1] - 71:21
**chose** [1] - 40:10
**chunk** [1] - 76:21
**circumstances** [1] - 42:8
**Civil** [1] - 3:9
**Claim** [1] - 28:17
**claimed** [1] - 66:1
**claiming** [2] - 54:4, 66:11
**claims** [7] - 66:4, 67:24, 68:11, 68:17, 69:2, 69:10, 80:14
**Claims** [2] - 29:6, 29:8
**clarify** [1] - 31:15
**clearly** [1] - 38:7
**client** [6] - 5:11, 5:15, 28:6, 28:17, 28:18, 33:22
**Client** [2] - 24:21, 72:15
**clients** [2] - 28:15, 33:18
**close** [2] - 19:18, 27:19
**Code** [1] - 23:22
**code** [1] - 69:14
**Coffey** [3] - 69:21, 69:25, 70:13
**collection** [1] - 73:7
**college** [21] - 16:19, 16:21, 16:24, 17:18, 18:5, 20:3, 20:16, 54:19, 55:1, 55:3, 56:14, 56:19, 56:25, 57:5, 57:12, 76:3, 76:4, 76:9, 76:13, 76:16, 76:25
**colleges** [1] - 56:2
**Columbia** [1] - 2:4
**combination** [1] - 26:16
**Comcast** [16] - 26:20, 58:14, 58:18, 58:21, 59:2, 59:10, 59:14, 59:17, 60:2, 60:14, 60:21, 61:16, 61:21, 74:22, 74:24, 75:11

**coming** [4] - 14:25, 16:3, 17:21, 18:5
**comment** [1] - 13:13
**comments** [10] - 11:6, 12:10, 14:5, 18:1, 19:11, 19:13, 42:20, 51:10, 52:8, 58:8
**commission** [1] - 82:19
**common** [2] - 52:23, 53:2
**communicated** [4] - 59:2, 59:6, 74:24, 75:10
**communicating** [2] - 26:18, 75:18
**communication** [2] - 42:16, 46:23
**communications** [2] - 42:24, 43:12
**companies** [1] - 53:10
**company** [1] - 10:21
**compare** [1] - 28:13
**Compensation** [1] - 28:18
**completely** [1] - 54:16
**compound** [1] - 5:20
**computer** [4] - 59:21, 60:20, 61:16, 61:18
**concerned** [1] - 71:22
**concise** [1] - 8:3
**concluded** [1] - 81:16
**Conditions** [1] - 28:7
**conduct** [2] - 28:12, 34:9
**confidential** [2] - 62:4, 62:14
**confused** [1] - 77:4
**confusing** [1] - 5:19
**connected** [7] - 40:21, 57:25, 59:21, 60:11, 61:7, 79:14, 81:2
**connecting** [1] - 56:22
**connection** [5] - 19:17, 19:18, 40:4, 40:16, 56:3
**connections** [1] - 56:6
**conscience** [1] - 41:16
**considered** [1] - 17:24
**consistent** [1] - 39:24
**conspire** [1] - 30:24
**constant** [4] - 52:10, 52:15, 53:5, 53:6
**constantly** [1] - 79:9
**constitute** [1] - 82:10
**Constitution** [1] - 5:7
**construction** [2] - 68:7, 73:6
**consulting** [1] - 23:14
**contains** [1] - 63:4

context [1] - 77:23
continue [5] - 17:25, 21:5, 25:25, 43:24, 44:22
continued [2] - 58:1, 58:9
continuing [1] - 40:13
Contract [1] - 73:18
contracts [2] - 7:14, 24:2
contributing [1] - 20:15
convenience [1] - 61:3
conversation [15] - 37:25, 39:15, 45:1, 49:1, 49:6, 49:17, 50:1, 50:4, 50:16, 51:7, 51:11, 51:14, 58:3, 77:17, 78:3
conversations [9] - 5:9, 5:12, 37:6, 37:9, 37:13, 39:7, 39:11, 49:10, 79:16
convert [4] - 10:2, 11:1, 42:13, 43:14
converted [1] - 65:13
cooperating [2] - 38:8, 38:10
correct [47] - 3:25, 4:23, 4:24, 5:8, 6:2, 6:9, 6:12, 6:15, 6:19, 6:21, 7:16, 12:20, 12:21, 24:14, 26:21, 30:14, 32:13, 33:17, 36:9, 36:14, 37:1, 37:6, 37:10, 37:15, 37:21, 41:8, 41:16, 41:19, 49:7, 53:10, 53:15, 53:18, 54:6, 54:25, 56:11, 59:7, 60:18, 61:13, 61:17, 62:2, 62:23, 63:13, 63:17, 67:16, 69:3, 69:16, 81:8
Correct [1] - 9:1
corrected [1] - 34:25
Corroon [3] - 70:2, 70:9, 70:13
corrupt [1] - 8:7
cost [2] - 55:19, 55:25
council [1] - 40:17
Council [1] - 36:2
counsel [2] - 3:3, 82:12
Count [1] - 7:7
COUNTY [1] - 1:4, 82:2
County [27] - 3:22, 6:8, 6:18, 7:13, 9:20, 10:16, 13:7, 15:17,

22:14, 28:5, 33:13, 39:20, 40:8, 40:13, 41:2, 41:12, 45:22, 47:4, 47:22, 51:20, 63:2, 64:7, 65:8, 65:16, 66:1, 66:1, 69:22, 78:17
couple [4] - 5:25, 20:2, 36:7, 65:2
course [2] - 8:20, 22:22
COURT [2] - 1:1, 1:21
Court [8] - 1:18, 4:17, 6:14, 33:15, 33:16, 36:13, 38:15, 82:4
cousin [1] - 56:4
cover [2] - 16:12, 74:6
coverage [3] - 28:9, 28:15, 69:9
covered [2] - 25:20, 74:1
covering [3] - 31:1, 31:21, 32:6
CREEK [1] - 1:22
current [1] - 54:13
custody [2] - 35:17, 35:18
cut [3] - 43:13, 45:4, 64:19

**D**

damage [1] - 66:4
damages [1] - 66:2
DATE [1] - 1:14
date [1] - 50:25
dated [1] - 24:25
dates [1] - 53:5
daughter [7] - 33:10, 40:5, 44:8, 55:2, 55:5, 55:18, 57:12
daughter's [10] - 16:19, 16:20, 16:24, 18:5, 20:16, 54:19, 76:4, 76:9, 76:16, 76:25
deal [2] - 13:6, 73:17
dealing [3] - 72:18, 73:1, 78:12
deals [1] - 31:19
dealt [2] - 53:3, 71:22
Dear [1] - 28:4
December [2] - 6:12, 6:13
decision [5] - 10:15, 18:16, 24:1, 56:9, 74:5
decisions [8] - 13:6, 13:14, 18:11, 18:22, 22:11, 30:1, 78:14, 78:16

deemed [1] - 73:24
Defendant [1] - 2:5
defendant [1] - 2:7
defendants [1] - 1:11
Defender [4] - 32:18, 36:11, 36:13, 36:17
Defender's [1] - 33:20
define [1] - 28:8
Defraud [1] - 7:9
defraud [1] - 7:23
defuse [1] - 13:18
deliver [1] - 15:5
Denmark [2] - 6:1, 6:4
deny [6] - 47:13, 58:25, 67:9, 70:15, 70:19, 70:20
department [2] - 11:15, 64:2
departure [1] - 14:15
deponent [1] - 3:11
DEPOSITION [1] - 1:5
Deposition [4] - 4:3, 5:24, 30:18, 81:16
deposition [5] - 2:19, 3:3, 3:8, 3:12, 46:3
depositions [1] - 32:22
Deputy [1] - 59:12
describe [1] - 20:11
Design [1] - 28:10
detail [7] - 36:25, 37:2, 37:20, 38:19, 38:22, 39:9, 39:14
details [2] - 39:2, 39:10
develop [1] - 28:12
Dick [3] - 3:17, 3:20, 27:25
died [1] - 33:8
different [3] - 15:23, 24:13, 71:18
difficult [2] - 10:20, 11:16
direct [1] - 65:5
directly [1] - 64:1
disagree [1] - 38:14
disclosed [3] - 39:14, 65:15, 65:16
discuss [2] - 15:1, 53:7
discussed [7] - 16:2, 37:23, 51:8, 57:21, 58:14, 69:13, 70:21
discussing [2] - 11:15, 51:3
discussion [4] - 20:25, 36:16, 52:21, 58:15
discussions [18] - 10:4, 10:7, 10:14, 10:17, 10:22, 10:24,

11:10, 11:11, 11:20, 12:4, 12:6, 12:9, 16:13, 16:17, 19:15, 20:14, 21:11
distracted [1] - 28:1
distribute [1] - 23:4
District [58] - 3:22, 6:9, 6:18, 7:13, 10:16, 13:7, 15:18, 22:16, 22:18, 22:23, 24:12, 25:19, 26:4, 28:6, 28:25, 31:20, 33:14, 39:21, 40:8, 40:13, 41:2, 41:8, 41:12, 45:23, 47:4, 47:22, 51:20, 53:15, 53:18, 53:21, 58:24, 59:1, 59:24, 59:25, 60:5, 61:9, 61:12, 62:2, 63:4, 63:20, 64:8, 64:16, 65:16, 65:21, 66:1, 67:6, 68:2, 68:10, 68:24, 69:9, 69:10, 69:23, 70:8, 70:22, 74:23, 75:23, 78:17, 79:18
DISTRICT [3] - 1:1, 1:1, 1:4
District's [2] - 13:15, 28:20
Districts [11] - 18:23, 21:18, 21:21, 22:2, 22:12, 22:14, 22:15, 26:13, 26:17, 26:25, 67:20
divert [2] - 9:8, 44:3
DIVISION [1] - 1:2
document [7] - 46:1, 46:4, 46:11, 46:17, 46:25, 64:6, 67:1
documents [2] - 15:22, 77:9
dollars [2] - 28:19, 53:3
done [7] - 27:19, 29:21, 34:20, 47:14, 47:16, 78:24, 79:2
down [1] - 72:9
DRIVE [1] - 1:22
due [1] - 10:20
duly [2] - 3:14, 82:8
during [9] - 2:19, 4:21, 13:3, 13:22, 14:9, 18:9, 34:4, 36:12, 72:17
duties [1] - 28:21

**E**

early [12] - 6:8, 36:8, 36:14, 39:20, 39:22,

40:9, 40:15, 40:18, 40:19, 40:24, 41:3, 41:13
easier [2] - 60:14, 61:5
education [1] - 77:1
effect [2] - 49:13, 50:5
either [8] - 14:5, 24:13, 31:1, 34:6, 49:3, 53:15, 63:20, 78:14
elicit [1] - 5:11
email [21] - 45:20, 46:15, 46:18, 49:3, 58:14, 58:18, 58:22, 59:2, 59:10, 59:25, 60:5, 60:12, 60:14, 60:17, 61:4, 61:6, 61:8, 61:10, 61:13
emails [8] - 11:19, 26:17, 26:25, 58:21, 59:14, 59:21
embezzling [1] - 6:17
employee [8] - 7:16, 7:20, 7:22, 22:18, 38:9, 64:8, 79:22
employees [3] - 7:23, 67:6, 74:23
end [3] - 36:8, 55:2, 72:6
ended [2] - 55:8, 55:13, 56:3
endorse [4] - 45:21, 46:21, 47:2, 47:3
endorsed [1] - 47:22
enemies [2] - 80:1, 80:4
enrich [1] - 7:13
enter [3] - 4:25, 5:1, 70:1
entered [3] - 5:17, 24:12, 70:6
entire [4] - 30:3, 31:6, 72:17, 78:12
entirely [1] - 78:13
envelope [2] - 62:1, 62:21
Esq [4] - 2:2, 2:3, 2:5, 2:8
establish [2] - 5:25, 16:20
established [1] - 70:13
evaluate [1] - 28:12
Evaluation [1] - 28:10
evaluation [1] - 29:10
evening [1] - 59:15
event [3] - 41:23, 48:18, 50:11
events [1] - 81:2
evidence [2] - 27:14, 67:25

**exact** [4] - 14:24, 42:8, 48:4, 51:10
**exactly** [8] - 11:25, 37:5, 37:8, 49:18, 50:9, 67:18, 68:15, 69:5
**EXAMINATION** [8] - 2:14, 2:15, 2:15, 2:16, 3:15, 36:3, 71:8, 79:3
**EXAMINATIONS** [1] - 2:11
**excuse** [1] - 51:5
**execute** [1] - 25:1
**executed** [1] - 25:3
**executing** [1] - 25:18
**Execution** [1] - 28:16
**Executive** [1] - 13:1
**exempt** [2] - 23:21, 69:14
**EXHIBITS** [1] - 2:17
**exhibits** [1] - 8:21
**Exhibits** [1] - 2:19
**expect** [3] - 35:9, 39:20, 41:1
**expires** [1] - 82:19
**explain** [2] - 4:2, 4:8
**explained** [1] - 3:11
**expose** [2] - 78:18, 78:22
**exposed** [5] - 18:24, 54:1, 74:19, 78:8, 79:7
**expressed** [1] - 58:4
**expressly** [1] - 57:21
**extent** [1] - 53:18
**eyes** [1] - 26:8

**F**

**facilitate** [1] - 24:2
**facility** [1] - 36:9
**fact** [7] - 3:24, 6:1, 6:4, 16:5, 38:13, 61:19, 73:25
**factor** [2] - 13:8, 74:11
**factored** [1] - 74:15
**facts** [1] - 5:25
**failed** [1] - 69:10
**faint** [1] - 66:17
**fair** [1] - 73:24
**familiar** [1] - 24:11
**family** [2] - 19:16, 19:18
**far** [4] - 39:13, 63:9, 67:22, 67:24
**fast** [1] - 64:25
**father** [4] - 33:8, 40:5, 44:8, 55:21
**fear** [3] - 13:19, 13:24,

54:1
**feared** [1] - 74:20
**fears** [1] - 14:1
**February** [1] - 82:19
**Federal** [8] - 3:9, 6:14, 33:15, 35:2, 35:17, 36:9, 39:24
**federal** [1] - 34:22
**Fee** [5] - 24:21, 52:20, 72:7, 72:16, 73:22
**fee** [5] - 8:16, 28:19, 73:8, 73:9, 73:10
**fees** [4] - 48:10, 48:13, 49:23, 73:6
**felt** [1] - 56:3
**few** [3] - 36:6, 71:10, 75:3
**fide** [1] - 53:9
**Fifth** [8] - 5:3, 5:6, 32:22, 65:18, 65:24, 66:3, 66:9, 66:14
**fight** [2] - 44:3, 44:4
**fighting** [1] - 43:17
**figure** [2] - 27:16, 31:15
**filed** [1] - 36:7
**Finance** [1] - 28:10
**finance** [1] - 28:16
**Financial** [1] - 71:21
**fine** [1] - 7:7
**finished** [1] - 60:22
**Firm** [3] - 68:19, 69:1, 80:13
**First** [3] - 8:2, 35:10, 42:23
**first** [23] - 3:13, 4:1, 5:23, 8:13, 14:9, 14:12, 22:23, 23:3, 25:1, 25:2, 32:15, 40:18, 45:3, 47:21, 49:16, 49:25, 50:3, 50:5, 50:25, 51:2, 69:25, 71:13, 72:22
**five** [2] - 17:8
**flat** [3] - 73:8, 73:9, 73:10
**flesh** [1] - 8:1
**Floyd** [3] - 80:7, 80:10, 80:12
**folks** [1] - 3:23
**follow** [1] - 71:10
**follow-up** [1] - 71:10
**following** [8] - 26:11, 26:13, 27:23, 28:7, 29:13, 35:24, 66:19, 71:5
**follows** [1] - 3:14
**FOR** [1] - 1:1
**foregoing** [1] - 82:9
**form** [18] - 3:6, 13:10, 22:25, 38:1, 38:3,

39:1, 39:23, 43:20, 44:14, 44:17, 45:25, 47:5, 47:6, 66:7, 68:22, 80:2, 80:15, 81:7
**formal** [1] - 29:13
**former** [1] - 38:9
**forward** [6] - 12:10, 18:10, 18:16, 59:14, 78:13, 81:2
**Franchini** [5] - 59:11, 59:13, 59:17, 60:1, 60:7
**free** [1] - 35:13
**Freedom** [2] - 27:6, 76:1
**frequently** [1] - 75:10
**front** [1] - 67:2
**fruit** [1] - 30:9
**fund** [10] - 16:19, 16:21, 17:18, 18:5, 20:16, 56:25, 76:4, 76:5, 76:9, 76:16
**funds** [5] - 9:8, 54:19, 56:14, 56:19, 76:13
**FURTHER** [2] - 2:15, 2:16
**future** [1] - 40:23

**G**

**general** [4] - 19:5, 19:10, 19:13, 49:22
**Georgia** [1] - 35:6
**gifted** [1] - 55:21
**given** [8] - 39:4, 39:21, 41:2, 52:25, 64:23, 65:3, 67:11, 82:11
**goal** [2] - 55:15, 55:16
**Gotcha** [1] - 77:4
**granted** [2] - 40:19, 40:23
**great** [1] - 29:21
**group** [1] - 36:21
**guess** [5] - 7:24, 20:13, 22:24, 50:10, 73:20
**guessing** [2] - 50:20, 50:21
**guilt** [2] - 13:19, 18:24
**guilty** [4] - 6:14, 6:24, 7:16, 33:15

**H**

**Hallagan** [2] - 68:19, 69:1
**hand** [5] - 62:7, 64:20, 67:6, 67:7, 82:15
**handle** [1] - 38:15

**hang** [1] - 24:17
**happy** [2] - 41:12, 46:3
**harassment** [1] - 43:24
**hard** [2] - 43:17, 44:3
**Hardy** [1] - 2:10
**Harpootlian** [10] - 2:2, 2:2, 3:21, 6:25, 27:25, 36:20, 36:22, 36:24, 38:19, 39:14
**HARPOOTLIAN** [82] - 2:14, 2:15, 3:16, 7:3, 7:6, 8:12, 9:4, 9:17, 10:12, 11:3, 12:3, 13:11, 14:3, 15:25, 16:15, 18:19, 19:12, 20:7, 20:19, 21:3, 21:15, 22:8, 23:1, 23:24, 24:9, 25:7, 25:12, 26:1, 26:10, 27:2, 27:13, 27:24, 29:3, 29:19, 29:24, 31:5, 31:11, 31:13, 31:24, 32:3, 32:10, 34:2, 34:12, 34:19, 35:25, 38:1, 38:6, 38:11, 38:16, 38:25, 39:23, 43:19, 43:22, 44:14, 44:17, 45:16, 45:24, 46:8, 46:12, 47:5, 60:22, 66:7, 68:22, 71:9, 72:5, 72:14, 72:25, 73:13, 74:3, 74:13, 75:7, 75:17, 75:24, 77:16, 77:21, 78:5, 78:20, 80:2, 80:15, 80:25, 81:7, 81:13
**head** [2] - 4:12, 78:9
**hear** [4] - 4:20, 12:10, 16:10
**heard** [1] - 43:7
**heart** [1] - 33:4
**Heather** [1] - 2:10
**help** [8] - 27:9, 33:14, 36:14, 57:11, 68:10, 70:22, 76:8, 77:12
**helped** [1] - 77:19
**helping** [1] - 24:4
**hereunto** [1] - 82:15
**hide** [1] - 58:23
**high** [1] - 56:2
**higher** [1] - 55:12
**himself** [1] - 7:13
**his/her** [1] - 3:11
**Hold** [7] - 6:23, 19:24, 34:21, 35:22, 46:16, 56:23
**hold** [3] - 24:19, 27:19, 78:24
**home** [24] - 15:7, 15:8,

15:11, 15:13, 15:16, 15:18, 15:21, 16:3, 16:5, 26:3, 58:18, 58:22, 59:19, 60:15, 60:20, 61:2, 61:8, 61:17, 61:21, 63:13, 63:15, 63:17, 63:20, 64:16
**honest** [2] - 22:4, 42:10
**honestly** [1] - 44:11
**hope** [1] - 40:19
**house** [4] - 26:14, 45:8, 76:19, 77:1
**HUB** [19] - 1:7, 1:8, 3:23, 18:1, 22:1, 22:21, 24:14, 28:25, 30:25, 34:4, 34:9, 36:2, 46:17, 49:20, 54:1, 66:2, 66:6, 66:13, 72:20
**HUB's** [1] - 46:17
**Hub(sic)** [1] - 35:2
**HUB26** [1] - 24:24
**hundred** [1] - 72:11
**hung** [1] - 78:9
**hurry** [1] - 75:15

**I**

**idea** [1] - 41:24
**identification** [1] - 29:10
**Identification** [1] - 28:9
**Identify** [1] - 28:12
**III** [2] - 6:1, 6:5
**IL** [1] - 2:6
**important** [3] - 41:6, 41:9
**impress** [1] - 44:22
**impressed** [3] - 44:11, 44:19
**impromptu** [1] - 29:11
**IN** [1] - 42:15
**inappropriate** [1] - 53:21
**Inc** [2] - 1:9, 28:4
**incarceration** [1] - 36:8
**incident** [3] - 8:4, 8:6, 49:1
**included** [1] - 6:17
**including** [1] - 3:23
**increments** [1] - 14:18
**indeed** [1] - 38:22
**INDEX** [2] - 2:11, 2:17
**indicate** [3] - 5:4, 12:7, 18:7
**indicated** [3] - 56:13,

71:16, 73:24
**indicates** [1] - 7:11
**Indictment** [1] - 7:8
**influence** [1] - 7:12
**Information** [2] - 27:6, 76:1
**information** [1] - 6:23
**input** [1] - 41:3
**inside** [1] - 79:18
**installment** [2] - 17:6, 17:8
**instance** [1] - 5:3
**instances** [2] - 26:3, 26:19
**instruct** [1] - 44:24
**INSTRUCTED** [1] - 2:21
**instructions** [2] - 9:23, 9:24
**Insurance** [2] - 1:9, 23:21, 65:12
**insurance** [29] - 7:14, 7:15, 7:19, 7:20, 7:22, 10:21, 12:19, 18:12, 18:17, 21:22, 24:11, 31:17, 34:7, 48:16, 53:8, 53:9, 53:14, 53:21, 54:7, 54:12, 64:5, 67:19, 69:13, 69:14, 69:19, 70:17, 78:15
**insured** [1] - 53:24
**insurers** [1] - 69:3
**intended** [1] - 10:25
**intentional** [2] - 41:23, 42:1
**intentionally** [1] - 41:22
**interest** [5] - 13:15, 13:16, 18:22, 22:13, 30:1
**interested** [1] - 82:14
**interests** [2] - 13:14, 53:17
**internal** [2] - 80:1, 80:4
**International** [2] - 1:7, 1:8
**interpret** [1] - 4:18
**interviews** [1] - 32:21
**invoice** [8] - 22:21, 23:10, 62:20, 63:3, 63:5, 63:19, 64:5, 64:16
**invoices** [4] - 14:23, 15:22, 62:11, 63:10
**involve** [2] - 8:13, 8:14
**involved** [2] - 8:15, 68:20
**involves** [1] - 5:12
**involving** [2] - 8:7,

34:4
**iPhone** [1] - 59:21
**issue** [5] - 15:9, 18:14, 19:7, 45:20, 65:21
**issued** [2] - 43:4, 48:5, 51:19

**J**

**J.** [1] - 1:9
**Jana** [18] - 7:24, 8:8, 8:23, 8:24, 9:13, 42:16, 42:24, 43:12, 43:18, 45:2, 45:20, 46:18, 48:3, 48:4, 48:22, 49:2, 50:18, 51:22
**Janna** [1] - 41:18
**Jesup** [1] - 35:6
**job** [2] - 29:21, 54:13
**John** [1] - 2:8
**joke** [1] - 20:5
**Judge** [3] - 31:14, 43:25, 44:23
**July** [3] - 65:7, 65:11, 65:20
**Jury** [1] - 31:14
**justify** [1] - 29:15

**K**

**keep** [5] - 21:6, 27:7, 60:5, 68:5, 75:22
**keeping** [1] - 13:20
**Ken** [3] - 69:21, 69:25, 70:13
**kept** [1] - 56:21
**Kerns** [1] - 1:17
**kerns** [1] - 82:4
**kickbacks** [2] - 7:15, 7:18
**kin** [1] - 82:12
**kind** [3] - 20:11, 50:12, 73:23
**kinds** [3] - 12:12, 63:1, 63:2
**Knauff** [25] - 1:9, 3:24, 12:20, 12:22, 18:1, 22:21, 24:14, 28:4, 28:7, 28:18, 28:25, 30:25, 34:4, 34:10, 49:20, 64:21, 65:12, 65:22, 66:2, 66:6, 66:13, 67:6, 68:4, 70:7, 72:20
**knowledge** [6] - 9:11, 9:12, 10:23, 10:25, 25:3, 28:23
**knowledgeable** [1] - 70:16

**L**

**LaSalle** [1] - 2:6
**last** [1] - 29:8
**Laurel** [1] - 2:3
**law** [2] - 34:15, 39:24
**Law** [3] - 68:19, 69:1, 80:13
**lawsuit** [4] - 3:22, 3:23, 30:14, 66:2
**lawyer** [2] - 5:13
**lead** [2] - 11:11, 13:23
**Leading** [2] - 20:6, 72:4
**leading** [3] - 7:2, 37:24, 38:4
**leap** [2] - 23:22, 24:1
**lease** [1] - 12:1
**least** [2] - 53:18, 74:19
**leave** [2] - 35:9, 54:1
**length** [2] - 54:19, 54:22
**letter** [3] - 8:22, 24:24, 63:3
**level** [2] - 21:6, 23:17, 73:16
**levels** [1] - 15:23
**life** [1] - 44:6
**likely** [4] - 59:22, 61:8, 63:24, 64:13
**Limited** [2] - 1:8, 1:9
**line** [2] - 36:17, 43:24
**lines** [2] - 19:22, 24:13
**lingo** [1] - 35:4
**Lisa** [2] - 1:17, 82:4
**LISAKERNS.CRS@ GMAIL.COM** [1] - 1:24
**listen** [1] - 5:19
**listing** [1] - 67:1
**LLP** [1] - 2:5
**LOCATION** [1] - 1:16
**look** [7] - 8:21, 12:16, 19:6, 43:18, 53:23, 61:21, 66:15
**looked** [1] - 34:3, 55:7, 55:18
**looking** [5] - 6:22, 8:20, 24:23, 53:22, 56:1
**looks** [1] - 24:24
**lose** [1] - 74:18

**M**

**mail** [4] - 15:5, 63:25, 64:21, 64:24
**mailed** [10] - 15:7, 15:10, 15:11, 15:13,

15:16, 15:17, 15:18, 15:21, 22:22, 61:25
**mailroom** [2] - 23:4, 62:17
**Management** [3] - 24:21, 72:7, 72:16
**management** [1] - 23:6
**Manager** [2] - 22:19, 64:2
**manner** [1] - 82:14
**March** [1] - 35:8
**Marcy** [4] - 22:17, 22:18, 23:5, 23:6
**market** [2] - 28:10, 28:12
**marketing** [1] - 67:19
**markets** [2] - 28:13, 28:15
**Massalon** [2] - 2:7, 2:8
**matter** [5] - 4:5, 4:15, 14:9, 61:2
**matters** [3] - 4:6, 59:7, 61:19
**mean** [36] - 5:1, 12:14, 14:19, 16:9, 19:5, 20:3, 20:13, 20:22, 24:22, 33:13, 33:14, 33:20, 45:12, 48:7, 49:3, 51:25, 52:15, 53:16, 53:22, 54:7, 54:21, 58:6, 60:1, 60:4, 60:11, 61:22, 62:6, 63:1, 64:13, 67:8, 69:11, 72:1, 72:9, 73:1, 75:2
**means** [3] - 17:25, 75:9, 75:10
**meant** [5] - 47:2, 47:18, 50:10, 52:11, 80:24
**meetings** [4] - 29:11, 67:5, 67:12, 71:18
**memorandum** [1] - 16:18
**memos** [1] - 29:9
**mess** [1] - 40:14
**Midwest** [1] - 1:8
**might** [9] - 42:1, 47:14, 47:15, 57:14, 57:16, 57:17, 64:2, 67:17, 74:18
**million** [1] - 34:8
**mind** [2] - 29:16, 60:12
**minute** [1] - 28:1
**misstates** [2] - 31:9, 31:12
**mistakenly** [3] - 41:18, 42:5, 42:12
**mitigate** [1] - 35:11

**mitigating** [1] - 33:19
**molestation** [4] - 68:11, 68:17, 69:2, 80:14
**MoloLamken** [1] - 2:5
**moment** [1] - 27:20
**money** [38] - 6:18, 11:6, 11:13, 11:18, 12:8, 16:11, 16:12, 17:17, 21:8, 24:5, 27:9, 30:25, 34:10, 34:16, 41:25, 42:2, 42:25, 43:5, 43:9, 51:11, 51:23, 56:19, 56:24, 57:4, 57:8, 65:4, 65:23, 66:5, 66:11, 76:4, 76:16, 76:17, 76:19, 76:21, 77:10, 77:13, 77:19
**month** [1] - 52:25
**months** [1] - 36:7
**morning** [3] - 54:21, 58:15, 66:22
**motivated** [1] - 33:23
**motive** [2] - 41:15
**Move** [1] - 80:17
**move** [2] - 60:24, 74:17
**MR** [161] - 2:14, 2:15, 2:15, 2:16, 3:14, 6:25, 7:3, 7:5, 7:6, 8:10, 8:12, 9:3, 9:4, 9:16, 9:17, 10:11, 10:12, 11:2, 11:3, 11:23, 12:3, 13:9, 13:11, 14:2, 14:3, 15:19, 15:25, 16:14, 16:15, 18:18, 18:19, 19:9, 19:12, 20:6, 20:7, 20:18, 20:19, 21:2, 21:3, 21:14, 21:15, 22:7, 22:8, 22:25, 23:1, 23:16, 23:24, 24:7, 24:9, 25:6, 25:7, 25:10, 25:12, 25:23, 26:1, 26:6, 26:10, 26:23, 27:2, 27:11, 27:13, 27:24, 29:2, 29:3, 29:17, 29:19, 29:23, 29:24, 31:3, 31:5, 31:9, 31:11, 31:12, 31:13, 31:22, 31:24, 32:1, 32:3, 32:9, 32:10, 34:1, 34:2, 34:11, 34:12, 34:18, 34:19, 35:25, 36:4, 38:1, 38:6, 38:11, 38:13, 38:16, 38:17, 38:25, 39:3, 39:23, 40:1, 43:19, 43:21, 43:22, 44:1, 44:14,

44:15, 44:17, 44:25, 45:16, 45:18, 45:24, 46:5, 46:8, 46:10, 46:12, 46:14, 47:5, 47:10, 60:22, 61:11, 66:7, 66:10, 66:20, 68:22, 68:25, 71:6, 71:9, 72:4, 72:5, 72:13, 72:14, 72:24, 72:25, 73:12, 73:13, 74:2, 74:3, 74:12, 74:13, 75:6, 75:7, 75:16, 75:17, 75:21, 75:24, 77:14, 77:16, 77:20, 77:21, 78:4, 78:5, 78:19, 78:20, 79:4, 80:2, 80:5, 80:15, 80:18, 80:25, 81:4, 81:7, 81:9, 81:13

**multiples** [1] - 34:15

## N

**name** [8] - 3:17, 3:20, 62:1, 62:9, 62:12, 62:21, 68:16, 68:18
**names** [1] - 62:10
**nature** [1] - 10:13
**necessarily** [1] - 73:15
**need** [18] - 4:1, 10:18, 11:7, 20:23, 27:7, 31:15, 43:8, 49:24, 51:11, 56:19, 56:24, 57:4, 62:6, 64:2, 74:17, 76:4, 76:16, 76:20
**needed** [12] - 11:21, 54:5, 57:8, 60:21, 61:16, 61:20, 62:5, 62:13, 76:17, 76:18, 76:19, 80:10
**needs** [2] - 4:20, 62:8
**negotiate** [4] - 73:3, 73:5, 73:19, 74:17
**negotiated** [2] - 65:3, 72:9
**negotiation** [3] - 72:11, 72:19, 73:23
**negotiations** [1] - 28:13
**NELLIEFIELD** [1] - 1:22
**Never** [1] - 60:12
**never** [16] - 42:15, 42:23, 43:3, 43:13, 45:4, 53:25, 56:18, 56:19, 56:23, 56:24, 57:1, 57:20, 69:2, 79:12
**new** [2] - 24:22, 77:1

**next** [5] - 29:21, 60:24, 61:23, 75:14, 76:6
**nicer** [1] - 76:19
**nobody** [3] - 54:15, 77:24, 78:1
**none** [1] - 2:22
**normal** [1] - 22:22
**normally** [1] - 4:11
**North** [1] - 2:6
**Norton** [2] - 43:25, 44:23
**NOT** [1] - 2:21
**Notary** [2] - 82:4, 82:18
**note** [1] - 40:2
**notes** [1] - 66:16
**nothing** [4] - 29:13, 58:11, 78:25, 82:9
**notice** [2] - 3:4, 3:5
**November** [11] - 1:14, 8:23, 46:18, 48:19, 48:23, 48:25, 51:4, 79:7, 79:12, 82:6, 82:16
**Number** [2] - 24:23, 46:17
**number** [11] - 6:14, 12:18, 24:13, 26:19, 28:21, 34:3, 46:2, 46:6, 74:23

## O

**Oath** [1] - 48:22
**object** [18] - 7:3, 13:9, 22:25, 38:1, 38:25, 39:23, 43:19, 43:21, 44:14, 45:24, 66:7, 68:22, 80:2, 80:15, 80:16, 80:25, 81:7
**Object** [6] - 8:10, 38:2, 38:25, 44:17, 47:5, 47:6
**objecting** [2] - 7:5, 43:22
**Objection** [4] - 8:10, 20:18, 21:14, 25:10
**objection** [49] - 4:21, 5:1, 5:2, 5:17, 9:3, 9:16, 10:11, 11:2, 11:23, 14:2, 15:19, 16:14, 18:18, 19:9, 20:6, 21:2, 22:7, 23:16, 24:7, 25:6, 25:23, 26:6, 26:23, 27:11, 29:2, 29:17, 29:23, 31:3, 31:9, 31:22, 32:1, 32:9, 34:1, 34:11, 34:18, 45:16, 72:4, 72:13, 72:24, 73:12, 74:2,

74:12, 75:6, 75:16, 75:21, 77:14, 77:20, 78:4, 78:19
**objections** [1] - 3:6
**occasion** [1] - 58:23
**occasions** [3] - 62:17, 62:18, 65:2
**occur** [1] - 51:14
**occurred** [4] - 12:4, 12:5, 67:5, 67:9
**odd** [1] - 20:22
**OF** [4] - 1:1, 1:6, 82:1, 82:2
**offered** [1] - 73:10
**office** [2] - 15:10, 30:9
**Officer** [1] - 71:21
**official** [1] - 7:12
**often** [1] - 61:20
**old** [2] - 24:22, 68:12
**once** [2] - 14:25, 64:19
**one** [40] - 5:9, 6:7, 6:23, 12:12, 13:18, 14:6, 17:4, 18:3, 19:24, 22:23, 23:3, 23:5, 23:6, 24:16, 24:17, 24:18, 24:19, 24:20, 24:23, 25:3, 29:8, 35:22, 47:21, 52:9, 52:13, 53:12, 55:14, 55:24, 58:23, 63:7, 67:6, 67:15, 68:17, 69:25, 72:11, 72:16, 73:21, 75:2, 78:24
**One** [3] - 20:2, 30:14, 34:21
**ones's** [1] - 24:22
**Ongoing** [1] - 28:16
**open** [5] - 62:4, 62:7, 62:12, 62:15, 62:18
**opened** [2] - 62:1, 62:9
**openly** [1] - 44:10
**operation** [2] - 76:18, 77:1
**opportunity** [1] - 39:21
**opposed** [4] - 10:15, 26:3, 64:20
**order** [3] - 65:8, 69:9, 71:14
**original** [1] - 9:24
**outcome** [1] - 82:14
**overpay** [1] - 48:13
**overpayment** [7] - 41:22, 42:6, 42:11, 42:25, 48:9, 48:10, 48:15
**override** [2] - 23:23, 24:1
**own** [10] - 11:1, 11:6,

72:18, 74:16

13:14, 13:16, 18:22, 30:1, 33:6, 33:7, 65:4, 65:13

## P

**p.m.)** [1] - 81:16
**PA** [1] - 2:2
**PAGE** [1] - 2:12
**pages** [1] - 82:10
**paid** [14] - 7:15, 7:19, 7:20, 15:24, 17:2, 17:11, 21:8, 28:19, 34:16, 52:1, 57:1, 63:22, 64:18, 66:5
**paper** [2] - 29:12, 67:11
**Paragraph** [2] - 7:10
**parole** [3] - 40:20, 40:24, 41:4
**part** [1] - 51:10
**particular** [1] - 3:23
**Parties** [2] - 1:16, 82:7
**parties** [2] - 3:3, 82:13
**party** [4] - 30:14, 38:3, 38:12, 53:9
**Party** [2] - 30:20, 30:23
**past** [1] - 5:10
**pattern** [1] - 44:22
**pay** [9] - 15:2, 28:18, 31:1, 34:10, 34:16, 51:23, 55:12, 72:10, 80:13
**payable** [3] - 8:25, 10:2, 65:22
**Payable** [5] - 23:12, 64:1, 64:7, 64:10, 64:11
**paying** [1] - 54:5, 71:24
**payment** [7] - 8:15, 12:1, 15:10, 17:4, 41:19, 63:21
**payments** [12] - 7:15, 7:18, 16:8, 16:21, 18:9, 18:14, 19:7, 20:3, 20:10, 23:15, 34:7, 74:10
**peaking** [1] - 40:17
**penitentiary** [2] - 34:22, 35:1
**people** [11] - 27:4, 53:22, 54:4, 54:7, 58:20, 59:1, 59:4, 61:20, 68:7, 79:18
**percentage** [3] - 73:5, 73:6, 73:9
**perhaps** [1] - 27:15
**period** [9] - 7:19, 12:17, 13:3, 13:23,

18:10, 31:6, 34:4, 72:18, 74:16
**periodic** [2] - 21:22, 68:5
**periods** [2] - 14:22, 57:25
**person** [7] - 23:5, 54:12, 54:13, 62:7, 62:13, 64:24, 74:21
**personal** [9] - 9:8, 43:14, 56:6, 59:23, 60:2, 60:4, 60:12, 62:14, 65:4
**personally** [3] - 15:5, 42:18, 65:13
**Petition** [1] - 36:7
**petition** [3] - 39:19, 40:18, 40:22
**Phillip** [1] - 2:3
**phone** [12] - 32:12, 32:19, 43:25, 44:20, 44:23, 46:11, 48:21, 49:3, 60:17, 61:4, 61:7, 61:13
**piece** [2] - 27:15, 29:12
**pieces** [1] - 67:11
**place** [1] - 82:11
**Plaintiff** [1] - 2:2
**plaintiff** [1] - 1:5
**plan** [2] - 17:1, 29:12
**planned** [1] - 11:5
**planning** [1] - 11:18
**play** [2] - 18:15
**plead** [6] - 7:16, 65:18, 65:24, 66:3, 66:8, 66:14
**pled** [5] - 6:14, 6:24, 33:15
**pocket** [1] - 41:25
**point** [16] - 6:7, 12:19, 16:24, 23:13, 27:10, 35:13, 40:20, 40:23, 45:14, 49:5, 55:14, 55:24, 64:15, 72:17, 74:15
**Pokorney** [93] - 1:10, 7:24, 7:25, 8:8, 8:23, 8:24, 9:14, 9:23, 10:7, 10:14, 10:17, 10:22, 11:9, 11:20, 12:6, 12:23, 14:13, 15:1, 16:1, 16:10, 17:19, 18:4, 18:13, 19:2, 19:4, 21:11, 21:17, 22:1, 22:5, 24:25, 28:22, 29:10, 30:4, 30:5, 37:9, 37:14, 39:7, 39:11, 39:15, 41:18, 42:16, 42:24, 43:7, 43:11,

43:12, 43:18, 45:2, 45:20, 46:19, 48:3, 48:4, 48:22, 49:2, 49:10, 49:17, 49:20, 50:4, 51:3, 51:9, 51:23, 53:1, 56:10, 56:18, 56:24, 57:7, 57:11, 57:21, 58:4, 67:5, 67:13, 67:19, 68:4, 68:9, 69:8, 69:22, 70:2, 70:15, 71:15, 71:22, 76:8, 76:13, 78:12, 78:16, 79:17, 79:21, 79:24, 80:9, 80:23

**Pokorney's** [7] - 20:25, 21:1, 26:18, 30:24, 34:5, 66:12, 77:12

**Policies** - 68:1, 68:3

**policies** [11] - 12:19, 18:12, 18:17, 49:23, 53:8, 53:9, 53:21, 53:23, 54:2, 54:16, 67:19

**portion** [1] - 74:18

**position** [3] - 7:12, 33:5, 61:23

**positive** [1] - 33:7

**possible** [11] - 38:19, 39:9, 39:14, 40:12, 47:20, 48:2, 48:7, 57:10, 69:5, 69:7, 79:24

**possibly** [3] - 36:25, 39:6, 63:6

**predecessor** [1] - 3:24

**predicate** [1] - 76:6

**premium** [1] - 48:16

**premiums** [4] - 34:6, 52:20, 53:4, 53:7

**Preparation** [1] - 28:11

**prepare** [1] - 8:24

**prepayment** [1] - 54:24

**present** [1] - 2:10

**presented** [3] - 18:12, 29:12, 73:21

**presume** [1] - 23:20

**pretty** [1] - 17:12

**prevent** [1] - 40:9

**price** [3] - 28:14, 72:8, 73:24

**private** [5] - 26:17, 26:19, 55:6, 55:10, 75:19

**privilege** [1] - 33:22

**problem** [1] - 64:11

**procedure** [3] - 3:9,

---

26:14, 62:3

**procedures** [1] - 10:21

**proceed** [2] - 24:10, 36:2

**proceedings** [4] - 27:23, 35:24, 66:19, 71:5

**process** [4] - 4:21, 51:25, 77:13, 78:12

**processing** - 23:12

**Procurement** [3] - 22:20, 23:22, 73:17

**Professional** [1] - 1:18

**proffered** [1] - 2:19

**Program** [1] - 28:10

**program** [2] - 28:9, 28:16

**programs** [2] - 28:14, 28:15

**promised** [1] - 33:8

**property** [1] - 28:8

**protect** [12] - 12:11, 14:6, 18:2, 42:21, 52:8, 58:9, 77:24, 78:2, 79:25, 80:10, 80:24

**prove** [1] - 46:7

**provide** [8] - 28:7, 28:9, 28:23, 41:3, 53:14, 71:1, 71:17, 73:2

**provided** [7] - 29:1, 56:11, 63:5, 63:8, 66:12, 66:22, 71:23

**providing** [3] - 57:13, 70:22, 72:2

**Public** [4] - 12:18, 33:20, 36:11, 36:13, 36:17, 82:4, 82:18

**public** [4] - 54:25, 55:19, 55:25, 56:25

**publish** [2] - 46:1, 46:9, 46:10

**purpose** [2] - 7:11, 17:21

**purposes** [1] - 3:10

**pursuant** [4] - 3:4, 3:8, 66:23, 71:15

**put** [3] - 27:19, 38:13, 41:24

---

## Q

**questioned** [1] - 39:13

**QUESTIONS** [1] - 2:21

**questions** [15] - 3:5, 4:11, 5:21, 30:22, 32:23, 33:5, 36:2, 36:6, 37:5, 37:24, 44:3, 44:10, 44:24,

---

71:7, 71:11

**quote** [2] - 58:18, 73:11

**quoted** [1] - 73:22

---

## R

**R&D's** [1] - 21:22

**raises** [1] - 15:9

**rate** [1] - 38:14

**read** [7] - 3:11, 7:8, 24:20, 27:5, 27:15, 29:5, 46:12

**reading** [1] - 46:16

**ready** [2] - 61:23, 75:14

**real** [1] - 33:11

**really** [6] - 19:21, 19:22, 49:23, 50:7, 67:22, 75:2

**realms** [1] - 10:18

**reason** [7] - 29:20, 42:16, 42:24, 43:4, 43:13, 48:9, 60:13

**recalling** [1] - 48:22

**receive** [4] - 9:13, 14:12, 29:9, 76:12

**received** [2] - 30:5, 67:23

**recollection** [3] - 14:20, 47:18, 51:2

**recommendations** [1] - 28:14

**recommended** [2] - 22:1, 78:15

**Record** [4] - 5:24, 5:25, 38:2, 39:10

**recovered** [1] - 68:13

**recross** [1] - 80:17

**reference** [2] - 21:23, 21:24

**referred** [2] - 36:11, 36:12

**refund** [13] - 8:17, 8:24, 12:2, 41:17, 48:23, 48:25, 51:4, 51:8, 51:20, 51:24, 52:22, 79:7, 79:12

**refuse** [1] - 32:23

**refusing** [2] - 5:5, 80:13

**regard** [3] - 19:2, 21:8, 49:18

**regarding** [2] - 39:7, 52:22

**regardless** [2] - 63:19, 64:15

**regular** [1] - 67:23

**regularly** [1] - 58:17

**related** [5] - 11:6,

---

16:19, 48:15, 59:23, 68:14

**relating** [1] - 49:21

**relationship** [7] - 19:22, 21:6, 30:3, 49:20, 49:22, 72:2, 72:3

**relationships** [2] - 33:22, 34:5

**relative** [1] - 21:17

**release** [7] - 36:8, 36:14, 39:20, 40:9, 40:15, 40:19, 41:13

**released** [1] - 39:22

**relying** [1] - 73:25

**remember** [35] - 8:7, 14:16, 14:24, 15:12, 15:14, 25:14, 25:15, 30:4, 30:6, 36:21, 36:22, 38:19, 38:23, 42:4, 47:7, 47:24, 47:25, 48:14, 48:17, 48:20, 49:4, 50:10, 50:14, 50:15, 50:24, 51:13, 52:1, 60:3, 63:9, 68:12, 68:13, 68:21, 69:11

**remembered** [1] - 39:18

**REMOTE** [1] - 2:1

**Remote** [2] - 1:16, 82:6

**renew** [2] - 18:12, 29:20

**renewal** [2] - 14:22, 57:25

**renewals** [1] - 53:4

**renewed** [2] - 18:17, 70:11

**Rep** [1] - 13:2

**repayment** [2] - 42:10, 42:11

**Repayment** [1] - 17:1

**repeat** [1] - 5:21

**Repeat** [1] - 39:12

**repetitive** [1] - 39:1

**report** [2] - 68:11, 69:10

**reported** [2] - 68:6, 69:2

**REPORTER** [1] - 1:17

**Reporter** [3] - 1:18, 4:17, 82:4

**REPORTING** [1] - 1:21

**represent** [1] - 3:21

**Representative** [1] - 72:20

**represented** [1] - 11:21

**request** [3] - 9:25, 42:10, 59:7

---

**requested** [1] - 11:17

**required** [1] - 4:7

**RES** [1] - 1:21

**resentenced** [1] - 33:19

**reserved** [1] - 3:7

**response** [1] - 37:24

**responsibilities** [1] - 28:20

**rest** [3] - 29:6, 29:8, 36:21

**result** [1] - 37:24

**reverse** [1] - 71:14

**Review** [1] - 28:11

**rewritten** [1] - 48:1

**Richard** [2] - 2:2, 3:22

**rights** [1] - 5:6

**risk** [1] - 29:9

**Risk** [8] - 22:19, 23:6, 28:9, 28:10, 28:16, 64:2, 68:1, 68:3

**role** [4] - 12:24, 18:13, 18:15, 22:19

**rules** [1] - 3:9

**Rules** [1] - 4:7

**run** [1] - 73:16

**ruse** [1] - 20:9

---

## S

**SAFE** [2] - 53:15, 53:18

**Satellite** [1] - 35:2

**save** [1] - 3:6

**saw** [1] - 42:2

**SC** [3] - 1:22, 2:4, 2:9

**scenario** [1] - 14:7

**scenes** [1] - 67:24

**Scheme** [1] - 7:9

**scheme** [3] - 7:11, 7:23, 25:25

**School** [45] - 3:22, 6:8, 6:18, 7:13, 10:16, 13:7, 13:15, 15:17, 18:23, 21:18, 21:21, 22:2, 22:12, 22:14, 22:15, 22:16, 22:18, 22:22, 24:12, 25:19, 26:4, 26:13, 26:17, 28:5, 28:20, 28:25, 31:20, 33:13, 39:21, 40:8, 40:13, 41:2, 41:8, 41:12, 45:23, 47:4, 47:22, 51:20, 59:23, 64:7, 65:16, 66:1, 69:22, 70:22, 78:17

**SCHOOL** [1] - 1:4

**school** [16] - 17:3, 54:25, 55:4, 55:6,

55:9, 55:11, 55:19, 55:24, 55:25, 56:2, 56:4, 56:5, 56:6, 56:7, 56:25, 70:16
**Schools** [1] - 9:21
**schools** [5] - 55:8, 55:9, 55:10, 55:20, 63:2
**Scott** [2] - 1:10, 7:25
**scratch** [2] - 29:12, 67:11
**seal** [1] - 82:16
**searching** [1] - 19:21
**sec** [1] - 19:24
**second** [9] - 6:23, 15:9, 19:25, 32:12, 35:22, 45:4, 46:16, 65:10, 78:24
**Secondly** [1] - 4:16
**seconds** [1] - 34:21
**secret** [1] - 27:7
**section** [1] - 19:17
**see** [16] - 8:2, 22:23, 23:3, 23:6, 23:11, 24:16, 26:8, 26:18, 61:6, 61:12, 62:4, 62:5, 62:6, 62:8, 67:25, 76:2
**seeing** [4] - 45:7, 45:10, 45:14, 77:8
**seek** [2] - 36:14, 40:24
**seeking** [1] - 36:8
**selected** [1] - 28:15
**selections** [1] - 28:14
**send** [6] - 30:9, 46:18, 57:21, 58:21, 60:4, 68:7
**sending** [1] - 56:21
**sent** [19] - 9:21, 9:22, 14:23, 26:3, 26:14, 46:23, 48:3, 48:4, 61:20, 62:2, 62:21, 62:22, 63:13, 63:15, 63:17, 63:19, 64:16, 72:7
**Sentence** [1] - 35:15
**sentence** [1] - 47:18
**sentences** [1] - 33:16
**September** [1] - 36:6
**series** [1] - 4:10
**serious** [1] - 52:5
**server** [2] - 58:24, 75:23
**service** [6] - 12:18, 13:4, 28:22, 67:24, 73:2, 73:10
**Service** [14] - 13:5, 24:21, 28:5, 29:6, 31:18, 34:7, 66:23, 70:7, 70:12, 71:15, 72:7, 72:16, 73:21

**services** [15] - 18:11, 18:17, 21:22, 22:5, 24:11, 28:8, 28:17, 29:1, 31:1, 66:22, 67:2, 67:23, 69:14, 71:23, 72:1
**Services** [7] - 23:21, 28:17, 28:24, 29:8, 70:1, 72:8, 78:14
**SERVICES** [1] - 1:21
**servicing** [1] - 67:20
**serving** [1] - 33:16
**set** [1] - 82:15
**several** [1] - 55:8
**sexual** [4] - 68:11, 68:17, 69:2, 80:14
**shame** [2] - 13:19, 18:24
**sharing** [1] - 7:14
**short** [2] - 66:15, 71:3
**sign** [4] - 3:12, 23:14, 26:8, 63:23
**signed** [6] - 12:17, 13:3, 13:5, 23:8, 34:6, 63:21
**signing** [2] - 31:17, 31:18
**simple** [1] - 64:15
**simply** [3] - 45:21, 47:21, 48:18
**single** [3] - 58:3, 63:7, 79:6
**sister** [1] - 36:23
**sit** [2] - 49:5, 72:9
**sitting** [1] - 67:21
**so..** [5] - 18:25, 52:16, 57:19, 66:17, 67:17
**someone** [1] - 73:9
**sometime** [1] - 35:18
**Sometimes** [3] - 63:12, 64:22, 64:24
**sometimes** [3] - 30:8, 63:16, 67:12
**somewhere** [1] - 34:8
**Sorry** [1] - 46:19
**sorry** [5] - 11:11, 32:25, 34:24, 35:3, 50:2
**sort** [7] - 13:19, 28:1, 32:11, 71:13, 71:18, 74:16, 78:11
**sorts** [2] - 19:16, 73:7
**SOUTH** [2] - 1:1, 82:1
**South** [5] - 17:1, 17:2, 55:9, 56:7, 82:18
**specific** [9] - 14:19, 19:7, 46:1, 48:21, 49:1, 49:6, 51:7, 52:21, 53:5
**specifically** [6] - 25:14, 37:14, 43:2,

43:16, 58:6, 58:12
**specifics** [1] - 48:20
**spelled** [2] - 28:21, 28:22
**staff** [1] - 23:5
**Stamp** [2] - 28:3, 46:2
**Stamped** [2] - 8:22, 24:23
**Stan** [41] - 7:24, 8:8, 10:7, 10:14, 12:6, 12:14, 12:15, 12:23, 16:9, 20:4, 20:14, 24:24, 37:16, 42:21, 43:18, 49:10, 49:17, 50:4, 51:3, 51:9, 51:23, 56:10, 56:18, 57:7, 57:10, 57:21, 67:5, 67:13, 68:4, 68:9, 69:21, 70:1, 70:15, 75:2, 76:8, 77:17, 78:12, 79:17, 79:21, 80:9
**standard** [1] - 62:3
**Stanley** [1] - 1:9
**start** [1] - 45:3
**started** [5] - 16:3, 17:1, 30:8, 50:12, 79:13
**state** [5] - 54:25, 55:3, 55:4, 55:10, 56:7
**STATE** [1] - 82:1
**State** [8] - 17:3, 33:16, 35:14, 35:15, 35:18, 55:1, 55:8, 73:18
**statement** [6] - 17:23, 18:21, 53:1, 79:8, 79:9, 79:24
**statements** [1] - 12:13
**States** [1] - 5:7
**STATES** [1] - 1:1
**steal** [6] - 9:9, 24:5, 27:9, 30:25, 77:10, 77:19
**stealing** [3] - 11:12, 25:21, 77:13
**Step** [1] - 35:10
**steps** [1] - 16:2
**still** [5] - 4:7, 30:14, 30:16, 40:19, 63:21
**stipulated** [1] - 3:2
**STIPULATIONS** [1] - 3:1
**stocks** [1] - 55:21
**stole** [3] - 65:4, 65:22, 66:5
**stolen** [1] - 12:7
**stop** [3] - 7:1, 23:19, 23:25
**story** [2] - 16:11, 33:11
**straight** [1] - 15:24

**Street** [3] - 2:3, 2:6, 2:8
**Strike** [8] - 8:4, 14:10, 51:1, 63:10, 64:5, 65:9, 68:2, 76:11
**strike** [5] - 18:7, 26:11, 45:2, 54:3, 76:14
**struck** [1] - 80:17
**stuff** [10] - 30:9, 59:23, 59:24, 60:2, 60:4, 60:6, 61:8, 62:6, 67:11, 70:24
**Submission** [1] - 28:11
**submitted** [1] - 63:21
**sued** [2] - 30:16, 38:12
**suggestion** [1] - 46:20
**Superintendent** [2] - 59:12, 80:6
**support** [2] - 52:6, 58:12, 79:17
**supported** [1] - 79:22
**supposed** [2] - 16:10, 44:21
**supposedly** [1] - 53:1
**sworn** [2] - 3:14, 82:8
**system** [2] - 23:19, 27:1

# T

**task** [1] - 10:20
**Teleconference** [2] - 1:16, 82:7
**Telephone** [1] - 5:24
**telephone** [2] - 4:13, 46:3
**Tellemontes** [2] - 68:16, 80:14
**ten** [1] - 35:16
**terms** [7] - 29:14, 39:11, 43:11, 67:19, 70:8, 70:12, 70:21
**Terms** [1] - 28:6
**testified** [2] - 3:14, 66:21
**testimony** [7] - 31:10, 31:12, 36:12, 42:6, 70:23, 70:25, 82:11
**texting** [1] - 59:9
**THE** [25] - 1:1, 11:24, 15:20, 19:10, 23:17, 24:8, 25:11, 25:24, 26:7, 26:24, 27:12, 29:18, 31:4, 31:23, 32:2, 47:7, 61:1, 66:8, 68:23, 75:22, 77:15, 80:3, 81:1, 81:8, 81:15
**theft** [8] - 31:2, 31:21,

32:4, 32:6, 74:1, 74:8, 74:10, 78:23
**theme** [7] - 52:10, 52:15, 52:23, 53:2, 53:5, 53:6, 79:9
**therein** [1] - 3:10
**thinking** [2] - 57:19, 80:21
**third** [1] - 53:9
**Thomas** [22] - 1:10, 1:6, 2:5, 2:13, 3:13, 3:17, 3:20, 6:1, 6:5, 7:11, 19:25, 26:2, 28:2, 36:1, 36:6, 40:3, 50:1, 66:21, 71:10, 79:5, 81:14, 82:5
**threat** [3] - 78:18, 78:22, 79:8
**threatened** [1] - 79:6
**thrilled** [1] - 80:7
**TIME** [1] - 1:15
**TO** [3] - 2:11, 2:17, 2:21
**today** [9] - 30:19, 33:5, 37:23, 39:10, 39:13, 41:12, 41:21, 49:5, 71:1
**together** [2] - 27:15, 38:8
**tone** [1] - 51:10
**took** [4] - 23:22, 23:25, 45:8, 73:10
**tough** [1] - 4:17
**track** [1] - 68:4
**transcript** [1] - 82:10
**trial** [1] - 3:8
**tried** [1] - 36:25
**trouble** [1] - 46:19
**true** [14] - 19:23, 46:15, 48:15, 58:17, 59:11, 59:13, 65:1, 65:20, 79:17, 79:21, 80:6, 80:9, 80:12, 82:10
**truth** [12] - 33:11, 37:2, 38:21, 38:24, 39:5, 39:17, 44:8, 70:24, 82:8, 82:9
**try** [6] - 5:11, 10:19, 44:10, 68:10, 69:9, 71:1
**trying** [8] - 35:11, 36:14, 37:4, 44:2, 57:11, 70:22, 74:6, 75:22
**Tuesday** [1] - 1:14
**Tuition** [1] - 17:1
**tuition** [2] - 17:2, 55:12
**twice** [2] - 14:23,

14:25
**two** [3] - 30:13, 36:19, 40:4
**typical** [1] - 11:25

## U

**uncommon** [3] - 54:10, 54:11
**uncorroborated** [1] - 14:1
**under** [4] - 5:6, 33:15, 48:22
**understood** [4] - 21:12, 37:18, 52:3, 52:5
**UNITED** [1] - 1:1
**United** [1] - 5:7
**unless** [4] - 4:22, 62:4, 62:13, 62:14
**up** [18] - 23:13, 25:20, 31:2, 31:21, 32:6, 33:6, 33:7, 40:14, 50:17, 52:18, 55:2, 55:8, 55:13, 56:3, 68:11, 71:10, 74:1, 74:6
**upset** [2] - 40:14, 80:12

## V

**value** [1] - 68:4
**vendor** [2] - 76:21
**vendors** [5] - 30:8, 63:1, 63:2, 73:2, 74:24
**Via** [2] - 1:16, 82:6
**viable** [1] - 13:24
**victim** [1] - 41:5
**vs** [1] - 1:6

## W

**Wachovia** [26] - 8:25, 9:6, 9:8, 9:13, 9:14, 10:3, 10:15, 10:18, 11:15, 11:22, 12:2, 42:13, 42:17, 43:4, 43:14, 45:5, 45:9, 45:11, 45:21, 46:20, 47:1, 47:8, 48:1, 48:5, 52:1, 77:7
**waived** [2] - 3:5, 3:12
**walk** [1] - 35:13
**wants** [1] - 41:8
**weigh** [3] - 39:21, 39:25, 40:9
**WHEREOF** [1] - 82:15

**whole** [2] - 49:19, 82:8
**Wiegand** [5] - 2:5, 7:1, 36:5, 71:18, 74:22
**WIEGAND** [79] - 2:15, 2:16, 6:25, 7:5, 8:10, 9:3, 9:16, 10:11, 11:2, 11:23, 13:9, 14:2, 15:19, 16:14, 18:18, 19:9, 20:6, 20:18, 21:2, 21:14, 22:7, 22:25, 23:16, 24:7, 25:6, 25:10, 25:23, 26:6, 26:23, 27:11, 29:2, 29:17, 29:23, 31:3, 31:9, 31:12, 31:22, 32:1, 32:9, 34:1, 34:11, 34:18, 36:4, 38:13, 38:17, 39:3, 40:1, 43:21, 44:1, 44:15, 44:25, 45:18, 46:5, 46:10, 46:14, 47:10, 61:11, 66:10, 66:20, 68:25, 71:6, 72:4, 72:13, 72:24, 73:12, 74:2, 74:12, 75:6, 75:16, 75:21, 77:14, 77:20, 78:4, 78:19, 79:4, 80:5, 80:18, 81:4, 81:9
**wife** [2] - 8:8, 12:14
**wife's** [3] - 12:24, 76:18, 77:1
**Willis** [3] - 70:2, 70:9, 70:13
**Wills** [1] - 2:7
**witness** [2] - 44:18, 82:7
**WITNESS** [27] - 2:12, 2:21, 11:24, 15:20, 19:10, 23:17, 24:8, 25:11, 25:24, 26:7, 26:24, 27:12, 29:18, 31:4, 31:23, 32:2, 47:7, 61:1, 66:8, 68:23, 75:22, 77:15, 80:3, 81:1, 81:8, 81:15, 82:15
**word** [1] - 20:9
**words** [7] - 37:14, 37:16, 37:18, 49:13, 52:13, 52:14, 73:8
**works** [2] - 4:2, 4:8
**worried** [2] - 18:23, 27:3
**worry** [12] - 12:11, 14:6, 18:2, 19:6, 19:15, 42:20, 49:24, 52:8, 58:8, 79:16, 79:25, 80:23
**worthless** [1] - 54:16
**writing** [1] - 43:3

**written** [13] - 9:20, 16:18, 42:17, 42:23, 43:4, 43:12, 45:11, 45:22, 47:3, 47:21, 77:6, 77:7

## Y

**y'all** [2] - 16:11, 66:17
**year** [13] - 14:20, 14:24, 14:25, 17:8, 25:13, 25:17, 29:13, 29:15, 29:21, 31:7, 52:25, 70:9
**years** [7] - 17:8, 25:15, 35:16, 35:20, 45:12, 47:11, 47:24
**yesterday** [9] - 32:13, 36:16, 36:20, 36:24, 37:3, 37:5, 38:20, 38:21, 70:21
**yourself** [2] - 43:1, 43:5

## Z

**Zurich** [1] - 80:13