**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| BERKELEY COUNTY SCHOOL DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:18-cv-00151-DCN |
| vs. | ) | |
| | ) | **FINDINGS OF FACT AND** |
| HUB INTERNATIONAL LIMITED, HUB | ) | **CONCLUSIONS OF LAW** |
| INTERNATIONAL MIDWEST LIMITED, | ) | |
| HUB INTERNATIONAL SOUTHEAST, | ) | |
| KNAUFF INSURANCE AGENCY, INC., | ) | |
| STANLEY J. POKORNEY, SCOTT | ) | |
| POKORNEY, and BRANTLEY THOMAS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on defendants HUB International Limited, HUB International Midwest Limited, HUB International Southeast (collectively, "HUB"), and Knauff Insurance Agency, Inc.'s ("Knauff") motion to compel arbitration, ECF No. 23. On January 29, 2019, the court denied the motion. ECF No. 63. On December 4, 2019, the Fourth Circuit vacated the court's order and remanded the matter for a fact-finding trial pursuant to Section 4 of the Federal Arbitration Act ("Section 4 Trial"), 9 U.S.C. § 4. Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd., 944 F.3d 225 (4th Cir. 2019). The court conducted the Section 4 Trial over five days from January 14, 2021 to February 1, 2021. Having considered the evidence and arguments there presented, the court makes the following findings of fact and conclusions of law, ultimately holding that plaintiff Berkeley County School District ("the District") did not agree to arbitrate this dispute.

1

# I. FINDINGS OF FACT

## A. Parties and Jurisdiction

1.     The District is a body politic and corporate of the State of South Carolina. ECF No. 36, Amend. Compl. ¶ 1.

2.     Knauff was an insurance agency and brokerage firm incorporated in North Carolina with its principal place of business located in Charlotte, North Carolina. Amend. Compl. ¶ 2.

3.     Hub International Limited is an international insurance brokerage firm incorporated in Delaware with its principal office located in Chicago, Illinois.  Amend. Compl. ¶ 3.

4.     Hub International Midwest Limited is an insurance brokerage firm affiliated with Hub International Limited and incorporated in Indiana with its principal place of business located in Chicago, Illinois.  Amend. Compl. ¶ 4.

5.     Hub International Midwest Limited purchased Knauff, and Knauff was merged into Hub International Midwest Limited on December 31, 2012.  ECF No. 23-8, Benfield Decl. ¶ 3.[1]

6.     Defendant Brantley Thomas ("Thomas") is a former employee of the District currently incarcerated at Jesup Federal Correctional Institution in Georgia.  ECF No. 189-2, Thomas Dep. 35:20–36:6.  He proceeds pro se in this action.

7.     Defendant Stanley Pokorney ("Pokorney," "Stan Pokorney," or "Mr. Pokorney") provided insurance brokerage and consulting services to the District from

---

[1] The District initially objected to the admission of this declaration into evidence on hearsay grounds but subsequently agreed to withdraw the objection and so clarified to the court.

1996 to 2017.  Trial Tr. 528:1–2.[2]  He was employed by insurance services provider

Willis Corroon (or by entities purchased by Willis Corroon) until 2000, when he left and

joined Knauff.  Trial Tr. 531:7–532:2, 680:22–25.  He was employed by Knauff until

2012, when Knauff was acquired by HUB.  Trial Tr. 572:17–573:14; Benfield Decl. ¶ 3.

He was employed by HUB until 2017.  Trial Tr. 672:24, 674:12–15.

**B.  Procedural History**

8.    The District filed the present action on January 18, 2018, alleging that

Thomas secured a series of excessive or unnecessary insurance policies and brokerage

service contracts through HUB and Knauff, and that in exchange for Thomas's assistance

in steering those contracts to them, HUB and Knauff paid Thomas bribes and assisted

Thomas in embezzling money from the District.  ECF No. 1, Compl.

9.    On March 5, 2018, HUB and Knauff responded to the complaint with a

motion to compel arbitration.  ECF No. 23.

10.    In their motion, HUB and Knauff argued that the District agreed to

arbitrate this dispute by assenting to arbitration provisions contained in six Brokerage

Service Agreements ("BSAs").  Each BSA is from Knauff and addressed to Thomas.  The

BSAs are dated June 18, 2002; June 27, 2003; August 16, 2005; December 19, 2006;

December 19, 2009; and May 1, 2011, respectively.[3]  ECF No. 23-2–23-7; Pl.'s Exs. 108,

109, 104, 105, 107, 111.

---

[2] The transcript of the Section 4 Trial proceedings is located at ECF Nos. 218–
222.  For the sake of efficiency, the court cites to the transcript as "Trial Tr."
[3] The court refers to each BSA according to the year corresponding to each's date.
For example, the court refers to the BSA dated June 18, 2002 as the "2002 BSA."

11.    The 2002 BSA was signed on behalf of the District by Angel Cartwright ("Cartwright"), the District's then-Risk Manager, and the 2003 BSA was signed on behalf of the District by Thomas, then the District's Executive Director of Finance.  The other four BSAs are unsigned.

12.    On March 19, 2018, the District filed a memorandum in opposition to the motion to compel arbitration and an amended complaint, which remains the operative complaint in this action.  ECF No. 33; Amend. Compl.

13.    The amended complaint alleges claims against HUB, Knauff, and Thomas for federal RICO violations, plus common law claims for fraud, negligent misrepresentation, civil conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, conversion, constructive trust, and unjust enrichment for the period of 2005 through 2017.  Amend. Compl. ¶¶ 161–303.

14.    After further briefing and a hearing held on May 17, 2018, the court denied HUB's motion to compel arbitration.  ECF No. 63.

15.    Pursuant to 9 U.S.C. §§ 16(a)(1)(A)–(B), HUB immediately appealed the denial order on February 11, 2019.  ECF No. 72.  On December 4, 2019, the Fourth Circuit vacated the court's order, finding that "there are multiple disputes of material fact as to 'the making of [any] arbitration agreement,'" and remanded the matter for a trial on that issue pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4.  Berkeley Cty. Sch. Dist., 944 F.3d at 241 (alternation in original).  Specifically, the Fourth Circuit instructed the court to hold the Section 4 Trial to resolve "some factual disputes concerning the formation of the four unsigned [BSAs]," meaning the 2005, 2006, 2009, and 2011 BSAs.  The court explicitly held that the signed BSAs—the 2002 and 2003

BSAs—"predate the steering and kickback fraud scheme and conspiracy alleged in the Operative Complaint" and therefore cannot provide grounds to compel arbitration. Id. The Fourth Circuit noted that that the 2002 and 2003 BSAs "might be relevant" only to the extent that they bear on "questions of whether [the District] had knowledge of, or assented to, the subsequent [BSAs]." Id.

16.     To be clear, the purpose of the Section 4 Trial and consequently this order is for the court to resolve the factual disputes underlying the issue of whether the District assented to the four unsigned BSAs—the 2005, 2006, 2009, and 2011 BSAs. While resolving that issue requires the court to probe beyond the District's allegations and into the substance of this dispute, the court's role is not to resolve the merits of this action, and it does not do so in this order. Instead, the court determines whether the District agreed to arbitrate this dispute by assenting to any of the four unsigned BSAs. Having received and considered the evidence, the court concludes that it did not.

### C.  Factual Background

17.     In the early 1990s, the District purchased insurance through the South Carolina Insurance Reserve Fund (the "IRF"). Trial Tr. 17:23–18:1. The IRF is a state-run agency that provides insurance coverage to governmental entities. It "operates like an insurance company" by issuing policies, collecting premiums, and paying claims. Insurance Reserve Fund. "Insurance Reserve Fund – About Us," https://www.irf.sc.gov/ (last visited May 5, 2021).

18.     The District began to look for coverage outside the IRF in 1996, after Assistant Superintendent Ken Coffey ("Coffey") met Stan Pokorney at an annual conference for school-district vendors. Trial Tr. 18:2–17. Coffey oversaw the District's

financial and operational services at the time; his job entailed making recommendations to the Berkeley County School Board of Trustees (the "Board") about the District's insurance.  Id. at 17:15–22.

19.    Later that year, the District began procuring insurance through Willis Corroon, for whom Pokorney worked.  Trial Tr. 26:5–12.  The District used Willis Corroon for its insurance services from 1996 to 2000 and decided to continue using Willis Corroon, by Board vote, in November 2000.  Id. at 26:13–27:5.

20.    Months later, at the beginning of the 2001–2002 fiscal year, Pokorney left Willis Corroon and began working for Knauff.  Trial Tr. at 27:10–19, 76:25–77:4.  Porkorney testified that he left Willis Corroon because he was unhappy with his compensation, which he believed to be inadequate.  Trial Tr. 531:7–532:2.  In response, Willis Corroon sought a temporary restraining order ("TRO") to prohibit the District from working with Pokorney.  Defs.' Ex. 13.

21.    Despite the TRO, the District chose to continue working with Pokorney and accordingly, in the beginning of the 2001 fiscal year, began to use Knauff as its insurance provider.  Trial Tr. at 30:7–15; Defs.' Ex. 15.  That decision was made by Coffey, who remained in charge of the District's insurance matters at that time.  Id.

22.    In 2001, finance was removed from Coffey's portfolio of duties, and Thomas became Executive Director of Finance and later Chief Financial Officer ("CFO"), reporting directly to the Superintendent.  Trial Tr. 64:9–18, 101:1–3, 787:17–788:1.  Coffey has no knowledge regarding insurance matters after 2001.  Trial Tr. 63:4–12, 65:8–23.

23.    From 2002 to 2017, Thomas, as the District's Executive Director of Finance and later CFO, was responsible for securing contracts to broker insurance policies for the District.  Trial Tr. 787:17–20.

24.    Throughout that time, Pokorney provided insurance brokerage and consulting services to the District, first on behalf of Knauff, Trial Tr. 572:17–573:14, and then—after HUB purchased Knauff—on behalf of HUB, Trial Tr. 672:24, 674:12–15.

25.    While he acted as the District's insurance broker, Pokorney was assisted by his wife, Jana Pokorney née Zuerner ("Jana Pokorney" or "Ms. Pokorney"), who was employed by Knauff and HUB as Mr. Pokorney's account manager.  Dep. of Brooks Jones, November 6, 2020, 94:1–95:13; see Pl.'s Ex. 115.  HUB's Rule 30(b)(6) representative testified that while acting as Mr. Pokorney's account manager, Ms. Pokorney's duties included ensuring that BSAs with Mr. Pokorney's clients were fully executed.  Jones Dep. 95:5–13.  Ms. Pokorney, however, testified that she was not required to get signatures and that the usual practice was to work without a signed agreement.  Trial Tr. 37:6–23.  Mr. Pokorney married Ms. Pokorney in 2005.  Trial Tr. 427:1–20.  She retired from HUB at the end of 2014.  Trial Tr. 401:22–25.

26.    In February 2017, the District learned that Thomas was suspected of crimes including embezzlement and steering insurance contracts in exchange for bribes.  Trial Tr. 793:13–16.

27.    Thomas was indicted and, after pleading guilty, was convicted for those crimes.  Pl.'s Exs. 1–4, 6, 7, 9, 10, 13, 15.  He was sentenced to a term of incarceration of 63 months in a federal penitentiary to be followed by 132 months in state prison.  Pl.'s Exs. 13, 15.

### D.  The BSAs

28.    The six BSAs at issue here are dated from 2002 to 2011 and obligated Knauff to provide the following services:

      a.  Risk Identification and Evaluation

      b.  Risk Finance Program Design

      c.  Market Submission Preparation and Review

      d.  Brokering

      e.  Risk Finance Program Execution

      f.  Ongoing Client Service

      g.  Claims Services

29.    To be clear, the BSAs are contracts for insurance-related services, like brokering and consulting, not contracts for insurance coverage.

30.    Each BSA called for the District to pay a brokerage service fee in exchange for the above services to be provided.  These fees were charged in lieu of commission.  Trial Tr. 421:9–15.  The customary broker's commission on insurance in this context is 10 to 15 percent of the premium the insured pays on the relevant policies. Trial Tr. 800:4–9.

31.    Each BSA also contains the following arbitration provision:

All disputes, claims or controversies relating to [these Agreements], or the services provided, which are not otherwise settled, shall be submitted to a panel of three arbitrators and resolved by final and binding arbitration, to the exclusion of any courts of laws, under the commercial rules of the American Arbitration Association.

See, e.g., Defs.' Ex. 18 at 3–4.

### 1. The 2002 BSA

32.    The 2002 BSA was signed on behalf of the District by Angel Cartwright, the District's risk manager who reported to Thomas.  Trial Tr. 800:15–24; Dep. of Angel Cartwright, Oct. 7, 2020, 13:23–14:18  Pokorney signed on behalf of Knauff.  Pl.'s Ex. 108.

33.    The District located a copy of the 2002 BSA agreement in a binder maintained by Cartwright.  Trial Tr. 800:25–801:2; Cartwright Dep. 107:19–109:8.

34.    The 2002 BSA called for the District to pay Knauff $100,000 in twelve monthly installments as a brokerage service fee for services provided on Commercial Package, Excess Liability, Activity Bus Travel Accident, Excess Crime, Boiler & Machinery, and Medical Professional Liability lines of insurance.  Pl.'s Ex. 108.  Each of those policies was renewed from an existing line of coverage that the District purchased in 1996, when Pokorney was working for Willis Corroon.  Trial Tr. 36:21–41:11.

35.    From June 2002 to June 2003, the District paid Knauff insurance premiums (not including brokerage service fees) exceeding $1 million.  Defs.' Ex. 76 at 79.  Some of those premiums were for lines of insurance beyond the scope of the BSA, but the BSA's $100,000 brokerage service fee is consistent with a customary 10 to 15 percent commission on insurance.

36.    Knauff invoiced the fees described in the 2002 BSA, which the District paid.  Trial Tr. 803:22–25; Defs.' Exs. 1–3.

### 2. The 2003 BSA

37.    The 2003 BSA was signed by Thomas on behalf of the District.  Trial Tr. 802:12–14.  Pokorney signed on behalf of Knauff.  Pl.'s Ex. 109.

38.     When searching its files, the District located a cover letter addressed to Cartwright referring to the 2003 BSA but could not locate the BSA itself, which was addressed to Thomas.  Compare Trial Tr. 236:15–237:10 and Defs.' Ex. 20 at 1–2 (Bates labeling showing the cover letter was produced by the District) with Trial Tr. 237:11–24 and Defs.' Ex. 20 at 3–6 (Bates labeling showing the agreement was produced by HUB).

39.     The 2003 BSA called for the District to pay Knauff $100,000 in twelve monthly installments as a brokerage service fee for services provided on Commercial Package, Inland Marine, Excess Liability, Activity Bus Travel Accident, Excess Crime, and Boiler & Machinery lines of insurance.  Pl.'s Ex. 109.

40.     Like the 2002 BSA, the 2003 BSA's $100,000 brokerage service fee is consistent with a customary 10% to 15% commission on the insurance the District purchased through Knauff.  See Defs.' Ex. 76 at 79.

41.     Knauff invoiced the fees described in the 2003 BSA, which the District paid.  Trial Tr. 803:22–25; Defs.' Exs. 1–3.

### 3. The 2005 BSA

42.     In April 2005, the District issued Request for Proposals No. 181-(04-05) for insurance services (the "2005 RFP").  Trial Tr. at 118:3–6, 119:2–14.  Stan Pokorney submitted a bid on behalf of Knauff.  Defs.' Ex. 36.

43.     At some point in 2005, Knauff authored the 2005 BSA.  The District was not able to locate a copy of this agreement in its files and was unaware of the 2005 BSA's existence before HUB filed its motion to compel arbitration.  Trial Tr. 820:11–821:11.

44.     The 2005 BSA was for an indefinite term, Pl.'s Ex. 104, and not signed by anyone.  Trial Tr. 820:9–10.

45.     The only copy of the 2005 BSA that HUB produced has a handwritten note that says "proposed" at the top of the first page. Pl.'s Ex. 104.

46.     The 2005 BSA called for the District to pay Knauff $177,000 in quarterly installments as a fee for services provided. Trial Tr. 821:12–14. The District never paid these brokerage service fees. Trial Tr. 821:15–16.

47.     HUB's 30(b)(6) representative testified that, due to the 2005 RFP dispute discussed below, the 2005 BSA was never put into place. Jones Dep. 91:13–92:1. In closing arguments, HUB abandoned its argument that the District assented to this agreement. ECF No. 222, Closing Arg. Tr. 4:13–5:2.

48.     In June 2005, an independent insurance consultant concluded that the District's RFP did not include sufficient property and casualty coverage. Defs.' Ex. 39 at 5; Trial Tr. 124:15–125:2. The District thereafter withdrew the 2005 RFP and made an emergency procurement of insurance services from the IRF. Trial Tr. 131:1–8, 197:16–198:3. As a result of that decision, the District moved its property and casualty lines of insurance from Knauff to the IRF. Id.

49.     In response, Knauff retained a lawyer, filed a formal protest, Defs.' Ex. 41, and threatened litigation, Trial Tr. 600:14–601:19, 835:17–20.

50.     On January 31, 2006, Knauff and the District resolved that dispute by executing a settlement agreement. Pl.'s Ex. 160. The District agreed to pay Knauff a 15% commission on five enumerated insurance policies that Knauff had placed net of commission. Id. The District also agreed to pay Knauff $12,500 for claims management services on those policies and not to debar Knauff from offering insurance services to the District in the future. Id. Knauff agreed to withdraw its protest and agreed it had no

11

claim for any commissions, fees, or other charges not provided in the settlement

agreement.  Id.  Finally, both parties agreed:

> All appeals, claims, or disputes between Knauff and the District will be
> resolved in accordance with the District's Procurement Code, as may be
> amended or updated.  After exhausting the administrative process under the
> District's Procurement Code, Knauff agrees that judicial venue for any suit,
> action or proceeding arising out of or relating to this Agreement shall be
> proper only in the Court of Common Pleas for Berkeley County, South
> Carolina and Knauff and the District hereby waive and disclaim any and all
> right to a jury trial on any controversy arising from this Agreement.  This
> Agreement shall be governed by the laws of the State of South Carolina.
> Knauff and the District agree that before initiation of litigation concerning
> a dispute arising under this Agreement, the parties will submit such dispute
> to an agreed upon neutral for non-binding mediation.

Id.

51.     The District continued buying property and casualty coverage through the

IRF for the next decade.[4]  See Trial Tr. at 781:16–782:6.  The annual premium for those

policies totaled "over two million dollars."  Id. at 782:1–5.  Knauff continued providing

insurance-related services on that IRF-provided coverage, even though it had not

brokered the policies.  See Defs.' Exhibit 84; Trial Tr. 880:17–881:2.

### 4. The 2006 and 2009 BSAs

52.     The 2006 and 2009 BSAs were not signed by anyone.  Trial Tr. 827:10–

19, 831:13–18; Pl.'s Exs. 105, 107.

53.     No witness testified that any version or copy of the 2006 or 2009 BSA was

ever signed.  Stan Pokorney declined to so testify.  Trial Tr. 627:19–628:15.  The person

responsible for obtaining signatures, Jana Pokorney, testified that she was not required

to—and usually did not—obtain signatures on agreements.  Trial Tr. 370:6–23.

---

[4] After 2005, as the court outlines below, the District purchased other lines of
coverage through private brokers, meaning that it did not procure all of its insurance
coverage exclusively through the IRF.

54.     The District was not able to locate a copy of the 2006 or 2009 BSA in its files and was unaware of the 2006 and 2009 BSAs' existence before HUB filed its motion to enforce arbitration.  Trial Tr. 827:20–25, 831:19–21.

55.     The District is not a party to the 2006 and 2009 BSAs, which both state that they are between Knauff and Securing Assets for Education ("SAFE").  Pl.'s Exs. 105, 107.

56.     SAFE is a 501(c)(3) entity that was created in 2003 to build, manage, and lease new buildings for the District.  Trial Tr. 292:12–16.  To finance its operations, SAFE issued installment purchase revenue bonds.  Id. at 292:17–19.  It used the proceeds from those bonds to build new facilities, which it would then lease back to the District.  Id. at 292:18–23.  The District would own the facilities once the bonds were repaid.  Id. at 292:21–23.

57.     SAFE had no employees, and it had no expenses other than interest.  Trial Tr. 337:10–338:5; see Defs.' Ex. 65.

58.     The 2006 BSA called for a brokerage service fee of $118,625 per year for three years as a fee for services provided to SAFE on its Directors and Officers ("D&O") coverage.  Pl.'s Ex. 105.  The 2009 BSA likewise called for a brokerage service fee of $118,625 per year for three years as a fee for services provided to SAFE on D&O coverage.  Pl.'s Ex. 107.

59.     Knauff and HUB demonstrated awareness that SAFE was a separate entity from the District by addressing invoices for fees to SAFE rather than the District.  See Trial Tr. 828:21–829:4.  Pokorney considered SAFE a separate client from the District.  Trial Tr. 629:24–630:5.

60.     The SAFE board authorized Thomas to purchase D&O coverage for SAFE from Knauff in 2003.  Defs.' Ex. 25; Trial Tr. 326:5–8.  SAFE's bylaws provide that SAFE may purchase and maintain insurance on behalf of its directors.  Defs.' Ex. 24 at 13–14.

61.     Neither SAFE nor the District authorized Thomas to procure the consulting services or pay the fees outlined in the BSAs on behalf of the District.  Trial Tr. 322:7–11, 324:23–25, 326:9–12.

62.     Thomas was never a director, officer, or employee of SAFE.  Trial Tr. 325:25–326:4.  SAFE's bylaws prohibited District employees from serving as directors or officers.  Defs.' Ex. 24 at 3, 7.  Thomas signed SAFE's tax returns (IRS Form 990) under the title "Finance Director" because of a mistake by Greene Finney & Horton, LLP, the external accounting firm acting as the paid preparer of the return.  Trial Tr. 337:1–9.  SAFE never had a "Finance Director."  Trial Tr. 326:2–4.

63.     Thomas caused the District to purchase D&O coverage for the SAFE board in 2003.  Pl.'s Ex. 202 at 2.  The initial premium was $3,300.  Id.

64.     SAFE had no funds with which to purchase insurance.  Trial Tr. 337:10–22.  The District therefore paid for SAFE's D&O coverage as a donation.  Trial Tr. 338:6–11, 339:1–4.  Knauff invoiced SAFE for the fees described in the 2006 and 2009 BSAs.  See e.g., Pl.'s Ex. 113.

65.     The 2006 BSA requires each party to perform over a three-year period, from December 19, 2006 to December 19, 2009.  Pl.s' Ex. 105.

66.     The 2009 BSA requires each party to perform over a three-year period, from December 19, 2009 to December 19, 2012.  Pl.'s Ex. 107.

67.     The D&O coverage premium from 2006 to 2012 was only $65,000 per year.  Trial Tr. 432:12–20; Pl.'s Ex. 38.  A customary 15 percent commission would have been $9,750 per year.  The 2006 and 2009 BSAs charged a brokerage service fee of $118,625, over twelve times the customary commission.  Pl.'s Ex. 105, 107

68.     No claims against the D&O coverage were ever made.  Trial Tr. 832:8–10.

69.     There is no documentary evidence demonstrating that Knauff ever provided any consulting services regarding SAFE's D&O coverage.  Jones Dep. 35:20–38:24; Trial Tr. 451:1–452:4, 669:2–670:8.

70.     Stan and Jana Pokorney asserted that the $118,625 per year brokerage service fee was justified by the difficulty of placing D&O coverage for SAFE.  Trial Tr. 451:1–18; 644:20–645:16.  That assertion is not credible.

71.     Mr. Pokorney testified that the difficulty in placing D&O coverage for SAFE stemmed from a public controversy surrounding SAFE.  Indeed, HUB produced evidence that the District's use of SAFE to finance school buildings was the subject of some public scrutiny.  Pl.'s Ex. 152.  And HUB demonstrated that the legality of a similar nonprofit entity associated with the Greenville School District had recently been called into question by a lawsuit.  Trial Tr. 862:18–864:2; Defs.' Ex. 89.  The court finds that these "concerns" cannot justify the exorbitant brokerage service fees included in the 2006 and 2009 BSAs.

72.     The brokerage fees at issue in the 2006 and 2009 BSAs regard D&O coverage placed many years before.  Compare Pl.'s Ex. 202 with Pl.'s Exs. 105, 107.  The D&O insurance was placed in 2003, very shortly after SAFE directed Thomas to acquire it, and the initial premium was only $3,300.  Pl.'s Ex. 202 at 2.  The premium later

15

increased, presumably a result of SAFE issuing bonds, and then decreased, presumably

because the outstanding debt decreased, yet the service fee remained unchanged.  See

Pl.'s Exs. 113 (2006 invoice for $65,000 premium), 203 (2016 invoice for $32,131

premium).

       73.     No witness explained how SAFE's questionable legal status could impute

liability onto its board members.  See, e.g., Trial Tr. 866:5–10 ("Q: And in your

experience, that means there's a possibility that the board of SAFE could be held liable to

people who thought they were going to be paid by these bonds, correct?  A: I don't know

that that's the legal conclusion I'd draw.  My tendency is to draw otherwise.").  And no

witness offered any other explanation as to why it would be difficult to insure the

directors and officers of a real estate holding company that had no employees and only

issued debt backed by real property and funded by leases with a governmental entity.

       74.     Further, Mr. Pokorney's assertion that he "called in a favor from a

Cincinnati [Insurance Company] director on the board" to place the D&O coverage is not

credible.  Trial Tr. 645:10–16.  The D&O insurance was initially placed with the

Cincinnati Insurance Company in December 2003 for $3,300.  Pl.'s Ex. 202 at 2.  The

coverage was $1 million with a $5,000 deductible.  Id.  Mr. Pokorney's claim that no

other insurance company would offer that coverage "for four or five hundred thousand

dollars with a hundred-thousand dollar deductible," Trial Tr. 645:11–13, is not believable.

       75.     By way of comparison, Santee Cooper (which is also located in Berkeley

County) is a multibillion-dollar water and energy company that operates nuclear power

facilities and has over $2 billion in property insurance coverage alone.  Trial Tr. 344:4–

345:7.  The court heard testimony that from 2000 to 2017, Santee Cooper never paid

more than $150,000 for brokerage and consulting services for all lines of insurance, even though Santee Cooper had hundreds of employees and was the subject of three major class action lawsuits during that time.  Id.

76.    In sum, no claims were ever made and therefore no claims management services were ever provided under the 2006 or 2009 BSAs, and no evidence of advisory or consulting work product was ever produced.  The D&O coverage was placed in 2003, meaning that it was already in place during the period covered by the 2006 and 2009 BSAs.  Therefore, the District received no benefit from any agreement to pay brokerage service fees of $118,625 on existing D&O coverage for SAFE.

### 4.  The 2011 BSA

77.    The 2011 BSA was not signed by anyone.  Pl.'s Ex. 111.

78.    No witness testified that any version or copy of the 2011 BSA was ever signed.  Mr. Pokorney declined to so testify.  Trial Tr. 627:19–628:15.  The person responsible for obtaining signatures, Ms. Pokorney, testified that she was not required to—and usually did not—obtain signatures on agreements.  Trial Tr. 370:6–23.

79.    The District was not able to locate a copy of this agreement in its files. Trial Tr. 240:22–241:6.

80.    The Board did not approve the 2011 BSA.  Trial Tr. 823:19–20.

81.    The 2011 BSA called for the District to pay Knauff $70,000 annually as a brokerage service fee for services provided on School Leaders Errors & Omissions Liability ("E&O") coverage.  Trial Tr. 822:8–18.

82.    The E&O coverage premium was $75,000 for six years' coverage.  Trial Tr. 823:5–7.  A customary 15% commission would have been $11,250.  Over the six

years of the policy term, the 2011 BSA called for the District to pay $420,000, over 37 times the customary 15% commission.  <u>See</u> Trial Tr. 823:10–11.

83.     The 2011 BSA was for "multi-year periods," which given the policy term of the associated E&O coverage must be six years long.  <u>See</u> Pl.'s Ex. 111; Trial Tr. 439:11–16; 823:7.  The 2011 BSA requires the District to pay $70,000 annually over a six-year period from 2011 to 2017.  <u>Id.</u>

84.     The District had E&O coverage in place before 2011.  Trial Tr. 823:21–23.

85.     No claims were made against the District's E&O policy from 2011 to 2017.  Trial Tr. 823:24–824:1.

86.     There is no documentary evidence demonstrating that any consulting services were ever provided in connection with the E&O coverage.  Jones Dep. 35:20–38:24; Trial Tr. 451:1–452:4, 669:2–670:8, 824:14–24.

87.     Neither Mr. Pokorney nor Ms. Pokorney offered any explanation for the size of the E&O brokerage service fees relative to the policy premiums.  <u>See generally</u> Trial Tr. 352–489, 527–719.

88.     Knauff invoiced the annual fees described in the 2011 BSA, which the District paid.  Trial Tr. 823:8–13.

89.     Knauff mailed the invoices for the fees described in the 2011 BSA directly to Thomas's home address instead of mailing them to the District's offices or post office box.  Trial Tr. 825:6–826:9; Pl.'s Ex. 110.

**E.  Thomas's Authority to Bind the District**

90.     HUB has presented evidence that the 2006, 2009, and 2011 BSAs were sent to Thomas.  Pl.'s Ex. 105, 107, 111.

91.     Thomas's authority to bind the District was limited by dollar amount. From 2002 to 2008, Brantley Thomas had signing authority up to $75,000.  Trial Tr. 789:21–25.  After August 26, 2008, he had signing authority up to $100,000.  Trial Tr. 790:14–18; Pl.'s Ex. 31.  Thus, Thomas did not have the authority to approve fees in the amounts specified in the 2006, 2009, or 2011 BSAs.  Those required superintendent approval.  Id.

92.     The District's procurement rules require a formal solicitation process to obtain new insurance but not to renew existing insurance.  Trial Tr. 787:4–16.  The solicitation process requires issuing an RFP, formally evaluating the proposals received, and presenting an award recommendation to the Board.  Id.

93.     Pokorney admitted that the District never issued an RFP regarding the 2006, 2009, or 2011 BSAs.  Trial Tr. 588:24–589:6.  While Thomas had the authority to renew existing insurance coverage, which was exempted from procurement processes, Trial Tr. 787:8–16, neither Thomas nor the superintendent had the authority to approve the 2006, 2009, or 2011 BSAs on behalf of the District without an RFP for the consulting services described therein.

94.      Board approval is required for any multiyear contract because it commits unbudgeted school funds in future years.  Trial Tr. 790:19–23.  This rule is the same in any school district.  Trial Tr. 790:24–791:19.  Pokorney was aware of this rule, given his 46 years of experience working with school districts.  Trial Tr. 686:23–25.

95.     The Board never approved the 2006, 2009, or 2011 BSAs, given that no one at the District, other than Thomas, had knowledge of them.  Trial Tr. 845:14–22.

96.    Pokorney was aware Thomas needed Board approval for any BSA.  Trial Tr. 564:3–8.

97.    Pokorney asserts that he simply assumed that Thomas obtained board approval.  Trial Tr. 696:22–25.  Pokorney was aware of communications with and between Board members.  Trial Tr. 538:1–11, 539:10–18, 608:7–14.  In 2005, he prepared a 250-page proposal in response to the District's RFP and successfully litigated a dispute over that RFP.  Defs.' Ex. 36; Trial Tr. 600:14–601:19.  Given his intimate involvement in the process by which the District procured insurance coverage, Porkorney's assertion that he remained unaware for twelve years that the Board never approved his contracts for brokerage service fees exceeding one million dollars is not credible.

### F.  The Bribing of Brantley Thomas

98.    Thomas approved payments of brokerage service fees to Knauff and HUB from 2002 to 2017.  Trial Tr. 845:20–22.  No other District employee could approve Knauff or HUB's invoices during that period.  See Trial Tr. 815:22–816:2.

99.    The District first learned of Thomas's embezzlement and bribery schemes in early February 2017.  Trial Tr. 793:12–16.

100.    Thomas pleaded guilty on January 16, 2018 to a twenty-count federal criminal information and was sentenced to an imprisonment term of 63 months.  Pl.'s Exs. 6, 8, 13.

101.    Ten counts in the information were honest services wire fraud offenses for the period of March 2010 to November 2016.  Pl.'s Ex. 6.  Those offenses related to Thomas receiving bribes, in the form of checks for $2,000, from an insurance broker in exchange for steering insurance contracts to the broker.  Id. ¶¶ 5, 7, 16–23.  The

information notes that Thomas received and deposited ten separate $2,000 checks from an insurance broker from 2013 to 2016.  Id. ¶ 23.

102.    Thomas testified that Pokorney sent $2,000 checks directly to Thomas beginning "around 2010," Thomas Dep. 14:12–15:7, which Thomas regarded as bribes, Thomas Dep. 18:7–19:3, 20:24–21:13, and which, according to Thomas, Pokorney regarded as bribes, id. 21:11–13.  Thomas testified that Pokorney made comments insinuating that the $2,000 payments were bribes, such as "[i]t's between us," "[n]o one will find out," "you do not have to worry," and "we'll protect you."  Id. 12:9–13, 14:5–7.

103.    Pokorney denies bribing Thomas, but the court finds his denial not credible.  Pokorney admits to sending multiple $2,000 checks to Thomas.  Trial Tr. 556:7–23.  Pokorney claims that he periodically—"with no rhyme or reason [as] to when [he] sent them"—sent Thomas $2,000 checks to help fund Thomas's daughter's college education, based on Thomas's purported complaints that his salary was too low.  Id. Thomas testified, however, that Pokorney's sending of the checks coincided with the "annual renewal periods" for the services Thomas purchased on behalf of the District, signaling to Thomas that the payments were bribes.  Thomas Dep. 57:20–58:10. Pokorney testified that the "gifts" to Thomas were simply another way to "mak[e] sure a child gets a good education."  Trial Tr. 694:9–10.  This testimony is not credible.  The court finds that Pokorney sent Thomas the $2,000 checks in an effort to bribe him.

104.    While the federal investigation into Thomas was ongoing, he was indicted by a South Carolina grand jury in connection with the steering and bribery scheme.  Pl.'s Exs. 1, 2, 3, 9, 10.  Thomas was charged with multiple embezzlement offenses, and he pleaded guilty to all of them.  Pl.'s Ex. 15.

105.    Regarding one embezzlement charge, Thomas admitted to deliberately causing the District to overpay a vendor by $22,700, and then having the vendor send a refund of the overpayment to his home address, which he converted to his personal use in November 2007.  Pl.'s Ex. 3 at 3.

106.    The vendor was Knauff.  Thomas testified that Stan and Jana Pokorney knowingly assisted him in stealing this $22,700 in November 2007.  Thomas Dep. 8:1–12:16, 77:3–25.

107.    On November 19, 2007, Thomas sent a letter to Ms. Pokorney stating that he made a "double payment" for the commercial inland marine policy and requesting that Knauff send a refund payable to Wachovia (Thomas's bank) to his home address using an enclosed self-addressed envelope.  Pl.'s Ex. 167; Trial Tr. 794:10–17.

108.    On November 22, 2007, Thomas emailed Ms. Pokorney from his personal email account, again asking her to use the self-addressed stamped envelope to send the inland insurance premium refund to his home address.  He also again asked for the refund check to be payable to "Wachovia" instead of to the District.  Pl.'s Ex. 123; Trial Tr. 795:25–796:7.

109.    Ms. Pokorney made out a check to the District for the refund amount and mailed it to Thomas.  The check was issued to the District, not Wachovia as Thomas had requested.   Trial Tr. 384:18–385:2; Pl.'s Ex. 120; Defs.' Ex. 50 at 2.

110.    Thomas returned the check and asked Ms. Pokorney to submit the refund payable to the Wachovia account, rather than to the District itself.  Defs.' Ex. 50 at 2.  Ms. Pokorney apologized via email and promised to have the check reissued to Wachovia.

Pl.'s Ex. 120.  Ms. Pokorney promised "I'll do better next time," to which Thomas responded, "No prob baby . . . ."  Pl.'s Ex. 126.

111.    Ms. Pokorney attempted to reissue the refund check, but Knauff's accounting department informed Ms. Pokorney that it would only issue the check payable to a client, meaning the District.  Trial Tr. 384:25–385.  The accounting department also recommended that Thomas simply endorse the original check over to Wachovia after receiving it.  Trial Tr. 387:25–388:9; Defs.' Ex 50 at 2.

112.    Responding again to the same email the next day, Thomas stated, "good suggestion I called [W]achovia and asked if I could endorse and they said yes."  Pl.'s Ex. 127.  Reflecting on the event, Thomas testified, "I do believe that [Ms. Pokorney] knew that I was planning to take the money," Thomas Dep. 11:9–18, that he did in fact steal the money, Thomas Dep. 77:4–25, and that Mr. Pokorney afterward acknowledged that Thomas stole the money, id.

113.    Ms. Pokorney denies assisting Thomas in his scheme to steal this $22,700.  Trial Tr. 471:22–24.  And HUB has presented some evidence supporting her assertion.  For example, HUB notes that, according to the federal information, Thomas utilized the same scheme with respect to at least four other vendors.  Defs.' Ex. 76 at 58–59.

114.    The District insists that Ms. Pokorney's denial is not credible and has likewise presented some supporting evidence.  For example, Ms. Pokorney testified that she "had all checks returned to me" so she could send them to Thomas herself, "because if I didn't, they would put -- our accounting people put them in a window envelope and they'd wind up somewhere in the school district."  Trial Tr. 461:4–7.  Further, Ms. Pokorney's testimony denying a close personal relationship with Thomas is not true.

Trial Tr. 461:16–20 ("I never socialized with Brantley. I probably met him on one occasion at a luncheon."). Her denial was directly contradicted by an email from April 2015 in which she told Thomas, "Just want to say hi and thank you for the funniest dinner ever. My face hurt the next day from laughing so much. I so enjoyed seeing you again -- again -- and spending time with you." Trial Tr. 475:12–15. Ms. Pokorney also testified that she only socialized with Thomas after her December 31, 2014 retirement. But that testimony, too, was directly contradicted by other evidence. Mr. Pokorney testified that "[m]y wife and I considered Brantley almost like a family member, certainly one of my best, best, best friends . . . we considered Brantley as close a friend as we had." Trial Tr. 549:3–14. Obviously, Ms. Pokorney's testimony minimizing her relationship with Thomas cannot be true.

115.     In sum, the parties dispute whether Ms. Pokorney knowingly assisted Thomas in converting the $22,700 from the District for personal use, and each party has presented evidence in support of its position. The court need not issue a finding of fact with respect to this dispute because it can resolve the relevant issue—whether the District assented to any of the four unsigned BSAs—without it.

116.     According to Thomas, Stan Pokorney mailed documents like checks and invoices to Thomas's home address to help him avoid necessary approvals for the District to pay them. Thomas Dep. 15:8–16:7. The District considers it "very inappropriate" to send invoices directly to a District employee's home. Trial Tr. 826:6–9.

117.     Pokorney denies sending documents to Thomas's home to help conceal activities from the District, but, again, his denial is not credible. Pokorney testified that items were sent to Thomas's home address "[b]ecause he asked for them to" be mailed to

24

his house and "it was not uncommon for any of our clients to have something sent to their home." Trial Tr. 636:18–637:5. To be sure, it would not be unusual for an insurance broker to send certain personal items (e.g., a Christmas card) to a client's employee's home. But the issue here is whether it is unusual for an insurance broker to send invoices for hundreds of thousands of dollars to the home of an employee of a client rather than sending those invoices to the client's accounts payable department. Undoubtedly, such activity is unusual. Pokorney failed to explain why it was necessary or appropriate to send invoices addressed to the District to Thomas's home instead of sending them to the District's offices. Nor could he provide any example of any other client who received invoices at an employee's home. Instead, he testified that he sent "something" to the home of the Oconee County School District's risk manager when the risk manager was having major surgery. Trial Tr. 639:6–15. Pokorney's testimony implies that the "something" he sent was personal in nature, not a document related to the employee's capacity as risk manager. Surely, sending a personal item to an employee's home after he or she underwent major surgery is a far cry from routinely sending him or her invoices for hundreds of thousands of dollars. When asked specifically about the nature of his gift to the Oconee risk manager on cross-examination, Pokorney was evasive and nonresponsive. See Trial Tr. 639:19–24.

118.    Additionally, Pokorney repeatedly pointed a finger at his "service team" when asked about mailing documents to Thomas's home, testifying, "I was not involved with that" and "[t]hat was my service team." Trial Tr. 637:23–638:20. The court finds this assertion, too, to be incredible. In late 2017, after Thomas's crimes came to light, the District's risk manager, Rainy Talbert ("Talbert"), was preparing a spreadsheet of fees

paid to Knauff and HUB.  Talbert asked a member of Pokorney's "service team," Renee

Jones ("Jones"), why Talbert had never seen certain invoices for fees.  Jones told Talbert,

"You would not have seen those invoices because I was directed to send them straight to

[Thomas] or to his home."  ECF No. 169-2, Talbert Dep. 59:4–23.  Logically, that

direction must have come from Pokorney, who was in charge of his "service team."

119.    Thomas agreed to purchase services from Knauff and HUB to further his

own interests and not the interests of the District.  Thomas Dep. 13:3–21.  Specifically,

Thomas steered contracts for brokerage and other insurance services to Knauff and HUB

because Pokorney bribed him and willfully turned a blind eye to his other illegal

activities.  Thomas Dep. 23:13–24:6.

120.    Thomas testified that he agreed to the fee amounts described in the BSAs

not after an actual negotiation, but "based on trying to cover up the bribing."  Thomas

Dep. 73:20–74:20.  Knauff nor HUB ever performed the consulting services described in

the BSAs, Thomas Dep. 27:25–29:18, but Thomas had the District pay for those services

because Pokorney was bribing him, Thomas Dep. 29:20–30:2, 73:20–74:20.  Thomas

conspired with Pokorney when he was employed by Knauff and HUB to have the District

pay for services that Knauff and HUB never rendered.  In exchange, Pokorney gave

Thomas bribes in the form of $2,000 checks and stuck his head in the sand with respect to

Thomas's other illegal activities.  Thomas Dep. 30:22–32:8.

121.    Pokorney denies having any knowledge of Thomas's illegal activities prior

to 2017 and likewise denies that he intended the checks he mailed to Thomas to be bribes.

The court finds these denials incredible.  Having already been convicted, sentenced, and

jailed for his crimes, Thomas now has nothing to gain from lying about those crimes.  See

Thomas Dep. 33:4–25. Pokorney, on the other hand, has much to gain or at least to protect. Pokorney had a substantial financial incentive to bribe Thomas. Pokorney received 40 percent of the total revenue he generated at Knauff. Trial Tr. 568:16–21. Revenue includes service fees and commissions but not premiums. Trial Tr. 571:9–20. So, by way of an example, on a 15 percent commission on a policy with a $65,000 premium, Pokorney would earn $3,900 on the $9,750 commission. But when $118,625 brokerage services fees were charged in lieu of a commission on the same policy, Trial Tr. 421:9–15; Pl.'s Ex. 105, Pokorney earned $47,450. Hence the incentive to bribe Thomas.

122. Further, Pokorney's testimony that he thought HUB acquired Knauff in 2006, as opposed to 2012, is incredible. See Trial Tr. 682:5–9. While it is understandable that a person might misremember distant dates, Pokorney's demeanor during a full day of cross-examination showed his mind was not so far gone that he would forget who employed him for seven years. He had no difficulty remembering that he worked for Collier Cobb, Corroon and Black, and Willis Corroon before leaving for Knauff in 2000. Trial Tr. 531:10–24.

123. Pokorney's "misremembering" is material here because it was an attempt to assert his personal stake in the fees charged to the District during the period covered by the BSAs at issue was 9 percent rather than 40 percent. See Trial Tr. 670:25–671:1 ("[Q.] What piece of that 118 [thousand] did you get out of HUB? A. I told you, 9 percent. Q. Okay. And when did that start when HUB took over? A. When HUB bought Knauff, correct."). Pokorney received 40 percent of total revenue he generated at Knauff, Trial Tr. 568:16–21; he received a 9 percent after HUB purchased Knauff, Trial Tr. 670:25–671:1. By way of example based on the above numbers, at 9 percent Pokorney would

27

earn $10,676.25 for a $118,625 fee. Based on the same fee, at 40 percent Pokorney would earn $47,450. When compared to the $3,900 Pokorney would earn on a traditional commission, $10,676.25 is not nearly as egregious as $47,450.

124.    In any event, the evidence demonstrates that Pokorney's true commission at HUB was closer to 30 percent. Trial Tr. 673:6–10. The reduction to 9 percent was to cover the salary and costs of his son, Scott Pokorney, whom HUB employed because of Mr. Pokorney's desire to have his son inherit his book of business. Id.

125.    In sum, the court finds that Stan Pokorney knew of Thomas's illegal activities well prior to 2017 and that he sent Thomas bribes to steer the District's business to Knauff and HUB. In exchange for Pokorney's willful blindness of Thomas's illegal activities and at least ten $2,000 bribes, Pl.'s Ex. 6. ¶¶ 5, 7, 16–23, Thomas caused the District to pay exorbitant brokerage service fees, a significant portion of which was paid directly to Pokorney.

## II.   CONCLUSIONS OF LAW

126.    The court held the Section 4 Trial to resolve factual disputes underlying HUB's motion to compel arbitration. HUB asserts that the District agreed to arbitrate this dispute by assenting to five of the BSAs—the 2002 BSA, the 2003 BSA, the 2006 BSA, the 2009 BSA, and the 2011 BSAs.[5] The District opposes arbitration, arguing that it never assented to the relevant BSAs and thus that it cannot be bound by their arbitration

---

[5] HUB has conceded that the District did not assent to the 2005 BSA and therefore does not argue it provides a ground for compelling arbitration. HUB's 30(b)(6) representative testified that, due to the 2005 RFP dispute, the 2005 BSA was never put into place. Jones Dep. 91:13–92:1. In closing arguments, HUB abandoned any claim that this agreement was ever formed. ECF No. 222, Closing Arg. Tr. 4:13–5:2. Accordingly, the court is left with five BSAs—the 2002, 2003, 2006, 2009, and 2011 BSAs.

provisions.  For the following reasons, the court finds that the District did not assent to any of the relevant BSAs and therefore denies HUB's motion to compel arbitration.

### A.  Agreements to Arbitrate

127.    Arbitration "is a matter of consent, not coercion."  <u>EEOC v. Waffle House, Inc.</u>, 534 U.S. 279, 294 (2002); <u>see also</u> <u>Arrants v. Buck</u>, 130 F.3d 636, 640 (4th Cir. 1997) ("Even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate.").

128.    When the making of an arbitration agreement is at issue, 9 U.S.C. § 4 requires the district court to decide whether the parties have formed an agreement to arbitrate.  <u>Berkeley Cty. Sch. Dist.</u>, 944 F.3d at 234 (citing <u>Granite Rock Co. v. Int'l Bhd. of Teamsters</u>, 561 U.S. 287, 296 (2010) and <u>Snowden v. CheckPoint Check Cashing</u>, 290 F.3d 631, 637 (4th Cir. 2002)).

129.    Where genuine issues of material fact underlie the existence of an agreement to arbitrate, the court must "conduct a trial on the motion to compel arbitration" to resolve relevant factual disputes.  <u>Id.</u>

130.    The party asserting an arbitration agreement has the burden to show the making of the agreement.  <u>In re Mercury Const. Corp.</u>, 656 F.2d 933, 939 (4th Cir. 1981) (en banc).

131.    Whether an arbitration agreement has been formed is an issue of state contract law.  <u>Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.</u>, 913 F.3d 409, 415 (4th Cir. 2019).

**B.  South Carolina Contract Law**

132.    To determine whether the parties assented to a contract to arbitrate, the court employs South Carolina law.  <u>Livingston v. Atl. Coast Line R. Co.</u>, 180 S.E. 343, 345 (S.C. 1935) ("It is fundamental that unless there be something intrinsic in, or extrinsic of, the contract that another place of enforcement was intended, the lex loci contractu governs.").

133.    Under South Carolina law, a contract is formed between two parties when there is, inter alia, "a mutual manifestation of assent to [its] terms."  <u>Edens v. Laurel Hill, Inc.</u>, 247 S.E.2d 434, 436 (S.C. 1978) (internal quotation marks omitted).  Such assent "must be as to all the terms of the contract."  <u>Id.</u>

134.    South Carolina's "presumption in favor of arbitration applies to the scope of an arbitration agreement; it does not apply to the existence of such an agreement or to the identity of the parties who may be bound to such an agreement."  <u>Wilson v. Willis</u>, 827 S.E.2d 167, 173 (S.C. 2019) (internal quotation marks omitted).[6]

135.    For multiyear commercial contracts such as the BSAs at issue here, assent is ordinarily shown by authorized signature.  But assent may be shown by other means.  South Carolina "courts have held that '[a] contract does not always require the signature of both parties; it may be sufficient, if signed by one and accepted and acted on by the other.'"  <u>Pools Plus, Inc. v. Timmons</u>, 2008 WL 9841169, at *1 (S.C. Ct. App. Mar. 25, 2008) (quoting <u>Jaffe v. Gibbons</u>, 351 S.E.2d 343, 346 (S.C. Ct. App. 1986)).  For

---

[6] Such is the case with respect to the federal presumption in favor of arbitration as well.  <u>Applied Energetics, Inc. v. NewOak Capital Markets, LLC</u>, 645 F.3d 522, 526 (2d Cir. 2011) ("[W]hile doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made.").

example, the manifestation of assent can be demonstrated by a return promise or performance.  See Sauner v. Pub. Serv. Auth. of S.C., 581 S.E.2d 161, 166 (S.C. 2003).

136.    Additionally, a contract may be accepted on a principal's behalf by an agent acting with due authority.  The Fourth Circuit explained in this case that "an entity (such as [the District]) can be bound by an acceptance made by another (such as Thomas) of terms of an offer if there is an agency relationship between the two."  Berkeley Cty. Sch. Dist., 944 F.3d at 236.

**C. Mutual Assent**

137.    "A contract is an agreement between two or more parties, the preliminary step in the making of which is the offer by one party and the acceptance by the other, in which the minds of the two parties meet and concur in the understanding of the terms."  Lee v. Travelers' Ins. Co. of Hartford, Conn., 175 S.E. 429, 433 (S.C. 1934).  Thus, to prove the existence of a contract, the proponent must offer evidence that the other party "concur[red] in the understanding of the terms[.]"  Id.  As the South Carolina Supreme Court has repeatedly made clear, a party cannot be bound by a contract absent a showing that it assented "to all the terms of the contract."  Edens, 247 S.E.2d at 436.

**1. The District's Payment of Brokerage Service Fees**

138.    The District paid the brokerage service fees described in the 2006, 2009, and 2011 BSAs.  HUB argues that the District's payment of these brokerage fees provides sufficient evidence to establish its assent to the BSAs.  The court disagrees.  Payment alone does not demonstrate that the District knew of and agreed to all terms in the BSAs— especially the arbitration provisions.  The South Carolina Supreme Court addressed this issue over 100 years ago:

> The ordinary unsigned railroad ticket is not itself the sole evidence of the contract of carriage. Such a ticket is a token or receipt given to show that the passenger has paid his fare from the place of departure mentioned therein to the place of destination mentioned therein. Hence parol evidence is admissible to prove the terms of the contract entered into, or the representation made by the agent at the time the ticket was purchased.

Levan v. Atl. Coast Line R. Co., 68 S.E. 770, 773–74 (S.C. 1910). In other words, a purchased ticket shows payment of a fare for transport but is insufficient to show agreement to terms not included on the ticket. While other evidence might prove the terms under which the ticket was sold, payment for the ticket alone does not evidence that ticketholder's assent to additional contract terms. Here, likewise, the fact that the District paid brokerage service fees to Knauff and HUB only shows payments for services; it is insufficient to show agreement to terms not on the invoice. Accordingly, payment alone falls short of establishing the District's assent to "all the terms of the" BSAs. Edens, 247 S.E.2d at 436.

139.    HUB failed to present any evidence of the District's (or SAFE's) assent to the terms of the 2006, 2009, or 2011 BSAs. HUB produced no correspondence exchanging or discussing drafts of those BSAs. Further, the BSAs do not appear in the District's files. Findings of Fact ("FOF") ¶¶ 54, 79, supra. And the court has found that the District was not aware of the 2006, 2009, or 2011 BSAs before this litigation. Id.

140.    To be sure, HUB has presented some evidence that the BSAs were sent to Thomas, then an employee of the District. FOF ¶ 90. But, during that period and specifically in relation to the relevant BSAs, Thomas was acting with Pokorney, Knauff, and HUB against the District's interests. FOF ¶¶ 100–17, 119–121. Accordingly, Thomas's knowledge of the specific terms of the BSAs cannot be imputed to the District. Knobeloch v. Germania Sav. Bank, 27 S.E. 962 (S.C. 1897) (holding that a principal is

not charged with the knowledge of his agent when the agent "meditates a fraud against his principal or some third person in his own interest"); see also Galphin v. Pioneer Life Ins. Co., 154 S.E. 855, 864 (S.C. 1930) ("[T]he principal will not be bound by the knowledge of the agent if the agent is acting in fraud of his principal . . . .").

141.     Thus, assuming Thomas may have had knowledge of the 2006, 2009, and 2011 BSAs does not establish the District's knowledge of those agreements.  Similarly, evidence that the District paid the brokerage service fees outlined in the 2006, 2009, and 2011 BSAs is insufficient to establish its assent to all the terms of those agreements, including their arbitration clauses.

## 2.  The District's Assertion of Breach-of-Contract Claims

142.     HUB argues that the District's assertion of breach-of-contract claims in its original complaint demonstrates that it knew about and assented to the relevant BSAs. The court disagrees.

143.     First, the Fourth Circuit explicitly noted in this very case that "an amended complaint—such as the Operative Complaint here—supersedes an initial complaint and renders it of no effect."  Berkeley Cty. Sch. Dist., 944 F.3d at 241 (emphasis added) (quoting Fawzy v. Wauquiez Boats SNC, 873 F.3d 451, 455 (4th Cir. 2017)).

144.     More fundamentally, HUB's second argument suffers from the same fatal flaw as its first.  The fact that the District asserted breach-of-contract claims with respect to unidentified contracts governing Knauff and HUB's services does not equate to any knowledge of or assent to the specific BSAs at issue here or all of the terms included therein.  The District's original complaint merely alleges that "[t]he District entered into multiple contracts with [Knauff] for consulting services, which required [Knauff] to use

33

[its] expertise as [an] insurance consultant[] to provide sound advice concerning the insurance needs of the District." Defs.' Ex. 76 ¶ 234. The District does not dispute that it paid Knauff and HUB brokerage service fees. Of course, the District was aware that it paid fees to Knauff and HUB pursuant to some agreement between the parties. However, there is no evidence that the District ever received the specific BSAs at issues here, much less that it assented to all of their terms. The District's general assertion of a breach-of-contract claims is, at best, weak evidence that it had knowledge of the specific BSAs at issue here, especially given the more convincing evidence to the contrary. In other words, binding the District to the BSAs based on its assertion of generalized and since-abandoned breach-of-contract claims is a bridge too far.

### 3. The 2002 and 2003 BSAs

145.     HUB argues that the 2002 and 2003 BSAs bind the District to arbitration. Unfortunately for HUB, the law of the case says otherwise. The Fourth Circuit explicitly held that the 2002 and 2003 BSAs "predate the steering and kickback fraud scheme and conspiracy alleged in the Operative Complaint" and therefore cannot provide grounds to compel arbitration. Berkeley Cty. Sch. Dist., 944 F.3d at 241. In other words, the Fourth Circuit held that the 2002 and 2003 BSAs cannot compel this dispute to arbitration because—according to the operative complaint—this dispute arose after the period covered by those BSAs. As the "law of the case," the court must abide by the Fourth Circuit's decree. United States v. Aramony, 166 F.3d 655, 661 (4th Cir. 1999) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

146.    Thus, the court does not consider whether the District agreed to arbitrate this dispute by assenting to the 2002 and 2003 BSAs.  Instead, the court only considers the 2002 and 2003 BSAs to the extent that they are "relevant to questions of whether [the District] had knowledge of, or assented to, the subsequent [BSAs]."  Berkeley Cty. Sch. Dist., 944 F.3d at 241.

147.    Further, the court finds that the 2002 and 2003 BSAs constitute weak evidence of District's assent to subsequent BSAs.  As the court has found, the 2005 RFP cut off any "continuing conduct" or "continuing performance" with respect to the 2002 and 2003 BSAs.  When the RFP was withdrawn, the District moved its business from Knauff to the IRF.  FOF ¶ 48.  HUB's 30(b)(6) designee admitted that the 2005 BSA was never put in place because of the RFP dispute.  Jones Dep. 91:13–92:1.  Knauff claimed the loss of its book of business with the District violated its rights, and in January 2006 Knauff and the District settled those claims in a fully executed settlement agreement. FOF ¶¶ 49–50.  The settlement expressly terminates any obligations the District might have had under previous agreements, meaning that the District had no obligation to continue to perform under any such agreements.  Id.  Accordingly, the court finds that the 2002 and 2003 BSAs do little to show the District's assent to subsequent BSAs.

### 4.  The 2006 and 2009 BSAs

148.    The 2006 and 2009 BSAs are unsigned.  FOF ¶ 52.

149.    The District is not a party to the 2006 or 2009 BSA.  FOF ¶¶ 52–55. Those BSAs concern D&O coverage for SAFE's board of directors.  Id.  SAFE is a 501(c)(3) corporation distinct from the District.  FOF ¶ 56.

150.    As a nonparty to the 2006 and 2009 BSAs, the District cannot be bound by their arbitration provisions, absent some exception under the law.  Wilson, 827 S.E.2d at 173 ("[T]he general rule that a nonsignatory is not bound by an arbitration clause") (quoting Comer v. Micor, Inc., 436 F.3d 1098, 1103–04 (9th Cir. 2006)).

151.    "In the arbitration context," the doctrine of benefits estoppel "recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him."  Id. at 175.  A nonparty to an arbitration agreement may nonetheless be bound by it only where he "knowingly exploits the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement."  Id.  In other words, a nonparty who relies on a contract as a sword to obtain its benefits may not subsequently shield himself from the effect of the contract's arbitration provision.  "However, direct benefits estoppel is not implicated simply because a claim relates to or would not have arisen 'but for' a contract's existence[.]"  Id. at 176.

152.    The doctrine of benefits estoppel does not apply here because the court has determined that the District, a nonparty, received no benefit from the 2006 and 2009 BSAs.  Even assuming that the placement of D&O coverage for SAFE's board somehow benefits the District (perhaps because the District paid for it), the D&O coverage for SAFE had been put in place years before December 2006, and HUB has presented no credible evidence that claims were ever made or consulting services were ever provided. FOF ¶¶ 63, 68–69.  At most, the District paid exorbitant brokerage service fees for a line of insurance that had been in place since 2003.

36

153.    Accordingly, the District did not assent to the 2006 and 2009 BSAs.

**5. The 2011 BSA**

154.    As the court has found, the 2011 BSA is unsigned, FOF ¶ 77, and HUB
failed to produce any convincing evidence that anyone at the District knew of or assented
to the 2011 BSA. The District was not able to locate a copy of this agreement in its files,
FOF ¶ 79, and the Board did not approve it, id. ¶ 80. Further, Knauff sent the invoices
associated with the 2011 BSA to Thomas's house, not the District's office. Id. ¶ 89.

155.    Accordingly, the court finds that no one at the District assented to the 2011
BSA.

**D. Thomas's Authority**

156.    "An agent contracting with the authority of his principal binds him to the
same extent as if the principal personally made the contract." Berkeley Cty. Sch. Dist.,
944 F.3d at 237 (internal quotation marks omitted). Whether an agency relationship
exists and the extent of the agent's authority are questions of fact under South Carolina
law. See Am. Fed. Bank, FSB v. Number One Main Joint Venture, 467 S.E.2d 439, 442
(S.C. 1996); Hiott v. Guar. Nat'l Ins. Co., 496 S.E.2d 417, 421 (S.C. Ct. App. 1997).

157.    An agency relationship may be established by evidence of actual or
apparent authority. Fochtman v. Clanton's Auto Auction Sales, 106 S.E.2d 272, 274–75
(S.C. 1958). "[A]ctual authority is that which is expressly conferred upon the agent by
the principal." Charleston, S.C. Registry for Golf & Tourism, Inc. v Young Clement
Rivers & Tisdale, LLP, 598 S.E.2d 717, 721 (S.C. Ct. App. 2004). A principal's express
direction to enter into a contract on the principal's behalf is an example of actual

authority.  See e.g., Ritter & Assocs., Inc. v. Buchanan Volkswagen, Inc., 748 S.E.2d 801,

805 (S.C. Ct. App. 2013).

158.    Apparent authority "focuses on the principal's manifestations to a third

party that the agent has certain authority."  Rickborn v. Liberty Life Ins. Co., 468 S.E.2d

292, 296 (S.C. 1996).  It exists where "the principal knowingly permits the agent to

exercise authority, or the principal holds the agent out as possessing such authority."

Berkeley Cnty. Sch. Dist., 944 F.3d at 237 (quoting Richardson v. P.V., Inc., 682 S.E.2d

263, 265 (S.C. 2009)).   A "principal is bound by the acts of its agent when it places the

agent in such a position that persons of ordinary prudence, reasonably knowledgeable

with business usages and customs, are led to believe that the agent has certain authority

and they in turn deal with the agent based upon that assumption."  Rickborn, 468 S.E.2d

at 296.   This inquiry turns on whether the third party's belief that the agent possesses

actual authority is reasonable.

159.    "Apparent authority ends when it is no longer reasonable for the third

party with whom an agent deals to believe that the agent continues to act with actual

authority."  Restatement (Third) of Agency § 3.11.  Regarding the reasonableness of a

third party's belief, the Restatement comments observe:

> If a third party knows that the actor in question is an agent and knows the
> identity of the principal, the third party should assess what is observed of
> the agent in light of the agent's position as a fiduciary with a duty to use
> authority on behalf of the principal.  In a transactional context, the agent's
> position as a fiduciary should prompt doubt in the mind of the reasonable
> third party when the agent appears to be using authority to bind the principal
> to a transaction that will not benefit the principal.

Restatement (Third) Of Agency § 2.03 cmt. d (2006) (emphasis added).

160.    In South Carolina, "A party asserting agency as a basis of liability must

prove the existence of the agency, and the agency must be clearly established by the

facts." <u>Hodge v. UniHealth Post-Acute Care of Bamberg, LLC</u>, 813 S.E.2d 292, 304 (S.C. Ct. App. 2018).

### 1. Thomas's Actual Authority

161.    Even if Thomas did have knowledge of the 2006, 2009, or 2011 BSAs, he did not have the actual authority to bind the District them without the approval of his superiors or the Board.  All the BSAs demanded fee amounts exceeding his signing authority.  FOF ¶ 91.  No RFP soliciting the BSAs ever issued.  FOF ¶¶ 92–93.  Neither Thomas nor any other District employee is permitted to execute multiyear agreements without Board approval.  FOF ¶ 94.

162.    HUB argues that Thomas had actual authority to enter into the 2006 and 2009 BSAs because the SAFE board directed Thomas to place insurance on its behalf. To be sure, HUB has presented evidence that the SAFE board did just that in 2003. Defs.' Ex. 25.  But, as the court has found, SAFE and the District are separate entities. FOF ¶ 59.  The authority SAFE conferred onto Thomas to place insurance on its behalf in 2003 does not somehow equate to authority from the District to bind the District to over a million dollars in brokerage service fees from 2006 to 2017.  In other words, Thomas had the authority to procure insurance, not to procure illusory brokerage services in exchange for exorbitant fees.  FOF ¶ 61.  The relevant inquiry is whether the District conferred upon Thomas actual authority to enter into the 2006 and 2009 BSA, not whether SAFE conferred authority upon Thomas to place insurance in 2003. Accordingly, the court finds that Thomas did not have the actual authority to bind the District to the 2006 and 2009 BSAs.

## 2. Thomas's Apparent Authority

163.   Thomas lacked apparent authority to enter into the 2006, 2009, and 2011 BSAs because any third-party belief that Thomas had the actual authority to enter into those agreements was unreasonable.

164.   Pokorney's purported belief that Thomas had the actual authority to enter into the BSAs is unreasonable because Pokorney knew about Thomas's illegal scheme to defraud the District.  FOF ¶¶ 121–125.  Certainly, no reasonable person can believe that an agent has the actual authority to defraud and embezzle money from his principal.

165.   Further, Pokorney bribed Thomas to steer policies to Knauff and HUB, meaning that he knew Thomas was not acting in the District's best interest.  No reasonable person would believe that an agent has the actual authority to act against his principal's best interest.  See GolTV, Inc. v. Fox Sports Latin Am. Ltd., 277 F. Supp. 3d 1301, 1315 (S.D. Fla. 2017) ("[T]here is not a reasonable belief the agent possessed apparent authority where he/she, in self-dealing, was acting, not just for his/her own interest, but directly contrary to the interests of the principal.").

166.   Moreover, the court has found that the brokerage service fees associated with the 2006, 2009, and 2011 BSAs were far greater than those customary in the industry.  FOF  ¶¶ 30, 75.  Therefore, even aside from Pokorney's knowledge of Thomas's scheme, the BSAs at issue cost too much and offered too little for Knauff or HUB to reasonably believe the District's employee could agree to them.  A customary insurance broker commission is 15 percent.  FOF ¶ 30.  The 2006, 2009, and 2011 BSAs charged fees that were wildly more—by 1200 and 3700 percent.  FOF ¶¶ 67, 82.  The BSAs demanded fees far exceeding the premiums for the lines of insurance purportedly

being serviced.  The 2006 and 2009 BSAs demanded fees that were twice the premiums for the purportedly serviced D&O coverage, and the 2011 BSA demanded fees well over five times the premium for the purportedly serviced E&O coverage.  Id.  Further, Knauff nor HUB provided consulting services or even placed new insurance.  FOF ¶¶ 63, 68–69.

167.    No reasonable person could believe Thomas had the authority to bind the District to pay many hundreds of thousands of dollars for many years in exchange for literally nothing.

168.    Thus, the court finds that Thomas had neither actual nor apparent authority to bind the District to the 2006, 2009, or 2011 BSAs.

### E.  Summary of Conclusions

169.    The law of the case is that the arbitration provisions in the signed 2002 and 2003 BSAs cannot require the District to arbitrate this dispute because they predate the conduct alleged in the operative complaint.

170.    Knauff and the District never agreed to the 2005 BSA.

171.    The District had no knowledge of the 2006, 2009, and 2011 BSAs and therefore never assented to the arbitration provisions contained therein.

172.    The District is not a party to the 2006 and 2009 BSAs and, as a nonparty, cannot be bound by their arbitration provisions because the District received no benefit from those BSAs.

173.    Thomas did not have actual authority to execute the 2006, 2009, or 2011 BSA on behalf of the District.

174.    Thomas did not have apparent authority to execute the 2006, 2009, or 2011 BSA on behalf of the District.

175.    Accordingly, the District did not assent to the 2006, 2009, or 2011 BSAs, meaning that it cannot be bound by the arbitration provisions contained within them.

### III.   CONCLUSION

For the foregoing reasons the court **FINDS** that the District did not agree to arbitrate this dispute and therefore **DENIES** the motion to compel arbitration.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**June 3, 2021**
**Charleston, South Carolina**