**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| BERKELEY COUNTY SCHOOL DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>HUB INTERNATIONAL LIMITED, HUB INTERNATIONAL MIDWEST LIMITED, HUB INTERNATIONAL SOUTHEAST, KNAUFF INSURANCE AGENCY, INC., and BRANTLEY THOMAS,<br><br>Defendants. | C.A. No. 2:18-cv-00151-DCN |

**HUB'S MOTION TO ENFORCE ARBITRATION
AGREEMENTS AND MEMORANDUM IN SUPPORT**

Defendants HUB International Limited and HUB International Midwest Limited respectfully move under the Federal Arbitration Act, 9 U.S.C. §§ 1-4, for an order compelling arbitration and staying this case.

**INTRODUCTION**

The Berkeley County School District (the "District") has now amended its complaint for a second time in an effort to avoid the arbitration clauses in the 2002 and 2003 Brokerage Service Agreements it entered with HUB's predecessor, Knauff.[1]  But the District fails to achieve its goal, because it remains unwilling to fundamentally alter its claims in a way that removes this case from the arbitration provisions' broad reach.

---

[1] This memorandum refers to HUB and Knauff interchangeably as "HUB."

In the 2002 and 2003 Agreements, the parties agreed to arbitrate "[a]ll disputes, claims or controversies relating to" the Agreements "or the services provided."  Ex. A § 4.4; Ex. B § 4.4. The services HUB provided under those agreements encompassed, among other things, "Risk Identification and Evaluation" and "Brokering" with respect to insurance policies for "Excess Liability," "Excess Crime," and "Inland Marine."  Ex. A §§ 1.1, 1.4, 2.1; Ex. B §§ 1.1, 1.4, 2.1. The District's Second Amended Complaint ("SAC") acknowledges that such policies were covered by the 2002 and 2003 Agreements, Dkt. 255 ¶¶ 47, 49, yet the District **still** asserts multiple claims, and seeks damages, based on HUB's recommending that the District take out such policies, *e.g.*, *id.* ¶ 3.  As a result, "***a significant relationship*** exists between the asserted claims and the contract in which the arbitration clause is contained," which requires that this case be sent to arbitration.  *Landers v. FDIC*, 739 S.E.2d 209, 214 (S.C. 2013) (emphasis added).

While the SAC variously alleges that HUB's supposedly fraudulent conduct began "a few months after February 2006," in "at least 2007," and sometime "before 2010," Dkt. 255 ¶¶ 2, 5, 175, such allegations do not remove this case from the reach of the 2002 and 2003 Agreements' arbitration clauses.  The District's First Amended Complaint ("FAC") alleged that the conduct supposedly began in "at least . . . 2005," Dkt. 36 at 2, yet the Fourth Circuit held that such allegations are not dispositive.  The court of appeals remanded for reconsideration of the arbitration issue because, notwithstanding the FAC's allegations, "[t]he record reveals evidence that some conduct at issue in this case may have occurred before 2005 and may thereby implicate the 2002 or 2003 BSA."  *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, No. 21-1691, 2022 WL 17974626, at *2 (4th Cir. Dec. 28, 2022) ("*Berkeley County II*").  That remains true, notwithstanding the District's changes in the SAC.

Even if there were doubt about the issue—and there should be none—the Court still would be required to submit this case to arbitration. As the Fourth Circuit found in the first appeal, the 2002 and 2003 Agreements delegated all questions of arbitrability—such as whether a dispute falls within the scope of the arbitration provision—to the arbitrators. *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 n.9 (4th Cir. 2019) ("*Berkeley County I*"). Thus, under the Supreme Court's decision in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019), it is crystal clear that any disputes regarding arbitrability must themselves be submitted to the arbitrators—even "if the court thinks that the argument" for compelling arbitration "is wholly groundless." *Id.* at 529.

Time and again, HUB has made clear its position that any claims concerning the insurance policies listed in the 2002 and 2003 Agreements fall within the scope of those Agreements' arbitration provisions. The District has been given multiple opportunities to amend its complaint to omit all such claims, but has again chosen not to do so. This case has now seen three complaints, an arbitrability trial, and two trips to the Fourth Circuit. The time has come for the Court to order this dispute to arbitration.

## BACKGROUND

### I.    THE ORIGINAL COMPLAINT

The original complaint in this action alleged that the District's former Chief Financial Officer, Brantley Thomas, as just one part of his fraud upon the District, orchestrated a sixteen-year scheme in which he steered the District into buying insurance policies and services sold by HUB. *See* Dkt. 1 at 1-2 & ¶¶ 2, 7, 15-19. The crux of the allegations was that Stanley Pokorney, who worked for HUB, recommended unnecessary insurance policies, as well as insurance brokering and consulting services, which Thomas caused the District to purchase in exchange for kickbacks. Dkt. 1 at 1-2. The complaint alleged that the defendants had been engaged in a corrupt

scheme "since at least 2001." *Id.* ¶ 21.  It asserted federal claims under RICO, state-law breach of

contract claims, and state-law torts including fraud, negligence, and breach of fiduciary duty.  *Id.*

¶¶ 158-245.

The District identified eight Knauff-brokered insurance policies that it alleged were

worthless:

- Excess General Liability;
- Crime / Excess Crime Coverage;
- Student Accident Coverage;
- Inland Marine Coverage;
- School Board Errors and Omissions Coverage;
- Builders Risk Coverage;
- Directors and Officers Liability Coverage for Securing Assets for Education, a nonprofit development organization; and
- Cyber Coverage.

*See* Dkt. 1 ¶ 40.  The complaint sought to recover everything the District paid for insurance services

and premiums relating to those policies from 2001 through 2017.  *See, e.g., id.* ¶¶ 44-47 (alleging

that all premiums and fees were the result of alleged torts); *see also id.* ¶¶ 168, 176, 188, 196, 203,

210, 219, 232, 236, 241, 244 (individual claims seeking damages dating to 2001).  It also sought

an award of treble damages.  *Id.* at 55.

## II.  HUB's First Motion To Compel Arbitration Under The Brokerage Service Agreements

The original complaint alleged that the insurance services at issue were provided pursuant

to contracts.  Dkt. 1 ¶¶ 233-236.  The District did not attach those contracts, but HUB searched its

files and found copies of Brokerage Service Agreements dating from 2002, 2003, 2005, 2006,

2009, and 2011.  Those Agreements related to the insurance services at issue in the complaint.

The 2002 and 2003 Agreements, for example, covered services for "Risk Identification and

Evaluation" and "Brokering" with respect to "Excess Liability," "Excess Crime," and "Inland Marine" insurance policies, among others.  Ex. A §§ 1.1, 1.4, 2.1; Ex. B §§ 1.1, 1.4, 2.1.

Each Brokerage Service Agreement contains the same broad arbitration provision.  *See*, *e.g.*, Ex. A § 4.4; Ex. B § 4.4.  It requires that any dispute concerning the underlying relationship be resolved through arbitration:

> ***All*** disputes, claims or controversies ***relating to this Agreement, or the services provided***, which are not otherwise settled, ***shall*** be submitted to a panel of three arbitrators and resolved by final and binding arbitration, to the exclusion of any courts of laws, under the commercial rules of the American Arbitration Association.

*E.g.*, Ex. A § 4.4 (emphasis added).

The 2002 and 2003 Agreements were signed on behalf of the District by its Risk Manager, Angel Cartwright, and its CFO, Thomas, respectively.  *See* Ex. A at 5; Ex. B at 5.  Unlike the 2002 and 2003 Agreements, HUB's copies of the 2005, 2006, 2009, and 2011 Agreements were not signed.  *See* Dkt. 225 ¶ 11.

HUB moved to compel arbitration under Sections 3 and 4 of the FAA.  It urged that the District's claims were subject to the arbitration provisions in the Brokerage Service Agreements, and that any one of the Agreements was sufficient to require that the entire case be sent to arbitration.  *See* Dkt. 23 at 5-13.

## III.    THE DISTRICT'S FIRST AMENDED COMPLAINT AND OPPOSITION TO HUB'S ARBITRATION MOTION

In response, the District simultaneously filed an opposition to HUB's motion and an amended complaint.  The new pleading was nearly identical to the original, but it included three changes in an effort to avoid the Brokerage Service Agreements' arbitration requirement.  First, the original complaint had alleged that the supposed scheme and conspiracy between Thomas and HUB had been going on "at least since 2001." Dkt. 1 at 2.  The First Amended Complaint ("FAC") claimed that the alleged scheme began in "at least . . . 2005." Dkt. 36 at 2.  Second, the FAC

dropped the District's claim for breach of contract. Third, the District modified its attached spreadsheet listing payments related to HUB to include only those payments made after the 2003 Agreement expired in July 2004. *See* Dkt. 36-4 at 6. However, the modified spreadsheet still included amounts that were based on services provided, as well as ***incurred*** by the District and ***invoiced*** by HUB, before that date—while the 2003 Agreement was still in effect. *Id.*

The District's brief opposing the motion to compel arbitration essentially ignored the signed 2002 and 2003 Agreements. The District argued that they were no longer "relevant to this action in light of the [First Amended] Complaint, which does not include the years during which those documents were supposedly in place." Dkt. 33 at 20.

As for the later Agreements, the District argued that it did not agree to them because it "did not know the[y] . . . existed until [HUB's arbitration] Motion was filed." Dkt. 33 at 19. And it urged that Thomas "did not have authority to bind the District" contractually because, among other things, he "was committing fraud for his own benefit and, as such, was acting outside the scope of his agency for the District." *Id.* at 26-27.

## IV.    THIS COURT'S RULINGS DENYING ARBITRATION AND THE FOURTH CIRCUIT'S DECISIONS VACATING AND REMANDING

This Court denied HUB's first motion to compel arbitration, Dkt. 63, and HUB appealed. The Fourth Circuit vacated that decision. *Berkeley County I*, 944 F.3d at 242. It held that "genuine disputes of material fact exist regarding whether Berkeley Schools agreed to arbitrate the claims alleged in the [Amended] Complaint," and that "the [district] court was obliged to conduct" an evidentiary hearing to resolve those issues. *Id.* at 235. The court of appeals' opinion largely focused on factual disputes concerning the formation of the 2005, 2006, 2009, and 2011 Agreements. *Id.* at 238-41. Turning to the 2002 and 2003 Agreements, the court of appeals stated that they "predate the steering and kickback fraud scheme and conspiracy alleged in the [FAC],"

and so they "could not require Berkeley Schools to arbitrate any claims on the basis of conduct that began after" those agreements terminated. *Id.* at 241. The court reached that decision only because it "accept[ed] as true," *id.* at 233, the allegations in the FAC that the disputed conduct "beg[an] in 2005," *id.* at 230. The court of appeals remanded for this Court to conduct a trial under Section 4 of the Federal Arbitration Act. *Id.* at 241-42.

On remand, HUB again argued that the District's claims are subject to the broad arbitration clauses in each of the 2002, 2003, 2006, 2009, and 2011 Agreements. In opposition, the District argued that the 2006, 2009, and 2011 Agreements are not enforceable contracts. But the District did not challenge the enforceability of the 2002 and 2003 Agreements. Instead, the District maintained that they were irrelevant because they terminated before the events at issue in this case. *See* Dkt. 222 at 14:15-20. HUB countered that, notwithstanding the FAC's allegation that the alleged fraud began in "at least . . . 2005," Dkt. 36 at 2, the evidence showed that the conduct underlying the District's claims bore a significant relationship to the 2002 and 2003 Agreements. The FAC, for example, alleged that the District never would have taken out Excess General Liability, Crime/Excess Crime, and Errors and Omissions policies had it not been duped by Thomas's and HUB's supposed fraudulent scheme. *Id.* ¶¶ 117-130, 144-150. And former Assistant Superintendent Ken Coffey testified that the District had purchased all three policies ***as early as 1996*** and renewed them in 2002, while the Agreement was in effect. Dkt. 218 at 38:1-39:23. Marcia Abrahamson, the District's 30(b)(6) witness, further explained how the FAC's damages claims included payments for policies and insurance services the District procured while the 2003 Agreement was still in effect. *See id.* at 111:17-112:12, 113:24-114:21, 115:5-23.

This Court again denied HUB's motion to compel arbitration. The Court determined that the District had not assented to the terms of the 2006, 2009, and 2011 Brokerage Service

Agreements.  Dkt. 225 ¶¶ 148-155.  It also concluded that Thomas lacked actual or apparent authority to bind the District to those Agreements.  Thus, none of those three Agreements, the Court concluded, could provide a basis to compel arbitration.  *Id.* ¶¶ 161-162, 163-168.  The Court did not address the merits of HUB's arguments that the 2002 and 2003 Brokerage Service Agreements required arbitration.  Instead, it held that, based on the Fourth Circuit's prior decision, "the law of the case" precluded consideration of those Agreements.  *Id.* ¶ 145.  The Court thus "d[id] not consider whether the District agreed to arbitrate this dispute by assenting to the 2002 and 2003 BSAs."  *Id.* ¶ 146.

HUB appealed a second time, challenging only this Court's refusal to consider whether the 2002 and 2003 Agreements required arbitration.  On appeal, the District admitted to the court of appeals that the 2002 and 2003 Agreements "are valid agreements."  Oral Argument at 14:20, *Berkeley Cty. Sch. Dist. v. HUB Int'l Ltd.* (No. 21-1691), https://www.ca4.uscourts.gov/ OAarchive/mp3/21-1691-20221208.mp3.

The Fourth Circuit again vacated this Court's decision denying arbitration.  It explained that "the law-of-the-case doctrine is not absolute," and that "a district court need not follow an earlier appellate decision if 'a subsequent trial produces substantially different evidence.'" *Berkeley County II*, 2022 WL 17974626, at *2.  The court of appeals thus held that this Court "was not bound by [the Fourth Circuit's] prior decision about the 2002 and 2003 BSAs because the Section 4 trial produced substantially different evidence on that score."  *Id.*  The court of appeals found that, notwithstanding the allegations in the FAC, "[t]he record reveals that some conduct at issue in this case may have occurred before 2005 and may thereby implicate the 2002 or 2003 BSA."  *Id.*  The court of appeals "therefore conclude[d]" that this Court "erred by declining to consider new evidence implicating the 2002 and 2003 BSAs."  *Id.*

The Fourth Circuit also rejected an argument, advanced by the District, that "a 2006 settlement agreement between the parties precludes HUB from asserting its arbitration rights under" the 2002 and 2003 Agreements. *Berkeley County II*, 2022 WL 17974626, at *3.  The court of appeals "conclude[d] that the settlement agreement does not foreclose reliance on the arbitration clauses in the 2002 and 2003 BSAs and this matter must be returned to the district court for further proceedings." *Id.*  The court of appeals thus remanded for this Court to consider whether the 2002 and 2003 Agreements require that this case be sent to arbitration. *Id.*

## V.    THE DISTRICT'S SECOND AMENDED COMPLAINT

On remand, the District chose not to stand on the FAC.  Instead, it sought, and was granted, leave to file a Second Amended Complaint ("SAC").  Dkt. 248; Dkt. 255.

The SAC alleges the very same supposedly wrongful conduct alleged in the first two complaints.  It again contends that Thomas and HUB "engaged in multiple schemes in which Thomas helped the Insurance Defendants obtain the District's insurance business for consulting and conducting insurance reviews, in exchange for which they paid Thomas illegal kickbacks." Dkt. 255 ¶2.  Where the original complaint alleged that fraud had been ongoing "at least since 2001," Dkt. 1 at 2, and the FAC alleged that the scheme began in "at least . . . 2005," Dkt. 36 at 2, the SAC variously alleges that the scheme began "a few months after February 2006," in "at least 2007," and sometime "before 2010," Dkt. 255 ¶¶2, 5, 175.

The SAC asserts the same 11 claims for relief as in the FAC.  *See* Dkt. 255 ¶¶172-313. Those include claims for negligence, negligent misrepresentation, and breach of fiduciary duty, *see id.* ¶¶243-256, 262-300, 305-309 (counts 3, 5-8, 10), which are not dependent upon the District proving kickbacks or a fraudulent scheme.  The District alleges that HUB breached its "duties to the District" because, despite being paid "for [its] expertise as insurance consultants," HUB

supposedly "made no effort to lower the District's insurance costs and, instead, recommended costly duplicative policies." *Id.* ¶ 68.

With respect to the insurance policies at issue, the SAC continues to allege that the Excess Liability and Excess Crime policies, specifically, are policies that "[a]n experienced insurance consultant acting in the best interests of a district such as Berkeley would have recommended against purchasing" because they are "unnecessary and/or duplicative." Dkt. 255 ¶ 145. The SAC drops the FAC's extended discussion of the Inland Marine policy, *see* Dkt. 36 ¶¶ 131-143 (FAC), but still itemizes it as one of the commercial policies HUB "recommended," Dkt. 255 ¶ 45. As the SAC acknowledges, those policies are covered by the 2002 and 2003 Agreements. *Id.* ¶¶ 47, 49.

As for damages, the SAC changes the time periods for which it quantifies the premiums the District paid on insurance policies purchased through HUB, and the consulting and broker's fees the District paid to HUB, from 2005-2017 to 2006-2017. *Compare* Dkt. 255 ¶¶ 63, 65 (SAC) *with* Dkt. 36 ¶¶ 48, 50 (FAC). Yet the SAC further alleges the District has been "harm[ed]" because it "paid **tens of millions** of dollars in unnecessary, duplicative premiums and sham consulting fees," Dkt. 255 ¶ 267 (emphasis added); *see id.* ¶ 1—an amount that dwarfs the total premiums and fees listed for the 2006-2017 time frame. The SAC also adds new allegations of "special damages," contending that HUB is the reason the District is "unable to provide" adequate services for "special education" and "special services to children with special needs." *Id.* ¶¶ 162-163.

The District's counsel represented to the Fourth Circuit that the 2002 and 2003 Agreements "are valid agreements." Oral Argument at 14:20, *Berkeley Cty. Sch. Dist. v. HUB Int'l Ltd.* (No. 21-1691), https://www.ca4.uscourts.gov/OAarchive/mp3/21-1691-20221208.mp3. The SAC calls the "validity" of those Agreements "questionable," but concedes that HUB "performed the

services," that the contracts were "commercially reasonable," and that "the District paid" the "fees described" in those agreements.  Dkt. 255 ¶¶ 48-49.

The SAC also adds an extended discussion of the 2006 settlement agreement between Knauff and the District concerning a 2005 Request for Proposal for insurance services.  Dkt. 255 ¶¶ 51-61.  As noted above, the Fourth Circuit has already "conclude[d] that the settlement agreement does not foreclose reliance on the arbitration clauses in the 2002 and 2003 BSAs." *Berkeley County II*, 2022 WL 17974626, at *3.

## ARGUMENT

### I.     THE 2002 AND 2003 BROKERAGE SERVICE AGREEMENTS REQUIRE THAT THIS CASE BE SENT TO ARBITRATION

The Supreme Court has repeatedly underscored the "emphatic federal policy in favor of arbitral dispute resolution" embodied in the Federal Arbitration Act.  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985); *see also, e.g.*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  A party aggrieved by another's failure to follow a written agreement requiring that a dispute be arbitrated may petition a district court to order the parties to arbitration.  9 U.S.C. § 4.  And if issues in a pending suit are referrable to arbitration, a district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  *Id.* § 3.

A party seeking to compel arbitration must establish: " '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the [party] to arbitrate the dispute.' "  *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 87 (4th Cir. 2005) (quoting *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500-01 (4th Cir. 2002)).

The 2002 and 2003 Brokerage Service Agreements require that this case be submitted to arbitration. There is no debate that a dispute exists between HUB and the District (factor 1), or that the District refuses to resolve that dispute in arbitration (factor 4). HUB has previously shown the relationship of the transactions to interstate commerce (factor 3), *see* Dkt. 23 at 12, and the District has not disputed that. As for the second factor, the District admitted to the Fourth Circuit that "the 2002 and 2003 agreements . . . are valid agreements." Oral Argument at 14:20, *Berkeley Cty. Sch. Dist. v. HUB Int'l Ltd.* (No. 21-1691), https://www.ca4.uscourts.gov/OAarchive/mp3/ 21-1691-20221208.mp3. The record confirms that they are valid contracts, as they were signed by District personnel with actual (or at least apparent) authority to bind the District. And it is also clear that the broad arbitration clauses in the 2002 and 2003 agreements bear a significant relationship to the allegations at the core of the District's case.

### A. The 2002 and 2003 Brokerage Service Agreements Are Valid Written Contracts

The 2002 and 2003 Brokerage Service Agreements containing the relevant arbitration clauses are valid written contracts. This Court found that "[t]he 2002 BSA was signed on behalf of the District by Angel Cartwright, the District's risk manager who reported to Thomas." Dkt. 225 ¶ 32. It likewise found that "[t]he 2003 BSA was signed by Thomas on behalf of the District." *Id.* ¶ 37. Those signatures sufficed to bind the District to the Agreements. *WDI Meredith & Co. v. Am. Telesis, Inc.*, 597 S.E.2d 885, 887 (S.C. Ct. App. 2004) (agreement signed by company vice president bound company).

1. " '[A]n agent contracting with the authority of his principal binds him to the same extent as if the principal personally made the contract.' " *Berkeley County I*, 944 F.3d at 237 (emphasis omitted). "[A]ctual authority is that which is expressly conferred upon the agent by the principal." *Charleston, S.C. Registry for Golf & Tourism, Inc. v. Young Clement Rivers & Tisdale,*

*LLP*, 598 S.E.2d 717, 721 (S.C. Ct. App. 2004).   Apparent authority exists where a principal "places the agent in such a position that persons of ordinary prudence, reasonably knowledgeable with business usages and customs, are led to believe that the agent has certain authority and they in turn deal with the agent based upon that assumption."   *Rickborn v. Liberty Life Ins. Co.*, 468 S.E.2d 292, 296 (S.C. 1996).

Here, Cartwright and Thomas had actual, or at least apparent, authority to enter the 2002 and 2003 Agreements on behalf of the District.  Cartwright was "the District's risk manager," Dkt. 225 ¶ 32, a title that suggests she had significant authority over the District's insurance matters. Thomas, the Court found, was the "District's Executive Director of Finance and later CFO," and as such, he "was responsible for securing contracts to broker insurance policies for the District." *Id.* ¶ 23.  The District's representative witness at trial admitted that "it would be reasonable for someone to think that Mr. Thomas had the authority to enter into contracts on behalf of the [D]istrict," in 2002 and 2003, Dkt. 218 at 101:10-18, and that the same would be true for Ms. Cartwright, *id.* at 88:13-17.  There was nothing unusual about the terms of the Agreements that would lead a reasonable person to believe Cartwright and Thomas did not have authority to enter the Agreements on the District's behalf, as the fees charged were "consistent with a customary . . . commission on insurance."  Dkt. 225 ¶¶ 35, 40.  Nor was there any evidence that Cartwright or Thomas was wrongfully induced to sign the 2002 and 2003 Agreements.  *See id.* ¶¶ 32-41.  Thus, a person of "ordinary prudence, reasonably knowledgeable with business usages and customs," would reasonably believe Cartwright and Thomas had authority to sign the 2002 and 2003 agreements on behalf of the District.  *Rickborn*, 468 S.E.2d at 296.  As a result, the District is bound by the 2002 and 2003 Agreements.

2.     At this point in the case, the District should not be heard to argue that the 2002 and

2003 Agreements are not valid written contracts.  The District's counsel represented to the Fourth

Circuit, without qualification, that "the 2002 and 2003 agreements . . . are valid agreements."  Oral

Argument at 14:20, *Berkeley Cty. Sch. Dist. v. HUB Int'l Ltd.* (No. 21-1691), https://www.ca4.

uscourts.gov/OAarchive/mp3/21-1691-20221208.mp3.   That is consistent with the District's

decision not to challenge the validity of the 2002 and 2003 Agreements at the same time it

challenged the validity of the 2006, 2009, and 2011 Agreements in the Section 4 trial before this

Court.  The District was on notice during the trial of HUB's position that the 2002 and 2003

Agreements provide grounds for ordering this case to arbitration, *see* Dkt. 218 at 6:14-7:18, but

the District chose not to contest the validity of those Agreements.  Instead, the District simply

maintained that the 2002 and 2003 Agreements were irrelevant because they supposedly had

terminated before the events at issue in this case.  *See* Dkt. 222 at 14:15-21.  By failing to challenge

the validity of the 2002 and 2003 Agreements during a trial held for the purpose of hearing the

District's challenges to the validity of the Brokerage Service Agreements, the District has waived

any such argument.  *See United States v. Williams*, 684 F.2d 296, 299 (4th Cir. 1982) (argument

waived when not raised at trial).  And while the SAC now calls the "validity" of those Agreements

"questionable," Dkt. 255 ¶¶ 48-49, it alleges nothing that would suggest Cartwright and Thomas

lacked apparent authority to sign on the District's behalf.

Indeed, the allegations in the SAC actually provide an independent basis to hold the

contracts valid, wholly apart from Cartwright's and Thomas's authority to bind the District.  It is

hornbook law that a contract may be formed when a party "accepts . . . by actual performance"

under the terms of the contract.  *Sauner v. Pub. Serv. Auth. of S.C.*, 581 S.E.2d 161, 166 (S.C.

2003); *see also Finney v. Lincare, Inc.*, No. 2:11-cv-1400-DCN, 2012 WL 1533139, at *8 n.20

(D.S.C. May 1, 2012) (finding that plaintiff's "continued performance constituted acceptance of" the defendant's offer). The SAC confirms that the District did just that. The SAC concedes that HUB "performed the services," that the contracts were "commercially reasonable," and that "the District paid" the "fees described" in those agreements. Dkt. 255 ¶¶ 48-49. For that reason, too, the 2002 and 2003 Agreements are valid and binding contracts.

**B.     The District's Claims Fall Within the Scope of the Arbitration Clauses**

In the 2002 and 2003 Agreements, the parties agreed to arbitrate "[a]ll disputes, claims or controversies relating to" the agreements "or the services provided." Ex. A § 4.4; Ex. B § 4.4. That "broad" language has an "expansive reach," encompassing any claim with a "significant relationship" to the contract. *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996); *see also Landers*, 739 S.E.2d at 214. A "significant relationship" exists if the facts " 'underlying the claim are within the scope of the arbitration clause, regardless of the legal label assigned to the claim.' " *Am. Recovery*, 96 F.3d at 93. And "any doubts concerning the scope of arbitrable issues" must be resolved "in favor of arbitration." *Levin v. Alms and Assocs., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011).

1.     Despite the District's amending its complaint a second time, the allegations in the SAC ***still*** fall within the scope of the 2002 and 2003 Agreements' arbitration provisions. The core of the District's claims is that "Pokorney, in his position with Knauff and HUB as the District's insurance broker or consultant, recommended various insurance policies to the District which Defendants knew were unnecessary and prohibitively expensive." Dkt. 255 ¶ 34. HUB, the SAC alleges, "repeatedly and secretly breached [its] duties to the District by advising the District to purchase insurance policies that [HUB] knew were excessive and not necessary to protect the District from risk." *Id.* ¶ 3. The SAC alleges that, "[d]espite their duty to act in the best interests of the District . . . Defendants failed to properly audit the District's records for insurance needs,

15

including property insurance . . . ." *Id.* ¶ 74. The SAC alleges that HUB breached its "duties to the District" because, despite being paid "for [its] expertise as insurance consultants," HUB supposedly "made no effort to lower the District's insurance costs and, instead, recommended costly duplicative policies." *Id.* ¶ 68. And it alleges that "any experienced insurance consultant, acting in good faith and in the District's best interests," would have understood "that the District was expending millions of dollars of its precious resources needlessly to insure itself against non-existent, or nominal, risk. Still, [HUB] continued to advise the District to renew the policies year after year . . . ." *Id.* ¶ 69.

Indeed, all eleven causes of action in the SAC are founded on some variation of the general allegation that HUB "breached [its] duties to the District by advising the District to purchase insurance policies that [HUB] knew were excessive and not necessary to protect the District from risk, and charging sham broker's and consulting fees." Dkt. 255 ¶ 3; *see also id.* ¶¶ 220 (count 1: "representing to the District that it needed certain insurance"), 233 (count 2: "advising the District to purchase insurance that Defendants knew was unnecessary"), 244 (count 3: "advising the District to purchase insurance that Defendants knew was unnecessary"), 259 (count 4: "advis[ing] the District that it required certain insurance . . . and consulting services, which it did not"), 266 (count 5: "advising [District] to purchase and maintain insurance that was unnecessary"), 274 (count 6: "advising [District] to purchase and maintain insurance that was unnecessary"), 283 (count 7: "failing to provide [District] with prudent advice that the District was over-insured"), 291 (count 8: "misrepresenting the District's need for the insurance procured"), 303 (count 9: incorporating similar allegations), 307 (count 10: incorporating similar allegations), 311 (count 11: "charg[ing] exorbitant consulting and broker fees for unnecessary insurance policies").

The SAC lists the following "commercial insurance policies" that HUB is alleged to have wrongfully "recommended" as "the District's insurance consultant[ ]":

a.      Builder's Risk Policies;

b.      Student Accident Policies;

c.      Crime – Excess Crime Policies;

d.      Cyber Policies;

e.      Excess General Liability and Umbrella Policies;

f.      Directors and Officers Liability Policies for the nonprofit organization Securing Assets for Education;

g.      Inland Marine Policies, including terrorism coverage; and

h.      Errors and Omissions coverage for School Board members.

Dkt. 255 ¶ 45.  The SAC discusses certain policies in greater detail, including the "Excess Insurance" and "Crime Insurance" "Policies." *Id.* ¶¶ 133-145.  At the end of the section concerning those policies, the SAC alleges that "[a]n experienced insurance consultant acting in the best interests of a district such as Berkeley would have recommended against purchasing this unnecessary and/or duplicative insurance coverage, or recommended discontinuing it, in light of the District's limited exposure." *Id.* ¶ 145.

The SAC's allegations clearly bear a "significant relationship" to the 2002 and 2003 Agreements.  *Am. Recovery*, 96 F.3d at 93.  The SAC acknowledges, as it must, that the 2002 Agreement covers "services provided" by HUB on the "Excess Liability" and "Excess Crime" policies, Dkt. 255 ¶ 47, and that the 2003 Agreement covers "services provided" by HUB on the "Inland Marine," "Excess Liability," and "Excess Crime" policies, *id.* ¶ 49.  And the services HUB provided with respect to those policies are ***precisely*** the services the SAC alleges in its causes of action that HUB failed to honestly and competently provide: "Risk Identification and Evaluation" and "Brokering" of the policies.  Ex. A §§ 1.1, 1.4; Ex. B §§ 1.1, 1.4.

2.     HUB expects the District will argue that the arbitration clauses in the 2002 and 2003 Agreements do not apply because those Agreements expired before the date that the SAC alleges the wrongful conduct began.  That fails, for a host of reasons.

First, the District's FAC had alleged that the conduct supposedly began in "at least . . . 2005," Dkt. 36 at 2, yet in the last appeal, the Fourth Circuit held that such allegations are not dispositive.  The court of appeals remanded for reconsideration of the arbitration issue because, notwithstanding the FAC's allegations, "[t]he record reveals evidence that some conduct at issue in this case may have occurred before 2005 and may thereby implicate the 2002 or 2003 BSA." *Berkeley County II*, 2022 WL 17974626, at *2.  The fact that the SAC now alleges that HUB's supposedly fraudulent conduct began "a few months after February 2006," in "at least 2007," and sometime "before 2010," Dkt. 255 ¶¶ 2, 5, 175, does nothing to change the fact that "[t]he record reveals evidence that some conduct at issue in this case may have occurred before 2005 and may thereby implicate the 2002 or 2003 BSA," *Berkeley County II*, 2022 WL 17974626, at *2.  As detailed above, the core of the District's case is the allegation that HUB recommended certain types of commercial insurance policies that the District never needed, either because the District had little to no risk, or because it could have obtained similar policies more cheaply elsewhere.  And the record shows that HUB recommended that the District take out the Excess Liability and Crime policies about which the District complains pursuant to the 2002 Agreement, and that HUB recommended that the District take out both of those policies plus Inland Marine pursuant to the 2003 Agreement.

Second, and in any event, the SAC's allegations of when kickback "schemes" and "conspiracy" began, Dkt. 255 ¶¶ 2, 5, or when "acts of racketeering began," *id.* ¶ 175, are legally irrelevant to the numerous causes of action asserted by the District that do ***not*** require proof of

fraudulent activity, but only proof of breach of a professional standard of care in recommending unnecessary policies, such as negligence, negligent misrepresentation, negligence per se, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. *Id.* ¶¶ 243-256, 262-300. HUB recommended many of those policies while the 2002 and 2003 Agreements were in effect, which establishes a significant relationship between those Agreements and the conduct alleged in the SAC.

Indeed, the SAC can reasonably be read as ***directly*** seeking to hold HUB liable for its conduct under the 2002 and 2003 Agreements. The SAC specifically discusses the 2002 and 2003 Agreements and the policies HUB recommended the District take out under those Agreements, including Excess Liability, Excess Crime, and Inland Marine. Dkt. 255 ¶¶ 47-49. The SAC contains numerous general allegations that HUB "breached [its] duties to the District by advising the District to purchase insurance policies that [HUB] knew were excessive and not necessary to protect the District from risk," *id.* ¶3; pp. 15-16, *supra* (quoting allegations), and those allegations, read within the SAC as a whole, logically apply to the discussion of HUB's conduct under the 2002 and 2003 Agreements. While the SAC concedes that "the arrangement" under those Agreements "was commercially reasonable" in terms of the ***commissions*** HUB charged, Dkt. 255 ¶¶ 48-49, the SAC nowhere excludes HUB's ***performance*** under those contracts from the allegations of wrongdoing.

The District's damages claims further suggest that the SAC seeks to hold HUB directly liable for its conduct under the 2002 and 2003 Agreements. At one point, the SAC quantifies the "total premiums paid . . . from July 2006 through 2017" as "$4,711,209.50," and the "broker's fees charged during that period" as "$2,854,573," which together total $7,565,782.50. Dkt. 255 ¶ 65. Yet the SAC elsewhere alleges the District has been "harm[ed]" because it "paid ***tens of millions***

of dollars in unnecessary, duplicative premiums and sham consulting fees," *id.* ¶ 267 (emphasis added); *see id.* ¶ 1, and its prayer for relief demands "***all*** actual, compensatory, consequential, [and] economic . . . damages" it supposedly incurred, *id.* at 71 (emphasis added).  The District's damages claim thus clearly is ***not*** limited to the 2006-2017 time frame, and would need to reach all the way back to 2002 to approach "tens of millions of dollars" in premiums and fees.[2]

## II.     ANY DISPUTES REGARDING THE ARBITRABILITY OF THE DISTRICT'S CLAIMS MUST THEMSELVES BE SUBMITTED TO ARBITRATION

Even if this Court harbors doubt about whether the District's claims in the SAC fall within the scope of the 2002 and 2003 Agreements, this case still must be sent to arbitration.  As the Fourth Circuit previously explained, "[h]ere, the Arbitration Clauses incorporate the Commercial Rules of the American Arbitration Association, which provide that an arbitrator has the power to rule on arbitrability issues." *Berkeley County I*, 944 F.3d at 234 n.9.  That includes the "threshold" question of "whether [the] arbitration agreement applies to the particular dispute." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019).  The Supreme Court held that where, as here, "the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract." *Id.* at 529.  This Court thus "possesses no power to decide the arbitrability issue," even if it "thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Id.*  But for all the reasons above, there are powerful arguments showing that the arbitration clauses in the 2002 and 2003 Agreements apply to this dispute.

## <u>CONCLUSION</u>

HUB respectfully requests an order compelling arbitration and staying this case.

---

[2] The District cannot evade the consequences of its own allegations by stating, as it did in the Fourth Circuit, that it "sometimes alleged an incorrect damages amount."  Brief of Appellee at 42, *Berkeley Cty. Sch. Dist. v. HUB Int'l Ltd.*, No. 21-1691 (4th Cir.) (filed Sept. 24, 2021).

Dated:  June 2, 2023

Respectfully submitted,

*/s/* John A. Massalon

Thomas J. Wiegand, admitted *pro hac vice*
MOLOLAMKEN LLP
300 N. LaSalle St.
Chicago, IL  60654
(312) 450-6700 (telephone)
(312) 450-6701 (facsimile)
twiegand@mololamken.com

Michael G. Pattillo, Jr., admitted *pro hac vice*
MOLOLAMKEN LLP
600 New Hampshire Ave., N.W.
Washington, D.C.  20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
mpattillo@mololamken.com

John A. Massalon (#5227)
Christy F. Allen (#07549)
WILLS MASSALON & ALLEN LLC
PO Box 859
Charleston, SC  29402
(843) 727-1144 (telephone)
(843) 727-7696 (facsimile)
jmassalon@wmalawfirm.net
callen@wmalawfirm.net

*Attorneys for Defendants HUB International Limited and*
*HUB International Midwest Limited*