**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| BERKELEY COUNTY SCHOOL DISTRICT, <br><br> Plaintiff, <br><br> v. <br><br> HUB INTERNATIONAL LIMITED, HUB INTERNATIONAL MIDWEST LIMITED, KNAUFF INSURANCE AGENCY, INC., and BRANTLEY THOMAS, <br><br> Defendants. | C/A No. 2:18-cv-00151-DCN <br><br><br> **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' SECOND MOTION TO COMPEL ARBITRATION** |

Plaintiff Berkeley County School District (the "District"), through undersigned counsel, hereby responds in opposition to Defendants HUB International Limited and HUB International Midwest Limited's (collectively with Defendant Knauff Insurance Agency, Inc., "HUB") second motion to compel arbitration. HUB argues arbitration provisions in two one-year Brokerage Service Agreements (BSAs), one covering the period July 2002 to June 2003 (the "2002 BSA") and another covering the period July 2003 to June 2004 (the "2003 BSA") compel arbitration of a dispute that arose years after those agreements expressly terminated and after those agreements were expressly superseded by subsequent agreements. The Court should deny HUB's motion because, as explained below, the 2002 and 2003 Brokerage Service Agreements do not purport to cover, and are not significantly related to, the claims in the second amended complaint.

## I.   Background

### A.   Factual Background[1]

#### 1.   *The Beginning of the District's Dealings with Stan Pokorney*

Before 1996, the District purchased insurance through the South Carolina Insurance Reserve Fund (IRF), a state-run agency providing insurance to governmental entities. Findings of Fact and Conclusions of Law ¶ 17, June 3, 2021, ECF No. 225 (hereinafter "FOF & COL"). But after Assistant Superintendent Ken Coffey met Stan Pokorney in 1996 at an annual conference for vendors in 1996, the District began purchasing insurance from Mr. Pokorney. *Id.* ¶¶ 18–19. Mr. Pokorney was at that time an insurance agent for Willis Corroon. *Id.* ¶ 19. The District continued to use Willis Corroon until Mr. Pokorney, unhappy with his compensation, left Willis Corroon for Knauff in 2001. *Id.* ¶ 20. Mr. Coffey chose to continue to purchase insurance from Mr. Pokorney at his new employer. *Id.* ¶ 21.

Later in 2001, finance was removed from Mr. Coffey's duties and Brantley Thomas became Executive Director of Finance, and later Chief Financial Officer. *Id.* ¶ 22. In those capacities, Mr. Thomas was responsible for acquiring insurance for the District and he reported directly to the superintendent. *Id.* ¶¶ 22–23. Mr. Thomas continued in those roles until February 2017. *Id.* ¶ 23. During his tenure (2001 to 2017), Mr. Thomas continued to purchase insurance from Mr. Pokorney at Knauff and later HUB, which acquired Knauff on December 31, 2012. *Id.* ¶ 24. In February 2017, however, Mr. Thomas was terminated because the District learned he was suspected of crimes including embezzlement and steering insurance contracts in exchange for bribes. *Id.* ¶ 26. Mr. Thomas was later indicted and, after pleading guilty in federal and state court proceedings,

---

[1] This factual background is largely identical to the factual background presented in the District's most recent appellate brief.

was sentenced to 63 months incarceration in a federal prison to be followed by 132 months in a state prison. *Id.* ¶ 27.

## 2.    *The Brokerage Service Agreements*

The BSAs are contracts for insurance-related services like brokering and consulting. *Id.* ¶¶ 28–29. They are not contracts for insurance coverage. *Id.* There were at one time six BSAs at issue in this case: the 2002 BSA, the 2003 BSA, the 2005 BSA, the 2006 BSA, the 2009 BSA, and the 2011 BSA. *Id.* ¶ 10. The terms of each BSA would require the District to pay a brokerage service fee in exchange for the insurance-related services to be provided. *Id.* ¶ 30. These fees were charged in lieu of the traditional 10% to 15% commission on insurance premiums. *Id.* Each BSA contains an arbitration provision:

> All disputes, claims or controversies relating to [these Agreements], or the services provided, which are not otherwise settled, shall be submitted to a panel of three arbitrators and resolved by final and binding arbitration, the exclusion of any courts of laws [sic], under the commercial rules of the American Arbitration Association.

*Id.* ¶ 31.

### a.    The 2002 and 2003 Brokerage Service Agreements

The 2002 BSA was signed by Angel Cartwright, a District employee under Mr. Thomas's supervision, at his direction, and by Mr. Pokorney. *Id.* ¶ 32. Neither Ms. Cartwright nor Mr. Thomas had authority to enter into this agreement. *Id.* ¶ 91. The District was able to locate an executed copy of this BSA in its files. *Id.* ¶ 33. Under the terms of the BSA, the District agreed to pay—and it in fact did pay—a brokerage service fee of $100,000 on Commercial Package, Excess Liability, Activity Bus Travel Accident, Excess Crime, Boiler & Machinery, and Medical Professional Liability lines of insurance for the 2002–03 fiscal year. *Id.* ¶ 34. These lines of insurance were all renewals of policies first put in place by Mr. Pokorney in 1996, when he worked

at Willis Corroon. *Id.* Because the premiums exceeded $1 million, a $100,000 fee in lieu of a 10% to 15% commission was reasonable. *Id.* ¶ 35.

The 2003 BSA was identical to the 2002 BSA in every respect, except (1) it was signed by Mr. Thomas instead of Ms. Cartwright, (2) it was for the 2003–04 fiscal year, (3) Inland Marine insurance was added, and Medical Professional Liability insurance was removed, and (4) and the District was unable to locate an executed copy in its files. *Id.* ¶¶ 37, 39. The District, however, did find a cover letter addressed to Ms. Cartwright referencing the 2003 BSA, which was addressed directly to Mr. Thomas. *Id.* ¶ 38. As with the 2002 BSA, Mr. Thomas lacked authority to enter into the agreement, but the District did in fact pay the $100,000 brokerage service fee, which was a reasonable substitute for a commission on the premiums of the insurance lines covered. *Id.* ¶¶ 40–41, 91.

b.    *The Switch away from Service Agreements back to Commissions*

There was no BSA for the period July 2004 to June 2005. For that period, Knauff and the District expressly agreed to discontinue their previous practice of a fee under a brokerage service agreement having an arbitration provision, and instead converted to a straight commission arrangement which also paid for risk management services, and which did not (and could not) include any arbitration agreement. 2d Am. Compl. ¶ 50; **Exhibit A** (letter from Knauff attorney R. Bryan Barnes to District attorney William F. Halligan dated Nov. 1, 2005).

c.    *The 2005 Request for Proposals*

Nor was there a BSA for the period July 2005 to June 2006. In April 2005 the District put its insurance business out to bid, issuing Request for Proposals Number 181-(04-05) for insurance services (the "2005 RFP"). *Id.* ¶ 42; *see also* Defs.' Trial Ex. 36.001–.008. Mr. Pokorney submitted a bid for Knauff. *Id.* ¶ 42. Knauff's proposal was not for a continuation of the fee-in-lieu-of-commission arrangement embodied in the 2002 and 2003 BSAs. Defs.' Trial Ex. 36.008.

Instead, Knauff proposed a traditional 13.5% average commission on the covered lines of insurance, continuing what was then the current practice. *Id.* Knauff however indicated, "If the District prefers, we will net out all commission and convert to a separate fee agreement for these RFP lines," *id.*, and a sample BSA was included with the proposal, Defs.' Trial Ex. 36.008.

But two months later, a consultant advised the District that its RFP did not include sufficient property and casualty coverage. FOF & COL ¶ 48. The District therefore withdrew the RFP and made an emergency procurement of insurance from the IRF. *Id.* The result of that decision was to move the District's property and casualty lines of insurance from Knauff to the IRF. *Id.*

Knauff retained a lawyer, filed a formal protest of the procurement decision, and threatened litigation. *Id.* ¶ 49. On January 31, 2006, Knauff and the District executed a settlement agreement. Exhibit E. The District agreed to pay Knauff a 15% commission on five enumerated insurance policies that Knauff had placed previously: crime/fidelity, healthcare professionals (meaning school nurses), school leaders errors and omissions, excess liability, and builders risk but only on four specified construction projects. Of those, two—crime and excel liability—were referenced in the 2002/03 BSAs. The District also agreed to pay Knauff $12,500 for claims management services on those policies, and not to debar Knauff from offering insurance services to the District in the future. *Id.* ¶ 50; Resp. Opp'n 1st Mot. Compel Arbitration Ex. D, No. 33-4. Nothing was paid on student accident coverage. Knauff agreed to withdraw its protest, and agreed it had no claim for any commissions, fees, or other charges not provided in the settlement agreement. Finally, both parties agreed:

> 4. Knauff has no claim against the District for commissions, fees or other charges or expenses not provided in this Agreement.
>
> . . .

6. All appeals, claims, or disputes between Knauff and the District will be resolved in accordance with the District's Procurement Code, as may be amended or updated. After exhausting the administrative process under the District's Procurement Code, Knauff agrees that judicial venue for any suit, action or proceeding arising out of or relating to this Agreement shall be proper only in the Court of Common Pleas for Berkeley County, South Carolina and Knauff and the District hereby waive and disclaim any and all right to a jury trial on any controversy arising from this Agreement. This Agreement shall be governed by the laws of the State of South Carolina. Knauff and the District agree that before initiation of litigation concerning a dispute arising under this Agreement, the parties will submit such dispute to an agreed upon neutral for non-binding mediation.

Resp. Opp'n 1st Mot. Compel Arbitration Ex. D, No. 33-4.

The settlement agreement itself did not expressly terminate any prior BSA because the most recent BSA had on its own terms expired a year-and-a-half before the settlement, and because the parties had a year ago agreed to replace the practice of charging a fee-in-lieu-of-commission through a BSA separate from the insurance agreement with a straight commission on premiums paid—which was the basis for the settlement agreement to continue to pay a commission on premiums for policies placed by Knauff. The settlement agreement, however, did delineate all services due the District and all payments due Knauff arising from their expired prior agreements. Any claim for payment or performance related to an agreement before January 30, 2006, would "arise out of or relate to" the settlement agreement. For example, if Knauff claimed the District failed to pay an invoice for fees due under a the 2002 BSA, that claim would relate to the settlement agreement wherein Knauff agreed it had no claim against the District for any fees not provided for in the settlement agreement.

Unfortunately, the settlement agreement did not debar Knauff from future business with the District, providing "This Agreement does not foreclose terms in any future contract that may be formed between the parties by mutual agreement as a result of a future solicitation of products or services pursuant to the District's Procurement Code."

d.    *The Purported 2005 Brokerage Service Agreement*

The District was unaware of the purported 2005 BSA's existence before HUB filed its first motion to compel arbitration, which attached a copy of the agreement with "proposed" written at the top of the first page. *Id.* ¶¶ 43, 45. It was for an indefinite term and was not signed by anyone. *Id.* ¶ 44. HUB testified, through its Rule 30(b)(6) representative, that, because of the dispute regarding the 2005 RFP, the District never agreed to the 2005 BSA. *Id.* ¶ 47.

e.    *The 2006 and 2009 Brokerage Service Agreements*

After the RFP settlement agreement, Knauff and Pokorney were once again able to obtain the District's insurance business, this time by the bribes and kickbacks to District's CFO, Brantley Thomas, described below. They returned to charging fees in lieu of commissions—this time because fees could conceal payments far larger, as a percentage of premiums, than would be possible through a commission charged as a disclosed percentage of the premiums.

The 2006 and 2009 BSAs do not identify the District as a party. *Id.* ¶ 55. Rather, they state the agreement is between Knauff and Securing Assets for Education (SAFE). *Id.* SAFE is a tax-exempt, 501(c)(3) nonprofit corporation created in 2003 to finance school construction. *Id.* ¶ 56. SAFE issued installment purchase revenue bonds, and used the proceeds to build schools, which it would then lease to the District. *Id.* ¶ 56. The District would own the buildings once the bonds were repaid. *Id.* SAFE had no employees and no expenses other than interest on property-secured debt. *Id.* ¶ 57.

The 2006 BSA nonetheless charged SAFE a fee of $118,625 per year for each of three years for brokering and consulting services to be provided to SAFE on its Directors' and Officers' (D&O) coverage. *Id.* ¶ 58. The annual premium for that coverage was $65,000. *Id.* ¶ 67. A 15% commission would have been $9,750 per year; instead, the 2006 BSA charged over 12 times that amount—effectively a 182.5% commission. *See id.* The 2009 BSA was identical to the 2006 BSA

7

except that it was for the three-year period 2009 to 2012. 1st Mot. Compel Arbitration Ex. F, ECF No. 23-6. The premiums during that period were also only $65,000 per year. FOF & COL ¶ 67. Further, the 2006 and 2009 BSAs regarded renewals of D&O coverage first placed many years earlier, so no brokering services were provided. *Id.* ¶¶ 72, 152. No claims were ever made, so no claims management services were ever provided. *Id.* ¶¶ 68, 152. Nor were any consulting services provided. *Id.* ¶¶ 69, 152.

The 2006 and 2009 BSAs were not signed by anyone. *Id.* ¶ 52. No witness testified that any version or copy of these agreements was signed. *Id.* ¶ 53. The person responsible for obtaining signatures, Mr. Pokorney's account manager and wife, Jana Pokorney, testified she usually did not obtain signatures on agreements. *Id.* The District was unaware of the 2006 or 2009 BSAs before HUB filed its motion to compel arbitration. *Id.* ¶ 54. Mr. Thomas, however, caused the District to pay Knauff's invoices for the fees set forth in the 2006 and 2009 BSAs. Trial Tr. 845.

Knauff and HUB were aware SAFE was a separate entity from the District, and so they addressed invoices for fees to SAFE rather than the District. FOF & COL ¶ 59. Mr. Pokorney considered SAFE a separate client from the District. *Id.* However, because SAFE has no funds with which to purchase insurance, the District paid the invoices addressed to SAFE for its D&O insurance coverage as a donation to SAFE. *Id.* ¶ 64.

SAFE's bylaws authorize it to purchase D&O coverage, and SAFE's board authorized Mr. Thomas to purchase D&O insurance from Knauff on its behalf, but he was never a director, officer, or employee of SAFE and the SAFE board never authorized the purchase of insurance consulting services under the 2006 and 2009 BSAs. *Id.* ¶¶ 60–62. Nor did the District's procurement policies allow him to enter such contracts—his signing authority was limited to $75,000 until 2008, when

it increased to $100,000, and he did not have authority to enter multiyear contracts. *Id.* ¶¶ 91, 94. Knauff and HUB were aware Mr. Thomas lacked authority to enter multiyear contracts. *Id.* ¶ 94.

f.    *The 2011 Brokerage Service Agreement*

The 2011 BSA states it is between the District and Knauff. 1st Mot. Compel Arbitration Ex. G, ECF No. 23-7. The District was unaware of the 2011 BSA before HUB filed its motion to compel arbitration. *See* FOF & COL ¶ 95. It calls for the District to pay an annual fee of $70,000 for services provided on School Leaders Errors and Omissions (E&O) coverage. *Id.* ¶ 81. The E&O premium was $75,000 for six years' coverage. *Id.* ¶ 82. The customary 15% commission would have been $11,250. *Id.* Over the six years of the policy term, the 2011 BSA required the District to pay $420,000 in fees, over 37 times the customary commission—effectively a 560% commission. *See id.* Like the 2006 and 2009 BSAs, the 2011 BSA regarded renewals of coverage first placed many years earlier, so no brokering services were provided. *Id.* ¶ 84. No claims were made in the period 2011 to 2017, so no claims management services were ever provided. *Id.* ¶ 85. Nor were any consulting services provided. *Id.* ¶ 86.

Like the 2006 and 2009 BSAs, the 2011 BSA was not signed by anyone. *Id.* ¶ 77. No witness testified that any version or copy of these agreements was signed. *Id.* ¶ 78. The School Board did not approve the 2011 BSA, as required under the District's Procurement Code for multiyear contracts. *Id.* ¶¶ 80, 94. Knauff and HUB were aware Mr. Thomas lacked authority to enter multiyear contracts and that the School Board had not approved the 2011 BSA. *Id.* ¶¶ 94–97. They were also aware that although the District's Procurement Code exempted insurance renewals from the request for proposals process, the brokering and consulting services in 2011 BSA were not exempted yet no request for proposals was ever issued. *Id.* ¶¶ 92–93.

Knauff and HUB did invoice the amounts indicated in the 2011 BSA, and the District did pay those invoices. *Id.* ¶ 88. Knauff and HUB mailed invoices under the 2011 BSA directly to

Mr. Thomas's personal residence instead of to the District's offices or accounts payable post office box. *Id.* ¶ 89.

### 3.     *The Bribing of Brantley Thomas*

Mr. Thomas was the District employee approving all payments of brokerage service fees from 2002 to 2017. *Id.* ¶ 98. In 2017, the District learned Mr. Thomas had engaged in bribery and embezzlement. *Id.* ¶ 99. Mr. Thomas ultimately pleaded guilty to a 20-count federal information. *Id.* ¶ 100. Ten of those counts were honest services wire fraud offenses from March 2010 to November 2016, in which Mr. Thomas accepted bribes from Mr. Pokorney in exchange for steering insurance contracts to Mr. Pokorney. *Id.* ¶ 101. Mr. Thomas also pleaded guilty to multiple embezzlement charges in state court, including one for which there is substantial evidence Ms. Pokorney assisted. *Id.* ¶¶ 104–15.

Mr. Thomas agreed to purchase services from Knauff and HUB—services Knauff and HUB never performed—because Mr. Pokorney bribed him and turned a blind eye to his other illegal activities. *Id.* ¶ 119. Mr. Pokorney regularly sent invoices and other documents to Mr. Thomas's home to conceal his activities from the District and to avoid the District's internal controls regarding invoice payments. *Id.* ¶¶ 116–18. Mr. Pokorney did so because he had much to gain from bribing Mr. Thomas into causing the District to pay inflated service fees. *Id.* ¶ 121. Mr. Pokorney's compensation arrangement at Knauff gave him 40% of the total revenue he generated, which included brokerage service fees and commissions, but not insurance premiums. *Id.* On a 15% commission on a $65,000 D&O policy for SAFE, Mr. Pokorney would receive $3,900. *Id.* But when a $118,625 service fee was charged for the same policy, Mr. Pokorney received $47,450. *Id.*

## B.     Procedural History

### 1.     This Court's First Ruling Denying Arbitration

This action was filed on January 18, 2018, alleging Mr. Thomas steered contracts for unnecessary or excessive insurance services to Knauff and HUB in exchange for bribes from 2001 to 2017.  *Id.* ¶ 8; *see generally* Compl., ECF No 1.  HUB responded with its first motion to compel arbitration, arguing the District assented to the arbitration provisions of the 2002, 2003, 2005, 2006, 2009, and 2011 BSAs.  FOF & COL ¶¶ 9–10.  The District responded with a memorandum in opposition and an amended complaint.  *Id.* ¶ 12.  The amended complaint alleges racketeering, fraud, negligent misrepresentation, civil conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, conversion, constructive trust, and unjust enrichment for the period 2005 to 2017.  *Id.* ¶ 13.  After briefing and argument, the district court denied the motion to compel arbitration.  *Id.* ¶ 14.

### 2.     The First Interlocutory Appeal

HUB immediately appealed the denial pursuant to 9 U.S.C. §§ 16(a)(1)(A)–(B).  *Id.* ¶ 15.  On December 4, 2019, the U.S. Court of Appeals for the Fourth Circuit vacated this Court's denial of the motion to compel arbitration.  *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 242 (4th Cir. 2019).  The Fourth Circuit held "there are multiple disputes of material fact as to 'the making of [any] arbitration agreement,'" and remanded for trial to resolve "factual disputes concerning the formation of the four unsigned [BSAs]"—meaning the 2005, 2006, 2009, and 2011 BSAs—as required by 9 U.S.C. § 4.  *Id.* at 241.  As to the signed 2002 and 2003 BSAs, the Fourth Circuit held,

> Those Agreements predate the steering and kickback fraud scheme and conspiracy alleged in the Operative Complaint.  The Denial Order deemed the June 2002 and June 2003 Agreements as relevant because the initial complaint had predicated some of its claims on conduct dating from 2001.  We have recognized, however,

that an amended complaint—such as the Operative Complaint here—supersedes an initial complaint and renders it "of no effect."

Moreover, because the June 2002 Agreement terminated in June 2003, and the June 2003 Agreement ended in June 2004, the Arbitration Clauses therein could not require Berkeley Schools to arbitrate any claims on the basis of conduct that began after those Agreements terminated. At best, the June 2002 and June 2003 Agreements might be relevant to questions of whether Berkeley Schools had knowledge of, or assented to, the subsequent Brokerage Service Agreements and Arbitration Clauses. We leave such issues, however, for the remand proceedings

*Id.* (citation omitted).

### 3.    *The Trial and this Court's Second Ruling Denying Arbitration*

After the Fourth Circuit issued its opinion regarding the first interlocutory appeal, the case was remanded back to this Court for trial on December 26, 2019. Mandate, ECF No. 105. The parties conducted two years of pretrial discovery, including 10 depositions and numerous discovery-related motions. Finally, on January 14, 2021, the bench trial began. The trial took four full days, with closing arguments on a fifth day. *Id.* Seven witnesses testified at trial (counting Ms. Abrahamson and Ms. Williams twice as they were called by both parties) and another six were presented at trial via deposition designations.

On June 3, 2021, the Court issued extensive findings of fact and conclusions of law based on the evidence and argument presented at trial. FOF & COL. The Court concluded the District did not assent to the 2006, 2009, or 2011 BSAs and so is not bound by their arbitration provisions, and again denied the motion to compel arbitration. *Id.* ¶ 175. Regarding the 2002 and 2003 BSAs, the Court held the Fourth Circuit's opinion in the first appeal meant the 2002 and 2003 BSAs could be evidence of assent to later BSAs but could not directly bind the District to arbitrate claims based on conduct beginning after their expiration in mid-2004. *Id.* ¶¶ 145–147, ¶ 169.

### 4.    *The Second Interlocutory Appeal*

HUB again appealed.  In the second appeal, HUB did not challenge this Court's factual findings nor its conclusions regarding assent to the 2005, 2006, 2009, and 2011 BSAs.  Appellants' Brief at 1, *Berkeley Cnty. Sch. Dist. v. HUB Int'l Ltd.*, No. 21-1691, 2022 WL 17974626 (4th Cir. Dec. 28, 2022).  It only challenged the Court's conclusion that the Fourth Circuit's opinion in the first appeal that the 2002/03 BSAs could not directly bind the District to arbitrate claims asserted in the amended complaint was binding as the law of the case.  *Id.* at 1–3.  HUB argued that conclusion was erroneous because the Fourth Circuit's opinion was based only on the allegations in the amended complaint, but evidence at the subsequent trial purportedly showed the conduct complained of in that complaint actually began within the terms of the 2002/03 BSAs, and so the prior appellate decision was not law of the case.  *Id.* at 25–28.  This "new" evidence was that a vendor detail attached to the amended complaint erroneously included eight invoices paid after July 2004 that were for services rendered before July 2004, and that the amended complaint included allegations regarding seven lines of insurance put into place in or before 2003: Excess General Liability, Excess Crime Coverage, Student Accident Coverage, Inland Marine Coverage, School Board Errors and Omissions Coverage, Builders Risk Coverage, and Directors and Officers Liability for SAFE.  *See id.* at 28–29.  Of those, only Excess General Liability, Excess Crime Coverage, Inland Marine Coverage are relevant to the 2002 or 2003 BSAs.  *See* 2d Mot. Compel Arbitration Exs. A & B, ECF Nos. 258-1 & 258-2.  Neither the 2002 BSA nor the 2003 BSA concern Builders Risk Coverage, Directors and Officers Liability for SAFE, Student Accident Coverage (HUB may have confused Student Activity Bus Coverage with Student Accident Coverage).  *Id.*

In a brief unpublished decision, the Fourth Circuit vacated this Court's denial of HUB's first motion to compel arbitration in part.  The Court held "[t]he district court correctly interpreted

our prior decision in this case as it concerns the 2002 and 2003 BSAs" but "[n]evertheless, we agree with HUB that the district court was not bound by our prior decision about the 2002 and 2003 BSAs because the Section 4 trial produced substantially different evidence on that score." *Berkeley Cnty. Sch. Dist.*, 2022 WL 17974626, at *2. The Fourth Circuit noted the amended complaint had an "attached exhibit that quantified the financial losses it incurred by paying for allegedly fraudulent or unnecessary insurance policies and consulting services" of which "part of those alleged damages arose from insurance policies procured or services provided while the 2003 BSA was still in effect." *Id.*

The Fourth Circuit continued that "we do not opine on what the new evidence shows," "whether it leads to the conclusion that Berkeley Schools must arbitrate all or part of this dispute, whether the parties must arbitrate the question of arbitrability, or whether Berkeley Schools in fact assented to the 2002 or 2003 BSA." *Id.* The Fourth Circuit held that this Court's conclusion that the 2005, "2006, 2009, and 2011 BSAs do not require arbitration stands." *Id.* at *3.

**5.    *The Current Proceedings***

On remand, the District amended the complaint again. The operative second amended complaint seeks no damages from before July 14, 2006 (over two years after the expiration of the 2003 BSA) and no damages specific to Inland Marine Coverage. *See generally* 2d Am. Compl., ECF No. 255. HUB filed a second motion to compel arbitration and this opposition followed.

**II.    <u>Legal Standard</u>**

Pursuant to the Federal Arbitration Act (FAA),

A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. A litigant can compel arbitration under the FAA if the litigant can demonstrate: "(1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision which purports to cover the dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate and foreign commerce, and (4) the failure, neglect, or refusal of the defendant to arbitrate the dispute." *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991). "While the Supreme Court has acknowledged a 'liberal federal policy favoring arbitration,' . . . it has also consistently held that § 2 of the FAA reflects the 'fundamental principle that arbitration is a matter of contract.'" *Lorenzo v. Prime Comc'ns, L.P.*, 806 F.3d 777, 781 (4th Cir. 2015) (quoting *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) and *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), it has also consistently held that § 2 of the FAA reflects the "fundamental principle that arbitration is a matter of contract," *id.* (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). "Thus, a court may order arbitration only when 'satisfied that the parties agreed to arbitrate,' *id.* (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010)), and "[t]he burden of proving an agreement to arbitrate rests upon the party seeking arbitration," *Silkworm Screen Printers, Inc. v. Abrams*, 978 F.2d 1256 (4th Cir. 1992) (table) (citing *In re Mercury Construction Co.*, 656 F.2d 933, 939 (4th Cir. 1981)).

The question of whether the parties agreed to arbitrate is resolved by application of state contract law. *See Johnson v. Circuit City Stores, Inc.*, 148 F.3d 373, 377 (4th Cir. 1998). Both the South Carolina Supreme Court and the Fourth Circuit hold "broad" clauses which provide for arbitration of all disputes "arising out of or relating to" the contract are not limited "to the literal interpretation or performance of the contract [, but] embrace[] every dispute between the parties having a significant relationship to the contract." *Landers v. Fed. Deposit Ins. Corp.*, 739 S.E.2d

209, 214 (S.C. 2013) (quoting *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988)).  This is a concept of state contract law—that a "broad" arbitration clause expresses a contractual agreement to arbitrate disputes beyond the "literal interpretation or performance of the contract." *Id.*

## III.     Argument

### A.     The validity of the 2002 and 2003 Brokerage Service Agreements is not at issue.

HUB oddly begins its argument with an attempt to establish that the 2002 and 2003 BSAs are valid contracts.  2d Mot. Compel Arbitration 12–15.  HUB's improper attempt to cite trial testimony to relitigate factual findings that were not challenged on appeal cannot establish that the signatures of employees lacking authority to sign contracts on behalf of the District suffices to bind the District to those contracts.  As the Court found, Mr. Thomas lacked actual authority to sign them, and he lacked apparent authority because Mr. Pokorney had actual or constructive knowledge from his years of working with school districts that he lacked authority.  *See* FOF & COL ¶¶ 90–97.  Those findings were not challenged on appeal, and the Fourth Circuit expressed no opinion on "whether Berkeley Schools in fact assented to the 2002 or 2003 BSA." *Berkeley Cnty. Sch. Dist.*, 2022 WL 17974626, at *3.

However, the issue is irrelevant.  As the Court found, the terms of the 2002 and 2003 BSAs were commercially reasonable and both parties performed under them without complaint.  *See* FOF & COL ¶¶ 32–41.  That constitutes constructive ratification despite mistakes regarding signatory authority.  *See* Restatement (Second) of Contracts § 380 (1981) ("The power of a party to avoid a contract for mistake . . . is lost if after he knows or has reason to know of the mistake . . . he acts with respect to anything that he has received in a manner inconsistent with disaffirmance.").  And so the District accepted that they are "valid" insofar as their provisions are enforceable against the District despite the lack of proper signatory authority.  The District

16

therefore does not argue, decades later, that the arbitration provisions in the 2002 or 2003 BSAs are inapplicable because the District's assent to them suffers a technical defect. The District merely argues those arbitration provisions are inapplicable to unrelated conduct occurring years after the express termination of those agreements to arbitrate, after the services described in those agreements were discontinued, and after a superseding agreement to resolve any disputes arising during the period of the 2002 and 2003 BSAs in a judicial forum.

Since the enforceability of the 2002 and 2003 BSAs is not at issue, one is left to wonder why HUB starts its motion with makeweight pages discussing the issue. The apparent reason is stated in an umbrella paragraph to the argument regarding validity: HUB argues that the second factor a party seeking to compel arbitration must establish is "(2) a written agreement that includes an arbitration provision which purports to cover the dispute.," "[t]he record confirms [the 2002/03 BSAs] are valid contracts," "[a]nd so it is also clear that the broad arbitration clause in the 2002 and 2003 agreements bear a significant relationship to the allegations at the core of the District's case." 2d Mot. Compel Arbitration 11–12. But HUB's final leap in logic makes no sense. The mere validity of the 2002/03 BSAs establishes nothing regarding their relationship to the allegations in this case. The second factor is not whether any random agreement between the parties containing an arbitration provision is valid. The factor is whether there is "a written agreement that includes an arbitration provision *which purports to cover the dispute*." *Whiteside* 940 F.2d at 102. Neither the 2002 nor the 2003 BSA purports to cover this dispute because each expressly terminated years before this dispute first arose. Nothing in the text of either agreement purports to cover disputes about fees charged years after the termination of the agreement. Thus, the mere fact that the 2002 and 2003 BSAs were enforceable because they were constructively

ratified despite lacking the signature of any person having actual or apparent authority to bind the District in no way explains why they should govern disputes arising years after they terminated.

Moreover, HUB's argument is prohibited by the law of the case. The Fourth Circuit held the Court correctly interpreted its first opinion in this case to hold that the 2002 and 2003 BSAs cannot require the District to arbitrate this dispute if they "predate the conduct" from which the District's claims arise, and remanded only to consider whether new evidence presented at trial shows that the District's claims actually arose during the period during the period of those BSAs. *Berkeley Cnty. Sch. Dist.*, 2022 WL 17974626, at *2 ("The district court correctly interpreted our prior decision in this case as it concerns the 2002 and 2003 BSAs."); FOF & COL ¶ 169. The "new evidence" was the discovery that eight invoices on a vendor detail attached related to services before July 2004, and that certain lines of insurance were first placed during or before the term of the 2002/03 BSAs. Appellants' Brief at 25–29, *Berkeley Cnty. Sch. Dist.*, 2022 WL 17974626. HUB must argue this "new evidence" means the District's claims arise within the terms of the 2002/03 BSAs or satisfy the "significant relationship test" with those BSAs. HUB is prohibited from arguing (again) that the mere validity of the 2002/03 BSAs compels arbitration because that is not new evidence. The first appellate decision squarely dealt with that argument. *See Berkeley Cnty. Sch. Dist.*, 944 F.3d at 241 (discussing 2002/03 BSAs under the assumption that they are valid agreements).

**B.     The District's claims have nothing to do with the 2002 or 2003 Brokerage Service Agreements.**

A contractual provision—including an arbitration provision—may apply to a dispute it does not purport to cover if it satisfies the significant relationship test, which is a question of South Carolina contract law. *See Landers*, 739 S.E.2d at 214. "When a party invokes an arbitration clause after the contractual relationship between the parties has ended, the parties' intent governs

whether the clause's authority extends beyond the termination of the contract." *Davis v. ISCO Indus., Inc.*, 864 S.E.2d 391, 395 (S.C. Ct. App. 2021), *reh'g denied* (Oct. 1, 2021), *cert. denied* (Sept. 7, 2022) (internal quotation marks omitted).  "A broadly-worded arbitration clause applies to disputes that do not arise under the governing contract when a 'significant relationship' exists between the asserted claims and the contract in which the arbitration clause is contained." *Id.* (internal quotation marks omitted).  This is HUB's real argument—that although the actions giving rise to the claims asserted in the second amended complaint occurred years after the 2002/03 BSAs terminated, those claims nonetheless are "significantly related" to the 2002/03 BSAs.

"To decide whether an arbitration agreement encompasses a dispute, a court must determine whether the factual allegations underlying the claim are within the scope of the broad arbitration clause, regardless of the label assigned to the claim." *Id.* (internal quotation marks omitted).  Unfortunately for HUB, as explained below, the allegations of the second amended complaint provide no support for compelling arbitration.  But even more unfortunately, HUB represents to the Court,

> The SAC lists the following "commercial insurance policies" that HUB is alleged to have wrongfully "recommended" as "the District's insurance consultant[ ]":
>
> a.     Builder's Risk Policies;
> b.     Student Accident Policies;
> c.     Crime – Excess Crime Policies;
> d.     Cyber Policies;
> e.     Excess General Liability and Umbrella Policies;
> f.     Directors and Officers Liability Policies for the nonprofit organization Securing Assets for Education;
> g.     Inland Marine Policies, including terrorism coverage; and
> h.     Errors and Omissions coverage for School Board members.

Dkt. 255 ¶ 45.

2d Mot. Compel Arbitration 17.  But as HUB is aware, Paragraph 45 of the second amended complaint ***does not say that***.  Instead, it says:

45.    As the District's insurance consultants, the Insurance Defendants recommended, and the District, through Thomas, purchased myriad commercial insurance policies, including the following:

a.    Builder's Risk Policies;
b.    Student Accident Policies;
c.    Crime – Excess Crime Policies;
d.    Cyber Policies;
e.    Excess General Liability and Umbrella Policies;
f.    Directors and Officers Liability Policies for the nonprofit organization Securing Assets for Education ("SAFE"), which operates to benefit the District;
g.    Inland Marine Policies, including terrorism coverage; and
h.    Errors and Omissions coverage for School Board members.

HUB attempts to trick the Court into reading the adverb "wrongfully" in Paragraph 45 so that HUB can wrongly claim the second amended complaint asserts misconduct regarding services performed under the 2002/03 BSAs.   But Paragraph 45 merely alleges that the District purchased many insurance policies, including those listed, from Knauff, through (as explained in Paragraph 46) one-year brokerage service agreements.   This uncontested fact is presented as background information preceding the second amended complaint's chronological narrative beginning in 2002. *See* 2d Am. Compl. ¶¶ 47 *et seq.*   As to the events within the periods of the 2002/03 BSAs, the second amended complaint states that the amounts charged for the services described in those agreements were "consistent" with customary rates and "commercially reasonable."  *Id.* ¶¶ 47–49. There is no allegation that Knauff wrongfully recommended the coverages enumerated in the 2002 or 2003 BSA.

Beyond that, HUB presents a confusing word salad of phrases snipped from general allegations in the second amended complaint without attempting to engage the underlying specific allegations to show how they are related, significantly or otherwise, to the 2002/03 BSAs.  *See* 2d Mot. Compel Arbitration 16, 18, 19.  But even a cursory review of the second amended complaint's specific allegations of damages shows they do not relate to the 2002/03 BSAs:

*Sham Brokerage or Consulting Fees*.  The second amended complaint specifically seeks damages amounts paid for brokerage or consulting fees paid after July 14, 2006—over two years after the termination of the 2003 BSA, after Knauff and the District abandoned the fee structure of those BSAs in favor of a traditional model of commissions on premiums, after Knauff and the District and executed a settlement agreement regarding a dispute about those commissions arising from an RFP for insurance services that the District issued then withdrew, and after Knauff subsequently "persuaded" the District's CFO, Brantley Thomas, to resume paying "negotiated" fees to Knauff instead of industry-standard commissions. *See* 2d Am. Compl. ¶¶ 63–66.  Whether the District in 2002 and 2003 needed the insurance coverages listed in the 2002 or 2003 BSAs has nothing to do with sham fees charged years later.

HUB's only attempt to explain how this relates to the 2002/03 BSAs comes near the end of its motion, when HUB notes the liquidated damages alleged (for calculation of prejudgment interest) sum to $7,565,782.50 but the second amended complaint in other places asserts damages of "tens of millions of dollars." 2d Mot. Compel Arbitration 19–20.  HUB claims the only way to get the additional $2,434,217.51 needed to reach a penny over $10 million need to make the plural "tens" technically accurate is to "reach all the way back to 2002." *Id.* at 20.  But the liquidated damages are only fees charged since July 14, 2006.  They do not include premiums for the unnecessary or excessive coverages purchased after or expressly not encompassed under the 2002/2003 BSAs that are discussed below.  Nor do they include compounded, accrued interest— a substantial and very real expense on millions of dollars of liquidated damages from as long ago as 17 years.  That is how the actual damages in this case exceed $10 million even before special damages.

*Builders Risk Coverage*.  The second amended complaint seeks damages beginning in 2013 regarding Builders Risk coverage purchased for new schools built with proceeds from a bond issuance approved by voters in November 2012.  2d Am. Compl. ¶¶ 83–101.  Builders Risk is not a coverage enumerated in the 2002/03 BSAs, and, regardless, the Builders Risk coverage complained of in the second amended complaint was first purchased in 2013.

*Student Accident Insurance*.  The second amended complaint seeks damages regarding Student Accident Insurance, which is not a coverage enumerated in the 2002/03 BSAs and which was not purchased through HUB until 2015 (again, HUB may have confused Student Accident Insurance this with student activity bus travel liability coverage, which was covered under the 2002/03 BSAs but which is not at issue in this case).  *Id.* ¶¶ 101–115.

*D&O Coverage for SAFE*.  The second amended complaint seeks damages regarding Directors and Officers Liability policies purchased for SAFE, which, again, is not a coverage enumerated in the 2002/03 BSAs, and which were purchased through agreements to which the District was not even a party.  *Id.* ¶¶ 116–132.

*Cyber Insurance*.  The second amended complaint seeks damages seeks damages regarding Cyber Insurance, which was not purchased until 2013.  *Id.* ¶¶ 133–145

*School Board E&O Coverage*.  The second amended complaint seeks damages regarding School Board Errors and Omissions coverage, which is not a coverage enumerated in the 2002/03 BSAs.  *Id.* ¶¶ 146–151.

*Workers' Compensation Review*.  The second amended complaint seeks damages regarding a bogus review of workers' compensation coverage in 2016, which is (obviously) not an activity encompassed by the 2002/03 BSAs.  *Id.* ¶¶ 152–158.

*Excess Liability and Excess Crime.*  The only coverages enumerated in the 2002/03 BSAs that second amended complaint specifically seeks damages regarding are excess liability and excess crime (a point HUB hints at when it states, "The SAC discusses certain policies in greater detail, including the 'Excess Insurance' and 'Crime Insurance' 'Policies,'" 2d Mot. Compel Arbitration 17).  The allegations are that beginning in 2010, Knauff charged exorbitant broker's fees exceeding the total premiums for those coverages and recommended the purchase of additional, duplicative coverage.  *Id.* ¶¶ 133–145.  The amount of broker's fees charged for excess liability coverage in or after 2010 is not topic covered by the 2002/03 BSAs.  The allegations that Knauff and HUB acted improperly regarding excess liability and crime insurance beginning in 2010 when Mr. Pokorney started writing checks directly to Brantley Thomas simply have nothing to do with the 2002/03 BSAs.

HUB asserts "the record shows that HUB recommended that the District take out the Excess Liability and Crime polices about which the District complains pursuant to the 2002 Agreement, and that HUB recommended the District take out both of those policies . . . pursuant to the 2003 Agreement." [2]  2d Mot. Compel Arbitration 18.  But HUB told the Fourth Circuit that the District acquired Excess Liability and Crime policies in 1996, before the District ever dealt with Knauff or HUB (and that is just when the policies were purchased from commercial carriers rather than the IRF).  See Appellants' Brief at 29, *Berkeley Cnty. Sch. Dist.*, 2022 WL 17974626.  The Excess Liability and Crime "policies about which the District complains" in the second amended complaint were recommended and acquired in and after 2010.  2d Am. Compl. ¶¶ 133–145.  All that happened in 2002, 2003, or 2004 were routine renewals of coverages the District had

_____

[2] The ellipsis omits a reference to Inland Marine coverage.  At times, HUB's motion mentions Inland Marine coverage, but allegations regarding Inland Marine coverage were removed from the second amended complaint.

maintained for many years, which have nothing to do with the District's claims of wrongdoing beginning in 2010.

Finally, HUB fails to address just how extraordinarily attenuated the 2002/03 BSAs are from any damages now claimed in this case. The damages alleged in the second amended complaint occurred *years* after the express termination of the 2002/03 BSAs. They occurred after Knauff and the District agreed to do business through a traditional commission arrangement and to cease doing business through fee agreements with arbitration provisions. They occurred after Knauff and the District had a legal dispute over those commissions which they settled with an agreement selecting a judicial forum for disputes. Resp. Opp'n 1st Mot. Compel Arbitration Ex. D, No. 33-4. That RFP settlement *specifically* and *expressly* settled any claims about pre-January 2006 conduct regarding the Excess Liability and Crime policies which are the only two policies enumerated in the 2002/03 BSAs for which the second amended complaint claims damages— damages occurring six years or more after the 2003 BSA terminated. *See id.*

## C. The issue before the Court is whether an agreement to arbitrate exists, not whether this case is within the scope of an existing arbitration agreement.

In the last paragraph of its motion, HUB argues whether arbitration of this case should be compelled is a "threshold" question of arbitrability that under the Commercial Rules of the American Arbitration Association, incorporated in the arbitration provisions of the 2002 and 2003 BSAs, must be decided by an arbitrator. 2d Mot. Compel Arbitration 20. The argument is that some sort of arbitration agreement obviously exists in the 2002/03 BSAs, and the scope of that agreement must be decided by an arbitrator, not this Court. *Cf. Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.").

The fatal flaw with HUB's argument is that the arbitration agreements HUB seeks to enforce expressly expired years before the actionable conduct at issue in this case occurred.  For that reason, there is no agreement to arbitrate, and since HUB disagrees, the District has a right to a judicial determination of the existence of an agreement to arbitrate.  *Id.* at 530 (citing 9 U.S.C. § 2).  Because the 2002/03 BSAs contain nothing purporting to govern the allegations of the second amended complaint, the rule of decision for a judicial determination of whether an agreement exists is the significant relationship test: whether the broad arbitration clauses the parties agreed to in 2002 and 2003 compel arbitration here despite the absence of any agreement purporting to govern this dispute.  *See Davis*, 864 S.E.2d at 395.  Of course, an agreement to arbitrate one issue at one time is not an agreement to arbitrate all issues until the end of time.  Normally, arbitration agreements terminate with their container contracts:

> Therefore, even in cases involving very broad arbitration clauses, the presumption in favor of arbitrating disputes over contract duration can be overcome by a clear showing that the parties intended for the underlying contract to expire, or separately agreed to terminate it, before the relevant dispute arose.  For example, if a contract provides that "all disputes between the parties shall be arbitrated," but with equal clarity provides that it will expire on a date certain, then any dispute over whether the contract actually expired or was extended by the parties must be decided by the court rather than by the arbitrator.

*Nat'l R.R. Passenger Corp. v. Bos. & Maine Corp.*, 850 F.2d 756, 762–63 (D.C. Cir. 1988) (cited with approval in *Va. Carolina Tools, Inc.* v. *Int'l Tool Supply, Inc.*, 984 F.2d 113, 118 (4th Cir. 1993)).

Here, the parties agreed that the most recent agreement with an arbitration provision, the 2003 BSA, would terminate as of June 30, 2004.  2d Mot. Compel Arbitration Ex. B at ¶ 3.  That is why the Fourth Circuit held that "because the June 2002 Agreement terminated in June 2003, and the June 2003 Agreement ended in June 2004, the Arbitration Clauses therein could not require Berkeley Schools to arbitrate any claims on the basis of conduct that began after those Agreements

terminated." *Berkeley Cnty. Sch. Dist.*, 944 F.3d at 241. Thus, there can be no agreement to arbitrate this dispute unless it is so significantly related to the 2002 or 2003 BSA as to be subject to the terms of that now-expired agreement. *See, e.g.*, *Bartels by & through Bartels v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 678 (4th Cir. 2018); *Long v. Silver*, 248 F.3d 309, 316–17 (4th Cir. 2001); *J.J. Ryan & Sons, Inc.*, 863 F.2d at 321; *Hinson v. Jusco Co.*, 868 F. Supp. 145, 149 (D.S.C. 1994); *Landers*, 739 S.E.2d at 214; *Davis*, 864 S.E.2d at 395. As explained above, the claims in the second amended complaint simply have nothing at all to do with the 2002 BSA or the 2003 BSA. For that reason, there is no agreement to arbitrate those claims and HUB's motion to compel arbitration must be denied.

## IV.    **Conclusion**

For the foregoing reasons, HUB's second motion to compel arbitration should be denied.

Respectfully submitted by:

s/Phillip D. Barber
Richard A. Harpootlian (Fed. ID No. 1730)
Phillip D. Barber (Fed. ID No. 12816)
Andrew R. Hand (Fed. ID No. 12176)
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810
rah@harpootlianlaw.com
pdb@harpootlianlaw.com
arh@harpootlianlaw.com

Joshua S. Whitley, Esquire
Federal Bar No.: 10829
SMYTH WHITLEY, LLC
126 Seven Farms Drive
First Citizens Plaza, Suite 260
Charleston, South Carolina 29492
843.606.5635 Office
843.654.4095 Facsimile
jwhitley@smythwhitley.com

Jeffrey A. Breit, Esq.
Virginia State Bar No.: 18876
BREIT BINIAZAN, P.C.
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
757.670.3888 Office
757.670.3939 Facsimile
jeffrey@bbtrial.com
*Pro Hac Vice*

ATTORNEYS FOR PLAINTIFF
BERKELEY COUNTY SCHOOL DISTRICT

July 3, 2023
Columbia, South Carolina.