**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| BERKELEY COUNTY SCHOOL DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:18-cv-00151-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| HUB INTERNATIONAL LIMITED; HUB | ) | |
| INTERNATIONAL MIDWEST LIMITED; | ) | |
| HUB INTERNATIONAL SOUTHEAST; | ) | |
| KNAUFF INSURANCE AGENCY, INC.; | ) | |
| and BRANTLEY LAMAR THOMAS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The following matter is before the court on defendants HUB International Limited and HUB International Midwest Limited's (together, with HUB International Southeast, "HUB") motion to compel arbitration and stay this case. ECF No. 258. For the reasons set forth below, the court denies the motion.

## I.  BACKGROUND

This case arises out of the alleged embezzlement of millions of dollars from the Berkeley County School District (the "District").[1] The District alleges that its former Chief Financial Officer Brantley Thomas ("Thomas") conspired with Knauff Insurance Agency, Inc. ("Knauff"), HUB, and HUB's employees Stanley J. Pokorney and Scott Pokorney (together, "the Pokorneys")[2] (collectively, "defendants") to defraud the District

---

[1] The court omits citations throughout the background section but notes that the facts are taken from the second amended complaint, the findings of fact and conclusions of law from the Section 4 Trial as well as previous decisions from the Fourth Circuit. ECF Nos. 102; 225; 240; 255; 2d Amend. Compl.

[2] On October 9, 2020, the Pokorneys were terminated as defendants. ECF No. 182.

through a concerted kickback scheme related to the purchasing of unnecessary insurance policies.

At the onset of this case, HUB filed a motion to compel arbitration based on the arbitration clauses in six Brokerage Service Agreements ("Agreements" or "BSAs") between the District and Knauff that spanned from 2002 to 2011.[3]  Each Agreement is addressed to Thomas, and the dates of the Agreements are June 18, 2002; June 27, 2003; August 16, 2005; December 19, 2006; December 19, 2009; and May 1, 2011.[4]  The 2002 Agreement was signed on behalf of the District by Angel Cartwright ("Cartwright"), the District's then-Risk Manager, and the 2003 Agreement was signed on behalf of the District by Thomas.  The other four Agreements were not signed.  The Agreements are contracts for insurance-related services like brokering and consulting but are not contracts for insurance coverage.

Relevant to the instant motion, the 2002 Agreement expressly terminated on June 29, 2003, and the 2003 Agreement expressly terminated on June 29, 2004.  ECF No. 258-2.  The District and Knauff meaningfully changed their relationship at that time.  For the period from July 2004 to July 2005, Knauff and the District discontinued their previous practice of a brokerage service fee under an express agreement, and instead converted to a straight commission arrangement, which also paid for risk management services.  This is a key distinction because it is through this new structure that the defendants were later able to allegedly "conceal payments far larger, as a percentage of premiums, than would be possible through a commission charged as a disclosed percentage of the premiums."

---

[3] HUB acquired Knauff Insurance in 2012.
[4] The court will identify the agreement it refers to by describing it in reference to the year it was signed (e.g., the 2002 Agreement or the 2002 BSA).

2

2d Amend. Compl. ¶ 62.  The kickback scheme began in or around February 2006 and continued for many years.  It was not discovered until February 6, 2017, when officials from the Federal Bureau of Investigation and Wells Fargo Bank met with officials of the District and informed them that Thomas was under federal investigation for misappropriation of public funds.[5]

On January 18, 2018, the District filed the complaint.  ECF No. 1.  On March 19, 2018, the District filed the first amended complaint.  ECF No. 36.  On January 29, 2019, the court denied HUB's first motion to compel, ECF No. 23, and found that the District did not agree to the Agreements and therefore did not agree to arbitrate (the "January 2019 Order").  ECF No. 63.  HUB appealed the court's order.  ECF No. 67.  On December 4, 2019, the Fourth Circuit found that "there are multiple disputes of material fact as to 'the making of [any] arbitration agreement' between Berkeley Schools and the Appellants" and remanded the matter for a trial on that issue pursuant to Section 4 of the Federal Arbitration Act ("Section 4 Trial").[6]  ECF No. 102, Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd. ("Berkeley I"), 944 F.3d 225, 241 (4th Cir. 2019).

On remand in January and February 2021, the court held a five-day bench trial over video.[7]  ECF Nos. 206; 208; 211; 212; 217.  On June 3, 2021, the court filed its

---

[5] Thomas has since pleaded guilty to four state charges of embezzlement. Thomas also pleaded guilty of ten counts of wire fraud in violation of federal law which arose out of the illegal kickbacks in the amount of $36,000 that he received from "a broker employee" in exchange for "steer[ing] [the District's] insurance policy purchases through" the broker employee.  ECF No. 36 at 9.

[6] The Fourth Circuit did not opine as to this court's summary of arbitration law. See Berkeley I, 944 F.3d at 225–42.  Rather, its decision primarily focused on the importance of the trial provision of the Federal Arbitration Act, see 9 U.S.C. § 4, and remanded for a trial in accordance with the same.  Berkeley I, 944 F.3d at 225–42.

[7] This trial was held over video due to the disruptions caused by the COVID-19 pandemic.

findings of fact and conclusions of law and held that the District did not agree to arbitrate

this dispute in the 2006, 2009, or 2011 Agreements.  ECF No. 225.  This court also found

that the Fourth Circuit's opinion in <u>Berkeley I</u> regarding the 2002 and 2003 Agreements

foreclosed this court from finding those Agreements to require this dispute be arbitrated,

thus denying the motion to compel arbitration, ECF No. 23.[8]  <u>Id.</u>  HUB appealed that

decision on June 17, 2021.  ECF No. 227.  On December 28, 2022, the Fourth Circuit

vacated in part and remanded for additional proceedings and held that the district court

erred by declining to consider new evidence implicating the 2002 and 2003 Agreements

which arose from the Section 4 Trial.[9]  ECF No. 236, <u>Berkeley Cnty. Sch. Dist. v. HUB</u>

<u>Int'l Ltd.</u> ("<u>Berkeley II</u>"), 2022 WL 17974626 (4th Cir. Dec. 28, 2022).  On remand, the

district court's conclusion that the 2006, 2009, and 2011 Agreements do not require

arbitration stands, and HUB remains bound by its waiver of any reliance on the 2005

Agreement.  <u>Id.</u>  However, the Fourth Circuit charged this court with re-evaluating its

---

[8] At the Section 4 Trial, HUB disclaimed any further reliance on the arbitration clause in the 2005 Agreement.  ECF No. 225 ¶ 47.

[9] The district court concluded that "[t]he [Fourth Circuit] explicitly held that the signed BSAs—the 2002 and 2003 BSAs—'predate the steering and kickback fraud scheme and conspiracy alleged in the Operative Complaint' and therefore cannot provide grounds to compel arbitration."  ECF No. 225 ¶ 15 (quoting <u>Berkeley I</u>, 944 F.3d at 241).  In <u>Berkeley I</u>, the Fourth Circuit noted that the 2002 and 2003 BSAs might be relevant only to the extent that they bear on questions of whether the District had knowledge of, or assented to, the subsequent BSAs.  <u>Id.</u> (citing <u>Berkeley I</u>, 944 F.3d at 241).  In <u>Berkeley II</u>, the Fourth Circuit first noted that the district court correctly interpreted its prior decision in this case as it concerned the 2002 and 2003 Agreements.  ECF No. 236, <u>Berkeley II</u>, 2022 WL 17974626, at *2 (4th Cir. Dec. 28, 2022).  However, it then found that the district court "was not bound by [the Fourth Circuit's] prior decision about the 2002 and 2003 BSAs because the Section 4 trial produced substantially different evidence [from the operative complaint] on that score."  <u>Id.</u>  Thus, it remanded the case once again to the district court, finding that the court was freed from the law of the case and should have considered any new evidence from the Section 4 Trial as to the 2002 and 2003 Agreements.  <u>Id.</u>

conclusions concerning the 2002 and 2003 Agreements in light of any new evidence produced at trial.  Id.

On April 27, 2023, the District filed a second amended complaint, now the operative complaint.[10]  ECF No. 255, 2d Amend. Compl.  On June 2, 2023, HUB filed the instant motion to compel arbitration.  ECF No. 258.  On July 3, 2023, the District responded in opposition, ECF No. 259, to which HUB replied on July 31, 2023, ECF No. 260.  The court requested that the parties file supplemental briefs on the issue of gateway questions of arbitrability on September 25, 2023.  On October 10, 2023, the District filed its supplemental brief, ECF No. 263, as did HUB, ECF No. 264.  On October 26, 2023, the parties filed a joint stipulation detailing that the 2002 and 2003 BSAs affected interstate commerce.  ECF No. 266.  The court held a hearing on this motion on November 15, 2023.  ECF Nos. 267; 268.[11]  At the hearing, the court requested that the

---

[10] The claims alleged in the operative complaint of the instant dispute include eleven causes of action.  See 2d Amend. Compl. ¶¶ 172–313. First, the District alleges defendants violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO") premised on wire fraud in violation of 18 U.S.C. §§ 1343, 1346; mail fraud in violation of 18 U.S.C. §§ 1341, 1346; bribery of a public official in violation of S.C. Code Ann. Sections 16-9-210 and 16-19-220; violation of 18 U.S.C. § 1961(4) for combining and conspiring to defraud the District and the taxpayers of Berkeley County; and conspiring to violate and violation of 18 U.S.C. § 1962(d) from at least 2007 through 2016.  Id. ¶¶ 172–231.  The remaining ten causes of action are slightly simpler to set out and the court lists them in turn with the causes of action asserted against all defendants unless stated otherwise: (2) fraud, id. ¶¶ 232–42; (3) negligent misrepresentation, id. ¶¶ 243–56; (4) civil conspiracy for the purpose of defrauding the District and causing the District damage, id. ¶¶ 257–67; (5) breach of fiduciary duty, id. ¶¶ 262–69; (6) aiding and abetting breach of fiduciary duty, id. ¶¶ 270–78; (7) negligence, id. ¶¶ 279–88; (8) negligence per se and violation of South Carolina law governing insurance providers asserted against HUB and Knauff, id. ¶¶ 289–300; (9) conversion, id. ¶¶ 301–04; (10) breach of constructive trust, id. ¶¶ 305–09; and (11) unjust enrichment, id. ¶¶ 310–13.

[11] The parties requested the filing of the official transcript from the hearing on November 15, 2023, which is available at ECF No. 268.

parties provide written answers by email to additional questions posed by the court. Id. Both parties emailed responses to those questions on December 1, 2023.[12] As such, the motion is fully briefed and is now ripe for review.

## II. STANDARD

Courts recognize that the Federal Arbitration Act ("FAA") creates a strong presumption in favor of arbitration. See 9 U.S.C. §§ 1–14. As the Supreme Court has explained, "[t]he preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985). Arbitration "is a matter of consent, not coercion." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 294 (2002); see also Arrants v. Buck, 130 F.3d 636, 640 (4th Cir. 1997) ("Even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate."). Thus, arbitration "is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010) (internal quotation marks and citations omitted).

The Fourth Circuit has stated that,

> Application of the FAA requires demonstration of four elements: (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.

---

[12] The court attaches the parties' respective email responses to this order at ECF No. 269-1 (HUB) and ECF No. 269-2 (District). To the extent that this court cites to those responses, it will cite to the respective attachments to this order.

Galloway v. Santander Consumer USA, Inc., 819 F.3d 79, 84 (4th Cir. 2016) (alteration

and internal quotation marks omitted) (quoting Rota-McLarty v. Santander Consumer

USA, Inc., 700 F.3d 690, 696 n.6 (4th Cir. 2012)).  Although courts must compel

arbitration when a party satisfies these four factors, the standard of review and procedural

mechanisms to be applied in resolving these four factors are less clear.  Gibbs v. Stinson,

421 F. Supp. 3d 267, 299 (E.D. Va. 2019), aff'd sub nom. Gibbs v. Sequoia Cap.

Operations, LLC, 966 F.3d 286 (4th Cir. 2020).  "Recently, a number of district courts in

the Fourth Circuit have determined the burden of proof is 'akin to the burden on

summary judgment' because motions to compel arbitration often require courts to

consider evidence outside of the pleadings."[13]  Id. (quoting Novic v. Midland Funding,

LLC, 271 F. Supp. 3d 778, 782 (D. Md. 2017), rev'd on other grounds sub nom. Novic v.

Credit One Bank, Nat'l Ass'n, 757 F. App'x 263 (4th Cir. 2019)); see also Galloway, 819

F.3d at 85 n.3.  As such, the party asserting an arbitration agreement has the burden to

show the making of the agreement.  In re Mercury Constr. Corp., 656 F.2d 933, 939 (4th

Cir. 1981) (en banc), aff'd sub nom. Moses H. Cone Mem'l Hosp. v. Mercury Constr.

Corp., 460 U.S. 1 (1983).

---

[13] Alternatively, courts evaluate a motion to compel arbitration under the
standards espoused by § 4 of the FAA, which states in relevant part, that the district court
will compel arbitration "upon being satisfied that the making of the agreement for
arbitration or the failure to comply therewith is not in issue."  9 U.S.C. § 4.  Under this
standard, there must be "a judicial conclusion" that there is a validly formed, express
agreement to arbitrate.  Granite Rock Co., 561 U.S. at 303.  As another court has noted,
"[i]t is unclear what daylight exists, if any, between the two approaches.  Both require the
party seeking arbitration to offer evidence to satisfy the court that an arbitration
agreement actually exists, and both allow the non-moving party to rebut that evidence."
Gibbs, 421 F. Supp. 3d at 299 n.51.  The court opts to follow the logic of other courts
within this district that have considered motions to compel arbitration under the burden of
proof that is akin to a motion for summary judgment.

"[T]he heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration." Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 867 F.2d 809, 812 (4th Cir. 1989) (internal quotation marks omitted).  Thus, the court "may not deny a party's request to arbitrate an issue 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" Long v. Silver, 248 F.3d 309, 316 (4th Cir. 2001) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–83 (1960)).  "[A] broadly-worded arbitration clause applies to disputes that do not arise under the governing contract when a 'significant relationship' exists between the asserted claims and the contract in which the arbitration clause is contained." Id. (citing Am. Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 93 (4th Cir. 1996)).

Whether an arbitration agreement has been formed is an issue of state contract law. Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., 913 F.3d 409, 415 (4th Cir. 2019); Hengle v. Treppa, 19 F.4th 324, 334 (4th Cir. 2021) ("[A]rbitration is a matter of contract.").  To determine whether the parties assented to a contract to arbitrate, the court employs South Carolina law. Livingston v. Atl. Coast Line R.R. Co., 180 S.E. 343, 345 (S.C. 1935) ("It is fundamental that unless there be something intrinsic in, or extrinsic of, the contract that another place of enforcement was intended, the lex loci contractu governs.").  South Carolina's "presumption in favor of arbitration applies to the scope of an arbitration agreement; it does not apply to the existence of such an agreement or to the identity of the parties who

may be bound to such an agreement." Wilson v. Willis, 827 S.E.2d 167, 173 (S.C. 2019) (internal quotation marks omitted).

### III.  DISCUSSION

At the outset, the court notes that it is only evaluating whether HUB may compel arbitration under the 2002 and 2003 Agreements. See ECF No. 236. HUB moves under the FAA, 9 U.S.C. §§ 1–4, for an order compelling arbitration and staying this case. ECF No. 258 at 1. Essentially before the court are several overlapping questions: (1) whether the FAA governs this dispute; (2) whether the parties delegated questions of arbitrability to the arbitrator; (3) whether the parties agreed to the arbitration clause; and (4) whether this dispute falls within the scope of the arbitration clause.[14]

In its motion to compel arbitration, HUB primarily argues that the District must arbitrate all or part of this dispute and indicates its understanding that, should the court find otherwise, the express contractual language requires the parties arbitrate the question of arbitrability. See ECF No. 258 at 11–20. At base, HUB contends that the District's claims still fall within the scope of the arbitration clauses included within the 2002 and 2003 Agreements. Id. at 15. Namely, the alleged fraudulent conduct is HUB's purported recommendation that the District purchase unnecessary and/or duplicative coverage. Id.

---

[14] HUB implies that a fifth question is at issue: whether the 2002 and 2003 Agreements were valid. See ECF No. 258 at 12–14. The District unambiguously states that it does not contest that the 2002 and 2003 Agreements were commercially reasonable and that both parties performed them without complaint, which constituted constructive ratification despite mistakes regarding signatory authority. ECF No. 259 at 16–17. In other words, the District has accepted that the 2002 and 2003 Agreements are "valid" and therefore enforceable against the District despite the lack of proper signatory authority. Id. In its reply, HUB accepts that the District finds the 2002 and 2003 Agreements valid and therefore argues that the sole remaining issue is whether the merits of the District's claims must be resolved in arbitration. ECF No. 260 at 1.

at 15–17.  HUB lists eight categories of coverage that the District claims were

fraudulently recommended and that list includes two services that the 2002 and 2003

Agreements also covered: excess liability and excess crime.  Id.  HUB provided the risk

identification and evaluation as well as the brokering for all the Agreements—including

the 2002 and 2003 Agreements—which are the services that the second amended

complaint alleges that HUB failed to honestly and competently provide.  Id.  Thus, HUB

argues the conduct named in the second amended complaint, at a minimum, bears a

"significant relationship" to the 2002 and 2003 Agreements.  Id.

HUB anticipates the District's defense that the express language of the second

amended complaint identifies conduct at issue which occurred after the termination of the

2002 and 2003 Agreements—meaning the arbitration clauses in the 2002 and 2003

Agreements would not apply.  Id. at 18.  HUB preemptively provides three

counterarguments.  Id. at 18–20.  First, the conduct listed in the second amended

complaint is not dispositive of the question.  Id. at 18–19.  Second, the causes of action

not based in fraud, such as those alleging a breach of professional standard of conduct,

have a significant relationship with the 2002 and 2003 Agreements.  Id.  Third, the

sizable sought damages—tens of millions of dollars—implies that the District is seeking

to recover for damages that date back to 2002, a time when the 2002 and 2003

Agreements were in force.  Id. at 19–20.

In response, the District explains that HUB's real argument is "that although the

actions giving rise to the claims asserted in the second amended complaint occurred years

after the [2002 and 2003 Agreements] terminated, those claims nonetheless are

'significantly related' to the [2002 and 2003 Agreements]."  ECF No. 259 at 19.  The

District emphasizes that its claims are in no way significantly related to the 2002 and 2003 Agreements. The District rebuts HUB's arguments by (1) showing that the facts underlying their claims do not significantly relate to the 2002 and 2003 Agreements, (2) detailing the actual damages sought in this action, and (3) unpacking flaws within HUB's assertion that the question of the case's arbitrability of the 2002 and 2003 Agreements must be decided by an arbitrator, not the court. Id. at 17–26.

In reply, HUB first focuses on its final argument: the court has no authority to address the question of whether the 2002 and 2003 Agreements are significantly related to the claims in the second amended complaint "given that the arbitration clauses at issue require that threshold questions of arbitrability must themselves be decided in arbitration." ECF No. 260 at 1. HUB emphasizes that what the District really argues is that "it is entitled to a judicial determination of whether the parties' [2002 and 2003] Agreements cover these claims—i.e., whether this dispute falls within the scope of the 2002 and 2003 Agreements' arbitration clauses." Id. at 3. Moreover, HUB claims that none of the cases that the District cites, or any other law, support the argument that because the 2002 and 2003 Agreements have expired, the District is no longer bound by the arbitration clauses' requirement that threshold questions of arbitrability be submitted to the arbitrator. Id. Second, HUB rebuts the District's claim that its second amended complaint concerns conduct which falls outside the scope of the 2002 and 2003 Agreements, because a significant relationship exists between this dispute and the 2002 and 2003 BSAs since the policies at issue were first placed during or before the term of the 2002 and 2003 Agreements. Id. at 7. Moreover, HUB contends that the District "nowhere denies that many of the causes of action it asserts do not require fraud or

kickbacks, but only breach of the professional standard of care for an insurance advisor," which HUB posits could reach back to when the 2002 and 2003 Agreements were in force. Id. at 7–8. Thus, HUB argues that the question is whether any conduct at issue in this case may have occurred before 2005 and may thereby implicate the 2002 or 2003 Agreement. Id. at 10 (citing Berkeley II, 2002 WL 17974626, at *2).

The court requested that the parties file supplemental briefs on two discrete issues: (1) in what order must the court reach gateway questions of arbitrability, and (2) when the party moving to compel arbitration must meet its burden to prove that the FAA applies to the dispute. The parties filed those supplemental briefs on October 10, 2023. See ECF Nos. 263 (District); 264 (HUB).

The court first sets forth general principles of arbitration law before examining gateway questions which impact the matter's arbitrability. The court ultimately finds that the parties did not form an agreement to arbitrate this dispute such that the court must deny this motion.

### A. Principles of Arbitration Law

In this court's January 2019 Order, the undersigned specified principles of arbitration law which help to explain the complexity of this case. Those principles bear repeating.

As an initial matter, courts use the word "agreement" in a variety of contexts when discussing arbitration, sometimes making it difficult to determine to which agreement the court is referring. The general meeting of the minds to use arbitration as a method of dispute resolution will be referred to as "an agreement to arbitrate." Within an agreement to arbitrate, parties may also agree to send questions of arbitrability to

arbitration.  Arbitrability refers to "gateway questions," such as whether the parties agreed to arbitrate or whether the agreement to arbitrate covers a certain dispute.  Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 68–69 (2010).  An agreement to arbitrate these gateway questions "is simply an additional, antecedent agreement" to an agreement to arbitrate.  Id. at 70.

An agreement to arbitrate may be included in a contractual relationship in two ways.  First, the parties may form a new relationship, for example, an employer/employee relationship.  Pursuant to that relationship, they may sign a contract, the entirety of which requires parties to arbitrate any disputes related to their relationship.  For example, in Rent-A-Center, the employer hired an employee, and they entered into a contract titled "Mutual Agreement to Arbitrate Claims" as a condition to the employee's employment. 561 U.S. at 65.  The court will refer to this type of agreement to arbitrate as an "arbitration contract."  Within an arbitration contract, there may be a delegation provision that delegates any dispute regarding the parties' relationship to arbitration ("delegation provision").  Id. at 68.

Alternatively, parties may enter into a contract related to any number of topics. The court will refer to this contract as a "container contract."  Within that contract, there may be an arbitration clause ("arbitration clause") that requires any claim related to the container contract to be resolved by arbitration.  An example of a container contract is found in Simply Wireless, Inc. v. T-Mobile US, Inc., where the parties entered into a contract titled "Amended & Restated Limited Purpose Co-Marketing and Distribution Agreement for Equipment Sold th[r]ough HSN & QVC" pursuant to the parties' joint project.  877 F.3d 522, 527 (4th Cir. 2017), abrogated on other grounds by Henry Schein,

13

Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 528 (2019) (rejecting the wholly groundless doctrine). This contract contained an arbitration clause that sent claims related to the container contract to arbitration. Id. at 525. Moreover, within the arbitration clause, there may be a delegation provision that requires an arbitrator to resolve any arbitrability questions.

Here, the challenged agreement to arbitrate is an arbitration clause found within both the 2002 and 2003 BSAs, which are container contracts. The 2002 Agreement's arbitration clause provides:

> All disputes, claims or controversies relating to this Agreement, or the services provided, which are not otherwise settled, shall be submitted to a panel of three arbitrators and resolved by final and binding arbitration, to the exclusion of any courts of laws [sic], under the commercial rules of the American Arbitration Association [(the "AAA")].

ECF No. 258-1 at 4. The 2003 Agreement's arbitration clause is identically phrased. ECF No. 258-2 at 4. While there is no separate delegation provision in the Arbitration Clauses within the Agreements, HUB argues that the incorporation of the AAA rules create a de facto delegation provision.

Thus, the court must determine whether the parties delegated questions of arbitrability to the arbitrator and, if so, whether there are any questions that this court may answer which nevertheless require the court deny the motion to compel arbitration.

### B. Gateway Questions

Gateway questions are those questions whose "answer[s] will determine whether the underlying controversy will proceed to arbitration on the merits." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002). The phrase is applicable to those narrow circumstances where contracting parties would likely have expected a court—not an

14

arbitrator—to have decided the gateway matter, in the absence of clear and unmistakable evidence to the contrary.  Id. at 83–84; Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452 (2003).  These include certain gateway matters such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy (i.e., the applicability of the arbitration clause to the underlying dispute between the parties).  Bazzle, 539 U.S. at 452.

There are three gateway questions at issue: (1) does the FAA govern this dispute; (2) does the arbitration clause include a valid and enforceable delegation clause; and (3) did the parties agree to arbitrate this dispute.  The parties disagree over which question the court must reach first.  The District argues that the court must first decide whether the FAA applies to the dispute as well as whether there is an agreement to arbitrate which covers the relevant conduct identified in the operative complaint.  ECF Nos. 259 at 25; 263 at 1.  In contrast, HUB argues that the court must first reach the question of whether the parties agreed to arbitrate disputes of arbitrability and seems to contend that the District's argument is one of scope.  ECF Nos. 258 at 20; 260 at 1–2.  The court directed the parties to submit supplemental briefs on this issue.  See ECF Nos. 263; 264.

There is somewhat conflicting authority as to which gateway question the court should consider first.  Compare Peabody Holding Co. v. United Mine Workers of Am., Int'l Union, 665 F.3d 96, 101 (4th Cir. 2012) (explaining that the court first determines who determines whether a dispute is arbitrable before reaching the question of whether a matter is arbitrable) with Granite Rock Co., 561 U.S. at 297 (explaining that a court may order arbitration only when it is satisfied that the parties agreed to arbitrate).  Further complicating matters, the Supreme Court has expressly held that under the FAA, parties

15

may agree to have an arbitrator decide not only the merits of a particular dispute but also "gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." Henry Schein, Inc., 139 S. Ct. at 529 (internal quotation marks and citations omitted).

When this court previously considered this issue in its January 2019 Order, it found that the court must first determine whether the parties formed an agreement to arbitrate before reaching the question of who determines the scope and the enforceability of that agreement. ECF No. 63 at 23; see, e.g., Allstate Ins. Co. v. Toll Bros., Inc., 171 F. Supp. 3d 417, 424 (E.D. Pa. 2016) ("When one party contends that an agreement to arbitrate was never formed, looking to the text of that very agreement is problematic because the agreement is only a valid indicator of the parties' intent if they agreed to be bound by its terms.").[15]

The court first considers whether the FAA applies to this dispute, ultimately finding that it does. Thereafter, the court next considers whether the parties agreed to a

---

[15] Several other circuits have reached this same conclusion. See, e.g., China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp., 334 F.3d 274, 288 (3d Cir. 2003) ("[I]ncorporation of [arbitration] rule[s] into the contract is relevant only if the parties actually agreed to its incorporation. After all, a contract cannot give an arbitral body any power, much less the power to determine its own jurisdiction, if the parties never entered into it."); VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P., 717 F.3d 322, 326 n.2 (2d Cir. 2013) ("The more basic issue . . . of whether the parties agreed to arbitrate in the first place is one only a court can answer, since in the absence of any arbitration agreement at all, 'questions of arbitrability' could hardly have been clearly and unmistakably given over to an arbitrator."); Edwards v. Doordash, Inc., 888 F.3d 738, 744 (5th Cir. 2018) ("In summary, we first look to see if any agreement to arbitrate was formed, then determine if it contains a delegation clause."); Nebraska Mach. Co. v. Cargotec Sols., LLC, 762 F.3d 737, 741 n.2 (8th Cir. 2014) (explaining that the court must first address the threshold question of the validity of the arbitration agreement before determining whether the parties intended to submit the case to an arbitrator).

delegation clause, ultimately finding that they have.  Finally, the court considers whether the parties agreed to arbitrate, ultimately finding that they have not.

### 1.  Applicability of the FAA

The District makes several overlapping arguments.  First, the District argues that HUB has not demonstrated that the 2002 and 2003 Agreements purport to cover this dispute, which is a threshold requirement for the FAA to apply.  ECF No. 259 at 17, 25.  Second, the District argues that it never agreed to the arbitration clause.  Id. at 25.  These arguments blend in its motion such that the court is required to peel them apart to determine whether the District contests the formation of the arbitration clause, the scope of the arbitration clause, and/or the threshold question of whether HUB has met its burden of proof to demonstrate the applicability of the FAA.  The court first focuses on the question of the applicability of the FAA.

The District claims that HUB has not met its burden of proof to demonstrate that the FAA applies to this dispute, which is a gateway question reserved for the court to determine.  ECF No. 259 at 25.  Application of the FAA requires that HUB demonstrate four elements:

> (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.

Galloway, 819 F.3d at 84 (quoting Rota-McLarty, 700 F.3d at 696 n.6); see also Whiteside v. Teltech Corp., 940 F.2d 99,102 (4th Cir. 1991).  The District primarily argues that HUB has not satisfied the second factor because it has not shown that the

17

arbitration clauses in the 2002 and 2003 BSAs purport to cover this dispute.[16]  ECF No. 259 at 25.  HUB contends it has met the second factor because "the District admitted to the Fourth Circuit that 'the 2002 and 2003 agreements . . . are valid agreements.'"  ECF No. 258 at 12 (citing Oral Argument at 14:20, Berkeley Cnty. Sch. Dist. v. HUB Int'l Ltd. (No. 21-1691), https://www.ca4.uscourts.gov/OAarchive/mp3/21-1691-20221208.mp3).  HUB avers that the 2002 and 2003 Agreements are valid contracts and "it is also clear that the broad arbitration clauses in the 2002 and 2003 agreements bear a significant relationship to the allegations at the core of the District's case."  Id.  A district court "has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview."  Adkins v. Lab. Ready, Inc., 303 F.3d 496, 500 (4th Cir. 2002) (emphasis added).  The District argues that the issues in this case do not fall within the purview of the 2002 or 2003 Agreements.  ECF No. 259 at 25.

In its supplemental brief, HUB appears to shift its argument to contend that it has met all the required factors that it must show to this court under the FAA to demonstrate that the FAA applies to this dispute.  ECF No. 264 at 1.  The core of the argument is that HUB need not show the court the contested subpart of the second factor—whether the agreement purports to cover this dispute—because that is a question of scope reserved for the arbitrator.  Id. at 2–3 (citing New Prime Inc. v. Oliveira, 139 S. Ct. 532, 538 (2019)).

---

[16] The District does not claim that HUB has failed to meet the remaining three factors, and the court likewise finds them met.  In the interests of completeness, the court lists the facts providing said support: (1) as this court and the Fourth Circuit are well aware, there is clearly a dispute between the parties; (3) HUB has previously shown the relationship of the transactions to interstate commerce, ECF No. 23 at 12, and both parties have entered a stipulation to that effect, ECF No. 266; and (4) the District refuses to resolve the dispute in arbitration.  ECF No. 258 at 12.

In contrast, the District emphasizes in its supplemental brief that HUB must first demonstrate the FAA applies to this dispute by showing that all four factors are met in their entirety before a court may compel arbitration. ECF No. 263 at 6–9 (citing Whiteside, 940 F.2d at 102).

The Supreme Court has noted that "before invoking the severability principle, a court should 'determine[] that the contract in question is within the coverage of the Arbitration Act.'" New Prime Inc., 139 S. Ct. at 538 (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 402 (1967)). New Prime specifies that Sections 1 and 2 of the FAA "define the field in which Congress was legislating," and Sections 3 and 4 "apply only to contracts covered by those provisions." Id.; see also Bernhardt v. Polygraphic Co. of Am., 350 U.S. 198, 201–02 (1956). Section 2 declares, with exceptions not relevant here, that

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable.

9 U.S.C. § 2. "Sections 3 and 4 [of the FAA] . . . provide two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, [id.] § 4." Chorley Enters. v. Dickey's Barbecue Rests., Inc., 807 F.3d 553, 563 (4th Cir. 2015) (alteration and internal quotation marks omitted). In other words, only if Section 2 applies can the court reach Sections 3 and 4. See New Prime Inc., 139 S. Ct. at 538. Even where a delegation clause exists, the court may enforce that delegation clause only after a showing that the clause "appears in a 'written provision in . . . a contract

evidencing a transaction involving commerce' consistent with § 2." See id. (quoting 9 U.S.C. § 2).

Based on the Fourth Circuit's decision in Galloway, a four-factor test determines whether Section 2 of the FAA is invoked. See Galloway, 819 F.3d at 84 (specifying the requirements of 9 U.S.C. § 2 before stating the four factors which demonstrate the FAA applies to a dispute); see also James v. Synovus Bank, 2020 WL 1479115, at *2 (D. Md. Mar. 26, 2020) (noting that the Fourth Circuit has required that four elements be established for § 2 of the FAA to apply). Given that interpretation and the Supreme Court's decision in New Prime, 139 S. Ct. at 538, the court initially concludes that all four factors—including whether the agreement purports to cover the dispute—must be shown by the party seeking to compel arbitration before the court delegates the matter to the arbitrator pursuant to Section 4, even where a delegation clause exists. Thus, the court finds that it may reach the question of whether the arbitration provision purports to cover the dispute notwithstanding the alleged delegation provision. However, a further review of caselaw indicates that this interpretation is not as straightforward as it might initially appear.

The Fourth Circuit has recognized that a court "may not deny a party's request to arbitrate an issue 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" Am. Recovery Corp., 96 F.3d at 92 (quoting United Steelworkers of Am., 363 U.S. at 582–83). Nevertheless, as far as the court has found, there is not a clear test to determine whether an arbitration provision "purports to cover the dispute." See Adkins, 202 F.3d at 500–01. Upon a review of various decisions examining the second element, the court determines

that an agreement purports to cover a dispute by first looking to the text of the agreement, determining the broad coverage of the plain language of the agreement, and then looking to the dispute between the parties and determining whether the dispute falls within that coverage.[17] Thus, applying the logic from these cases, the court must assess whether the asserted claims—including, inter alia, RICO conspiracy, fraud, breach of fiduciary duty[18]—relate to or arise out of the 2002 and 2003 BSAs by construing them as generously as possible to determine whether the claims are "susceptible of an interpretation that covers the asserted dispute." 2d Amend. Compl. ¶¶ 172–313; see also Am. Recovery Corp., 96 F.3d at 92.

---

[17] A review of decisions from other courts in the Fourth Circuit indicates that a typical analysis requires a review of the text of the agreement and a review of the dispute itself. For example, the Northern District of West Virginia found that the provision at issue included in a lease agreement purported to cover the dispute because the dispute, and all the claims therein, "relate[d] either to the Lease itself, to the property, or to the circumstances surrounding the formation and alleged termination of the Lease." See Heller v. TriEnergy, Inc., 877 F. Supp. 2d 414, 429 (N.D.W. Va. 2012). Similarly, a court in that same district recently found that an arbitration agreement did not purport to cover a dispute when it found that "it [wa]s clear that the parties agreed to arbitrate disputes over damages to crops, trees, or fences." Columbia Gas Transmission, LLC v. RDFS, LLC, 2024 WL 756286, at *3 (N.D.W. Va. Feb. 5, 2024). Yet, the dispute in that case "[wa]s not about damages to crops, trees or fences. The dispute [wa]s about whether Columbia has the authority to enter RDFS's property to perform subsidence mitigation work." Id. Accordingly, that Court found that the FAA did not apply because "the Right of Way Agreement d[id] not include an arbitration provision 'which purports to cover the dispute.'" Id. A recent decision from a court in the District of Maryland found that an employment contract contained an arbitration agreement that purported to cover the dispute because the language of the agreement indicated that "the parties must resolve any employment-related disputes through binding arbitration," when that agreement specified that the employee and company agreed to arbitrate any dispute arising out of or related to the employee's employment with or termination of employment with the company. Apex Sys., LLC v. Foster, 2024 WL 555125, at *5 (D. Md. Feb. 12, 2024).

[18] The eleven causes of action are named in paragraphs 172 through 313 of the second amended complaint and are also detailed, supra, in footnote 8. In brief, the District alleges violation of the RICO Act, fraud, negligent misrepresentation, civil conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, negligence per se, breach of constructive trust, and unjust enrichment.

However, such an analysis is the same analysis that the Fourth Circuit established to determine the <u>scope</u> of an arbitration clause. In its scope analysis, the Fourth Circuit determined whether that broad arbitration clause encompassed disputes beyond the underlying consulting agreement "by examining the significance between each of [the plaintiff's] claims and the consulting agreement." <u>Am. Recovery Corp.</u>, 96 F.3d at 93. It went on to specify that the court "must determine whether the factual allegations underlying the claim are within the scope of the arbitration clause, regardless of the legal label assigned to the claim." <u>Id.</u> The arbitration clause considered by the <u>American Recovery</u> panel included language which required arbitration of "any dispute that 'ar[ose] out of or related to' the consulting agreement" between the two parties ARC and CTI. <u>Id.</u> at 93. The court then considered plaintiff ARC's three claims, ultimately finding that each related to the underlying consulting agreement such that they were arbitrable.[19] <u>Id.</u> at 93–95. This is, in essence, the same analytical framework that each of the district courts applied to determine whether the FAA purported to cover a dispute. <u>See</u>

-------

[19] First, it considered ARC's claim that defendant CTI tortiously induced defendant Richard Secord's breach of fiduciary duty by secretly negotiating the personal services agreement with Secord and found that the claim significantly related to the consulting agreement and was thus arbitrable. <u>Am. Recovery Corp.</u>, at 93–94. Second, it considered ARC's claim that CTI tortiously interfered with ARC's contractual relationship with defendant Fluor-Daniel by inducing Fluor-Daniel to breach its noncircumvention agreement with ARC and found it clearly related to the consulting agreement because an express term of the consulting agreement mandated that CTI would not enter into any agreement with Fluor-Daniel. <u>Id.</u> at 94. Third, ARC claimed it was entitled to compensation in quantum meruit from CTI for security a financing commitment from EDS for the China project, which ARC contends was a duty that CTI requested it perform, and the court found that this claim related to the consulting agreement because ARC relied on the terms of the consulting agreement to prove its claim. <u>Id.</u> at 94–95.

TriEnergy, Inc., 877 F. Supp. 2d at 429; Columbia Gas Transmission, LLC, 2024 WL 756286, at *3; Apex Sys., LLC, 2024 WL 555125, at *5.

Ultimately, the court infers, based on language from American Recovery, that the analytical framework to determine whether a contract purports to cover the dispute is the same framework as that of the scope analysis. Am. Recovery Corp., 96 F.3d at 92–95. As such, the court is faced with contradictory binding precedent. One the one hand, the Supreme Court specified that the court must first determine whether the contract falls within or beyond the boundaries of §§ 1 and 2 of the FAA before invoking its statutory powers under §§ 3 and 4 to stay litigation and compel arbitration. New Prime Inc., 139 S. Ct. at 537–38. Even where a delegation clause exists, the court may enforce that delegation clause only after a showing that the clause "appears in a 'written provision in . . . a contract evidencing a transaction involving commerce' consistent with § 2." See id. at 539 (quoting 9 U.S.C. § 2). The Fourth Circuit's decision in Galloway logically reads to indicate that the four-factor test established in Rota-McLarty, 700 F.3d at 696 n.6, provides the framework to determine whether § 2 of the FAA governs a dispute. Galloway, 819 F.3d at 84. The second element of that test requires "a written agreement that includes an arbitration agreement which purports to cover the dispute." Id. Thus, read together, binding precedent dictates that the court must find, inter alia, that the arbitration agreement purports to cover the dispute before staying litigation and compelling arbitration. See New Prime Inc., 139 S. Ct. at 537–38; Galloway, 819 F.3d at 84.

On the other hand, the Fourth Circuit is silent as to how to determine whether an agreement purports to cover the dispute. See generally Galloway, 819 F.3d at 84. In

practice, district courts look to the terms of the contract and the arbitration agreement and then look to the dispute and determine whether there is overlap.  See, e.g., TriEnergy, Inc., 877 F. Supp. 2d at 429; Columbia Gas Transmission, LLC, 2024 WL 756286, at *3; Apex Sys., LLC, 2024 WL 555125, at *5.  That test is, in essence, a test of scope.  Am. Recovery Corp., 96 F.3d at 93.  As the court later concludes, the parties have delegated the question of scope to the arbitrator.  Henry Schein, Inc., 139 S. Ct. at 529.  Thus, the conflict arises as to whether the court is required to determine scope in its analysis of whether § 2 of the FAA governs a dispute before compelling arbitration where the parties have agreed to a delegation provision which encompasses the question of scope.

The Fourth Circuit has indicated that it "'do[es] not lightly presume that the law of this circuit has been overturned, especially where as here' it is possible to read out existing precedent as 'harmonious[]' with the Supreme Court's current approach." Doe v. Sidar, 93 F.4th 241, 245–46 (4th Cir. 2024) (quoting Taylor v. Grubbs, 930 F.3d 611, 619 (4th Cir. 2019)).  In order to avoid running afoul of Supreme Court and Fourth Circuit precedent, the court concludes that the question of whether the arbitration "purports to cover the dispute" asks the question of "scope" which the court typically must determine prior to compelling arbitration except where the parties have explicitly delegated that question of arbitrability to the arbitrator.[20]  Thus, where an arbitration

---

[20] To be clear, this is a complex issue that requires the court to engage in a fair amount of interpretation.  As such, additional guidance on this issue is likely warranted, particularly considering language from the Supreme Court which indicates that the court must find § 2 of the FAA to apply to a dispute prior to compelling arbitration consistent with a delegation clause.  New Prime Inc., 139 S. Ct. at 538.  If the court is required to consider scope under the four-factor test established by the Fourth Circuit to determine whether § 2 of the FAA applies, Rota-McLarty, 700 F.3d at 696 n.6, such a requirement may run afoul of the Supreme Court's decision in Henry Schein which indicates that

agreement has delegated gateway questions of arbitrability, the question of whether the FAA "purports to cover this dispute" is eliminated from the four-factor test established in Rota-McLarty, 700 F.3d at 696 n.6. Here, when the question of whether the FAA "purports to cover this dispute" is eliminated from the test, the court finds that the FAA indeed governs this dispute because the parties do not dispute that the remaining factors of that test are met. See also ECF Nos. 259 at 25; 23 at 12; 266; 258 at 12. However, such a finding requires the court to interpret conflicting binding precedent and to reach the conclusion that the arbitration provision in the 2002 and 2003 Agreements includes a delegation clause requiring the arbitrator to resolve questions of arbitrability. The court will next analyze that latter conclusion.

### 2. Delegation Clause

Whether the arbitration provision also includes an agreement to arbitrate disputes of arbitrability, sometimes called a "delegation clause," is a "gateway question" to be decided first. See Howsam, 537 U.S. at 83–84; Hengle, 19 F.4th at 335. Arbitrability disputes often necessitate a two-step inquiry. E.g., First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944–45 (1995). "First, we determine who decides whether a particular dispute is arbitrable: the arbitrator or the court." Peabody Holding Co., 665 F.3d at 101. "Second, if we conclude that the court is the proper forum in which to adjudicate arbitrability, we then decide whether the dispute is, in fact, arbitrable." Id.

As in any garden-variety contractual claim, the intent of the contracting parties guides the analysis. Carson v. Giant Food, Inc., 175 F.3d 325, 328–29 (4th Cir. 1999).

---

questions of scope may be expressly reserved for the arbitrator, Henry Schein, Inc., 139 S. Ct. at 529.

Although the Fourth Circuit "has adopted a general policy-based, federal presumption in favor of arbitration, that presumption is not applied to resolve questions of the arbitrability of arbitrability issues themselves." Peabody Holding Co., 665 F.3d at 102 (internal quotation marks and citations omitted). "Indeed, 'the question of arbitrability . . . is undeniably an issue for judicial determination.'" Id. (quoting AT&T Techs., Inc., 475 U.S. at 649). "Parties, to be sure, can agree to arbitrate arbitrability, but such agreement "must . . . 'clearly and unmistakably' provide that the arbitrator shall determine what disputes the parties agreed to arbitrate." Carson, 175 F.3d at 329 (quoting AT&T Techs., Inc., 475 U.S. at 649). "The 'clear and unmistakable' standard is exacting, and the presence of an expansive arbitration clause, without more, will not suffice." Peabody Holding Co., 665 F.3d at 102. The Fourth Circuit has found that an arbitration clause "committing all interpretive disputes 'relating to' or 'arising out of' the agreement does not satisfy the 'clear and unmistakable' test." Id. (quoting Carson, 175 F.3d at 330). "Those who wish to let an arbitrator decide which issues are arbitrable need only state that 'all disputes concerning the arbitrability of particular disputes under this contract are hereby committed to arbitration,' or words to that clear effect." Carson, 175 F.3d at 330–31.

HUB focuses on the latter half of the arbitration clause—namely, "shall be submitted to a panel of three arbitrators and resolved by final and binding arbitration . . . under the commercial rules of the [AAA]." ECF No. 258 at 20; ECF No. 260 at 5. Specifically, HUB takes that language, along with a footnote from this case's first appeal to the Fourth Circuit, to conclude that, because one of the commercial rules of the AAA indicates that an arbitrator may rule on arbitrability issues, the question of

arbitrability is an issue left to an arbitrator.  Id.  Thus, HUB concludes that an arbitrator—not the court—must decide in the first instance whether under "the significant relationship test" the arbitration clauses included in the 2002 and 2003 Agreements compel arbitration of the District's claims.  See ECF Nos. 258 at 20; 260 at 5.  In other words, the arbitrator must determine the scope of the arbitration clauses in those agreements.

The court begins by examining whether its conclusion on this question is foreclosed by the law-of-the-case doctrine—namely, whether a Fourth Circuit conclusion as to this question forecloses the court's own determination.  See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815–16 (1988).  In Berkeley I, the Fourth Circuit included a footnote which said, "[h]ere, the Arbitration Clauses incorporate the Commercial Rules of the [AAA], which provide that an arbitrator has the power to rule on arbitrability issues." [21]   Berkeley I, 944 F.3d at 234 n.9 (citing Am. Arbitration Ass'n, Commercial Arbitration Rules, R-7(a) (amended Oct. 1, 2013)[22]).  However, in Berkeley II, the Fourth Circuit specified that it did "not opine on whether [the new evidence of the 2002 and 2003 Agreements] leads to the conclusion that Berkeley Schools must arbitrate all or part of this dispute, whether the parties must arbitrate the question of arbitrability, or whether Berkeley Schools in fact assented to the 2002 or 2003 [Agreements]."  Berkeley II, 2022 WL 17974626, at *2.  Read together, the two decisions most logically

---

[21] The footnote was provided in the context of that court's determination of whether the district court must conduct a Section 4 trial to determine whether the parties formed an agreement to arbitrate.  Berkeley I, 944 F.3d at 234.

[22] R-7(a) provides, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  Am. Arbitration Ass'n, Commercial Arbitration Rules, R-7(a) (amended Oct. 1, 2013).

indicate that the Fourth Circuit left the question of whether an arbitrator or the court must

decide questions of arbitrability for this court to resolve, should the court find that to be

at issue.  See Berkeley I, 944 F.3d at 234 n.9 (noting that the Commercial Rules of the

AAA indicate that an arbitrator has the power to rule on questions of arbitrability but not

that the arbitrator must rule on questions of arbitrability); Berkeley II, 2022 WL

17974626, at *2 (declining to opine on whether the parties must arbitrate the question of

arbitrability).

      The court begins with an overview of the binding case law governing this issue.

The Supreme Court has noted,

> When the parties' contract delegates the arbitrability question to an
> arbitrator, a court may not override the contract.  In those circumstances, a
> court possesses no power to decide the arbitrability issue.  That is true even
> if the court thinks that the argument that the arbitration agreement applies
> to a particular dispute is wholly groundless.[23]

Henry Schein, Inc., 139 S. Ct. at 529 (footnote added).  However, the Court's ruling on

the wholly groundless exception relates to the scope of the agreement to arbitrate, not to

its formation, and therefore it is inapplicable to a party's argument that it never formed an

agreement to arbitrate.  See id.  Thus, the question becomes whether the parties'

agreement delegates threshold arbitrability questions to the arbitrator by "clear and

unmistakable" evidence.  Id. at 530.  However, as explained by the Rent-A-Center Court,

the "clear and unmistakable" requirement relates "to the parties' manifestation of intent,

---

[23] The Supreme Court explicitly rejected the argument that "as a practical and policy matter[] it would be a waste of the parties' time and money to send the arbitrability question to the arbitrator if the argument for arbitration is wholly groundless."  Henry Schein, Inc., 139 S. Ct. at 530.  The Court concluded that the FAA contains no "wholly groundless" exception and that courts may not engraft exceptions onto the statutory test, even where the arbitrator will inevitably conclude that the dispute is not arbitrable and then send the case back to the district court.  Id.

not to the agreement's <u>validity</u>."  561 U.S. at 69 n.1 (emphasis in original).

Consequently, when deciding whether a party agreed to delegate questions of arbitrability

to arbitration, a court looks to the parties' intent.

      The Fourth Circuit has held that contracting parties' express incorporation of the

JAMS Comprehensive Rules and Procedures constitutes clear and unmistakable evidence

of the sophisticated parties' intent to delegate to the arbitrator questions of arbitrability.

<u>Simply Wireless</u>, 877 F.3d at 527.  Several other circuit courts also reached this

conclusion regarding the incorporation of the AAA Rules.[24]  <u>See, e.g.</u>, <u>Brennan v. Opus

Bank</u>, 796 F.3d 1125, 1130 (9th Cir. 2015); <u>Fallo v. High-Tech Inst.</u>, 559 F.3d 874, 878

(8th Cir. 2009); <u>Qualcomm Inc. v. Nokia Corp.</u>, 466 F.3d 1366, 1373 (Fed. Cir. 2006),

<u>abrogated by</u> <u>Henry Schein, Inc.</u>, 139 S. Ct. 524; <u>Terminix Int'l Co. v. Palmer Ranch Ltd.</u>

---

[24] The court notes that there are meaningful differences between the applicable JAMS rule and the AAA commercial rule at issue in this case.  Namely, Rule 11(b) of the JAMS Comprehensive Arbitration Rules and Procedures (effective July 1, 2014) provides that:

> Jurisdictional and <u>arbitrability disputes</u>, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought . . . <u>shall be submitted to and ruled on by the Arbitrator</u>.  The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

<u>Simply Wireless</u>, 877 F.3d at 527.  In contrast, Rule R-7(a) of the AAA commercial rules provides,

> The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

Am. Arbitration Ass'n, <u>Commercial Arbitration Rules</u>, R-7(a) (amended Oct. 1, 2013).  The former dictates that the arbitration <u>shall</u> rule on arbitrability disputes whereas the latter, which governs this case, indicates that the arbitrator has the power to rule on arbitrability disputes but omits any requirement that he or she <u>must</u> rule on arbitrability disputes.

P'ship, 432 F.3d 1327, 1332–33 (11th Cir. 2005); Contec Corp. v. Remote Sol., Co., 398

F.3d 205, 208 (2d Cir. 2005). Following the Fourth Circuit's decision in Simply

Wireless, courts in this circuit have applied that incorporation principle to arbitral rules

other than JAMS. See, e.g., A Grade Above Others, LLC v. BCVP2 Baileys Run, LLC,

2020 WL 4501512, at *3 (D.S.C. Aug. 5, 2020), on reconsideration, 2020 WL 6526047

(D.S.C. Nov. 5, 2020) (AAA's Construction Industry Arbitration Rules); Choice Hotels

Int'l, Inc. v. TK Hosp. Grp., LLC, 2019 WL 6324523, at *3 (D. Md. Nov. 26, 2019)

(AAA Rules); GlobalOne Mgmt. Grp. Ltd. v. Tempus Applied Sols., LLC, 2018 WL

6440890, at *6 (E.D. Va. Dec. 7, 2018) (ICC Rules); Collins v. Discover Fin. Servs.,

2018 WL 6434503, at *2–3 (D. Md. Dec. 7, 2018) (AAA and JAMS Rules); Sunbelt

Residential Acquisitions, LLC v. Crowne Lake Assocs., Ltd. P'ship, 2021 WL 512228, at

*6 (M.D.N.C. Feb. 11, 2021), report and recommendation adopted, 2021 WL 7186398

(M.D.N.C. Mar. 2, 2021) (AAA Rules). Thus, precedent and persuasive opinions from

other circuits suggest that if the court finds that the parties agreed to arbitrate, the court

must also find that the 2002 and 2003 Agreements' reference to the AAA Rules is "clear

and unmistakable" evidence that the parties intended questions of arbitrability under that

agreement to be decided by the arbitrator, not the district court.[25] This is the crux of

HUB's argument.

---

[25] However, there is not unanimity among district courts, nor is circuit precedent clear, as to whether the holding in Simply Wireless applies to agreements between unsophisticated parties. See Stone v. Wells Fargo Bank, N.A., 361 F. Supp. 3d 539, 554 (D. Md. 2019); see also Ashworth v. Five Guys Operations, LLC, 2016 WL 7422679, at *3 (S.D.W. Va. Dec. 22, 2016) (finding that incorporation by reference of the AAA Rules to an agreement between employee and employer could be considered clear and unmistakable only "if the true meanings of 'clear' and 'unmistakable' are ignored"); Ingalls v. Spotify USA, Inc., 2016 WL 6679561, at *3 (N.D. Cal. Nov. 14, 2016); Allstate Ins. Co. v. Toll Bros., Inc., 171 F. Supp. 3d 417, 429 (E.D. Pa. 2016); but see

Precedent and persuasive authority dictates that when sophisticated parties expressly incorporate into a contract the AAA Rules that delegate questions of arbitrability to an arbitrator, the clear and unmistakable standard is met. See Henry Schein, Inc., 139 S. Ct. at 529; Simply Wireless, 877 F.3d at 527. Thus, the question of arbitrability—i.e., the scope of the arbitration clause—is reserved to the arbitrator even if HUB's argument that the claims are arbitrable is wholly groundless. See id.

However, to circle back to the District's argument, the determination of the applicability of the AAA Rules requires the court to first find that the parties agreed to an arbitration clause in the first place. Otherwise, the court would have to use the substance of an arguably unformed agreement to show that the agreement was formed, which "puts the cart before the horse." See Neb. Mach. Co. v. Cargotec Sols., LLC, 762 F.3d 737, 741 n.2 (8th Cir. 2014). As such, the court evaluates whether the parties agreed to arbitrate this dispute.

### 3. Agreement to Arbitrate

The issue of whether an arbitration clause is valid under Section 2 of the FAA is a different issue from whether the parties ever formed an agreement to arbitrate.[26] Rent-A-

---

Miller v. Time Warner Cable Inc., 2016 WL 7471302, at *5 (C.D. Cal. Dec. 27, 2016) (concluding that a reference to arbitration rules is clear and unmistakable evidence even when applied to agreements where one party is unsophisticated). The District does not contend that the two parties here are unsophisticated, nor does the court infer as much from the record. Therefore, this exception, to the extent it exists, does not apply.

[26] As this court noted in its January 2019 Order, often the basic requirement that the parties agreed to arbitrate gets wrapped up in the "scope of" arbitrability analysis, creating confusion over whether it is the court's or the arbitrator's role to determine whether the parties agreed to arbitrate. ECF No. 63 at 18–19. Yet some courts have said that "[a]rguments that an agreement to arbitrate was never formed, though, are to be heard by the court even where a delegation clause exists." Doordash, 888 F.3d at 744. The court agrees; when a party disputes whether it agreed to the arbitration clause in the first place, as opposed to whether the clause is valid, it is exclusively within the court's

Ctr., 561 U.S. at 70 n.2; see also Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444 n.1 (2006) ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded.").[27] Indeed, the Supreme Court explained that the validity of an arbitration clause, which is governed by § 2, addresses "whether it is legally binding, as opposed to whether it was in fact agreed to." Rent-A-Ctr., 561 U.S. at 69 n.1 (emphasis added); see also Nat'l Fed'n of the Blind v. The Container Store, Inc., 904 F.3d 70, 80 (1st Cir. 2018) ("Pursuant to established Supreme Court precedent, however, there's an important distinction between arguments challenging the validity of an agreement and those challenging an agreement's formation." (citations omitted)); Lefoldt for Natchez Reg'l Med. Ctr. Liquidation Tr. v. Horne, L.L.P., 853 F.3d 804, 810 (5th Cir. 2017), as revised (Apr. 12, 2017) ("The Court made clear in Buckeye Check Cashing and Rent-A-Center that when it explained that '[t]here are two types of validity challenges under § 2,' it was not addressing a contention that no agreement was ever concluded by the parties.'" (citations omitted)). Therefore, determination of an arbitration clause's validity under § 2 goes to whether the clause may be enforced—requiring the court to send the dispute to arbitration—not whether the parties agreed to arbitrate in the first place.

---

province to determine if an agreement to arbitrate was formed. Novic, 757 F. App'x at 265 ("[W]hen the parties disagree whether they have delegated [the gateway issues of arbitrability] to an arbitrator, that question of arbitrability must be answered by the court."); see also Granite Rock Co., 561 U.S. at 297 ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute.").

[27] While the Rent-A-Center Court and the Buckeye Check Cashing Court both identify this distinction, they also both clarify that they only subsequently address validity of the agreements to arbitrate, not their formation. Rent-A-Ctr., 561 U.S. 63, 71 n.2; Buckeye Check Cashing, Inc., 546 U.S. at 444 n.1. Therefore, neither Court discusses this distinction beyond its initial identification of the distinction.

Certainly, the Fourth Circuit has unequivocally held that incorporation of the rules

of the AAA, which allow the arbitrator to rule on questions of arbitrability, "does not

obviate the need for courts to decide the threshold issue of contract formation."[28]

Rowland v. Sandy Morris Fin. & Est. Plan. Servs., 993 F.3d 253, 258 (4th Cir. 2021).

"Section 4 of the FAA has made it clear that is it up to courts to determine whether a

contract has been formed."  Id.  "[W]hen the parties disagree whether they have delegated

th[e gateway issues of arbitrability] to an arbitrator, that question of arbitrability must be

answered by the court."  Novic v. Credit One Bank, Nat'l Ass'n, 757 F. App'x 263, 265

---

[28] This is not the first time the court has been asked to decide this issue.  In this court's January 2019 Order, the court expressly distinguished between a challenge to the validity of the arbitration clause and a challenge to whether an agreement to arbitrate was formed in the first place.  This distinction is worth repeating.

As the Supreme Court explained in Buckeye Check Cashing, there are two types of challenges under the FAA that a party may make related to the validity of an arbitration clause.  546 U.S. at 444.  The first challenge is to the validity of entire container contract, and the second challenge goes to the validity of the arbitration clause itself.  Id.  A challenge to the validity of the container contract must go to an arbitrator because the arbitration clause within the container contract represents the parties' agreement to resolve the challenge through arbitration.  Id. at 448–49.  But a challenge to the validity of the arbitration clause itself may be considered by a court.  Id.  A court may do so because the arbitration clause provides the court the authority to compel arbitration, so if the arbitration clause is invalid, the court cannot compel arbitration.  This distinction gives courts the ability to view the validity of an arbitration clause separately from the validity of the container contract.  Buckeye Check Cashing, Inc., 546 U.S. at 449.  Courts refer to this as the severability rule.  See, e.g., Rent-A-Ctr., 561 U.S. at 71 (discussing this distinction and referring to it as "the severability rule"); Nitro-Lift Techs., LLC v. Howard, 568 U.S. 17, 21 (2012) (noting that validity of the arbitration provision is subject to initial court determination under the severability rule); Novic v. Credit One Bank, Nat'l Ass'n, 757 F. App'x 263, 265 (4th Cir. 2019).  Therefore, courts generally have the power to determine the validity of an arbitration clause before requiring the parties to arbitrate an issue.  See id.  However, if a party is challenging the validity of the container contract, the challenge must be heard by an arbitrator.  See id.  Here, the court confines its analysis to the District's argument that it never agreed to the arbitration provision.

(4th Cir. 2019) (citing <u>AT&T Techs., Inc. v. Commc'ns Workers of Am.</u>, 475 U.S. 643, 649 (1986)).

A review of the operative complaint indicates that none of the conduct that gives rise to this action occurred during either the period covered by the 2002 or 2003 agreements. <u>See generally</u> 2d Amend. Compl. Rather, the earliest date in which the alleged fraudulent scheme began was in or around February 2006, which is over a year and a half after the 2003 Agreement expressly terminated. <u>See id.</u> ¶ 2; ECF No. 258-2. Thus, the court is confronted with the question of whether the arbitration clauses in the 2002 and 2003 Agreements nevertheless govern conduct which occurred <u>after</u> those constructively ratified agreements terminated.

The District primarily argues that it never agreed that the arbitrability clauses would be applicable to these facts. In other words, the arbitrability clauses are not challenged as invalid, but the District challenges whether it ever agreed to the clauses notwithstanding the uncontested validity of the container contract.[29] Inevitably, HUB

---

[29] It is unclear whether the District makes the argument that because the contract was only constructively ratified, the District did not specifically agree to the arbitration clause. To be sure, it is well established that "[a]rbitration may only be judicially compelled when the parties have agreed to it, and then only for those kinds of disputes that the parties have agreed to submit to arbitration." <u>Zandford v. Prudential-Bache Sec., Inc.</u>, 112 F.3d 723, 727 (4th Cir. 1997). The parties have not identified, and the court has not found, court cases where a party is able to escape an arbitration clause in a contract that was constructively ratified by performance rather than express consent. The few cases relevant to this issue tend to show that where a party has benefited from an unsigned agreement, estoppel dictates that the arbitration clauses included within that agreement may be enforced against that party. <u>See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH</u>, 206 F.3d 411, 417–18 (4th Cir. 2000) ("A nonsignatory is estopped from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing an arbitration clause.") (internal quotation marks and citations omitted); <u>Pearson v. Hilton Head Hosp.</u>, 733 S.E.2d 597, 601 (S.C. Ct. App. 2012) (applying <u>Int'l Paper</u>). "[E]stoppel is appropriate if in substance the signatory's underlying complaint is based on the nonsignatory's alleged breach of the obligations and

disagrees with the District's arguments regarding the expiration of the contracts.  See ECF Nos. 258 at 18–20; 260 at 2–5, 11; 264 at 5–6 n.1.  In other words, the District and HUB disagree over whether there is an agreement to arbitrate, and the District avers that the court—not the arbitrator—must settle that dispute.  ECF No. 259 at 25 (citing 9 U.S.C. § 2).

     HUB points to Virginia Carolina Tools, Inc. v. International Tool Supply, Inc., as authority which indicates that where a valid, enforceable delegation clause exists, the question of the arbitration clause's duration should be left to the arbitrator.  ECF No. 260 at 4.  In that case the Fourth Circuit first considered who—the court or the arbitrator— "should decide the threshold issue of the duration dispute's arbitrability."  984 F.2d 113, 117 (4th Cir. 1993).  Second, the Fourth Circuit considered whether the district court, upon deciding that it should decide the duration dispute's arbitrability, correctly decided that the duration dispute was not arbitrable but should also be decided by the court.  Id. The dispute arose partly over whether the entire contract—and, specifically, its arbitration clause—expired at the time the exclusive option provision expired or whether the expiration applied only to the exclusivity clause of the contract.  Id. at 115.  The

---

duties assigned to it in the agreement."  Lomax v. Weinstock, Friedman & Friedman, P.A., 583 F. App'x 100, 101 (4th Cir. 2014) (quoting Am. Bankers Ins. Grp., Inc. v. Long, 453 F.3d 623, 628 (4th Cir. 2006)).

     To be sure, the facts in this case are unique in that one of the two signatories to the 2002 and 2003 Agreements was fraudulently in cahoots with the other party to the agreement, though purportedly not at the time the parties signed the 2002 and 2003 Agreements.  Nevertheless, the District avers that the 2002 and 2003 Agreements were valid and constructively ratified as commercially reasonable, meaning that the District received the benefits of those contracts such that the court may determine that principles of equity hold that the arbitration clauses contained within those Agreements should be enforced.  See Int'l Paper Co., 206 F.3d at 417–18.  Thus, for the District to prevail on the gateway question, the court must find that the parties did not agree that the arbitration clauses in the 2002 and 2003 Agreements govern this dispute.

Fourth Circuit affirmed the district court's conclusion that as a matter of law the question of whether the duration dispute was arbitrable was for the court, not the arbitrator, to decide.  Id. at 117.  The Fourth Circuit found that the contract at issue did not contain a specific, express provision committing arbitrability issues to an arbitrator.  Id.  Therefore, it opted not to opine on what might meet that first test to require the arbitrator to decide the second question.  Id.  Though the Fourth Circuit remained silent as to the question and impact of a delegation clause, HUB encourages the court to interpret Virginia Carolina Tools as indicating that where a valid, enforceable delegation clause exists, the question of the arbitration clause's duration should be left to the arbitrator.  ECF No. 260 at 4.

Yet, in accordance with the Fourth Circuit's reasoning in that case, the question now before this court is question is one of "contract interpretation," which asks, "whether the parties, at the time they entered into the contract, intended that disputes over the duration of the contract would be decided by a court or the arbitrators."  Va. Carolina Tools, Inc., 984 F.2d at 118 (quoting Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp., 850 F.2d 756, 760 (D.C. Cir. 1988)) (internal quotation marks omitted).  This speaks to agreement because it "simply appl[ies] the fundamental principle that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit.'"  Id. (quoting United Steelworkers of Am., 363 U.S. at 582).  Thus, the court evaluates whether the parties' express incorporation of a termination clause into the 2002 and 2003 Agreements indicates their intent that their agreement to arbitration would not extend to facts which occurred after the contracts' respective terminations.

36

In general, parties likely would not intend, in the ordinary course of contractual relations, "to commit to arbitration disputes about the very existence (whether by origination or termination) of their contractual relationship." Id. Thus, the Fourth Circuit counsels that the general presumption in favor of arbitrability is accorded less force with respect to contract duration issues. Id.

Additionally, the Supreme Court has articulated that post-expiration grievances arise under the contract and are therefore arbitrable: (1) when the dispute "involves facts and occurrences that arose before expiration;" (2) when post-expiration action "infringes a right that accrued or vested under the agreement;" or (3) when "under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." [30] Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B., 501 U.S. 190, 206 (1991); see also United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO/CLC, Loc. No. 850L v. Cont'l Tire N. Am., Inc., 568 F.3d 158, 164 (4th Cir. 2009). The Court "refuse[d] to apply that presumption wholesale in the context of an expired . . . agreement, for to do so would make limitless the contractual obligation to arbitrate." Litton Fin. Printing Div.,

---

[30] Litton originally arose in the labor and employment context. See Litton, 501 U.S. at 193. It concerned a dispute over layoffs, which occurred after the expiration of a collective-bargaining agreement, and required the court to determine whether the dispute arose under the agreement despite its expiration. Id. Other courts have since applied the Litton factors in the context of the FAA for motions to compel or motions to stay where the conduct at issue occurred after the arbitration agreement's expiration. See, e.g., Breda v. Cellco P'ship, 934 F.3d 1, 7–8 (1st Cir. 2019); CPR (USA) Inc. v. Spray, 187 F.3d 245, 254–56 (2d Cir. 1999), abrogated on other ground as explained in Accenture LLP v. Spreng, 647 F.3d 72, 76 (2d Cir. 2011); Stevens-Bratton v. TruGreen, Inc., 675 F. App'x 563, 567 (6th Cir. 2017); Koch v. Compucredit Corp., 543 F.3d 460, 466–67 (8th Cir. 2008); Shivkov v. Artex Risk Sols., Inc., 974 F.3d 1051, 1060–63 (9th Cir. 2020); Wolff v. Westwood Mgmt., LLC, 558 F.3d 517, 520–21 (D.C. Cir. 2009).

501 U.S. at 209; see also Nolde Bros., Inc. v. Loc. No. 358, Bakery & Confectionary Union, 420 U.S. 243, 255 (1977) ("[W]here the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication.").  Thus, the court is tasked with determining whether the facts alleged in the operative complaint fall within the arbitration provisions in the 2002 and 2003 BSAs. Specifically, since the alleged actions underlying the complaint arose after the expiration of the 2002 and 2003 BSAs, the court must determine whether any of the three Litton circumstances apply whereby post-expiration grievances nevertheless arise under the contract.

HUB has not explicitly stated how post-expiration grievances arise under the 2002 and/or 2003 BSAs under any of the three Litton exceptions.  See ECF Nos. 258 at 18–20 (explaining that the second amended complaint does not change that the record reveals evidence that some supposedly fraudulent conduct may have occurred before 2005 and thereby implicate the 2002 or 2003 BSA); 260 at 2–5, 11 (explaining that persuasive authority leads to the conclusion that the arbitrator must decide the question of arbitrability notwithstanding the contention that an agreement had expired; 264 at 5–6 n.1 (emphasizing that the District's expiration argument invokes the significant relationship test and thereby implicates the question of scope).  When the court specifically requested that the parties analyze Litton, HUB contended that the Supreme Court's decision in Litton was based on precedent premised on federal labor-law policy under the National Labor Relations Act regarding a collective bargaining agreement—not

contract law in general.[31]  ECF No. 269-1 at 4–5.  HUB also argued that Litton was distinguishable because a party cannot be forced to arbitrate the arbitrability question under a collective bargaining agreement, meaning that the Litton court did not confront a delegation clause when it resolved the contract duration dispute.  Id.

The court first addresses HUB's argument that both the principles established in Litton and its progeny, as well as the broad holdings as to the duration dispute in Virginia Carolina Tools are inapplicable to this case because a delegation clause exists.  ECF No. 269-1 at 4–5.  Namely, the Fourth Circuit did not reach the question in Virginia Carolina Tools of whether a delegation clause would have delegated the question of contract interpretation to the arbitrator so that he or she, and not the court, should decide the arbitrability of the agreement's duration because it found no such delegation clause in the contract.  984 F.2d at 117–18.  Rather, it noted that "the typical, broad arbitration clause in the option agreement at issue here—which contains nothing approaching [a specific, express provision committing all arbitrability disputes to arbitration]—d[id] not" commit

---

[31] While courts have primarily applied Litton in cases concerning unions and collective bargaining agreements, at least seven courts of appeals have extended Litton's holdings to the FAA because the decision was not based on the peculiarities of labor law. See, e.g., Tristar Fin. Ins. Agency, Inc. v. Equicredit Corp of Am., 97 F. App'x 462, 466 (5th Cir. 2004) ("While Litton involved a labor arbitration dispute, the decision is not based on peculiarities of labor law and we find its reasoning and holding applicable to the pending case."); Breda v. Cellco P'ship, 934 F.3d 1, 7 (1st Cir. 2019); Biller v. S-H OpCo Greenwich Bay Manor, LLC, 961 F.3d 502, 508–14 (1st Cir. 2020); Brandom v. Gulf Coast Bank & Tr. Co., 253 F.3d 706 (5th Cir. 2001); Huffman v. Hilltop Cos., LLC, 747 F.3d 391, 395–98 (6th Cir. 2014); Wolff v. Westwood Mgmt., LLC, 558 F.3d 517, 520–21 (D.C. Cir. 2009); Koch v. Compucredit Corp., 543 F.3d 460, 465–66 (8th Cir. 2008); Shivkov v. Artex Risk Sols., Inc., 974 F.3d 1051, 1061–63 (9th Cir. 2020); CPR (USA) Inc. v. Spray, 187 F.3d 245, 254–56 (2d Cir. 1999), abrogated on other grounds as explained in Accenture LLP v. Spreng, 647 F.3d 72, 76 (2d Cir. 2011).

arbitrability issues to arbitration.  Id. at 117.  Thus, there is no binding caselaw requiring

this court to come out as HUB desires on this issue.

Moreover, the procedural history and prior court decisions evaluating HUB's

motion to compel arbitration in this case weigh in favor of the District's position.  In

Berkeley I, the Fourth Circuit considered the signed 2002 and 2003 Agreements and

found that,

> Those Agreements predate the steering and kickback fraud scheme and
> conspiracy alleged in the Operative Complaint.  The [January 2019] Order
> deemed the June 2002 and June 2003 Agreements as relevant because the
> initial complaint had predicated some of its claims on conduct dating from
> 2001.  We have recognized, however, that an amended complaint—such as
> the Operative Complaint here—supersedes an initial complaint and renders
> it "of no effect."  See Fawzy v. Wauquiez Boats SNC, 873 F.3d 451, 455
> (4th Cir. 2017) (quoting Young v. City of M[ount] Ranier, 238 F.3d 567,
> 573 (4th Cir. 2001)).
>
> Moreover, because the June 2002 Agreement terminated in June 2003, and
> the June 2003 Agreement ended in June 2004, the Arbitration Clauses
> therein could not require Berkeley Schools to arbitrate any claims on the
> basis of conduct that began after those Agreements terminated.  At best, the
> June 2002 and June 2003 Agreements might be relevant to questions of
> whether Berkeley Schools had knowledge of, or assented to, the subsequent
> Brokerage Service Agreements and Arbitration Clauses.

Berkeley I, 944 F.3d at 241 (emphasis added).  As specified above, this court interpreted

Berkeley I's holding to be a decree regarding the 2002 and 2003 Agreements in the

finding of facts and conclusions of law issued after the Section 4 Trial.  ECF No. 225

¶ 145 ("As the 'law of the case,' the court must abide by the Fourth Circuit's decree" that

the 2002 and 2003 BSAs cannot compel this dispute to arbitration because it arose after

the period covered by those BSAs).  HUB challenged this conclusion in its second appeal

to the Fourth Circuit.  The Fourth Circuit noted that "[t]he district court correctly

interpreted our prior decision in this case as it concerns the 2002 and 2003 BSAs" but

found that the law-of-the-case doctrine did not prevent the court from reaching conclusions as to the 2002 and 2003 Agreements if new evidence arose in the Section 4 Trial or amended complaint which indicated that the implicated conduct arose <u>during</u> the terms of the 2002 or 2003 BSAs.  <u>Berkeley II</u>, 2022 WL 17974626, at *2.

Ultimately, the court finds that the conduct at issue—which occurred years after the 2002 and 2003 BSAs expressly terminated—did not arise from those Agreements. Persuasive caselaw from other district courts in the Fourth Circuit bolsters this conclusion.  <u>See</u> <u>Beverage Network of Md., Inc. v. Hansen Beverage Co.</u>, 2009 WL 10682449, at *8 (D. Md. Jan. 15, 2009) (finding that the conduct at issue did not arise from the expired agreement where the dispute arose from conduct that occurred after the agreement containing the arbitration provision terminated); <u>cf.</u> <u>Va. Pro. Staff Ass'n v. Va. Educ. Ass'n</u>, 2014 WL 1670364, at *3–4 (E.D. Va. Apr. 28, 2014) (finding that the dispute arose under the expired contract where the infringed right accrued or vested under that agreement); <u>Cumberland Typographical Union No. 244 v. Times & Alleganian Co.</u>, 943 F.2d 401, 405 (4th Cir. 1991) (same).  It does not appear that the District is presently suing HUB on the basis of a right that vested under the 2002 or 2003 Agreements, nor is it apparent that the allegations arose from those Agreements.[32]

---

[32] Further, although the Fourth Circuit has not examined the vested rights prong of the <u>Litton</u> test, the Sixth Circuit has held that a right may be "vested" within the meaning of <u>Litton</u> only if one of two conditions is satisfied.  <u>See</u> <u>Cincinnati Typographical Union No. 3, Loc. 14519, Commc'ns Workers of Am. v. Gannett Satellite Info. Network, Inc.</u>, 17 F.3d 906, 910–11 (6th Cir. 1994).  First, "a court may use standard principles of contract interpretation to determine whether a right is vested," and thus "might conclude the parties intended a right to vest if [it is] shown contract language or extrinsic evidence to support that conclusion."  <u>Id.</u> at 910.  Second, "rights that can be worked toward or accumulated over time," such as severance or vacation pay, are generally presumed to be vested "without any other evidence in the contract."  <u>Id.</u> at 911.  To reiterate, the <u>Litton</u>

This accords with the Fourth Circuit's previous review of the 2002 and 2003 Agreements.  See Berkeley I, 944 F.3d at 241 (observing that because the June 2002 Agreement terminated in June 2003, and the June 2003 Agreement ended in June 2004, the Arbitration Clauses therein could not require Berkeley Schools to arbitrate any claims on the basis of conduct that began after those Agreements terminated); Berkeley II, 2022 WL 17974626, at *2 (concluding that the district court was required to evaluate whether any of the conduct underlying this action occurred while the 2002 and 2003 BSAs were in effect).  The court does not find an agreement to arbitrate because the facts underlying this action occurred after the 2002 and 2003 Agreements expressly terminated.[33]

---

Court and the Sixth Circuit analyzed this issue in the context of employment disputes, though the test has also been applied to other arbitration issues.

[33] HUB also points to the District's purported inconsistency for challenging later insurance policies as fraudulently recommended when the District also paid for those same policies in prior contracts which were "commercially reasonable."  ECF No. 258 at 18–19.  The District emphasizes that those policies inclusion in the 2002 and 2003 Agreements were "'consistent' with customary rates and 'commercially reasonable.'" ECF No. 259 at 20.  Indeed, if the policies' inclusion were neither consistent nor commercially reasonable, the District would have a strong argument that it never formed a contract through performance with HUB such that the motion to compel arbitration— and all arguments as to the delegation clause—would fail for lack of agreement.  See ECF No. 259 at 16–17.

Importantly, HUB's argument misses the key fact that the District and Knauff meaningfully changed their commercial relationship after the 2002 and 2003 Agreements terminated.  2d Amend. Compl. ¶ 50.  For the period from July 2004 to July 2005, Knauff and the District discontinued their previous practice of a brokerage service fee under an express agreement, and instead converted to a straight commission arrangement, which also paid for risk management services.  Id.  It was only through this new structure that the defendants were later able to allegedly "conceal payments far larger, as a percentage of premiums, than would be possible through a commission charged as a disclosed percentage of the premiums."  Id. ¶ 62.  Thus, the court looked at the claims in the second amended complaint, considered the underlying facts, and found them to not arise during the effective term of the 2002 and 2003 Agreements.  See ECF Nos. 258 at 18–20; 260 at 7–9.

South Carolina law also bolsters this conclusion.  "[T]he mere fact that an arbitration clause might apply to matters beyond the express scope of the underlying contract does not alone imply that the clause should apply to every dispute between the parties."  Aiken v. World Fin. Corp. of S.C., 644 S.E.2d 705, 708 (S.C. 2007) (quoting Vestry & Church Wardens of Church of Holy Cross v. Orkin Exterminating Co., 588 S.E.2d 136, 140 (S.C. Ct. App. 2003)).  "When a party invokes an arbitration clause after the contractual relationship between the parties has ended, the parties' intent governs whether the clause's authority extends beyond the termination of the contract."  Davis v. ISCO Indus., Inc., 864 S.E.2d 391, 395 (S.C. Ct. App. 2021) (quoting Towles v. United HealthCare Corp., 524 S.E.2d 839, 846 (S.C. Ct. App. 1999)); see also Zandford, 112 F.3d at 727 (same).  Using the same factors as identified by Litton, the court concludes that the parties' intent did not clearly indicate that the arbitration clauses of the 2002 and 2003 BSAs, which were constructive ratified by performance, were to extend beyond the termination of the contracts.

Notably, the 2002 and the 2003 Agreements included clauses which specified the term of the agreements.  See ECF Nos. 258-1 at 3; 258-2 at 3.  The Fourth Circuit has instructed that where the original contract had both a broad arbitration clause and an express termination date provision, such an existence should indicate to the court that there was "no incipient issue of contract duration in the parties' memorialized agreement, hence no built-in likelihood of a dispute over its duration."  Va. Carolina Tools, Inc., 984 F.2d at 118; see also Nat'l R.R. Passenger Corp., 850 F.2d at 763 ("[I]f a contract provides that 'all disputes between the parties shall be arbitrated,' but with equal clarity provides that it will expire on a date certain, then any dispute over whether the contract

actually expired or was extended by the parties must be decided by the court rather than by the arbitrator."). To reiterate, the court finds that the District constructively ratified the 2002 and 2003 Agreements, meaning it agreed to the clauses contained therein through performance of its respective obligations in the agreements. ECF No. 259 at 16 (referencing ECF No. 225 ¶¶ 32–41). Such constructive ratification included ratification of the termination clauses in addition to the arbitration clauses. See id. Thus, it would be illogical to conclude that it was the parties' intent that the arbitration clauses included in those agreements would not terminate on the same date as the container contract. Consequently, when the District filed the operative complaint based on allegations of misconduct which occurred after June 29, 2004, when the 2002 and 2003 Agreements terminated, those agreements cannot now be used to require arbitration of later misconduct. See ECF No. 258-2 at 3.

Having found that the parties did not agree to arbitrate, the court need not reach the question of scope because arbitration is a matter of consent and here the parties have not consented.[34] See Waffle House, Inc., 534 U.S. at 294.

---

[34] To be sure, the Fourth Circuit has held that "a broadly-worded arbitration clause applies to disputes that do not arise under the governing contract when a 'significant relationship' exists between the asserted claims and the contract in which the arbitration clause is contained." Long, 248 F.3d at 316 (citing Am. Recovery Corp., 96 F.3d at 93). However, read in full, those opinions clearly indicate that the significant relationship test is used to determine the scope of an arbitration clause, rather than whether the parties initially agreed to arbitration. See Am. Recovery Corp., 96 F.3d at 93 ("In applying this standard, we must determine whether the factual allegations underlying the claim are within the scope of the arbitration clause, regardless of the legal label assigned to the claim."). Thus, the only reason that this court would apply the significant relationship test is if it can reach the question of scope, which is a question delegated to the arbitrator.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** the motion to compel arbitration.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 30, 2024**
**Charleston, South Carolina**

45